UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,                    )
                                             )
                    Plaintiff,               ) CASE NO.
                                             ) 20-CR-00224-RGK
          vs.                                )
                                             )
BABAK BROUMAND,                              )
                                             )
                    Defendant.               )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**TRIAL DAY 7 - P.M. SESSION**

WEDNESDAY, SEPTEMBER 28, 2022

1:02 P.M.

LOS ANGELES, CALIFORNIA

_____

MAREA WOOLRICH, CSR 12698, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, SUITE 4311
LOS ANGELES, CALIFORNIA 90012
mareawoolrich@aol.com

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**


**FOR PLAINTIFF:**

    OFFICE OF THE UNITED STATES ATTORNEY
    By:  Ruth Pinkel
    -and- Michael Morse
    -and- Juan Rodriguez
    Assistant United States Attorneys
    312 North Spring Street
    Los Angeles, CA 90012


**FOR DEFENDANT:**

    LAW OFFICES OF STEVEN F. GRUEL
    By:  Steven F. Gruel
    315 Montgomery Street 10th Floor
    San Francisco, CA 94104


**UNITED STATES DISTRICT COURT**

**I N D E X**

WEDNESDAY, SEPTEMBER 28, 2022

**P.M. SESSION**

------------------------------------------------------------

**CHRONOLOGICAL INDEX OF WITNESSES**

**WITNESS**                                                      **PAGE**

BABAK BROUMAND
      DIRECT EXAMINATION (RESUMED) BY MR. GRUEL          4

------------------------------------------------------------

**INDEX OF EXHIBITS**

RECEIVED INTO EVIDENCE

Exhibit No. 1019                                                  92
Exhibit No. 1042                                                  23
Exhibit No. 1047                                                  80
Exhibit No. 1048                                                  80
Exhibit No. 1049                                                  82
Exhibit No. 1062                                                  41

**UNITED STATES DISTRICT COURT**

LOS ANGELES, CALIFORNIA; WEDNESDAY, SEPTEMBER 28, 2022

1:02 P.M.

-oOo-

(In the presence of the jury.)

THE COURT:  May the record reflect that all the members of jury are in their respective seats in the jury box. The witness is on the witness stand.

And, Counsel, you may inquire.  You are on direct.

MR. GRUEL:  Thank you, Your Honor.

BABAK BROUMAND, called as a witness by the defense, was previously sworn and testified as follows:

DIRECT EXAMINATION (RESUMED)

BY MR. GRUEL:

Q     Mr. Broumand, I think where we left off you were in Southern California, Los Angles, meeting with Henrik Mosesi; is that right?

A     That's correct.

Q     And this is about the EB-5 business you guys were talking about?

A     That's correct.

Q     That included Art Kalantar and Edgar Sargsyan?

A     That's correct.

Q     I think you said you had never been to the Grand

UNITED STATES DISTRICT COURT

Havana Room before that; is that right?

A      That's correct.

Q      And did you go to a law office after being at the meeting at the Grand Havana Room?

A      I did.

Q      And who went with you?

THE COURT:  We are talking about Pillar Law Office?

BY MR. GRUEL:

Q      Yes, Pillar Law.  You went to the Pillar Law Office?

A      I did.

Q      And that was at 150 South Rodeo Road; is that right?

A      That's correct.

Q      Okay.  And there were further discussions with respect to the EB-5?

A      Yes, there was.

Q      And has that business ever taken off?

A      No.

Q      Okay.  Now, after the meeting, did you return back to the Bay area?

A      I did.

Q      And so we are now in roughly, what, October 2014, something of that nature?

A      Yeah.  Yes.

Q        Were you going through any health concerns at that time?

A        I was going --

MS. PINKEL:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. GRUEL:

Q        Did you have an occasion to have a trip, go along on a trip to Las Vegas in November?

A        Yes.

Q        And was that November -- roughly November 2014?

A        That's correct.

Q        And tell me about how you got invited to this trip.

A        The -- you know, Henry and the Pillar Law Group, they were -- amongst the three of them had discussed it, and I got invited to go.

Q        All right.  And did you, in fact, go to Las Vegas in November of 2014?

A        I did.

Q        And how did you get to Las Vegas?

A        I flew.

Q        And from Oakland or --

A        Yeah, I flew from Oakland.

Q        Okay.  And we've heard about a party bus that Mr. Sargsyan paid for.  Were you on that bus?

UNITED STATES DISTRICT COURT

A       No.  I didn't know about that bus until it showed up.

Q       Showed up where?

A       In Las Vegas.

Q       Okay.  And did you know that the event was going to be at a mansion in Las Vegas?

A       No.

Q       How did you find out about it?

A       They came and picked me up several hours after I landed and took me there.

Q       Who is they?

A       Henry, Edgar, and Art.

Q       Were there other people on the bus?

THE COURT:  Try to use last names because they mean --

THE WITNESS:  I'm sorry.  Yes.  So Henrik Mosesi, Art Kalantar, and Edgar Sargsyan and several other people.  It was two full buses.

THE COURT:  Okay.  Thank you.

BY MR. GRUEL:

Q       And did you stay at that mansion for that weekend I think it was?

A       Yes, I did.

MR. GRUEL:  I'm going to publish to the jury, if I may, Your Honor, what's been already admitted as 1018.

**UNITED STATES DISTRICT COURT**

THE COURT:  Yes.

BY MR. GRUEL:

Q       Now, is that a photograph -- that photograph was taken at the mansion on -- during your stay there in 2014 November?

A       That's correct.

Q       Do you know who is in the photograph besides yourself?

A       I know two of those individuals.

Q       Who?  Which ones?

A       That's the one -- the one I'm leaning on is Edgar Sargsyan, yes.  And the white-haired gentleman on the far right, that's Attorney Naser Khoury.

Q       An attorney; is that right?

A       Yes.

Q       Now --

A       And I'm sorry.  I know the first name, I think of the other individual.  It's Trent.  I don't know his last name. I don't recall.

Q       And you are wearing a watch obviously in that photograph.  Was that a gold Rolex?

A       No.

Q       How long did you stay at that mansion for the party?

A       I think it was two nights.

**UNITED STATES DISTRICT COURT**

Q     How did you leave?

A     I took an Uber to the airport.

Q     Now, we've heard testimony about that there was cocaine at that party.  Did you see any cocaine?

A     No, no cocaine.

Q     We've heard a discussion about escorts at that party.  Did you see any escorts?

A     Yes.

Q     And did you actually get involved with one of the escorts?

A     I did.

Q     Okay.  Now, you returned back to the Bay area after that party; is that right?

A     That's correct.

Q     And was there a time when you began to have a relationship with Edgar Sargsyan?

A     Yes.

Q     How did that relationship start?

A     Well, Henrik Mosesi was telling me that Edgar had a lot of contacts within the community that might be beneficial to my professional work.  And one name in particular he gave me was Levon Termendzhyan.

Q     When you met Edgar Sargsyan initially back before the Love Bugs meeting, were you introduced as an FBI agent by Mr. Mosesi?

UNITED STATES DISTRICT COURT

A      Yes.

Q      And introduced to Edgar Sargsyan as an FBI agent?

A      Yes.

Q      Were you asked -- or did you tell them the area of work you did with the FBI?

A      Henry knew.

Q      Henry knew.  Do you know if Mr. Sargsyan -- to your knowledge, was Mr. Sargsyan informed?

A      I assumed that Henry had told him what I did. But I did tell both Art -- Art knew as well back --

Q      Last names, please.

A      I'm sorry.  Art Kalantar and Henry Mosesi knew back in 2012 what I did.  And I talked about it openly at the Grand Havana Room with Edgar Sargsyan as well.

Q      You told Mr. Sargsyan you worked in national security for the FBI?

A      Yes.

Q      Okay.  So after the mansion in Las Vegas, did you have an occasion to reestablish contact with Mr. Sargsyan?

A      Yes.

Q      And approximately when did that happen?

A      That was in January of '15, 2015.

Q      All right.  And --

A      December, January, that time period, the end of the year 2014 carrying over until January.

Q        And what type of contact was that?  Were you in Los Angeles?

A        No.  It was over the phone.

Q        And did you call him or did he call you, if you remember?

A        I don't quite remember.  We talked quite a bit. Everybody did.

Q        Okay.  Was there anything about Mr. Sargsyan that interested you with respect to establishing a friendship?

A        Well, from what I understood from Henry Mosesi and then kind of confirmed by Edgar Sargsyan was that he had a lot of contacts in the community.  And I was interested in Devon Termendzhyan.

Q        How about on a personal level?

A        I'm sorry?

Q        How about on a personal level?  Were you interested in him as a potential friend?

A        Oh, yeah, we hit it off.  We -- he's got a great personality.  We hit it off.  We had a fun time.  All of us did.

Q        With respect to the mansion in Las Vegas, did you know that he had paid for it all?

A        Yes.

Q        Did you have any belief that he was a wealthy individual?

UNITED STATES DISTRICT COURT

A        Oh, yeah.  He made it be known.

Q        Pardon me?

A        He let it be known that he was wealthy.

Q        How is that?

A        He always bought everything for everyone.  He always bought all the meals.  He got upset one time when I paid for a meal.

Q        All right.  So we've heard about the meals or the hotel rooms throughout the course of the trial that you received.  But in your personal -- did you personally observe him pay for others who were with you at the same events?

A        Yes.

Q        And when you were at the Grand Havana Room with him and with Mr. Sargsyan and others, did he always pick up the tab for everybody?

A        He did.

Q        It wasn't just you now, was it?

A        No.

Q        Okay.  I think the best way to go through the chronology is with the government's exhibits.  So this is Exhibit 212, I believe.

Mr. Broumand, we are starting at the top there, and it's dated January 8, 2015.  Do you see that?

A        Yes.

Q        And those are outgoing texts, I guess back and

forth, with Mr. Sargsyan.  Do you recall that?

A     I do.

Q     I mean, do you recall that you were texting him and getting texts from him during that time period; is that right?

A     Yes.

Q     Do you recall what the nature of those texts may have been?

A     I think they were just friendly banter.  And I was -- at that time I was interested in Levon Termendzhyan.

Q     All right.  When you say interested in him, what does that mean?

A     Edgar had told me -- Edgar Sargsyan had told me that Levon Termendzhyan was involved in sale of oil to ISIS, purchase and sale from ISIS.

Q     All right.  And did that interest you as a national security FBI agent?

A     It did.

Q     What did you do next with that information?

A     Well, I took the significant names, and I ran them through our databases.

Q     What does that mean, "significant names"?

A     Well, you just can't run, for example, a general term like oil or ISIS.  You'll come up with several hits.  So I focused -- I drilled down on Termendzhyan and the other search

UNITED STATES DISTRICT COURT

terms right there that you see.

Q       So we are looking at Exhibit 212, first page, and it's the purple section of the government's exhibit; is that right?

A       That's correct.

Q       So did you, in fact, query Termendzhyan and Sentinel?

A       I did.

Q       And did you, in fact, see this case number regarding Levon Termendzhyan?

A       Yes, I saw that.

Q       And what did you see about it, if you recall, whether it was active or inactive?

A       It was an inactive case.

Q       What does inactive mean?

A       Inactive means that it's no longer being pursued.

Q       Do you see -- did you inquiry in Sentinel something called Noil Energy Group?

A       Yes.

Q       Why did you do that?

A       That was Levon Termendzhyan's company.

Q       I see you queried Pillar Law; is that right?

A       That's correct.

Q       Why?

A       I wanted to see if there was any derogatory

**UNITED STATES DISTRICT COURT**

information on the law firm.

Q      Why is that important to you -- or is it important to you?

A      It's important to see if they are involved in any type of criminal activity or if there's other information coming from Pillar that might taint the information that I'm getting.

Q      And did you see anything about Pillar?

A      I did not.

Q      How about -- I see next is Sargsyan.  You queried Sargsyan?

A      I did.

Q      And why is that?

A      I wanted to see if there was again some negative information on Edgar.  I wanted to see if there was an investigation on him or if there was -- if he's providing intelligence or if there's something that's -- relates back to him.

Q      Did you tell the law partners of Pillar Law Firm that you planned to run them in Sentinel?

A      No.

Q      Did you tell Edgar Sargsyan that you planned to run him in Sentinel?

A      No.

Q      I see next on the government's exhibit the names

Korkmaz and Baron Korkmaz and Selgan Korkmaz that you were --
did you run those names in Sentinel?

A       I did.

Q       And what do those names mean to you?

A       All those three names are the same person.
They're aliases.  They're various names, different ways of
saying that individual.  So I wanted to see if there's hits, if
I get a result on those names.

Q       All right.  And did you get -- do you recall
getting any hits on Korkmaz Baron Korkmaz or Selgan Korkmaz?

A       I did not get a hit.

Q       All right.  And, finally, you have -- you queried
SBK Holding; is that right?

A       That is correct.

Q       And where did you get that term or company name?

A       All these terms I got from Edgar Sargsyan.  And
SBK Holding is one company that Levon Termendzhyan runs in
Turkey with Baron Korkmaz.  And it's also a company here in the
United States that Edgar Sargsyan is the president of or was
the president of.

Q       And was that of interest to you as a national
security interest -- national security agent?

A       Yes.  Again I wanted to see if there was any
nefarious activities or if there was other reporting that is
related to SBK Holding.

**UNITED STATES DISTRICT COURT**

Q      Now, dropping down further, you see that there are -- in the yellow section there are indeed more text messages, outgoing calls, outgoing texts, et cetera, between you and Mr. Sargsyan.  Do you see that on the exhibit?

A      I do.

Q      And what was that about, if you remember?

A      Well, what happened was I did get a hit on Levon Termendzhyan because there was a case.  And even though it's no longer active, it was significant.  So I called him up, and I wanted to set up a meeting with him in person with Los Angeles.

Q      Okay.  By the way, did you also get a hit or not with respect to Edgar Sargsyan?

A      No, I didn't get a hit, at least not in Sentinel.

Q      Okay.  Did you get a hit in another database?

A      I did get a hit in another database.

Q      And what was that, if you recall?

A      That's an older database that we don't use anymore.  Actually it's -- at that time, at least when I worked, it was a more robust -- it was kind of archaic in the sense it was a very old system, but it was reliable.  And it was -- you would get more accurate hits.  When I ran Edgar's name, I got a hit on that.

Q      Do you recall what it was for?

A      It was for a -- some credit card thing that he had done years ago.

Q        Now, did you ever tell Edgar Sargsyan that you got a hit on his name in that older database?

A        No.

Q        Never said that to him?

A        No.

Q        All right.  Now, did you -- we see at the bottom of the page there is this outgoing link to Steve Kusin on 9 -- 1st of -- 9th of January, 2015.  Do you see that?

A        Yes.

Q        And did that, in fact, occur?

A        I'm sorry?

Q        Did you have a conversation with him?

A        I did.

Q        All right.  And what was it about?

A        Well, I told him that I -- I introduced myself, and I said that I had gotten a hit on his case.

Q        Okay.

A        And that I had someone who might be able to provide information on his case.

Q        And now on the third page I guess it is of Exhibit 212 for the government, you see in the section there dealing with the 9th of January 2015 in blue and some things in purple.  Do you see that?

A        I do.

Q        All right.  So did you, in fact, text Mr. -- or

UNITED STATES DISTRICT COURT

e-mail Agent Kusin?

A       I did.

Q       And what was the purpose for that?

A       Again, the purpose was to introduce myself and let him know I had some potential information that might be useful for his investigation.

Q       Okay.  And did he respond to you?

A       Yes.  We did.  We communicated.  I don't know if it was on the 9th or not.  But we communicated back and forth, tried to set something up.

Q       Did you, in fact, then on the 9th run Mr. Sargsyan -- or Termendzhyan again?

A       I did.

Q       Why did you do that again?

A       I'm trying to flesh out the information and trying to figure out how my information would help, if at all.

Q       Okay.  And going down all the way to the 15th, did you have an exchange with -- again with Mr. Kusin setting up this meeting on the 30th of January?

A       I did.

Q       Okay.  And again, what was the purpose for that?

A       Well, the purpose was to hopefully introduce Edgar Sargsyan to Steven Kusin.

Q       All right.  And on the 15th at 11:04, did you, in fact, then contact your supervisor?

UNITED STATES DISTRICT COURT

A        Yeah, that's --

Q        Is that Victor Lem?

A        Victor Lem at that time was the acting supervisor.

Q        And for what purpose?

A        I wanted to let him know that I was making plans to go to Los Angeles to make this introduction and that I had Kusin's approval.

Q        Okay.  Now, during this time period, not on the chart, did you -- this would be Defense Exhibit 1042 in everyone's binder.  Did you prepare a -- let me ask if you can go to 1042 and whether you can recognize what's in that exhibit.

A        I do.

Q        What do you recognize it to be?

A        That's an intelligence report that I wrote.

Q        Is this something you would do in the normal course of your business with respect to your tasks as a national security agent with respect to information received from a contact?

A        Yes.

Q        And did you, in fact, write something up?

A        I did.

Q        Are did you, in fact, put it into the -- disseminate it within the intelligence community for USIC?

**UNITED STATES DISTRICT COURT**

A      Yes.

MS. PINKEL:  Your Honor, I'm going to object.  This report was not drafted by the defendant.  Page -- they're not numbered.  But Bates No. 475482 shows that the author was a completely different person, not the defendant.  And hearsay.

BY MR. GRUEL:

Q      Let's go --

THE COURT:  It hasn't been introduced yet.  So I can't tell if it's hearsay or not.

BY MR. GRUEL:

Q      Let's go to the last page -- or the page that counsel referred to.

A      82.

Q      Do you see an individual's name of Kyle Calvo?

A      Yes.

Q      And as a security -- national security agent for the FBI, do you also have assistants who work with you that -- to help you with your tasks?

A      Yes.

Q      And do you, in fact, you have two assistants who worked with you Kyle Calvo being one of them; is that right?

A      That's correct.

Q      And who is the other one?

A      Suruchi Chen.

Q      Suruchi Chen?

A       S-u-r-u-c-h-i is the first name.  Chen, common spelling, C-h-e-n.

Q       And were they assigned to work with you with respect to your daily tasks of drafting communications or other documents for USIC and the FBI?

A       Yes.

Q       Was that done routinely as part of the business for the FBI?

A       That's correct.

Q       And in this particular document, did you work with Mr. Calvo and provide him with the information?

A       Yes.  If you look at the previous page, you'll see that it's from me.

Q       And did you, in fact, assist him in drafting this as part of the normal business of the FBI?

A       Yes.

MR. GRUEL:  Your Honor, I move it into evidence.

MS. PINKEL:  Your Honor, it's hearsay, lack of foundation.  It is not a business record.  And counsel is misstating the rule of the intel analysts.  They are not just assistants.

THE COURT:  You can ask him that.  But your objection is that it's hearsay?  Is that what your objection is?

MS. PINKEL:  A number of things.  Hearsay, not

authored by the defendant, the intel analysts are not simply assistants.

THE COURT:  Counsel, you can get into that in cross-examination.  It goes toward the weight and credibility of the witness.  It will be received subject to a motion to strike check.

MR. GRUEL:  Thank you, Your Honor.

(Exhibit No. 1042 received into evidence.)

THE COURT:  You say you created that; he just -- you dictated it and he took it down or what?

THE WITNESS:  Yes, sir.  If you look at the --

THE COURT:  I'm not looking at anything.  I'm just asking.  Did you dictate it?

THE WITNESS:  Yes, I did.

THE COURT:  It's your words, but you had somebody else transcribe it for you?

THE WITNESS:  Exactly.

THE COURT:  Okay.  Go ahead, Counsel.

BY MR. GRUEL:

Q     Well, and you didn't meet with Edgar Sargsyan, did you -- or Mr. Calvo didn't meet with Edgar Sargsyan, did he?

A     No.

MR. GRUEL:  May I publish to the jury, Your Honor?

THE COURT:  Yes.

BY MR. GRUEL:

Q      Let's start at the top page.

A      Okay.

Q      What does that section reflect of your -- what is this document called, by the way?

A      This is called an IIR, which is informational intelligence report or it's an intelligence information report. I forget.  It's easier to just call it IIR.

Q      IIR?

A      IIR, yes.

Q      All right.  And in looking at this IRR, who is it prepared for?

A      It's prepared for members of the intelligence community.  And if you look at the first large paragraph, it listed everybody that it went to.  So it's prepared in the USIC.  In the spy world, they are called the consumer.

THE COURT:  Let me ask you a question.  This is a document you prepared reflecting what you did and what you heard and what you saw; is that correct?

THE WITNESS:  That's correct.

THE COURT:  Counsel, that's the best evidence, not the document.

MR. GRUEL:  Okay.

THE COURT:  He can testify to everything that's in the document I'm assuming.

**UNITED STATES DISTRICT COURT**

MR. GRUEL:  Sure.

MS. PINKEL:  Your Honor, renew the objection and motion to strike.  In fact, the evidence is not that the defendant drafted it.  Someone else drafted it.

THE COURT:  Okay.  Overruled.

BY MR. GRUEL:

Q     With respect to this document, Mr. Broumand, what was the subject for this document?

A     It was the Turkish planning of the purchase of oil for -- from Azerbaijan.

Q     Does this relate to the information provided by Mr. Sargsyan?

A     Yes.

Q     All right.

THE COURT:  Counsel, as I said before, the document itself will not be introduced into evidence -- or will not be received into evidence because he can testify himself as to everything in the document.  That's the best evidence.

MR. GRUEL:  So the document is admitted into evidence; is that right?

THE COURT:  No, it's not.  That's what I said.  It's not admitted.  All it's doing is parroting what he already can testify to.  He said everything he wrote, he knew, and he talked to the witnesses.  He can testify to that.  But the document itself would be irrelevant.  It's what he saw and what

he did, and he can testify to that.

MR. GRUEL:  All right.

BY MR. GRUEL:

Q     Well, what you saw -- what the information you received from Mr. Sargsyan you recorded in this particular document; is that right?

A     That's correct.

MS. PINKEL:  Objection.  Misstates the evidence.  He didn't write this document.

THE COURT:  Overruled.

BY MR. GRUEL:

Q     Did you, in fact, then disseminate the information you received within the intelligence community?

MS. PINKEL:  Objection.  Lack of foundation and also leading.

THE COURT:  Overruled.  The document has not been received.  Do you disseminate the information that you recorded in that document to everybody?

THE WITNESS:  Yes.

THE COURT:  Okay.  Next question.

BY MR. GRUEL:

Q     All right.  And why did you do that?

A     It's valuable information for the intelligence community.

Q     And what was the content of it that was of value

to you as an agent for the intelligence community?

A       Well, I don't know if you remember.  At that time ISIS was gaining a lot of ground.  And their funds seemed to be endless.  So my theory was that they were getting more powerful because of their sale of the oil that they had control over in Iraq and Syria.

Q       All right.  And this is memorialized and sent on -- I think it was in early January of 2015.  Does that appear right?

A       That's correct.

MR. GRUEL:  All right.  Your Honor, I would move Exhibit 1042 into evidence.

THE COURT:  I've already ruled on it, Counsel.  It's not received.

MR. GRUEL:  All right.

Q       Now, with that information in the system, let's go back to the timeline.

So did you, in fact, then submit a payment request to go down to Los Angeles; is that right?

A       That's correct.

Q       And do you see on 1-26-2015, you also queried Levon Termendzhyan again; is that right?

A       Yes.

Q       And why did you do that?

A       I was making sure to see if my report made it

into the file.

Q    And did it?

A    It did.

Q    Okay.  Now, you actually went down to Los Angeles, I believe on the 29th of January; is that right?

A    Yes.

Q    And --

MS. PINKEL:  Objection.  Misstates the testimony.

THE COURT:  Overruled.

BY MR. GRUEL:

Q    And did you have an occasion to meet with Mr. Kusin?

A    I did.

Q    And where did you meet with him?

A    In the cafeteria.

Q    Well, where?  What cafeteria?

A    There's a cafeteria outside the -- it's about half a football length from the office.  It's outside.  It's open to the public at the LA FBI office.

Q    Is that the first time you had met Mr. Kusin?

A    Yes.

Q    And describe your meeting with him.

A    He told me that he -- the case was not active. He wasn't really interested in Levon Termendzhyan.  And he was more interested in the local Armenian community.

UNITED STATES DISTRICT COURT

Q        Okay.  So he told you that the case with respect to Levon Termendzhyan was inactive; is that right?

A        That's correct.

Q        And how long did that meeting last?

A        10, 15 minutes.

Q        Was anyone else present?

A        The cafeteria was full.

Q        And anybody from the FBI present with Mr. Kusin?

A        No.

Q        And how was that meeting -- how was it left with Mr. Kusin when you departed after that 15, 20-minute conversation?

A        It was obvious that I couldn't convince him to follow up with Levon.  And he was interested in the local community.  So I told him I'd go talk with Edgar Sargsyan and let him know if Edgar would be interested in talking about the local community.

Q        How did you get to the FBI to meet with Mr. Kusin that afternoon?

A        I took a cab or Uber or something like that.

Q        From --

A        From the airport, from LAX.

Q        All right.  And how did you depart?

A        Edgar Sargsyan came and picked me up.

Q        Okay.  And why?

**UNITED STATES DISTRICT COURT**

A          Because I told him I was going to talk to him about my meeting.

Q          And did you -- and he did pick you up; is that right?

A          He did pick me up, yes.

Q          Was it in a Bentley?

A          It was in a Bentley.

Q          Okay.  And did you describe to Mr. Sargsyan your conversation with respect to Mr. Kusin?

A          In not so many details that I had with Mr. Kusin. But I did tell him that, you know, I was interested -- initially the purpose of the meet was to introduce Edgar Sargsyan to the LA office so he can talk about Levon Termendzhyan.  But I told him that the office is more interested in the local community --

Q          Okay.

A          -- local Armenian community rather, his clients.

Q          All right.  And what did Mr. Sargsyan say about that?

A          He didn't want any part of it.

Q          All right.  And were you still interested in Mr. Termendzhyan?

A          I was.  I thought there was a great need to get information on ISIS.

Q          Okay.  And what did you do next?

A        Well, I was with Mr. Sargsyan for a long time trying to convince him to have him report on the local community.  And then when I wasn't getting anywhere with that, I said that I would like to continue talking to him about Levon Termendzhyan.

Q        And was he receptive to that?

A        He was.

Q        Now, we've heard and seen on the timeline that you stayed in Los Angeles -- that was on a weekend; right?  You came down on a Friday?

A        Yes.

Q        And you stayed until February 1st which was Sunday?

A        I believe so, yes.

Q        All right.  And is it true that you received calls from Agent Kusin when you were down in Los Angeles during that time period?

A        I believe I was -- I think I turned off my phone at that -- when I was having that private discussions with Mr. Sargsyan.  I don't quite recall.  But he did call me several times.

Q        All right.  He being Mr. Kusin?

A        Mr. Kusin called me, yes.

Q        Why -- did you accept those calls?

A        I did not.

UNITED STATES DISTRICT COURT

Q       Why not?

A       I was trying to convince Mr. Sargsyan at the time to have him report on the local community.

Q       And?

A       I wasn't getting anywhere.

Q       And why couldn't you take Mr. Kusin's call?

A       I think my phone was off at the time.  But if it wasn't, I was in the middle of deep discussion trying to convince Sargsyan to report on the community.

Q       Did you eventually return the call and speak with Mr. Kusin?

A       I did.

Q       What did you tell him?

A       I told him that Sargsyan was not interested in reporting on the local community.

Q       Did you tell him that you had left the Los Angeles area?

A       I did.

Q       Was that true?

A       No, I hadn't -- hadn't left yet.

Q       Why did you tell him that?

A       Well, I was on personal leave.  So I didn't feel like I needed to report to him my whereabouts once I was done working.

Q       All right.  And, now, according to the ping

information, you stayed at -- you went to Alvarez Street, Mr. Sargsyan's home; is that right?

A       Yes.

Q       And where did you stay during that weekend?

A       It was at a hotel.  I don't recall.  I'm guessing by this paper I stayed at the Montage.

Q       All right.  You don't have any independent knowledge, but you don't contest --

A       I don't contest that, no.

Q       And did you happen to stay at either the Beverly Hills Wilshire or the Montage frequently when visiting Mr. Sargsyan?

A       Yes.

Q       Did you pay for that hotel room?

A       I did not.

Q       And who did?

A       My understanding was the Pillar Law Group, the law office.

Q       All right.  And why did you let them pay?

A       They offered to pay and were friends.  I said okay.

Q       Okay.  And what did you do during that weekend that you were down in Los Angeles Beverly Hills?  Did you socialize with Mr. Sargsyan?

A       It was a whole bunch of us.  It was me, Sargsyan,

**UNITED STATES DISTRICT COURT**

Mosesi, Kalantar, the usual group.  It was about maybe half a dozen to a dozen people.

Q       During that trip that weekend of the 30th to February 1st, did you actually get introduced to Levon Termendzhyan?

A       I did.

Q       Who set up that meeting?

A       Edgar did.

Q       And was that one of the reasons that you actually -- well, strike all that.

Was that a plan or did that -- was that something that just developed?

A       Well, after -- during my discussion with Mr. Sargsyan at that time, prior to talking with Kusin, I told him that I would love to meet Levon Termendzhyan.

Q       And did you?

A       I did.

Q       What happened?

A       We didn't really hit it off.  My initial --

THE COURT:  Next question, Counsel.

MR. GRUEL:  Okay.

Q       How long was that meeting with Mr. Termendzhyan?

A       It was two, three hours.  It wasn't just us two. It was about two or three hours.

Q       To your knowledge, did he know you were an FBI

**UNITED STATES DISTRICT COURT**

agent?

A    He did.

Q    How did -- did you tell him?

A    I did tell him.  But Sargsyan had told him prior.

Q    Okay.  And did you return back to the Bay area?

A    I did.

Q    Now, did you tell Mr. Kusin, Agent Kusin, that you had met -- upon your return, did you tell him you had met Levon Termendzhyan?

A    No, I did not.

Q    Why not?

A    He didn't care about Levon.

Q    Well, what gave you that impression?

A    I tried to force feed him the potential source that could report on his subject, and he didn't want it.

Q    All right.  Now, let's move to the bottom of this exhibit, 212.  Do you see down at the bottom it says February 17, 2015, a $5,000 cash deposit into Chase account, Love Bugs.  Do you see that?

A    I do.

Q    Did Edgar Sargsyan give you that money for that cash --

A    No.

Q    Let me finish my question, please.

A    Sorry.

Q        Did Edgar Sargsyan give you that money for that cash deposit?

A        No, he did not.

Q        If you recall, where did you get that money?

A        From Love Bugs.

Q        Love Bugs.  Okay.  What do you mean from Love Bugs?

A        Well, cash receipts from Love Bugs or check receipts from sales, proceeds of sales.

Q        Is it true that you had two Love Bugs accounts at two different banks during this time period?

A        That's correct.

Q        What we see here is 2-17-2015, that's the Chase account ending in 236 -- 8236; is that right?

A        That's correct.

Q        And you actually had another one at Wells Fargo; is that right?

A        That's correct.

Q        Do you remember the last four numbers of that account?

A        8017.

Q        All right.  Now, moving on in the timeline, now we are into -- that was February of 2015.  Now we are on the chart, and it's April of 2018 (sic).

Do you recall any activity with Mr. Sargsyan in

UNITED STATES DISTRICT COURT

March of 2015?

A       I don't recall.

Q       Okay.  Let's go to the timeline.  It looks like April 28, 2015.  Do you recall traveling back to the Wilshire Boulevard -- Beverly Hills and Wilshire Boulevard?

A       Yes.

Q       And why were you there on April 28th of 2015?

A       I went down there to buy a motorcycle.

Q       And -- all right.  Let's talk about that for a minute.  Had you, in fact -- were you in the process of looking for a new motorcycle?

A       I was.  Well, it wasn't new.  I was looking for a used motorcycle, yes.

Q       Okay.  What steps, if any, did you take prior to going to Beverly Hills on April 28, 2015, with respect to getting a motorcycle?

A       Well, the day before I deposited $14,000 into Wells Fargo.  And prior to that I was searching for motorcycles on Craigslist.

Q       Okay.  So you went to -- you sold a bike prior to -- wait.  Did you sell any motorcycles before going down to Beverly Hills on April 28th?

A       Yes.

Q       And what did you sell?

A       I sold a 2006 Ducati 999S.  I sold a 1975 Honda

UNITED STATES DISTRICT COURT

CB400.  And then I sold another 1978 Honda CB750.  I sold three motorcycles.

Q       Prior to coming down on April 28th, 2015 --

MS. PINKEL:  Objection.  Vague as to time.

THE WITNESS:  Yes.

THE COURT:  Yeah, I think he just gave it.

MS. PINKEL:  He said "prior," but we are not sure when prior.

BY MR. GRUEL:

Q       When did you sell the first vehicle, if you remember?

A       The first vehicle -- I think we have e-mails and stuff -- but it was just two or three months prior to going down there.

Q       All right.

THE COURT:  Did you sell them all in 2015?

THE WITNESS:  Yes, sir.

BY MR. GRUEL:

Q       I'm going to draw your attention to Exhibit 1062. Have had you a chance to look at that exhibit, Mr. Broumand?

A       Yes.

Q       It consists of several pages of -- do you recognize what's in 1062?

A       Yes, I do.

Q       And what do you recognize it to be?

A        1062 is the -- some of the vehicles that I sold and some of the emails when I was searching to purchase another motorcycle.

Q        What is the time period that you were doing this?

A        This first one is from April 4, 2015.

Q        And what motorcycle were you looking for then?

A        Well, this one, the very first one is the Honda CB400 that I sold.

Q        And how much did you sell it for?

A        $4,100.

Q        And did you get paid?

A        I did.

Q        How did you get paid?

A        It was a wire transfer.

Q        All right.  And into what account, if you recall?

A        The Wells Fargo 8017.

Q        That's another Love Bugs account?

A        Yes.

Q        And did you sell any other vehicles prior to going to -- within that time period?

A        Yes.  I sold the Ducati, the Ducati that I had. And I sold another Honda motorcycle.

Q        How much did you sell the Ducati for?

A        The Ducati I sold for $7,000.

Q        And how did you get paid?

A        Wire transfer into Wells Fargo.

Q        And that is the Love Bugs account?

A        Correct.

Q        And did you -- I think you mentioned a third vehicle you sold; is that right.

A        Yes.  That was -- yes.  That was the Honda CB750.

Q        And how much did you sell that for?

A        $3,000.

Q        And how did you get paid for that?

A        I got paid cash.

Q        Now, do you recognize -- in trying to sell these three vehicles -- motorcycles, did you actually -- where did you list them?

A        In a variety of places.  The -- actually, the two -- the CB400 was on -- it was on eBay.  And so was the Ducati was on eBay.  And a good friend of mine, Danny Liggens (phonetic), had heard that I was selling the other CB750 and he bought that.  I never listed that.

Q        And are those listings reflected in Exhibit 1064?

A        1064?  1062.

Q        1062.

A        Yes.

Q        Is that right?

A        Yes.

         MR. GRUEL:  Your Honor, I would offer 1062 into

evidence.

THE COURT:  It will be received.

(Exhibit No. 1062 received into evidence.)

BY MR. GRUEL:

Q        Now, you had roughly $14,000 from your sales of your three bikes; is that right?

A        That's correct.

Q        And that was in April of 2015; right?

A        That's correct.

Q        Did you ever withdraw -- this was all deposited through wire transfers; is that right?

A        Except the $3,000 that Mr. Liggens gave me, yes.

Q        All right.  And did you at any time withdraw that money out of the Love Bugs Wells Fargo account?

A        I did.

Q        And why did you do that?

A        I was getting ready to purchase a motorcycle locally in the Bay area for cash.

Q        Did you actually have someone -- did you find a seller?

A        I found a seller in Los Angeles, not one in the Bay area.

Q        Okay.  And was it for a Ducati?

A        It was for a Ducati, yes.

Q        Do you remember the name of that seller?

A       No.

Q       Okay.  And did you decide to go -- were you going to purchase this Ducati in Los Angeles?

A       Yes.

Q       And what steps did you take to make that happen?

A       Well, we e-mailed each other back and forth.  I know he was Greek.  And we settled on a date where I would come down and actually get to see it.

Q       Okay.  And did you actually withdraw $14,000 in cash for that Ducati in Los Angeles?

A       Withdraw, no.  I withdrew 11.  And then with the extra $3,000 that I had from Mr. Liggens for the other bike, I deposited that $14,000 into my account the day before I went down there.

Q       Okay.  So I understand.  You were going to buy a bike in San Francisco for cash?

A       Right.

Q       That didn't happen?

A       No.

Q       You were going to then buy one in Los Angeles for 14,000?

A       That's correct.

Q       Is that the $14,000 deposit that we see in the Wells Fargo Love Bugs account on April 27, 2015?

A       Yes.

UNITED STATES DISTRICT COURT

Q      Why did you put it back into the account?

A      Well, I didn't want to travel from here -- from Northern California down to Los Angeles with that much amount of cash.

Q      Okay.  You went to Los Angeles.  Did you meet again with Mr. Sargsyan?

A      Yes.

Q      And what for?

A      I don't remember.  We were just kind of hanging out.  But I figured as long as I'm down there, I want to see my friends.

Q      Okay.  Did you see Mr. Mosesi during that time period?

A      Oh, yeah, I saw the regular people, yeah.

Q      And regular people, Art Kalantar, is he --

A      Art Kalantar, Henry Mosesi, Levon Aslian, and, you know --

Q      At that time had you met Felix Cisneros?

A      Not at that time.

Q      Had you met John Balian?

A      No.

Q      Okay.  And was there an occasion where you told Mr. Sargsyan you were going to go look to buy a -- what happened with the seller down in Los Angeles?

A      I ended up not buying the bike.

UNITED STATES DISTRICT COURT

Q Why?

A Well, I had told Edgar, and all the guys knew I was coming down to look at this motorcycle. And on the day that Edgar was going to give me a ride to go look at this motorcycle, we were talking, and he's like you don't want to buy a used bike. And Edgar is all about new stuff.

And I said my budget is 14. I'm going to stick with that. And this guy, I know I could get him to 14. And then he told me that he had a friend, Steve -- and I don't remember his last name. It starts with an S, I think -- who is in the automotive industry. So he has a friend who owns a Ducati dealership in Beverly Hills and that they might have some used bikes.

I said sure. Let's go check it out. I'd rather buy from a brick and mortar place as opposed to someone I met through Craigslist. So that's how we ended up going to the dealership.

Q And did Mr. Sargsyan purchase a Ducati for you?

A He did.

Q How did that happen?

A Well, it was initially without my knowledge. You know, I was out with a salesman looking at some of the used motorcycles. And they didn't have the Ducati I wanted which is a Ducati 899. And when I got back into the showroom, he was finishing up purchasing -- it was a Ducati 1299S which is a

much bigger motorcycle than I anticipated.

Q     All right.  And this was a surprise to you?

A     It was a total surprise.  I mean, we argued about it.  I told him I don't want to take it.  And, you know, I probably shouldn't accept it.  But he convinced me to take it.

Q     Now, did you put the bike in your name?

A     I did.

Q     And was it delivered ultimately to your house?

A     Yes.

Q     And at any time -- was this a gift to you?

A     Yes.  And I tried to give him the 14,000 I had.  He wouldn't -- he wouldn't speak of it.  And he said it was already done.  He said he's bought cars for Art Kalantar, he's bought cars for Mosesi, and this was -- this was nothing.

Q     At any time was this for any type of information that you had provided --

A     Not at all.

Q     -- to Mr. Sargsyan?

A     Not at all.

Q     Was it for any type of information of staying away from some individual?

A     No.

Q     Was it for anything to do with to not -- to try to shield him from law enforcement detection?

A     No.

**UNITED STATES DISTRICT COURT**

46

Q       At any time -- all right.  Well, let's move on then.

And you accepted that Ducati; is that right?

A       That's right.

Q       And you stayed there for the entire, again, weekend; is that right?

A       If that's what the records say.

Q       Okay.  Your stay at the hotels there were also paid by Mr. Sargsyan?

A       I was under the understanding it was the law firm.

Q       Okay.  Now, it appears that in May, May of 2019, you are back in the -- you are in Las Vegas in that particular time; is that right?

A       Yeah.  If that's what the records say, yes.

Q       Do you recall why you were in Las Vegas at the ARIA?

A       I did take one trip to Las Vegas with another friend of mine.  I don't know if Edgar just happened to be there at the time.  But it was just -- I think it was just a friendly vacation, personal vacation.

Q       Okay.  So you remember being in the Las Vegas area during that time period.  It may or may not have been with Mr. Sargsyan; is that right?

A       That's correct.  Actually, you know, I think that

was without -- I did see him there, but I had gone there separately with another friend.

Q       Who was the friend?

A       That was this guy that I worked with.  He was another intelligence agency who had just retired.  Eric.  Eric --

Q       You don't remember the last name?

A       I don't remember the last name.

Q       All right.  And how long were you there with Eric?

A       I'm sorry?

Q       How long were you there with Eric?

A       I think it was just for the weekend, a couple days.

Q       Okay.  Do you know who Mr. Sargsyan was with during that trip?

A       He was with a Latin female and Henry and -- Henry Mosesi, Art Kalantar, Levon Aslian, the whole crew.

Q       Okay.  Moving along, do you recall what's reflected in this particular page of the exhibit -- we see on May 21, 2015, it says Mr. Sargsyan paid for rooms at the ARIA Resort and Casino; is that right?

A       That's correct.

Q       Was that for your stay, if you recall, or do you have any -- do you have memory of that or not?

A    I do not have a memory of that.  I paid for that trip myself.  I had gone with my friend, Eric.  And we just happened to, I think -- Edgar Sargsyan and I just happened to -- I knew he was going to be there.  But I did see him there.  But he did not pay for my room.

Q    Okay.  And who was Mr. Sargsyan with, if you know?

MS. PINKEL:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. GRUEL:

Q    Okay.  Now, on May 27, 2015, do you see yourself texting Mr. Sargsyan about his surgery --

A    Yes.

Q    -- going well.  What was that about, if you recall?

A    I believe he was getting cosmetic surgery.

Q    Okay.  Where were you, if you recall, when you texted that?

A    I'm -- I believe I was in Northern California.

Q    Okay.  And do you see the discussion about Qatar in serious damage control on May 27, 2015?

A    Yes.

Q    And what was that about, if you recall -- what is Mr. Sargsyan referring to, if you know?

A    Well, at that time what had happened was FIFA is

the Olympics of soccer, if you will, and happens every four years.  And Qatar was trying to host it.  Now, FIFA, the FIFA games happen in the summer.  And Qatar in the summer, it's 125 degrees in the shade.  So there was an allegation that Qatar royal family had bribed the FIFA officials to make FIFA take part in Qatar.  And that was coming up on the news.  So there was a lot of negative publicity for Qatar.

Q    Okay.  Now, in this time period that we are looking here on the exhibit, May of -- May 27th of 2015, there's discussion between you and Mr. Edgar Sargsyan with respect to Al Thani of Qatar; is that right?

A    That's correct.

Q    Is that the sheik we've heard about?

A    Yes.

Q    Is that right?

A    Yep.

Q    And did Mr. Sargsyan ever give the name of that individual to you in one of his conversations?

A    Yes, he did.

Q    Did you ever -- why did he give you that name?

A    I had told him to give me any name of individuals that he may think that may be beneficial for me professionally for me as an agent for foreign intelligence.  So generally I'm interested in heads of state, scientists, people who are movers and shakers in their respective countries as a means to gather

UNITED STATES DISTRICT COURT

intelligence.

Q     Did you view the sheik as someone who would be of that interest?

A     Yes.  I mean, his family runs the country.

Q     Did you run his name?

A     No.

Q     Why not?

A     Well, the information that I had was that this individual was hooked on Demerol.  So in the intelligence business, it's not always -- you are not always looking for nuclear information.  It can be anything.  If someone has cancer, if a heads of state has some addiction of some sort or heads of state has a drinking problem or gambling problem, that's important for the intelligence community.

So Mr. Sargsyan told me that this Qatari guy was hooked on Demerol.  And I shared that with Suruchi Chen, one of my analysts, and the other, Calvo, Kyle Calvo, and asked him if this was sufficient to put out an IIR.  So there was a threshold.  You can't just put any information out.  And they told me it wasn't specific enough.

Q     So you didn't run Mr. Al Thani?

A     No.

Q     Now we've heard in the next slides on the government's timeline basically deals with the Demerol that you were talking about.  And do you recall text messages back and

forth with Mr. Sargsyan about providing Demerol?

A       That's correct, yes.

Q       Did you have any intention to provide any Demerol to Edgar Sargsyan?

A       Not at all.

Q       Why were you texting about it then?

A       I was trying to get more information.  I did get the fact that, you know, he can't take pills.  But that didn't rise to the level where it would make that reporting valuable to the community.

Q       Did you ever get any Demerol for Mr. Sargsyan?

A       No.

Q       Did you ever tell him that you had a source of Demerol who was a DEA agent?

A       I don't, no.  I don't know any DEA agents.

Q       All right.  Now we are going to jump to August of 2015.

And during that time period, were you also in the Las Vegas area?

A       If that's what the stuff shows.

Q       Do you remember why you were there?

A       Probably just for vacation.  I don't know.

Q       All right.  Was there a time then when you and your wife filled out an application for a home in Tahoe?

A       Yes.

**UNITED STATES DISTRICT COURT**

Q       And had you already had a house in Tahoe at that time?

A       We did.

Q       And did you also have property, by the way, in Texas?

A       Yes.

Q       And where in Texas?

A       Corpus Christi.

Q       Okay.  And were those rental properties?

A       They were rental properties, yes.

Q       All right.  Now, also on this chart, we see that on 9-21, 9-24, and 9-25 there are three cash deposits into a Love Bugs account; is that right?

A       That's correct.

Q       And did Edgar Sargsyan give you the cash for those three deposits?

A       No.

Q       Where did you get the cash?

A       Those came from Love Bugs.

Q       And how did it come from Love Bugs?

A       They came from the checks that I was cashed -- cashing and keeping it in my desk as a reserve and regular cash from the business.

Q       Okay.  And so those cash deposits occurred prior to going to -- ultimately down to Orange County on the 29th of

September.  Do you see that?

A      Yes.

Q      Okay.  And that's here.  And did you ever -- did you then meet up with Edgar Sargsyan in Southern California after landing in Orange County?

A      I think on the 30th or later on that day maybe.  If the records say that, then yes.

Q      Okay.  The next page of the exhibit.  Why were you in Tustin, if you recall, on 9-30-2015 at 9 o'clock in the morning?

A      I had taken a couple days off for a vacation again.  And I just had gone down to see a friend in Orange County.  And then later on that day, I took an Uber up to Beverly Hills.

Q      Okay.  And did you meet with Mr. Sargsyan then on September 30th, 2015?

A      I did.

Q      And tell us what happened with respect to the cashier's check that is listed at 9-30-2015 on the government's exhibit?

A      Well, I had gotten a call earlier that day, I believe, from the mortgage broker that I needed to reduce my income-to-debt ratio.  So I had to get rid of some debt.  And they said that the -- my boat had to be paid off.  So I asked Mr. Sargsyan -- we were talking about it.  And I asked him if I

**UNITED STATES DISTRICT COURT**

could borrow some money to pay off that boat.

Q        Why did you go to Mr. Sargsyan for that?

A        Well, we were having breakfast, and he could tell that something was bothering me because I had just gotten the call from the broker.  And we were talking about it.  And so he was just there.  And he said that he could loan it.  I asked if I could borrow it.  And he said sure.

Q        Was there anything in exchange from you to him for that $30,000 cashier's check?

A        Not at all.

Q        Did you provide him any information about any law enforcement matter with respect to him, Mr. Sargsyan, in exchange for that check?

A        No, not at all.

Q        And after -- well, let's talk about that check for a second.  Why did you have it made out to Love Bugs and not to Babak Broumand?

A        Well, it was -- my personal bank is in Texas. USAA doesn't have a branch in California.  So I wanted to deposit that check as soon as I could so I can pay off my boat. So I just thought it would be the quickest way just to have it to Love Bugs and just deposit it right then and there, which I did.

Q        And who did you think Andor'e was?

A        I just thought it was one of his companies, one

of Mr. Sargsyan's companies.

Q       To your knowledge, did he have a lot of companies?

A       He did.

Q       And how did you become familiar with that?

A       When he first told me about Levon Termendzhyan, I just briefly talked about his source of income and what he did for a living.  And I believe Arca was one of the companies he said he owned.

Q       This is Andor'e.

A       I'm sorry.

Q       Arca is --

A       I'm sorry.  That's right.  Andor'e.  Pardon me.

Q       What did you know Andor'e to be?

A       At that time I didn't know what it was.

Q       Did you ever say -- when Mr. Sargsyan suggested Andor'e, did you ever say, oh, this is even better because -- it's a hair salon apparently.  Did you ever say to Mr. Sargsyan even better because it's going to Love Bugs which is also a hair salon?

A       No, it doesn't make sense.

Q       Did you have any intent to somehow conceal the source of these -- this loan from Mr. Sargsyan because it comes from a cashier's check by Andor'e?

A       No.  I mean, the business, Love Bugs, is in my

UNITED STATES DISTRICT COURT

name.  I don't know how I would conceal that.

Q      Okay.  What were the terms of your loan with Mr. Sargsyan?

A      It was just pay me back whenever you can.  We didn't really memorialize it in any way.  I didn't promise I'd give him, you know, a thousand bucks every two weeks or anything like that.  I just said that I will pay him back as soon as I can.

Q      To your knowledge, did Mr. Sargsyan help a lot of people?

A      He did.

Q      Did he give loans to other people to your knowledge?

A      He did.

Q      All right.  Did he seem to be someone wealthy enough that $30,000 meant nothing to him?

A      Oh, yeah.  I mean, I know of business -- I know about real estate that he bought and sold and he made --

THE COURT:  You answered the question.

THE WITNESS:  I'm sorry.  Okay.

BY MR. GRUEL:

Q      Let me ask this:  Did you know that he had two jets?

A      I think by then he had them.  I'm not sure when he had them.  But yes.

Q        Had you been to any of the mansions he lived in?

A        I had, yes.

Q        Was that in Calabasas?

A        I had been to Calabasas, yes.

Q        Okay.  And as you testified, he seemed to pick up the tab for everybody; is that right?

A        That's correct.

Q        So you got the -- got the loan.  And who were you working with at the mortgage company?

A        David Clark.

Q        Did you tell him that you were able to sell the boat?

A        I did.

Q        All right.  We are on the next page which is 15 of 16 for 2015.  Once you had the $30,000 from Mr. Sargsyan's loan into the Love Bugs account, what did you do with it next?

A        I paid off my boat.

Q        Did you transfer -- did you transfer any money from Love Bugs to the USAA account on 10-3-2015?

A        Yes.  Yes, I did that, yes.

Q        And what do you recall of that?

A        Well, the boat loan was with my bank, USAA.  So I had to transfer the money to pay off the loan.

Q        And was the boat paid off?

A        After that, yes.

UNITED STATES DISTRICT COURT

Q      What was owed on the boat, if you recall?

A      A little over $13,000.

Q      And also on 10-7-2015, did you, in fact, transfer $35,000 to the USAA account ending in 1128 from the Love Bugs account?

A      Yes.  That was a transfer from personal account to savings.

Q      And why was that?

A      Well, I was getting ready to purchase the house. And I just wanted to make sure I didn't touch the money that I was going to use for the down payment.  So if it stayed in my personal account, there was a chance that I would, you know, waste it.  So I wanted to set it aside so it was kind of out of sight.  And that's where I kept all my -- that was a practice that I would do regularly, just put all that money into savings, and I would have it set aside for what I really needed it for.

Q      Okay.  Now, also on this chart it shows that on 10 -- October of 2015 there are searches -- searches by you, queries involving Edgar Sargsyan and ACS; is that right?

A      Yes.

Q      What's ACS?

A      ACS is that database I was talking about earlier. It's a more robust but, you know, archaic in terms of it's not pretty.  But -- and most agents don't know how to use it.  But

I was taught by someone --

Q      And for what reason -- well, first of all, do you recall doing those searches in October of 20 -- October 14, 2015?

A      Yes.

Q      And in looking at the chart, it looks like it's repetitive.  159 seems to be several times listed and then 2:00.  Do you see that as well?

A      Yeah.  And I don't understand why they put it this way.  But I only ran it one time.  I don't know why there's four hits on one day.  It doesn't make sense to me.

Q      Why were you running Mr. Sargsyan in the ACS system?

A      Well, I didn't get a hit when I ran the name in Sentinel.  So I ran it in ACS.  And that's when I got an old -- I think it was like ten years old or something like that -- a record of something regarding a fraudulent credit card.

Q      For Mr. Sargsyan?

A      That's correct.

Q      Did you ever tell Edgar Sargsyan that you found information about him on this old credit card case?

A      No.  But I did question him on it in a roundabout way.  So when you work intel, you -- or when you try to vet somebody, you can ask them -- elicit certain kind of responses to see if they come forward without you actually confronting

UNITED STATES DISTRICT COURT

them.

So he had brought up the subject about him wanting to be an FBI agent and never understood why.  So we just kind started talking about that thinking of things -- talking about things that may have prevented him from becoming a federal agent.  And he confessed, for lack of a better word, that had he done some credit card fraud when he first came to the United States.

Q     Did you say Mr. Sargsyan told you he wanted to be an FBI agent?

A     Yes.

Q     Had you heard that he applied for -- to be a DHS agent?

A     No.

Q     Did you hear he was ever rejected in trying to be employed as a federal agent?

A     Yes, he told me he was.

Q     And from your experience with Mr. Sargsyan, did he seem to be -- did he like to be -- to your knowledge, seem to be surrounded by police and law enforcement?

A     Yes.

Q     Did you ever meet Ryan Lawrence?

A     Yes.

Q     Was there another Beverly Hills police officer you met later on in Las Vegas?

**UNITED STATES DISTRICT COURT**

A        Yes.  He didn't have a patch back then.

Q        Was that the gentleman that testified here?

A        Yes.  James --

Q        What about other law enforcement?  Did you see Mr. Sargsyan with what you believed to be other federal agents or police officers?

A        Yes.  I mean, there was -- yes, there was.  I mean -- yeah.

Q        He liked being around cops?

A        He did.

Q        Did you do that -- was this at the Grand Havana Room?

A        That was one of the places, yes.

Q        Okay.  Let me ask this:  With respect to this run of Mr. Sargsyan in the ACS system on 10-14-2015, was that in any way to check to make sure that your putting his name on a bill of sale wouldn't cause problems for you?

A        No.  No.

Q        Was it done in any way to curtail any type of detection with respect to your association with Mr. Sargsyan?

A        No.  If anything, that would highlight it.

Q        Okay.  And was it -- were you concerned at all with respect to having Mr. Sargsyan providing you a loan that was ultimately going to pay off the bike?

A        The boat?

**UNITED STATES DISTRICT COURT**

Q        Yes, the boat.

A        No.  At that time, no.  It was probably a lack of judgment.  But no, I didn't have any concerns.

Q        This was not -- this was done for your law enforcement purposes; is that right?

A        The searches, yes, correct.

Q        Not because of any concern of Edgar?

A        No, no, no.

Q        I think we've -- this was a -- do you remember writing -- we are on the white portion of the next page of Exhibit 212 on the 2015 timeline.  Do you see the -- did you write a letter to -- a letter in support of the loan -- Lake Tahoe home application saying that you sold your boat?

A        Yes.

Q        What prompted you to write that letter, if you recall?

A        Well, David Clark had called and said just give me something that says you had paid off the boat and why you sent the check to -- you put the check initially in Love Bugs.

Q        Would you look at 1041.

I believe it's been admitted into evidence, Your Honor, 1041.

THE COURT:  Yes, it has been.

BY MR. GRUEL:

Q        We've talked about that Mr. Clark -- you were

**UNITED STATES DISTRICT COURT**

talking with Mr. Clark.  He was trying to close that sale or that loan application, wasn't he?

A       Yes.

Q       And you were in the process of working with him to make that happen; right?

A       Right.

Q       And so you wrote to him on 10-21.  Was that in response to his reaching out to you?

A       Yes.

MR. GRUEL:  May I publish to the jury, Your Honor?

THE COURT:  Yes.

BY MR. GRUEL:

Q       I put on the screen 1041 for the defense.  Do you recognize that e-mail, Mr. Broumand?

A       Yes.

Q       What do you recognize it to be?

A       It was an e-mail David had sent me.  And there was a couple of issues or three issues that were outstanding. But No. 7 was the most important thing, and that had to deal with the sale of the boat and the funds from the boat.

Q       And did you respond to -- this was the letter that you wrote in response; is that right?

A       That's correct.  And that's where the whole bill came from.

Q       Now, Mr. Clark makes reference to "can you help

**UNITED STATES DISTRICT COURT**

us with No. 7?"  Is that the attachment that's on the next two pages of the exhibit?

A        That's correct.

Q        Do you see No. 7 listed there?

A        Yes.

Q        And is this -- this is his reference to closing this particular loan talking about No. 7 and with respect to the sale of the boat?

A        Yes.

Q        And he also makes reference to the fact that Love Bugs was the borrower -- the borrower came from Love Bugs with the $30,000 going to the USAA account?

A        Correct.

Q        And what were you responding to from him with respect to your letter, the letter that you drafted that the government has in evidence?

A        They just wanted to know why I put the check into Love Bugs as opposed to my personal.  And I explained that, you know, my bank, again, is in Texas.  And back then there wasn't, you know, instant phone banking.  And after USAA had that capability, it was only limited to $10,000.  So I didn't feel comfortable mailing a $30,000 check.  So I just said I'm going to deposit it into Love Bugs.

Q        Okay.  And did the actual loan then take place?

A        The -- yes.  Yes, it did.

UNITED STATES DISTRICT COURT

Q        And you purchased the house?

A        Yes.

Q        And as we see on 10-21, a wire went from your personal account at USSA to the Placer Title Company; is that right?

A        That's correct.

Q        And were you involved in making that down payment of earnest money and then the actual purchase total amount to close escrow?

A        That's correct.

Q        Now, how much was the earnest money with respect to that property, if you recall?

A        A little over $35,000.

Q        And when did you pay that, if you recall.

A        That had to be early on like when I first made the offer.

Q        Okay.

A        So maybe late September, early October.

Q        All right.  Now, with respect to the 355,335.06 that was wired from the personal account to Placer Title, do you see that on 10-21 on the particular government's exhibit chart?

A        Yes.

Q        What do you recall being the source of funds for that balance to pay off the down payment?

**UNITED STATES DISTRICT COURT**

A        Well, I sold my first house in Tahoe.  That was in Tahoma.  I made over 200 on that.  And then I sold one of the Texas properties, and I made over $70,000 on that.  I sold another house in Texas, and I made over approximately 30 on that.  And then I borrowed money from my -- from my retirement, another $40,000 or so.  So that's where all that came from.

Q        And how about what was -- what was in that account, if you recall?  Did you and your wife have direct deposit into that account from your paychecks?

A        Oh, yeah.  Yeah, we did direct deposit.

Q        And -- well, how much monthly was going in from your -- just from your salaries alone?

A        Just from our salaries, around -- about 17,000.

Q        Now, at any time, the 30,000 that came from Mr. Sargsyan and Andor'e, was any of that used in the down payment for the Homewood property in Lake Tahoe?

A        No.

Q        Now, moving along, now we are in November of 2015 at 136.  Do you recall querying Mr. Sargsyan in ACS -- in the ACS system?

A        I obviously did, yes.

Q        Do you recall why you did it?

A        It's my usual practice to run names a couple times because it is a computer system and sometimes things don't pop up.  So I maybe decide to do just do it one more time

UNITED STATES DISTRICT COURT

to see if I get a different hit from what I got previously.

Q   Is that something you do in any case that you are working on?  Do you go back to the system, either Sentinel or back then ACS, to check on the name of someone providing information to you?

A   Yes.

Q   And, Mr. Sargsyan, to be clear, was not a signed documented source at this time or any time by you?

A   That's correct.

Q   It's been alleged that you were looking at his name at this time to see if there was any concern because his name was on this bill of sale for the Sea Ray.

A   No, that's --

Q   Is that -- do you recall that statement?

A   That's what they said, yes.

Q   Is it true?

A   No.

Q   Why not?

A   It's not true.  I wouldn't do it.  It's ridiculous.

Q   Okay.  Now, we've talked about the -- they've talked about the bill of sale for the Sea Ray.  Did you prepare that document, that bill of sale?

A   I did.

Q   And did you -- did you pay it -- or prepare it in

response to David Clark's e-mail on October 21st saying that he had to -- he wanted to have the sale of the boat issue taken care of?

A    Yes.

MS. PINKEL:  Objection.  Leading.

THE COURT:  Sustained.  Why don't you re-ask the question.

MR. GRUEL:  All right.

BY MR. GRUEL:

Q    Did David Clark bring up the loan or the unpaid balance of the boat as an issue to you?

MS. PINKEL:  Objection.  Same objection.  Leading.

THE COURT:  Counsel, I'm going to give you time to think about it because it's 2:30.  You can figure out if you want to ask if a different way.

Ladies and gentlemen, we'll break for 15 minutes. Remember the admonishment not to discuss the case among yourselves or with anybody else or form or express any opinions about the matter until you retire to the jury room.  If you'll leave quietly, I have to talk to the attorneys.

THE COURTROOM DEPUTY:  All rise.

(Outside the presence of the jury.)

THE COURT:  The record will reflect that the jury's -- excuse me, that the jurors have left the courtroom.

And, Counsel, you may have seats.  Counsel for one

**UNITED STATES DISTRICT COURT**

or the other wanted to put something on the record.

MS. PINKEL:  Yes, Your Honor.  I am -- the government remains concerned about this computer.  Did you want me standing, sitting, lectern?

THE COURT:  Just for something you're going to put on the record, so you can -- if the record --

MS. PINKEL:  As we all saw this morning, the defendant has discovery on his computer, discovery from this case which is subject to a protective order.  He had -- we saw a number of files because he has short cuts.  And the government is very concerned that this is on defendant's unsecure computer.  He had specific file names, for example, Sargsyan and Cisneros that we saw.  He obviously had a lot of the discovery.

And it violates the protective order.  The protective order specifically states at page 4, and this is Docket No. 40, "The defense team does not include defendant, defendant's family members, or any other associates of defendant."

Defendant cannot have the government's discovery which is highly sensitive at all.  And it's on his computer.  We also saw a file, a short file that said CIPA.  And as this Court knows, CIPA stands for the Classified Information Procedures Act.

I don't know what defendant has on that computer.

But I'm very concerned that that computer must go into defense counsel's possession. And it needs to be secured until we resolve this problem.

THE COURT: She's put that on the record. Do you have anything you want to put on the record?

MR. GRUEL: Well --

THE COURT: Briefly. Because this is something that will be taken up at a much different time than now. This is not part of this trial.

MR. GRUEL: Certainly. All I'll put on the record, Your Honor, is I'm certainly cognizant of protective orders and the like. As the Court well knows, this case has over 500,000 pieces of paper. That computer has been used by me to try to get a handle on this case and specifically in working -- I don't have a paralegal or anyone. And Mr. Broumand has assisted me throughout this -- not only in this trial preparation and with respect to this trial. I can't handle both at the same time.

Let me just say about CIPA, I didn't see -- first of all, I didn't have my glasses on. I didn't see what --

THE COURT: If you want to put something on the record, that's fine. I'm not arguing it. It's not part of this case.

MR. GRUEL: Right. Well, I think this -- this computer has got work product on it. It's part of our defense

UNITED STATES DISTRICT COURT

in presenting our case to the jury.  It would cause grave concerns to the defense to have it apparently confiscated.

Now, if the government wants my assurance that I'll take possession of it --

THE COURT:  There's been no motion at this time to confiscate.  Is that your motion, to confiscate?

MS. PINKEL:  Your Honor, I think our motion is that it stay in defense counsel's possession and it not go back to the defendant or any family member.

And as far as counsel not having a paralegal, there are multiple private investigators that have been hired in this case, both in the Northern District and the Southern District. There is a defense financial --

THE COURT:  Okay.  Counsel --

MS. PINKEL:  -- expert.  I mean, the order is clear.

THE COURT:  -- both sides can go on forever nitpicking back and forth.  I feel we are in a sandbox here with two people arguing on it.  It has nothing to do with the case right now.  If your request is that I confiscate the computer, I'm not going to do that at this time.  If you want to prosecute it, if you want to do anything in the future for violations of a protective order, do what you want to do.  But it's not part of this case at this time.

MS. PINKEL:  Your Honor, I would like it secured in defense counsel's possession.  You know, there have been

**UNITED STATES DISTRICT COURT**

threats --

THE COURT:  Do you have any objection to that, Counsel?

MR. GRUEL:  No.

THE COURT:  Okay.

MS. PINKEL:  There have been threats to a witness --

THE COURT:  He already said he would do it.

MS. PINKEL:  Thank you.

THE COURT:  Okay.

MR. GRUEL:  Thank you.

THE COURTROOM DEPUTY:  All rise.

(At 2:34 p.m. a brief recess was taken.)

(In the presence of the jury.)

THE COURT:  Let the record reflect all the members of the jury are in their respective seats in the jury box including the alternates.  The witness is on the witness stand.

You were on direct.  Counsel, you may continue.

MR. GRUEL:  Thank you, Your Honor.

BY MR. GRUEL:

Q     Mr. Broumand, we were wrapping up the sale of the boat.  Do you see it on -- you see these events depicted on this next page and the last page of Exhibit 212.  Do you see that?

A     Yes.

Q     Now, we were talking about running Edgar in

ACS -- Edgar Sargsyan in ACS.  12-7-2015, 3:21 p.m., do you see that also reflected in the purple section of this chart?

A       Yes.

Q       And did you do a Sentinel query of Colette Pelissier?

A       Yes.

Q       Why?

A       Edgar Sargsyan had told me about Colette and said that in addition to being in the adult industry and adult film industry, she also was a real estate agent that had multiple properties, wealthy properties or expensive properties in the Malibu area and that her Rolodex included wealthy individuals from the Middle East that I might be interested in.

Q       You got that information from Mr. Sargsyan?

A       Yes.

Q       Did you -- and you ran Miss Pelissier's name in Sentinel; is that right?

A       That's correct.

Q       Did you get any positive hits?

A       No.

Q       Did you get any hits whatsoever?

A       None.

Q       Did you do any type of memorialization within the FBI to basically say you found nothing?

A       There's no need to write something that -- write

**UNITED STATES DISTRICT COURT**

something that says you got nothing.

Q     And that routinely occurs within the national security section --

A     Sure did.

Q     -- as an agent?

A     Yes.  Yes, definitely.

Q     We also see the very next day Mr. -- Mr. Broumand, you queried the name Solakyan, Sam Solakyan twice on the 8th of December.  Do you see that?

A     I do.

Q     And why did you query -- did you query the name Solakyan?

A     I did.

Q     And Sam Solakyan.  Why?

A     I did.  I was told by Mr. Sargsyan that Sam Solakyan had a very large medical company down in San Diego and that he was contemplating selling medical products and equipment to the Iranians via Dubai.

Q     And would that be of interest to you as a security agent?

A     Very much.

Q     And when you ran Mr. Solakyan, did you get any hits?

A     No.

Q     Nothing came up?

UNITED STATES DISTRICT COURT

A        Nothing.  Well, I'm sorry.  Strike that.  Yes, I did get a hit.

Q        All right.  And what do you recall what you did with that information, if anything?

A        Well, what I remember seeing is a 302 that -- and that's a -- 302 is a memorialization of an agent notes.  And right beside -- or right after Mr. Solakyan's name in parentheses said "protect identity."  So that's a term used in the FBI.  And what that generally means is that individual, that Sam Solakyan that's followed by "protect identity," it means that whoever wrote that 302, whoever wrote that report was looking at Mr. Solakyan as a potential source.

Q        And what did you do, if anything, next?

A        Well, I didn't do anything with Mr. Solakyan, with the name Solakyan, because he was potentially being looked at by another office as a source.  So I didn't want to touch anyone else's source.

Q        Did you contact Jeff Horner?

A        I don't recall -- well, I didn't contact Jeff Horner, no.

Q        And did you see his name presented on the Sentinel database, if you recall?

A        I don't recall.

Q        All right.  Now, did you do any report or any type of memorialization of querying Mr. Solakyan's name in the

**UNITED STATES DISTRICT COURT**

Sentinel?

A     No, again, because he was a potential source.  So there's no need for me to highlight that there's a potential source.

Q     Now, did you -- going back to Miss Pelissier, did you run her name in Sentinel for Mr. Sargsyan?

A     No.

Q     Did Mr. Sargsyan give you anything to run the name Colette Pelissier?

A     Well, he gave me the information that she was a high-powered real estate agent that had wealthy Arab clients who were interested in buying Malibu properties.

Q     My question, I guess, was inaccurate.  What I meant was did he give you anything of value for you to run Miss Pelissier for him?

A     No.

Q     Did you get any cash from him, Mr. Sargsyan, to run the name Pelissier?

A     No.

Q     Did you get any -- were you comped in rooms or had things paid for you in exchange for running Miss Pelissier's name?

A     Nothing in exchange, no.

Q     Did you give him any -- Mr. Sargsyan any information about Miss Pelissier?

**UNITED STATES DISTRICT COURT**

A       No.

Q       How about with respect to Mr. Solakyan?  Did you do that inquiry for Mr. Sargsyan's benefit?

A       No.

Q       Did he pay you anything to run the name Sam Solakyan?

A       No.

Q       Did you ever tell him stay away from Sam Solakyan?

A       No.

Q       Did you ever say don't go near that guy, he's trouble?

A       No.  Because from what I remember seeing, he was a source, a potential source.

THE COURT:  The answer is no.

THE WITNESS:  No.

BY MR. GRUEL:

Q       The answer is no.  And did Mr. Sargsyan give you anything in -- of value in exchange for you running the name Sam Solakyan?

A       No.

Q       Now, the last event was something I was trying to ask before the break, and that was the sale of the boat with respect to the Sea Ray; is that right?

A       Yes.

UNITED STATES DISTRICT COURT

Q        Now, did you prepare a bill of sale to present to David Clark as part of selling your boat?

A        Yes.

Q        And did you prepare that bill of sale in a way that was inaccurate?

A        Yes.

Q        Well, what did you do?

A        Well, David had called and said something to the effect you didn't borrow that money, did you?  You sold the boat; right?  You sold the boat; right?

So I took that as you sold the boat.  So he said just -- you know, we need a bill of sale.  So I just -- he asked for it, and I go gave it to him.

Q        Did you know it was wrong to do that?

A        Yes.

Q        Why did you do it?

A        Well, he just wanted to -- he asked for it.  He wanted to close the deal.  So I just filled out the form and sent it.

Q        All right.  Was that a mistake?

A        Yes.

Q        And ultimately you sold that boat to a Tim Schoonover, I believe; is that right?

A        That's correct.

Q        And that was the gentleman that came in and paid

for cash on that boat -- or for that sale.  Do you recall that?

A       I do recall that, yes.

Q       And how much did he pay you in cash?

A       $5,500.

Q       And that was the paperwork we saw where -- the boat was actually transferred into his name; is that right?

A       That's correct.

Q       I want to direct your attention quickly to some of the things you talked about earlier.

Defense Exhibit 1047 on your -- in your binder.  Tell me when you've looked at it.

A       Oh, yes.

Q       Do you see what's contained within that Exhibit 1047?

A       I do.

Q       What is it?

A       It's my motorcycles.

Q       What do you mean by that?

A       At that point I had four motorcycles, and three of them are the ones we spoke of earlier that I sold.

Q       The three that you talked about that totaled $14,000?

A       That's correct.

MR. GRUEL:  Your Honor, I would move into evidence 1047.

THE COURT:  It will be received.

(Exhibit No. 1047 received into evidence.)

BY MR. GRUEL:

Q       You talked about a Mr. Liggens also purchased one of the motorcycles and actually gave you cash, 3,000 in cash; is that right?

A       That's correct.

Q       Look at page -- Exhibit 1048.  Do you recognize who is in that photograph?

A       Yes, that's Danny, Danny Liggens.

Q       Is that the motorcycle he bought?

A       It is.

MR. GRUEL:  I would move that into evidence, Your Honor.

THE COURT:  It will be received.

(Exhibit No. 1048 received into evidence.)

BY MR. GRUEL:

Q       I want to look at 1049, Exhibit 1049, and ask if you recognize that.

A       Yes, I do.

Q       What do you recognize it to be?

A       That is Edgar's handwriting on a scratch piece of paper while we were discussing his various businesses.

Q       When was this -- was this made in your presence?

A       Yes.  As we were discussing, he was drafting this

and explaining his various businesses.  And it was in early 2015.

Q       Was this when you were first beginning to work with him as a contact?

A       Yes.

Q       And why were you having him list his businesses?

A       Well, I was getting assurances from Henry Mosesi that Edgar was legitimate and all his money was from legal means because he had a lot of it.  And so I just wanted to just talk to him about it and see where was all his money coming from.  And so he outlined these several companies that he owned and properties and whatnot.  So I was comfortable with that.

Q       Did he mention on that day his company SPK Holdings?

A       Yes.

Q       Did he mention several Regulin companies?

A       Yes.

Q       Did he mention the Pillar Law office?

A       Yes.

Q       Did he say he had a car wash, by the way?

A       He had a car wash and a gas station.

Q       Now, what did you -- why are you in possession of these notes?

A       I kept them.  I just wanted to keep them to know that, you know, I had this discussion with him about it.

UNITED STATES DISTRICT COURT

Q        And --

A        And I wanted to follow up and verify that he actually owned these companies.

Q        Did you do that?

A        I did.

MR. GRUEL:  Your Honor, I would move 1049 into evidence.

THE COURT:  It will be received.

(Exhibit No. 1049 received into evidence.)

BY MR. GRUEL:

Q        I also want to direct your attention to 1050, several pages.

A        Yes.

Q        Prior to your testimony this afternoon, have had you a chance to look at 1050?

A        I did.

Q        And what is 1050?

A        1050 is my notes, the notes that I made while I was discussing with Mr. Sargsyan, our discussions.

Q        Where did you make these notes?

A        I made these at my office.

Q        And was Mr. Sargsyan in your office?

A        No, no, no, no.  When we would talk, he would call me.  He would call me at my desk.  And as I was talking with him, I would jot down notes.

**UNITED STATES DISTRICT COURT**

Q       Do you recall when you made these notes?  Was it early in the relationship?  Late in the -- ongoing?  What do you mean?

A       It was early, it started early, and it was kind of ongoing.

Q       Where did you keep this information?

A       At my office in my desk.

Q       And I see it's in a -- it was in an envelope marked Pillar.  Why does it say Pillar?

A       Well, because he worked at Pillar, and I had a professional relationship with Henry Mosesi as well.

Q       Were these documents, to your knowledge, seized by the government when they searched your desk?

A       Yes.  It was in my desk.

MS. PINKEL:  Objection.  Calls for speculation.

THE COURT:  Sustained.

MS. PINKEL:  Move to strike.

BY MR. GRUEL:

Q       Did you get --

THE COURT:  I'm sorry?

MS. PINKEL:  And move to strike.

THE COURT:  It will be stricken.

BY MR. GRUEL:

Q       Do these documents have Bates numbers on them?

A       They do.

**UNITED STATES DISTRICT COURT**

Q        Did you put that on?

A        No.

MR. GRUEL:  Now, Your Honor, I'm going to move 1050 into evidence.

MS. PINKEL:  Your Honor, hearsay.

THE COURT:  Sustained.

BY MR. GRUEL:

Q        Did you make notes as the normal course -- in the normal course of your business as an FBI agent?

A        Of course.

Q        And did you keep notes within the --  at the FBI as part of your ongoing investigation?

A        Sure.

Q        And these notes were something that were used by you in the process of doing your Sentinel checks; is that right?

A        That's correct.

Q        Were they also used with respect to background information on some of the names provided by Mr. Sargsyan to you?

A        Yes.

MR. GRUEL:  Your Honor, I offer 1050 into evidence.

MS. PINKEL:  Your Honor, same objection.  It's hearsay.  They are not official FBI --

THE COURT:  Sustained.  Sustained.

**UNITED STATES DISTRICT COURT**

BY MR. GRUEL:

Q      All right.  Well, let's -- do you have an independent recollection of the notes that you kept during that time period?

A      Yes.

Q      All right.  Let me ask, without looking at them, did you keep notes with respect to -- when you would get a call from Mr. Sargsyan, did you on occasion take notes?

A      I did.

Q      And did you keep those notes in your office?

A      I did.

Q      Did you take notes with respect to, for example, Levon Termendzhyan?

A      I did.

       MS. PINKEL:  Objection, Your Honor.  Leading.

       THE COURT:  Overruled.

BY MR. GRUEL:

Q      Why did you do that?

A      He was of interest to me.  I wanted to get as much information on him as possible.

Q      Do you recall if you kept notes regarding his business as being an oil individual?

A      Yes.

Q      An oil business?

A      Yes.

Q       Did you take notes with respect to him being involved in Turkey?

A       Yes.

MS. PINKEL:  Objection.  Leading, Your Honor.

THE COURT:  Sustained.

BY MR. GRUEL:

Q       What kind of notes, if you recall, were you keeping on Mr. Termendzhyan from the information provided by Edgar Sargsyan?

A       I kept notes about his companies, his addresses, his date of birth, the countries that he traveled to and had business with.

Q       Now, did you consider -- did you keep any notes with respect to someone named Bradley Stein?

MS. PINKEL:  Objection.  Leading.

THE WITNESS:  Yes.

THE COURT:  Overruled.

THE WITNESS:  Yes, I did.

BY MR. GRUEL:

Q       And who was Bradley Stein, if you recall?

A       Yeah, I do.  At that time he worked for Mr. Sargsyan as his driver/bodyguard.

Q       Did you have in your notes in your office the name Sam Solakyan?

A       I did.

**UNITED STATES DISTRICT COURT**

Q        And why?

A        It was one of the names that Edgar Sargsyan had given me about his activities in Iran.

Q        Did your notes include, if you recall, Colette Pelissier?

A        Yes.

Q        Why?

A        Again, he had given me information about the real estate dealings she may have with wealthy Arabs.

Q        Did you recall considering these people within your notes as something called a PCH -- PCHS?

A        Yes.

Q        And why did you consider them to be potential confidential human sources?

A        They appeared to have access to valuable information for the United States.

Q        What did you base that on?

A        It was initially based on the information that Edgar had given me, Mr. Sargsyan.  And then as I verified -- as I tried to verify the information, the only one that really stood out that seemed to be credible was Levon Termendzhyan and Bradley Stein.

Q        Do you remember in your notes also a name, I think I'm going to try to pronounce it the best I can -- Levon -- C-h -- Levon Chatikyan?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        And what does that name mean to you, if anything?

A        It was another name or another individual that Mr. Sargsyan had give me that potentially had access to valuable information that I could use.

Q        Now, also during this time period, Mr. Broumand, was it your practice if you received a call and you were at your desk and you received a call from Mr. Sargsyan, you would take notes as we've described?

A        Yes, I would.

Q        Did you ever write any notation from Mr. Sargsyan's calls on your calendar book?

A        Yes.  My calendar, I had the old-fashioned kind of a big calendar.  It's like 8 1/2 by 10 sheets of paper. It's big.  And that was just real easy to jot down notes as I was talking to somebody so I could reference the date.

Q        Prior to your testimony today, did you have an opportunity to look at your calendar book, certain pages of your calendar book, which were your recordings of your conversations with Mr. Sargsyan?

A        I did.

Q        You did?

A        I did.

Q        And same type of questions.  Do you recall writing information with respect to let's say Sam Solakyan or

UNITED STATES DISTRICT COURT

Termendzhyan on your calendar as you were talking with Mr. --

A        Yes.

Q        -- Sargsyan?

A        Yes.

Q        Why would you do that?

A        Well, it was just convenient.  The calendar was there.  It's a big sheet of paper.  And I could take down notes.  And I always kept my calendars in my office.  If I ever had to go back, I would know exactly the date of the information.

Q        And did that -- do you recall writing information down on your calendar about Baron Korkmaz?

A        Yes, I did.

Q        Now, this wasn't an official document, your calendar, right?

A        Yeah, it's just a calendar.

Q        And it wasn't an official document, your notepad.  That's not memorializing it officially with the FBI, is it?

A        No.

Q        Why did you do it that way?

A        Just out of convenience.  It's just take down -- jot down some notes.  And if the information ends up being -- if there ends up being more to that information based on some of the searches I've done, then I would take the initial step to do an actual document.

Q      Now, did you -- part of your discussions with Mr. Sargsyan, did he -- he mentioned to you Baron Korkmaz; is that right?

A      He did.

Q      And also Levon Termendzhyan; right?

A      That's correct.

Q      And did he tell you that he had actually -- that Edgar Sargsyan had actually gone to Turkey with Levon Termendzhyan?

A      I believe so.

Q      Did Mr. -- in your discussions and relationship with Mr. Sargsyan, did he ever show you some photographs that he had with respect to Baron Korkmaz and President Erdogan?

A      Yes.

Q      And when did that occur?

A      That was early on the -- he showed me some early on, like in January of '15.  And then he showed me some more in May of '16, 2016.

Q      Okay.  And how did he show you?  Were they on his phone?  Did he have still photos, if you recall?

A      It was on his own.

Q      And what did you do with these photographs, if anything?

A      I just verified the information he was giving me. Was another piece to verify the information.

UNITED STATES DISTRICT COURT

Q        And did he tell you how he obtained these photographs?

A        He did.

Q        What did he say?

A        Some he took personally.  And he told me that some he just received from Levon Termendzhyan.

Q        I draw your attention to Exhibit -- Government's Exhibit -- sorry, People's -- Defense Exhibit 1019 and ask you to take a look at that.

A        Yes.

Q        Do you recognize what's depicted in those -- in that exhibit?

A        I do.

Q        And what do you recognize it to be?

A        That's Baron Korkmaz with the Czech President Erdogan.

Q        Were these the photographs that were provided to you or shown to you by Mr. Sargsyan?

A        Yes.

Q        And were they all provided to you?

A        No.  I think he just -- he may have texted me one or two.  I don't remember.  But I remember seeing these on his phone.

        MR. GRUEL:  Your Honor, I would move 1019 into evidence.

UNITED STATES DISTRICT COURT

THE COURT:  It will be received.

(Exhibit No. 1019 received into evidence.)

MR. GRUEL:  May I publish?

THE COURT:  Yes.

BY MR. GRUEL:

Q      I'm going to show you the first photograph on 1019.  Do you know who is in that photograph?

A      Yes.

Q      Who is this individual?

A      That's Baron Korkmaz.

Q      And who is this, if you know?

A      That's the Turkish president, Erdogan.

Q      And this was a photograph shown to you by Edgar Sargsyan in January of 2015?

A      That's correct.

Q      Was it significant to you?

A      Yes.

Q      Why?

A      It validated the information he was giving me that Baron is meeting with a Turkish president.  And it looks like they are in deep discussion about some contract or something or some discussion of some sort.

Q      Do you see who is -- now the second photograph in People -- Defense 1019, do you recognize who is in that particular photograph?

A       Yes.

Q       And who do you recognize?

A       Again I recognize the Turkish president, and then next to him -- yeah, that one is Baron Korkmaz.

Q       Do you know who that is?

A       That's one of the Kingston brothers from Utah.

Q       Okay.  And this gentleman?

A       I have no idea who that is.

Q       The third photograph, it's a little dark.  Do you recognize anyone in that photograph?

A       Yes.

Q       Who?

A       The -- you'll see a female with the -- with a head covering.

Q       Here (indicating)?

A       Yes.  I believe that's Erdogan's significant other.  And that's Erdogan standing next to her looking down.

Q       Here (indicating)?

A       Yes.  Yeah.  And then right there, that's Levon Termendzhyan.

Q       Then finally do you know who is in this photograph?

A       Yes.

Q       Is that President Erdogan?

A       That's President Erdogan, and that's Levon

Termendzhyan.

Q    I see.  I know we are talking back to 2015.  In your mind, as a security -- national security agent, was this -- these photographs of significance to you in your work?

A    Yes, definitely.

Q    Why?

A    Again, it goes to show the credibility of the information.  It kind of validates the information and the hunch that I had of what was going on.

Q    Now I'm moving on to 2016.  Back to the government's chart.  Do you recall being in Las Vegas on 1-20-2016?

A    Yes.

Q    And what was the reason that you were in Las Vegas at that time?

A    It was -- again, it was another guy's trip to Vegas.  They hadn't told me it was the porn convention.

Q    Well, let's unpack that.  Who did you go with, if you recall?

A    I went with Sargsyan, Edgar Sargsyan, Henry Mosesi, Art Kalantar, and there was like 20 people, 24 people on the planes.

Q    Who jets?

A    Two jets.

Q    All right.  And this was a trip to the AVN

convention; is that right?

A       Yes.

Q       What do you mean you didn't know about it?

A       They didn't tell me.  They thought it would be a nice surprise.

Q       All right.  And so you went there, right, and stayed for the weekend; is that right?

A       That's correct.

Q       And was that all paid for by -- did Mr. Sargsyan cover everyone's room and food during that time, if you recall?

A       Yes.

Q       And did you stay for the weekend with him at that -- for that trip; right?

A       That's correct.

Q       Was Colette Pelissier on that trip?

A       Yes.

Q       And was that the first time you ever met her?

A       Correct.

Q       And did you talk with her at all during that particular trip with respect to trying to gather some intelligence?

A       No.  They -- no.

Q       All right.  So it was just a social trip?

A       That's correct.

Q       All right.  Did you do anything to protect

Edgar Sargsyan from law enforcement in exchange for going on that trip to the AVN convention with all those other people?

A      No.

Q      Was Felix Cisneros on that trip?

A      I don't recall him being on the trip.  But from the photos, I see that he -- that he was.

Q      Yeah.  Because it was over six years ago.

A      Right.

Q      But you recall that he was -- the photo refreshes your memory --

A      The photos, yes.

Q      And was John Balian on that trip?

A      Yes.  From the photos, again, I remember that he was, yes.

Q      All right.  Did you have any type of corrupt relationship with Felix Cisneros to assist Mr. Sargsyan?

A      Not at all.

Q      Did you have any type of corrupt relationship with John Balian to assist Edgar Sargsyan in avoiding law detection?

A      Not at all.

Q      How about we've heard -- you never texted Felix Cisneros, have you?

A      No.

Q      Have you ever telephoned Felix Cisneros to your

knowledge?

A       No.  I don't have his number.

Q       How about with respect to John Balian?  Did you ever text him?

A       No.

Q       Did you ever call him?

A       I did call him one time.

Q       Why was that?

A       Edgar had texted me and gave me Balian's information and said that his dad had just passed.  So at that point, I had talked to him before.  So I called and gave him my condolences.

Q       That was the only time you ever talked to John Balian?

A       Over the phone.

Q       Yes.

A       Yes.

Q       All right.  Because we did see that you were at the Grand Havana Room with him; right?

A       Right.

Q       And with a lot of other people; is that right?

A       That's correct, yep.

Q       And at the area -- I guess you sat across from him in the dining room at least in one photograph.  Do you remember that?

**UNITED STATES DISTRICT COURT**

A       I remember seeing the photograph, yes.

Q       Right.  Did you have any personal relationship with John Balian?

A       It wasn't until after his father's death that we would -- I got to know him a little bit better.  But no, I never had any contact.

Q       All right.  And how about did you have any personal relationship with Felix Cisneros?

A       No.

Q       Did you also know Anthony Williams by chance as being part of Mr. Sargsyan's entourage?

A       Yes.  He was another individual.

Q       I think there was some talk about a boxing match that took place in Las Vegas.  Did you participate -- did you go along on that trip?

A       I did not.

Q       Do you know who went along -- who went to that trip for a boxing match in Las Vegas at the -- as guests of Edgar Sargsyan?

A       From the photographs I know, yes.

Q       And what do you recall?

A       It was Henry Mosesi, Art Kalantar, Felix Cisneros, John Balian, obviously Edgar Sargsyan, Anthony Williams, and maybe one or two people that I don't know who they are.

**UNITED STATES DISTRICT COURT**

Q        Okay.  Moving right along.  While we are on the next page of this exhibit, do you recall having a conversation with Jim Keenaghan on 1-28-2016?

A        Jim -- yes, yeah.

Q        Do you recall what that was about?

A        Yes.

Q        Well, what was it about?

A        At that time I was talking to Jim about having a notable surveillance on --

Q        All right.  Let's go back.

A        Okay.

Q        Back to Las Vegas --

A        Right.

Q        -- AVN convention.

A        Right.

Q        The guests included Ryan Lawrence and Mr. Keenaghan.  Do you recall that?

A        Yes.  There were about 40, 45 people there.  But yes, I remember those two.

Q        Are do you recall that they -- that they were Beverly Hills police officers; correct?

A        That's correct.

Q        And were they working as security for Mr. Sargsyan during that weekend?

A        Yes.

Q        Had you met them before -- had you met either of them -- or let's -- one at a time.  Had you met Mr. Keenaghan before this trip?

A        No.

Q        Had you met Ryan Lawrence before this trip?

A        No.

Q        Okay.  And was there a time after the trip that you had a conversation with Mr. Keenaghan?

A        Yes.

Q        Had Edgar Sargsyan introduced you to these two gentlemen while in Las Vegas?

A        Yes.  If I could go back, I think -- was the Grand Havana party after AVN?  I'm all confused now.

        THE COURT:  Next question, Counsel.

BY MR. GRUEL:

Q        All right.  Once you got back to -- let's see here.  Let's go to 2-10 on -- February 10th -- well, I'm sorry. I'm missing something.  On 1-28-2016, $5,500 are deposited in a Chase account of Love Bugs.  Do you see that?

A        Yes.

Q        Did that cash come from Edgar Sargsyan?

A        No.

Q        Do you recall where that cash came from?

A        I believe that was the sale of the boat.

Q        The boat sold to Mr. Schoonover?

A      I think so.

Q      What?

A      I think so.

Q      All right.  Is that your memory?

A      I think so.

Q      All right.  But not from Mr. Sargsyan?

A      No, no, no, no.

Q      Let's move on then to 2-10-2016, you are receiving outgoing texts back and forth with Mr. Sargsyan regarding an Andrei Mel -- M-e-l-k-o-u-m-o-v, December 22, 1962.  Do you see that?

A      I do.

Q      And do you recall getting that text?

A      Yes.

Q      From Mr. Sargsyan?

A      Yes.

Q      What do you recall about it?

A      He sent me that name and had said that Mr. Melkoumov was a wealthy Russian with connections in Russia.

Q      And did you respond "Got it"?

A      Yes.

Q      And what did you do with that information from Mr. Sargsyan, if anything?

A      I decided to run it through Sentinel to see if there was -- if I could find anything on Andre's Russian

connections.

Q        You could not find anything.

A        No.

Q        Did you do any type of report afterwards regarding this individual?

A        No.

Q        Did you do -- did you run this individual as a -- as a favor or an exchange for something of value from Mr. Sargsyan?

A        No.

Q        Was this information he was providing to you as a contact throughout your relationship with him?

A        Yes.

Q        Now, we see that on 2-11, several times, at 8:34, 8:35, querying the name of Andrei Melkoumov.  Do you see that?

A        I do.

Q        All right.  We also see that you are visiting your parents on 2-22-2016; is that right?

A        That's correct.

Q        And this was during the time period your father was ill; is that right?

A        That's correct.

Q        And were you also having conversations with Mr. Sargsyan also there on February 23rd with respect to calls and texts?

UNITED STATES DISTRICT COURT

A      That's correct, yes.

Q      And did you ultimately meet up with Mr. Sargsyan?

A      I did.

Q      All right.  Can you tell us -- well, let me ask a couple of questions here.

This is mid -- well, mid -- February 23, 24th of 2016.  And there's a lot of activity going on reflected in these charts.  Were you reaching out to James Keenaghan?

A      Yes.

Q      Were you talking with James Keenaghan?

A      I was.

Q      And was this about putting together a surveillance team of Mr. Sargsyan's security who happened -- well, at least one person, Mr. Keenaghan, to follow Levon Termendzhyan?

A      Yes.

Q      And why were you doing this?

A      I know it's a little unorthodox.  But in the intelligence world, you know, there's really two ways of gathering information.  It's either what we call the carrot or the stick.  So you try a nice approach.  And if the target isn't forthcoming, you twist his arm.  And what my plan was with this was to get surveillance on him and make it obvious.

So -- and when he would approach -- because I knew he did that all the time, him or his security would

approach the surveillance, they would show local badges, Beverly Hills Police Department.  And I was hoping -- it was a long shot, but I was hoping that that might trigger him to remember me or at least reach out to Edgar and that Edgar would then say talk to Babak, the FBI will -- can protect you type of thing.  So, in essence, forcing his hand to come to me to cooperate, that was the genesis of the idea.

Q      Did you ever explain this to Mr. Sargsyan?

A      Oh, yeah.

Q      Yes?

A      Yes.

Q      Why would you give him such detail?

A      Because I wanted his cooperation.  I even told Jim what my plan was.

Q      And this came on the heels of your earlier and only meeting with Mr. Termendzhyan where he flat out didn't like you?

A      Right.  So the carrot approach didn't work.  So I thought let's try the stick.

Q      Why were you accepting -- or did you accept any money from Mr. Sargsyan to do this?

A      Well, I didn't accept money from him.

Q      All right.  Well, did he offer to pay?

A      No, no, no, no, huh-uh.

Q      What happened with respect to that?

**UNITED STATES DISTRICT COURT**

A       With respect to what?

Q       Well, was any money provided to Jim Keenaghan to get equipment?

A       Yes.

Q       Okay.  And who provided that, if you recall?

A       I did.

Q       You paid that?

A       I did.

Q       And did you tell him it came from Edgar Sargsyan?

A       No.  I didn't tell anybody that it came from Edgar.

Q       Now, you are doing this -- this operation in -- this off-the-books operation; is that right?

A       Right.  Right.

Q       Down in Los Angeles; am I right?

A       That's correct.

Q       Why were you doing this unorthodox approach that you've described for us?

A       Well, several reasons.

Q       Give us one.

A       Well, LA doesn't like me.  And back in 2012 --

THE COURT:  Well, you answered the question.

Next question.

BY MR. GRUEL:

Q       Okay.  You said Los Angles doesn't like you.

**UNITED STATES DISTRICT COURT**

What does that mean?

A        It means FBI Los Angeles doesn't like me working in their territory.

Q        And -- well, are there rules, are there not, with respect to the FBI having -- working in areas of responsibility?

A        There are.

Q        And your area of responsibility is not Los Angeles, is it?

A        No, it's not.

Q        And it's, in fact, up in San Francisco?

A        That's correct.

Q        So with that in mind, Mr. Broumand, what are you doing down there putting together this stick approach on Levon Termendzhyan?

A        Well, again, if you take the circumstances at that time, ISIS was getting more and more powerful --

MS. PINKEL:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

BY MR. GRUEL:

Q        What were you -- why did you do it?

A        Because when I had talked to the case agent, Kusin, he had no interest in Levon Termendzhyan.

Q        During this time period, Mr. Sargsyan was not a documented source?

**UNITED STATES DISTRICT COURT**

A        No.

Q        He never was; right?

A        No.

Q        Did you let Jon Kelly know, your supervisor, you were doing this unorthodox operation in Los Angeles?

A        I did not.

Q        Why?

A        It was risky.  It was unorthodox.  I ended up not doing it but --

Q        I understand.  One question at a time.

A        Okay.

Q        I'm trying to figure out why you wouldn't tell anybody about this particular operation.  Was it something novel to you?

A        Novel in which way?

Q        Well, did you often run unorthodox operations to get results?

A        I did.

Q        And why would you do that?

A        Because I got results.  And it was always easier to ask for forgiveness than permission.

Q        I see.  Well, ultimately you didn't go forward with this off-the-books unorthodox operation; is that right?

A        That's correct.

Q        And why not?

UNITED STATES DISTRICT COURT

A        They wanted too much money.

Q        The --

A        The surveillance team.

Q        That being Mr. Keenaghan?

A        Correct.

Q        And Mr. Star -- or the Star -- the private detective with Star?

A        That's correct.

Q        But Edgar Sargsyan gave you nothing with respect to this --

A        No, no.

Q        -- is that right?

A        That's true.

Q        So it's untrue if he says he gave you money?

A        Exactly.

Q        Why would you tell Edgar Sargsyan then at the bottom "Jim flaked.  Says he'll come tomorrow morning"?  Did you tell Sargsyan that this operation wasn't going to take place?

A        Yeah.  I think I -- that text doesn't refer -- I'm not referring to the operation not taking place.

Q        What was it that you were referring to there?

A        I was supposed to have a meeting with Jim that day, and he flaked.  And I was hoping that Edgar would put pressure on Jim to make the meeting.

Q       Do you know if Mr. Sargsyan had his own motivations to have Levon Termendzhyan followed?

A       Maybe.

Q       Do you know Levon Termendzhyan accused Mr. Sargsyan of stealing money from SPK?

MS. PINKEL:  Objection.  Calls for speculation, lack of foundation.

THE COURT:  Sustained.

BY MR. GRUEL:

Q       Do you know if a lawsuit was filed by Mr. Termendzhyan against Mr. Sargsyan?

MS. PINKEL:  Same objections, Your Honor.

THE COURT:  Sustained.

BY MR. GRUEL:

Q       Have you ever seen a lawsuit from Mr. Sargsyan -- Mr. Termendzhyan suing Mr. Sargsyan?

MS. PINKEL:  Your Honor, this time I'll also add relevance.

THE COURT:  I'm sorry?

MS. PINKEL:  Adding a relevancy objection.

THE COURT:  Relevancy, is that --

MS. PINKEL:  Yes.

THE COURT:  Sustained.

BY MR. GRUEL:

Q       Did Levon -- Edgar Sargsyan ever tell you he had

any security concerns about being followed by Levon Termendzhyan?

A    No.

Q    Never mentioned that?

A    Nope.

Q    Okay.  The next page I think just covers testimony we talked about with respect to trying to set up this unorthodox surveillance.

All right.  We'll -- after the surveillance never happened, you came back to the Bay area; is that right?

A    That's correct.

Q    And you -- at some time you had left an FBI placard with Mr. Sargsyan; is that right?

A    That's correct.

Q    Did you tape your name and business card on the back?

A    No.

Q    Why did you give that placard -- or did you give that placard to Mr. Sargsyan?

A    I did.  It was a mistake.  I did.

Q    Why did you do that?

A    It was a stupid joke.

Q    Well, it was a piece of official government property; was it not?

A    I understand.

Q        Yes?

A        Yes, yes.

Q        It was -- it had a purpose with the FBI, is that right, for parking?

A        For parking.

Q        For parking in illegal spots in order to conduct business; is that right?

A        That's correct.

Q        Yet you say it was a gag or a joke; is that right?

A        That's correct.

Q        Why did you consider it such?

A        Well, I didn't intend him to use it for parking. We had -- he had casually mentioned it.  And one day while I was rummaging through my desk, I saw an extra one.  And that conversation popped in my mind.  And it was dumb.  I thought give it to him.  He can maybe display it in his office or something.

Q        Had you given a similar kind of gag gift to Art Kalantar?

A        Yes.  Not a parking placard, but it's a little FBI badge and credential that you buy from the gift shop.

Q        It says Junior GI?

A        Junior GI, yeah.

Q        Something like that.  Did you do that similar to

UNITED STATES DISTRICT COURT

Mr. Sargsyan's children?

A      Yes.

Q      You gave them some gifts?

A      I did, same thing for his children.

Q      All right.  Did you give that placard to Mr. Sargsyan in exchange for anything of value?

A      No.

Q      Did you give that placard to Mr. Sargsyan to protect him from law enforcement?

A      No.

Q      Did you give that placard to help shield him from law enforcement?

A      No.

Q      It was a joke?

A      Right.

Q      Was that a mistake?

A      It was a mistake, yes.

Q      I see -- now, apparently you had some conversations when Mr. -- Mr. Sargsyan got pulled over.  Do you recall -- with the placard.  Do you recall receiving a call from him or a text about that event?

A      Yes.

Q      What do you recall about it?

A      He said that he -- he got pulled over, and it just fell out of his glove box.

**UNITED STATES DISTRICT COURT**

Q      And anything else did he say with respect -- did he say the Burbank Police was asking questions about it?

A      Yes.

Q      And did you tell him to do anything with respect to the placard?

A      No.

Q      Did you get in trouble for that placard?

A      Oh, yeah.  Yes.

Q      Did it have extreme ramifications within the FBI for you?

A      For me, it did, yes.

Q      Was there an administrative investigation opened about this event?

A      That's what I was told.

Q      Were you reprimanded by Jon Kelly with respect to this, your supervisor?

A      Yes.

Q      Did it cause you internal problems within the FBI because of this mistake?

A      Yes.  I was prevented from going to Italy on a case.

Q      What's that?

A      They prevented me from going to Italy on a case.

Q      Oh, Italy.  I see.

A      Yeah.

Q        Were you also now -- by the way, I think Mr. Kelly -- you were prohibited -- was this when you were prohibited to go to Los Angeles on official business; is that right?

A        That's correct.

Q        Was it after this event?

A        Oh, no, that was in 2012.

Q        I see.  So except for the time when you went down to see Mr. Kusin on January 30th, 2015, you were not supposed to be on official business in Los Angeles at all?

A        Without prior approval, yes.

Q        And could you go down there nonetheless for vacation?

A        Sure.

Q        Or for personal reasons?

A        Yes.  I had family there.

Q        Okay.  There was $8,000 deposited into the account of Love Bugs in cash on February 29, 2016.  Do you see that?

A        I do.

Q        Did that money, that cash come from Edgar Sargsyan?

A        No.

Q        Where did it come from?

A        Love Bugs.

**UNITED STATES DISTRICT COURT**

Q       And --

A       My cash hoard, my cash drawer, my cash reserves.

Q       All right.  Cash reserves, what is that?

A       Well, again, I would get a lot of checks, and I would cash them and keep them in my desk.

Q       All right.  And why would you do that?

A       Well, initially started out to help pay for my undercover credit cards because the government didn't reimburse me fast enough.  So I learned this method from another intelligence agency I used to work with that they always had lots of cash reserves in their desks.  And at the end of the month, they would just take those receipts and, you know, get their money back.  So I started doing that.  And as things progressed, just the cash started building up in my desk.

Q       Where would you -- was this a locked desk?

A       Yes.

Q       Did you keep other valuables in this locked desk?

A       Yes.

Q       Like what?

A       My undercover IDs and my watches.

Q       And we saw photographs of your watches.  How many did you have?

A       I don't know.  Ten maybe.

Q       And what was the rough value of all those watches?

**UNITED STATES DISTRICT COURT**

A       Well, with the gold Rolex -- the two most valuable were the gold Rolex and a stainless steel Rolex.  The rest were really not that much value.  But to answer your question, maybe 25, 30,000 maybe.

Q       Of watches?

A       Of watches.

Q       There seems to be more cash activity in 2015 -- cash deposit activity in 2015 and then again in 2016.  Do you recall the slides showing that?

A       Yes.

Q       Was there anything going on in 2015 that caused you to create more of a cash reserve?

A       I was buying the -- my house.

Q       Okay.  Let's break that down.  In 2015 what house were you buying?

A       In 2015 I was buying the second purchase in Lake Tahoe.  I was buying that.

Q       And that included -- I think you talked about selling other properties; is that right?

A       Right.

Q       In 2016 what were you purchasing?

A       In 2016, after my father passed away, we had to bring my mom up.  So we were buying a new place in Lafayette. I was moving.

Q       All right.  And the cash deposits we've been

UNITED STATES DISTRICT COURT

talking about came from Love Bugs; is that right?

A        That's correct.

Q        On 3-1-2016 -- oh, I'm sorry.  Forget that.

All right.  On 3-3-2016, did you text Mr. Sargsyan that you were in trouble?

A        I did.

Q        What did you mean by that?

A        Well, that the placard got me in trouble.

Q        And did he ever, by the way, say something to the effect of send me a copy of your paycheck?  Did you actually send a copy of your paycheck to him?

A        No.

Q        In fact, you responded at 1:53 with a "ha ha ha." Was that a joke again between the two of you?

A        Yeah, it was a dumb joke.

Q        Did Mr. Sargsyan apologize to you because of using that placard?

A        He did.  He felt really stupid.

Q        All right.  Now let's move on to the other cashier's check -- or the actual check from Arca.  What kind of business was your father in?

A        He was in the men's clothing business.

Q        What was the name of that business?

A        It's called Piero Men's Boutique.

Q        And where was it located?

A       At that time it was located in Lake Elsinore, like Riverside County area.

Q       I see.  And in 2016, early -- well, did your father get sick?

A       Yes.

Q       When was that?

A       His cancer came back in early '16.

Q       All right.  Was there a turn then about his not being able to operate the business any longer?

A       Yes.  In late '15, early '16, we were just -- he was just barely there.  The store was practically closed.

Q       Did your mom work at that boutique as well?

A       She did.  Like the last five, six years of his life, she helped him tremendously.

Q       And did you have other employees there?

A       There was one --

THE COURT:  The question was did you have other employees.

THE WITNESS:  Thank you, Your Honor.  Off and on.

BY MR. GRUEL:

Q       Off and on.  All right.

Did there come a time when you had to make the decision to begin to close your father's clothing store?

A       Yes.

Q       And were you interested in -- so there was -- how

UNITED STATES DISTRICT COURT

big was the store, if you recall?

A    It was a rather large store.  It was about 2,000 square feet, 2,500 square feet.

Q    And you were -- were you -- did you take a role in trying to sell the inventory?

A    I did.

Q    And how did you -- how did you -- what did you do to try to sell the inventory?

A    There was one individual who was a former client of my dad who actually had moved to Las Vegas who had a clothing store.  That didn't pan out.  My mom had tried various ways.  That didn't pan out.  I thought about trying to sell it online on eBay or something.  That just didn't seem reasonable with 350 suits.

So I talked to Mr. Sargsyan if he had any contacts within the community that had a clothing store that would be interested in buying the clothes.

Q    Okay.  And do you see what's on the -- for 2016 dated March 6, 2016, do you see that text message at 4:44?

A    Yes.

Q    Who sent that?

A    I sent that to Mr. Sargsyan.

Q    Why?

A    Well, he said that he might have some people, and he had one individual in mind and if I would send him the list

UNITED STATES DISTRICT COURT

of what we had.  So I tried to give as detailed as -- well, just -- not too detailed but just send him a list of potentially what was there.

Q        Did he tell you he had a potential buyer?

A        He did.

Q        And was that of interest to you?

A        Yeah, it was -- I thought it was a godsend that had he found somebody who was going to buy my dad's stuff and we would be relieved of that extra pressure.

Q        Did you have any idea what Mr. Sargsyan was going to do with the merchandise if, indeed, it was purchased?

A        He was just brokering the meeting.  He was going to broker the buyer.  And they were going to pick it up and pay for the merchandise.

Q        Okay.  And did that transaction actually take place?  Was the merchandise -- he found a buyer; is that right?

A        He found a buyer, yes.

Q        And the merchandise was boxed; was it not?

A        It was, yes.

Q        And picked up by the buyer; is that right?

A        Yes.

Q        Were you participating in the actual boxing of the merchandise?

A        No.

Q        Do you know how much the merchandise went for?

A       30,000.

Q       And who negotiated that price?

A       I did.

Q       With who?

A       I told Mr. Sargsyan that my father would like to get 50,000 for it.  But, you know, at this point he was pretty much bedridden.  So I just wanted it gone.  So I told Sargsyan that it's -- that's what he's asking, but I think 30 would be, you know, a nice price just to tempt a potential buyer to buy it and we could just be done with it.

Q       Sure.  Did you -- now, did you do -- did you provide any type of law enforcement shield or protection from law enforcement for Mr. Sargsyan in exchange for him brokering that deal?

A       No, not at all.

Q       Did he do that deal as a broker or find that buyer in exchange for anything from you?

A       No.

Q       Was a check actually drafted in exchange for the inventory?

A       Yes.

Q       Was that the check from Arca?

A       From the discovery, I know that it's from Arca. I didn't know at the time who it was from.

Q       Well, was it -- was it ever actually handed to

**UNITED STATES DISTRICT COURT**

you?  Were you involved in the actual picking up of the check, that type of thing?

A      Yes.  I went to -- again, to the Grand Havana. It was in an envelope.  I opened it up, saw the dollar amount, that's all I really cared for, and saw my mom's name and that was it.

Q      So the check was made payable to your mom?

A      Yes.

Q      Why wasn't it made payable to the clothing store?

A      She just wanted to deposit into her account so she can pay the bills.

Q      Was the buyer at the Grand Havana Room?

A      No.

Q      All right.  Anyone else with you and Mr. Sargsyan when he handed you the envelope?

A      Yes.

Q      Who was that?

A      There was Henry Mosesi, Mara Teigen and her girlfriends.  Art Kalantar I believe was there and a couple bodyguards.

Q      Okay.  I see also on this chart two more cash deposits on March 8, 2016, and March 17th of 2016.

A      Yes.

Q      The first was $5,000 into the Chase account.  Do you see that?

A       I do.

Q       And the second was $4,000 in the Chase account. Do you see that?

A       Yes.

Q       Did either of those -- were the source of those -- either of those cash deposits from Edgar Sargsyan?

A       No.

Q       Where did this money come from, if you recall?

A       It's the sales of -- from Love Bugs, cash or checks that were cashed.

Q       And why were you depositing them at that time? Was there a purpose for those deposits?

A       Yes.  I was getting ready for taxes, to pay taxes.

Q       Okay.  Now, by the way, the check was apparently backdated of -- in December of -- this transaction happened in March of 2016; right?

A       Yes.

Q       Do you have any idea why it was backdated?

A       It was for tax purposes.

Q       How do you know that?

A       My mom called from the bank in a panic saying that the check is, you know, three months old.  And she put me in touch with the banker.  And the bank teller said it's fine. And then I reached out to Edgar and said hey, I didn't know the

**UNITED STATES DISTRICT COURT**

check was, you know, three months old.  What gives?  And he said, oh, oh, just the buyer did it for tax purposes so he can write it off the previous year.

Q       Do you see here on this next exhibit at 3 -- on 3-19-2016, is this when Mr. Sargsyan is saying someone is coming with the check?

A       Yes.

Q       And Mr. Sargsyan at 3-19 on 3-19 at 1:34 is asking who to make the check out to; is that right?

A       That's correct.

Q       And do you -- you provide your mother's name to him; is that right?

A       I did, yes.

Q       Of course, we see that on March 21, 2016, the check from Arca Capital is deposited at your mother's bank; is that right?

A       That's correct.

Q       Okay.  Now, during this time period, your father passed away; correct?

A       Correct.

Q       And were you in charge of the costs that are associated with a family member passing away?

A       Yes.

Q       And were you not only in charge -- were you in charge of the arrangements?

A        I was.

Q        Were you also in charge of the expenses associated with your father's passing?

A        I was.

Q        What did those responsibilities include?

A        They included making funeral arrangements, the burial plot, the mortuary, setting up for a life remembrance.

Q        Did you have -- what do you mean by life remembrance?

A        Just a little party for my dad.

Q        How about the lunches that were associated with --

A        Yes, lunches, and we had one ceremony down in Southern California and one ceremony up in Northern California.

Q        How about with respect to any air travel or rental cars?

A        Yes.

        MS. PINKEL:  Objection, Your Honor.  Relevance.

        THE COURT:  Sustained, Counsel.

BY MR. GRUEL:

Q        Well, your expenses that you paid -- was it your understanding that your mother was going to reimburse you for the expenses you incurred with respect to your father's funeral arrangements?

        MS. PINKEL:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

BY MR. GRUEL:

Q      Did you put -- all right.  Well, what did the costs come to that you had to incur for your father's funeral arrangements?

MS. PINKEL:  Objection.  Relevance.

THE COURT:  Sustained.

Counsel, it's 4:00 at this time.  So we are going to break for the evening recess.

Ladies and gentlemen, I apologize to you.  This really has been dragging on.  And I think that we should be able to get this to you by hopefully tomorrow morning on it.  Hopefully it will speed up a little bit on it.  But don't think about this case during the break.

Remember the admonishment not to discuss the case among yourselves or with anybody else or form or express any opinions about the matter until it's submitted to you and you retire to the jury room.  We'll see you back here tomorrow morning at 8:30.  We'll take up right at 8:30 and start at that time.

We will be in recess.

THE COURTROOM DEPUTY:  All rise.

(At 4:00 p.m. the proceedings adjourned.)

UNITED STATES DISTRICT COURT

**CERTIFICATE OF OFFICIAL REPORTER**

I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  20TH  DAY OF JANUARY, 2023.

/S/ MAREA WOOLRICH

MAREA WOOLRICH, CSR NO. 12698, CCRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**

## $

**$10,000** [1] - 64:21
**$13,000** [1] - 58:2
**$14,000** [6] - 37:17, 41:5, 42:9, 42:13, 42:23, 79:22
**$3,000** [3] - 40:8, 41:12, 42:12
**$30,000** [5] - 54:9, 56:16, 57:15, 64:12, 64:22
**$35,000** [2] - 58:4, 65:13
**$4,000** [1] - 123:2
**$4,100** [1] - 39:10
**$40,000** [1] - 66:6
**$5,000** [2] - 35:18, 122:24
**$5,500** [2] - 79:4, 100:18
**$7,000** [1] - 39:24
**$70,000** [1] - 66:3
**$8,000** [1] - 114:17

## '

**'15** [3] - 10:22, 90:17, 118:10
**'16** [3] - 90:18, 118:7, 118:10

## 1

**1-20-2016** [1] - 94:12
**1-26-2015** [1] - 27:21
**1-28-2016** [2] - 99:3, 100:18
**1/2** [1] - 88:14
**10** [3] - 29:5, 58:19, 88:14
**10-14-2015** [1] - 61:15
**10-21** [3] - 63:7, 65:3, 65:21
**10-3-2015** [1] - 57:19
**10-7-2015** [1] - 58:3
**1018** [1] - 7:25
**1019** [6] - 3:16, 91:8, 91:24, 92:2, 92:7, 92:24
**1041** [3] - 62:20, 62:22, 63:13
**1042** [5] - 3:16, 20:10, 20:12, 23:8, 27:12
**1047** [5] - 3:17, 79:10, 79:14, 79:25, 80:2
**1048** [3] - 3:17, 80:8, 80:16
**1049** [5] - 3:18, 80:18, 82:6, 82:9

**1050** [6] - 82:11, 82:15, 82:17, 82:18, 84:3, 84:22
**1062** [8] - 3:18, 38:19, 38:23, 39:1, 40:20, 40:21, 40:25, 41:3
**1064** [2] - 40:19, 40:20
**10th** [2] - 2:11, 100:17
**11** [1] - 42:11
**1128** [1] - 58:4
**11:04** [1] - 19:24
**12-7-2015** [1] - 73:1
**125** [1] - 49:4
**1299S** [1] - 44:25
**136** [1] - 66:19
**14** [3] - 44:7, 44:8, 59:3
**14,000** [2] - 42:21, 45:11
**15** [4] - 29:5, 29:11, 57:14, 68:16
**150** [1] - 5:12
**159** [1] - 59:7
**15th** [2] - 19:17, 19:24
**16** [1] - 57:15
**17** [1] - 35:18
**17,000** [1] - 66:13
**17th** [1] - 122:22
**1962** [1] - 101:11
**1975** [1] - 37:25
**1978** [1] - 38:1
**1:02** [1] - 4:2
**1:34** [1] - 124:8
**1:53** [1] - 117:13
**1st** [3] - 18:8, 31:12, 34:4

## 2

**2,000** [1] - 119:3
**2,500** [1] - 119:3
**2-10** [1] - 100:17
**2-10-2016** [1] - 101:8
**2-11** [1] - 102:14
**2-17-2015** [1] - 36:13
**2-22-2016** [1] - 102:18
**20** [2] - 59:3, 94:21
**20-minute** [1] - 29:11
**200** [1] - 66:2
**2006** [1] - 37:25
**2012** [3] - 10:13, 105:21, 114:7
**2014** [5] - 5:23, 6:10, 6:18, 8:4, 10:25
**2015** [36] - 10:22, 12:23, 18:8, 18:22, 27:8, 35:18, 36:23, 37:1, 37:4, 37:7, 37:15, 38:3, 38:16, 39:5, 41:8, 42:24,

47:21, 48:11, 48:21, 49:9, 51:17, 53:16, 57:15, 58:19, 59:4, 62:11, 66:18, 81:2, 92:14, 94:2, 114:9, 116:7, 116:8, 116:11, 116:14, 116:16
**2016** [14] - 90:18, 94:10, 103:7, 114:18, 116:8, 116:21, 116:22, 118:3, 119:18, 119:19, 122:22, 123:17, 124:14
**2018** [1] - 36:24
**2019** [1] - 46:12
**2022** [2] - 3:2, 4:1
**21** [2] - 47:21, 124:14
**212** [6] - 12:21, 14:2, 18:21, 35:17, 62:11, 72:22
**21st** [1] - 68:1
**22** [1] - 101:10
**23** [2] - 3:16, 103:6
**236** [1] - 36:14
**23rd** [1] - 102:24
**24** [1] - 94:22
**24th** [1] - 103:6
**25** [1] - 116:4
**27** [3] - 42:24, 48:11, 48:21
**27th** [1] - 49:9
**28** [4] - 3:2, 4:1, 37:4, 37:15
**28th** [3] - 37:7, 37:22, 38:3
**29** [1] - 114:18
**29th** [2] - 28:5, 52:25
**2:00** [1] - 59:8
**2:30** [1] - 68:14
**2:34** [1] - 72:12

## 3

**3** [1] - 124:4
**3,000** [1] - 80:5
**3-1-2016** [1] - 117:3
**3-19** [2] - 124:8
**3-19-2016** [1] - 124:5
**3-3-2016** [1] - 117:4
**30** [2] - 66:4, 121:8
**30,000** [3] - 66:14, 116:4, 121:1
**302** [3] - 75:5, 75:6, 75:11
**30th** [5] - 19:19, 34:3, 53:6, 53:16, 114:9
**312** [1] - 2:6
**315** [1] - 2:11

**350** [1] - 119:14
**355,335.06** [1] - 65:19
**3:21** [1] - 73:1

## 4

**4** [3] - 3:9, 39:5, 69:16
**40** [2] - 69:17, 99:18
**41** [1] - 3:18
**45** [1] - 99:18
**475482** [1] - 21:4
**4:00** [2] - 126:8, 126:23
**4:44** [1] - 119:19

## 5

**50,000** [1] - 121:6
**500,000** [1] - 70:12

## 6

**6** [1] - 119:19

## 7

**7** [4] - 63:19, 64:1, 64:4, 64:7

## 8

**8** [3] - 12:23, 88:14, 122:22
**80** [2] - 3:17, 3:17
**8017** [2] - 36:21, 39:16
**82** [2] - 3:18, 21:13
**8236** [1] - 36:14
**899** [1] - 44:24
**8:30** [2] - 126:19
**8:34** [1] - 102:14
**8:35** [1] - 102:15
**8th** [1] - 74:9

## 9

**9** [2] - 18:7, 53:9
**9-21** [1] - 52:12
**9-24** [1] - 52:12
**9-25** [1] - 52:12
**9-30-2015** [2] - 53:9, 53:19
**90012** [1] - 2:7
**92** [1] - 3:16
**94104** [1] - 2:11
**999S** [1] - 37:25
**9th** [4] - 18:8, 18:22, 19:9, 19:11

## A

**able** [4] - 18:18, 57:11,

118:9, 126:12
**accept** [4] - 31:24, 45:5, 104:20, 104:22
**accepted** [1] - 46:3
**accepting** [1] - 104:20
**access** [2] - 87:15, 88:4
**according** [1] - 32:25
**account** [27] - 35:18, 36:14, 36:20, 39:15, 39:17, 40:2, 41:14, 42:13, 42:24, 43:1, 52:13, 57:16, 57:19, 58:4, 58:5, 58:6, 58:12, 64:12, 65:4, 65:20, 66:8, 66:9, 100:19, 114:18, 122:10, 122:24, 123:2
**accounts** [1] - 36:10
**accurate** [1] - 17:21
**accused** [1] - 109:4
**ACS** [11] - 58:20, 58:22, 58:23, 59:12, 59:15, 61:15, 66:19, 66:20, 67:4, 73:1
**act** [1] - 69:24
**acting** [1] - 20:3
**active** [3] - 14:13, 17:9, 28:23
**activities** [2] - 16:24, 87:3
**activity** [5] - 15:5, 36:25, 103:7, 116:7, 116:8
**actual** [6] - 64:24, 65:8, 89:25, 117:20, 120:22, 122:1
**add** [1] - 109:17
**addiction** [1] - 50:12
**adding** [1] - 109:20
**addition** [1] - 73:9
**addresses** [1] - 86:10
**adjourned** [1] - 126:23
**administrative** [1] - 113:12
**admitted** [4] - 7:25, 25:19, 25:22, 62:21
**admonishment** [2] - 68:17, 126:15
**adult** [2] - 73:9
**afternoon** [2] - 29:19, 82:14
**afterwards** [1] - 102:4
**agency** [2] - 47:5, 115:10
**agent** [23] - 9:24, 10:2, 13:17, 16:22, 20:19, 21:16, 27:1, 35:1, 49:23, 51:14, 60:3,

---

**UNITED STATES DISTRICT COURT**

60:6, 60:10, 60:13, 60:16, 73:10, 74:5, 74:20, 75:6, 76:11, 84:9, 94:3, 106:22
**Agent** [3] - 19:1, 31:16, 35:7
**agents** [3] - 51:15, 58:25, 61:5
**ago** [2] - 17:25, 96:7
**ahead** [1] - 23:18
**air** [1] - 125:15
**airport** [2] - 9:2, 29:22
**al** [1] - 50:21
**Al** [1] - 49:11
**aliases** [1] - 16:6
**allegation** [1] - 49:4
**alleged** [1] - 67:10
**alone** [1] - 66:12
**alternates** [1] - 72:16
**Alvarez** [1] - 33:1
**amount** [3] - 43:3, 65:8, 122:4
**analysts** [3] - 22:20, 23:1, 50:17
**Andor'e** [7] - 54:24, 55:10, 55:13, 55:14, 55:17, 55:24, 66:15
**Andre's** [1] - 101:25
**Andrei** [2] - 101:10, 102:15
**Angeles** [23] - 2:7, 11:2, 17:10, 20:7, 27:19, 28:5, 31:9, 31:16, 32:17, 33:23, 41:21, 42:3, 42:10, 42:20, 43:3, 43:5, 43:24, 105:15, 106:2, 106:9, 107:5, 114:3, 114:10
**ANGELES** [1] - 4:1
**Angles** [2] - 4:17, 105:25
**answer** [3] - 77:15, 77:18, 116:3
**answered** [3] - 48:8, 56:19, 105:22
**Anthony** [2] - 98:10, 98:23
**anticipated** [1] - 45:1
**apologize** [2] - 117:16, 126:10
**appear** [1] - 27:9
**APPEARANCES** [1] - 2:1
**appeared** [1] - 87:15
**application** [3] - 51:24, 62:13, 63:2
**applied** [1] - 60:12
**approach** [6] - 103:21, 103:24, 104:1,

104:18, 105:17, 106:14
**approval** [2] - 20:8, 114:11
**April** [9] - 36:24, 37:4, 37:7, 37:15, 37:22, 38:3, 39:5, 41:8, 42:24
**Arab** [1] - 76:11
**Arabs** [1] - 87:9
**Arca** [6] - 55:8, 55:12, 117:20, 121:22, 121:23, 124:15
**archaic** [2] - 17:19, 58:24
**area** [14] - 5:21, 9:12, 10:4, 32:17, 35:5, 41:18, 41:22, 46:23, 51:19, 73:12, 97:23, 106:8, 110:10, 118:2
**areas** [1] - 106:5
**argued** [1] - 45:3
**arguing** [2] - 70:22, 71:18
**ARIA** [2] - 46:17, 47:21
**arm** [1] - 103:22
**Armenian** [2] - 28:25, 30:17
**arrangements** [4] - 124:25, 125:6, 125:24, 126:5
**art** [4] - 4:23, 7:12, 10:10
**Art** [10] - 7:17, 10:12, 43:15, 43:16, 45:13, 47:18, 94:21, 98:22, 111:19, 122:19
**aside** [2] - 58:13, 58:16
**Aslian** [2] - 43:16, 47:18
**assigned** [1] - 22:3
**assist** [3] - 22:14, 96:16, 96:19
**Assistant** [1] - 2:6
**assistants** [4] - 21:17, 21:20, 22:21, 23:2
**assisted** [1] - 70:16
**associated** [3] - 124:22, 125:3, 125:11
**associates** [1] - 69:18
**association** [1] - 61:20
**assumed** [1] - 10:9
**assuming** [1] - 24:25
**assurance** [1] - 71:3
**assurances** [1] - 81:7
**attachment** [1] - 64:1

**attention** [4] - 38:19, 79:8, 82:11, 91:7
**ATTORNEY** [1] - 2:4
**attorney** [2] - 8:13, 8:14
**attorneys** [1] - 68:20
**Attorneys** [1] - 2:6
**August** [1] - 51:16
**author** [1] - 21:4
**authored** [1] - 23:1
**automotive** [1] - 44:11
**AVN** [4] - 94:25, 96:2, 99:14, 100:13
**avoiding** [1] - 96:19
**Azerbaijan** [1] - 25:10

## B

**BABAK** [2] - 3:8, 4:11
**Babak** [2] - 54:17, 104:5
**backdated** [2] - 123:16, 123:19
**background** [1] - 84:18
**badge** [1] - 111:22
**badges** [1] - 104:1
**balance** [2] - 65:25, 68:11
**Balian** [7] - 43:20, 96:12, 96:19, 97:3, 97:14, 98:3, 98:23
**Balian's** [1] - 97:9
**bank** [6] - 54:18, 57:22, 64:19, 123:22, 123:24, 124:15
**banker** [1] - 123:24
**banking** [1] - 64:20
**banks** [1] - 36:11
**banter** [1] - 13:9
**barely** [1] - 118:11
**baron** [1] - 16:1
**Baron** [9] - 16:10, 16:18, 89:12, 90:2, 90:13, 91:15, 92:10, 92:20, 93:4
**base** [1] - 87:17
**based** [2] - 87:18, 89:23
**Bates** [2] - 21:4, 83:24
**Bay** [6] - 5:21, 9:12, 35:5, 41:18, 41:22, 110:10
**become** [1] - 55:5
**becoming** [1] - 60:5
**bedridden** [1] - 121:7
**began** [1] - 9:15
**begin** [1] - 118:23
**beginning** [1] - 81:3

**belief** [1] - 11:24
**beneficial** [2] - 9:20, 49:22
**benefit** [1] - 77:3
**Bentley** [2] - 30:6, 30:7
**beside** [1] - 75:7
**best** [4] - 12:19, 24:21, 25:18, 87:24
**better** [4] - 55:17, 55:19, 60:6, 98:5
**between** [3] - 17:3, 49:10, 117:14
**Beverly** [10] - 33:10, 33:23, 37:5, 37:15, 37:22, 44:12, 53:14, 60:24, 99:21, 104:2
**big** [4] - 88:14, 88:15, 89:7, 119:1
**bigger** [1] - 45:1
**bike** [7] - 37:20, 42:12, 42:16, 43:25, 44:6, 45:6, 61:24
**bikes** [2] - 41:6, 44:13
**bill** [8] - 61:17, 63:23, 67:12, 67:22, 67:23, 78:1, 78:4, 78:12
**bills** [1] - 122:11
**binder** [2] - 20:11, 79:10
**birth** [1] - 86:11
**bit** [3] - 11:6, 98:5, 126:13
**blue** [1] - 18:22
**boat** [28] - 53:24, 54:1, 54:20, 57:12, 57:17, 57:22, 57:24, 58:1, 61:25, 62:1, 62:13, 62:18, 63:20, 64:8, 68:2, 68:11, 72:21, 77:23, 78:2, 78:10, 78:11, 78:22, 79:1, 79:6, 100:24, 100:25
**bodyguards** [1] - 122:20
**book** [3] - 88:12, 88:18, 88:19
**books** [2] - 105:13, 107:23
**borrow** [3] - 54:1, 54:7, 78:9
**borrowed** [1] - 66:5
**borrower** [2] - 64:11
**bothering** [1] - 54:4
**bottom** [4] - 18:6, 35:16, 35:17, 108:17
**bought** [7] - 12:5, 12:6, 40:18, 45:13, 45:14, 56:18, 80:11
**Boulevard** [2] - 37:5

**boutique** [2] - 117:24, 118:12
**box** [3] - 4:7, 72:15, 112:25
**boxed** [1] - 120:18
**boxing** [3] - 98:13, 98:18, 120:22
**Bradley** [3] - 86:14, 86:20, 87:22
**branch** [1] - 54:19
**break** [5] - 68:16, 77:23, 116:14, 126:9, 126:14
**breakfast** [1] - 54:3
**bribed** [1] - 49:5
**brick** [1] - 44:15
**brief** [1] - 72:12
**briefly** [2] - 55:7, 70:7
**bring** [2] - 68:10, 116:23
**broker** [4] - 53:22, 54:5, 120:13, 121:16
**brokering** [2] - 120:12, 121:13
**brothers** [1] - 93:6
**brought** [1] - 60:2
**BROUMAND** [2] - 3:8, 4:11
**Broumand** [11] - 4:16, 12:22, 25:7, 38:20, 54:17, 63:14, 70:15, 72:20, 74:8, 88:6, 106:13
**bucks** [1] - 56:6
**budget** [1] - 44:7
**Bugs** [31] - 9:24, 35:19, 36:5, 36:6, 36:7, 36:8, 36:10, 39:17, 40:2, 41:14, 42:24, 52:13, 52:19, 52:20, 54:16, 54:22, 55:19, 55:25, 57:16, 57:19, 58:4, 62:19, 64:11, 64:18, 64:23, 100:19, 114:18, 114:25, 117:1, 123:9
**building** [1] - 115:14
**bunch** [1] - 33:25
**Burbank** [1] - 113:2
**burial** [1] - 125:7
**bus** [4] - 6:24, 6:25, 7:1, 7:13
**buses** [1] - 7:18
**business** [22] - 4:20, 5:18, 20:18, 22:7, 22:15, 22:19, 50:10, 52:23, 55:25, 56:17, 84:9, 85:22, 85:24, 86:12, 110:15, 111:7, 114:3,

**UNITED STATES DISTRICT COURT**

114:10, 117:21, 117:22, 117:23, 118:9
**businesses** [3] - 80:23, 81:1, 81:6
**buy** [9] - 37:8, 42:15, 42:20, 43:23, 44:6, 44:15, 111:22, 120:8, 121:9
**buyer** [9] - 120:4, 120:13, 120:16, 120:17, 120:20, 121:9, 121:17, 122:12, 124:2
**buying** [8] - 43:25, 76:12, 116:13, 116:15, 116:16, 116:17, 116:23, 119:17
**BY** [45] - 3:9, 4:15, 5:8, 6:6, 7:20, 8:2, 21:6, 21:10, 23:19, 24:1, 25:6, 26:3, 26:11, 26:21, 28:10, 38:9, 38:18, 41:4, 48:10, 56:21, 62:24, 63:12, 68:9, 72:19, 77:17, 80:3, 80:17, 82:10, 83:18, 83:23, 84:7, 85:1, 85:17, 86:6, 86:19, 92:5, 100:15, 105:24, 106:20, 109:9, 109:14, 109:24, 118:20, 125:20, 126:2

## C

**C-h-e-n** [1] - 22:2
**CA** [2] - 2:7, 2:11
**cab** [1] - 29:20
**cafeteria** [4] - 28:15, 28:16, 28:17, 29:7
**Calabasas** [2] - 57:3, 57:4
**calendar** [10] - 88:12, 88:13, 88:14, 88:18, 88:19, 89:1, 89:6, 89:12, 89:15, 89:16
**calendars** [1] - 89:8
**CALIFORNIA** [1] - 4:1
**California** [7] - 4:17, 43:3, 48:19, 53:4, 54:19, 125:14
**Calvo** [6] - 21:14, 21:21, 22:11, 23:21, 50:17
**cancer** [2] - 50:12, 118:7
**cannot** [1] - 69:20

**capability** [1] - 64:21
**Capital** [1] - 124:15
**car** [2] - 81:20, 81:21
**card** [5] - 17:24, 59:17, 59:21, 60:7, 110:15
**cards** [1] - 115:8
**care** [2] - 35:12, 68:3
**cared** [1] - 122:5
**carrot** [2] - 103:20, 104:18
**carrying** [1] - 10:25
**cars** [3] - 45:13, 45:14, 125:16
**case** [23] - 14:9, 14:14, 17:8, 18:16, 18:19, 28:23, 29:1, 59:21, 67:2, 68:17, 69:9, 70:12, 70:14, 70:23, 71:1, 71:12, 71:19, 71:23, 106:22, 113:21, 113:23, 126:14, 126:15
**cash** [37] - 35:18, 35:22, 36:2, 36:8, 40:10, 41:18, 42:10, 42:16, 43:4, 52:12, 52:15, 52:18, 52:22, 52:24, 76:17, 79:1, 79:3, 80:5, 100:21, 100:23, 114:18, 114:21, 115:2, 115:3, 115:5, 115:11, 115:14, 116:7, 116:8, 116:12, 116:25, 122:21, 123:6, 123:9
**cashed** [2] - 52:21, 123:10
**cashier's** [4] - 53:19, 54:9, 55:24, 117:20
**cashing** [1] - 52:22
**casino** [1] - 47:22
**casually** [1] - 111:14
**caused** [1] - 116:11
**CB400** [3] - 38:1, 39:8, 40:15
**CB750** [3] - 38:1, 40:6, 40:17
**ceremony** [2] - 125:13, 125:14
**certain** [2] - 59:24, 88:18
**certainly** [2] - 70:10, 70:11
**cetera** [1] - 17:3
**CH** [1] - 87:25
**chance** [4] - 38:20, 58:12, 82:15, 98:10
**charge** [4] - 124:21,

124:24, 124:25, 125:2
**chart** [9] - 20:10, 36:24, 52:11, 58:18, 59:6, 65:22, 73:2, 94:11, 122:21
**charts** [1] - 103:8
**chase** [5] - 35:18, 36:13, 100:19, 122:24, 123:2
**Chatikyan** [1] - 87:25
**check** [27] - 23:6, 36:8, 44:14, 53:19, 54:9, 54:13, 54:15, 54:20, 55:24, 61:16, 62:19, 64:17, 64:22, 67:4, 117:20, 121:19, 121:22, 122:1, 122:7, 123:15, 123:23, 124:1, 124:6, 124:9, 124:15
**checks** [4] - 52:21, 84:15, 115:4, 123:10
**Chen** [3] - 21:24, 22:1, 50:16
**chen** [1] - 21:25
**children** [2] - 112:1, 112:4
**Christi** [1] - 52:8
**CHRONOLOGICAL** [1] - 3:5
**chronology** [1] - 12:20
**CIPA** [3] - 69:22, 69:23, 70:19
**circumstances** [1] - 106:16
**Cisneros** [8] - 43:18, 69:13, 96:4, 96:16, 96:23, 96:25, 98:8, 98:23
**Clark** [7] - 57:10, 62:17, 62:25, 63:1, 63:25, 68:10, 78:2
**Clark's** [1] - 68:1
**classified** [1] - 69:23
**clear** [2] - 67:7, 71:15
**client** [1] - 119:9
**clients** [2] - 30:17, 76:11
**close** [4] - 63:1, 65:9, 78:18, 118:23
**closed** [1] - 118:11
**closing** [1] - 64:6
**clothes** [1] - 119:17
**clothing** [5] - 117:22, 118:23, 119:11, 119:16, 122:9
**cocaine** [3] - 9:4, 9:5

**cognizant** [1] - 70:11
**Colette** [5] - 73:5, 73:8, 76:9, 87:5, 95:15
**comfortable** [2] - 64:22, 81:12
**coming** [6] - 15:6, 38:3, 44:3, 49:6, 81:10, 124:6
**common** [1] - 22:1
**communicated** [2] - 19:8, 19:9
**communications** [1] - 22:4
**community** [19] - 9:20, 11:12, 20:25, 24:14, 26:13, 26:24, 27:1, 28:25, 29:15, 29:17, 30:15, 30:17, 31:3, 32:3, 32:9, 32:15, 50:14, 51:10, 119:16
**companies** [8] - 54:25, 55:1, 55:3, 55:8, 81:11, 81:16, 82:3, 86:10
**company** [8] - 14:21, 16:15, 16:17, 16:18, 57:9, 65:4, 74:16, 81:13
**comped** [1] - 76:20
**completely** [1] - 21:5
**computer** [10] - 66:24, 69:3, 69:8, 69:12, 69:21, 69:25, 70:1, 70:13, 70:25, 71:20
**conceal** [2] - 55:22, 56:1
**concern** [2] - 62:7, 67:11
**concerned** [4] - 61:22, 69:3, 69:11, 70:1
**concerns** [4] - 6:1, 62:3, 71:2, 110:1
**condolences** [1] - 97:12
**conduct** [1] - 111:6
**confessed** [1] - 60:6
**confidential** [1] - 87:14
**confirmed** [1] - 11:11
**confiscate** [3] - 71:6, 71:19
**confiscated** [1] - 71:2
**confronting** [1] - 59:25
**confused** [1] - 100:13
**connections** [2] - 101:19, 102:1
**consider** [3] - 86:13,

87:13, 111:12
**considering** [1] - 87:10
**consists** [1] - 38:22
**consumer** [1] - 24:16
**contact** [9] - 10:19, 11:1, 19:25, 20:20, 75:18, 75:19, 81:4, 98:6, 102:12
**contacts** [3] - 9:20, 11:12, 119:16
**contained** [1] - 79:13
**contemplating** [1] - 74:17
**content** [1] - 26:25
**contest** [2] - 33:8, 33:9
**continue** [2] - 31:4, 72:17
**contract** [1] - 92:21
**control** [2] - 27:5, 48:21
**convenience** [1] - 89:21
**convenient** [1] - 89:6
**convention** [4] - 94:17, 95:1, 96:2, 99:14
**conversation** [6] - 18:12, 29:12, 30:9, 99:2, 100:8, 111:16
**conversations** [4] - 49:18, 88:20, 102:23, 112:19
**convince** [4] - 29:13, 31:2, 32:2, 32:9
**convinced** [1] - 45:5
**cooperate** [1] - 104:7
**cooperation** [1] - 104:13
**cops** [1] - 61:9
**copy** [2] - 117:10, 117:11
**corpus** [1] - 52:8
**correct** [73] - 4:19, 4:22, 4:24, 5:2, 5:14, 6:11, 8:6, 9:14, 14:5, 14:23, 16:14, 21:22, 22:9, 24:19, 24:20, 26:7, 27:10, 27:20, 29:3, 36:12, 36:15, 36:18, 40:3, 41:7, 41:9, 42:22, 46:25, 47:23, 49:12, 51:2, 52:14, 57:7, 59:19, 62:6, 63:23, 64:3, 64:13, 65:6, 65:10, 67:9, 73:18, 78:24, 79:7, 79:23, 80:7, 84:17, 90:6, 92:15,

95:8, 95:14, 95:18, 95:24, 97:22, 99:21, 99:22, 102:19, 102:22, 103:1, 105:16, 106:12, 107:24, 108:5, 108:8, 110:11, 110:14, 111:8, 111:11, 114:5, 117:2, 124:10, 124:17, 124:19, 124:20

**corrupt** [2] - 96:15, 96:18

**cosmetic** [1] - 48:16

**costs** [2] - 124:21, 126:4

**Counsel** [6] - 23:18, 27:13, 72:3, 72:17, 100:14, 125:19

**COUNSEL** [1] - 2:1

**counsel** [13] - 4:9, 21:12, 22:19, 23:3, 24:21, 25:15, 34:20, 68:13, 68:25, 71:10, 71:14, 126:8

**counsel's** [3] - 70:2, 71:8, 71:25

**countries** [2] - 49:25, 86:11

**country** [1] - 50:4

**county** [1] - 118:2

**County** [3] - 52:25, 53:5, 53:13

**couple** [6] - 47:13, 53:11, 63:18, 66:23, 103:5, 122:19

**course** [6] - 12:9, 20:18, 84:8, 84:9, 84:10, 124:14

**COURT** [74] - 4:6, 5:7, 6:5, 7:14, 7:19, 8:1, 21:8, 22:22, 23:3, 23:9, 23:12, 23:15, 23:18, 23:25, 24:17, 24:21, 24:24, 25:5, 25:15, 25:21, 26:10, 26:16, 26:20, 27:13, 28:9, 34:20, 38:6, 38:16, 41:2, 48:9, 56:19, 62:23, 63:11, 68:6, 68:13, 68:23, 69:5, 70:4, 70:7, 70:21, 71:5, 71:14, 71:16, 72:2, 72:5, 72:7, 72:9, 72:14, 77:15, 80:1, 80:15, 82:8, 83:16, 83:20, 83:22, 84:6, 84:25, 85:16, 86:5, 86:17,

92:1, 92:4, 100:14, 105:22, 106:19, 109:8, 109:13, 109:19, 109:21, 109:23, 118:17, 125:19, 126:1, 126:7

**Court** [2] - 69:23, 70:12

**COURTROOM** [3] - 68:21, 72:11, 126:22

**courtroom** [1] - 68:24

**cover** [1] - 95:10

**covering** [1] - 93:14

**covers** [1] - 110:6

**Craigslist** [2] - 37:19, 44:16

**create** [1] - 116:12

**created** [1] - 23:9

**credential** [1] - 111:22

**credibility** [2] - 23:4, 94:7

**credible** [1] - 87:21

**credit** [5] - 17:24, 59:17, 59:21, 60:7, 115:8

**crew** [1] - 47:18

**criminal** [1] - 15:5

**cross** [1] - 23:4

**cross-examination** [1] - 23:4

**curtail** [1] - 61:19

**cuts** [1] - 69:10

**Czech** [1] - 91:15

### D

**dad** [3] - 97:10, 119:10, 125:10

**dad's** [1] - 120:8

**daily** [1] - 22:4

**damage** [1] - 48:21

**Danny** [3] - 40:16, 80:10

**dark** [1] - 93:9

**database** [6] - 17:14, 17:15, 17:17, 18:2, 58:23, 75:22

**databases** [1] - 13:21

**date** [4] - 42:7, 86:11, 88:16, 89:9

**dated** [2] - 12:23, 119:19

**David** [7] - 57:10, 62:17, 63:17, 68:1, 68:10, 78:2, 78:8

**days** [2] - 47:14, 53:11

**DEA** [2] - 51:14, 51:15

**deal** [4] - 63:19, 78:18, 121:14, 121:16

**dealership** [2] - 44:12,

44:17

**dealing** [1] - 18:22

**dealings** [1] - 87:9

**deals** [1] - 50:24

**death** [1] - 98:4

**debt** [2] - 53:23

**December** [4] - 10:24, 74:9, 101:10, 123:16

**decide** [2] - 42:2, 66:25

**decided** [1] - 101:24

**decision** [1] - 118:23

**deep** [2] - 32:8, 92:21

**defendant** [10] - 21:3, 21:5, 23:1, 25:4, 69:8, 69:17, 69:19, 69:20, 69:25, 71:9

**DEFENDANT** [1] - 2:9

**defendant's** [2] - 69:11, 69:18

**defense** [13] - 4:12, 20:10, 63:13, 69:17, 70:1, 70:25, 71:2, 71:8, 71:13, 71:25, 79:10, 91:8, 92:24

**definitely** [2] - 74:6, 94:5

**degrees** [1] - 49:4

**delivered** [1] - 45:8

**Demerol** [7] - 50:9, 50:16, 50:24, 51:1, 51:3, 51:11, 51:14

**depart** [1] - 29:23

**departed** [1] - 29:11

**department** [1] - 104:2

**depicted** [2] - 72:21, 91:11

**deposit** [10] - 35:18, 36:2, 42:23, 54:20, 54:22, 64:23, 66:9, 66:10, 116:8, 122:10

**deposited** [6] - 37:17, 41:10, 42:13, 100:18, 114:17, 124:15

**depositing** [1] - 123:11

**deposits** [7] - 52:12, 52:16, 52:24, 116:25, 122:22, 123:6, 123:12

**DEPUTY** [3] - 68:21, 72:11, 126:22

**derogatory** [1] - 14:25

**describe** [2] - 28:22, 30:8

**described** [2] - 88:9, 105:18

**desk** [11] - 52:22, 82:24, 83:7, 83:13,

83:14, 88:8, 111:15, 115:5, 115:14, 115:15, 115:17

**desks** [1] - 115:11

**detail** [1] - 104:12

**detailed** [2] - 120:1, 120:2

**details** [1] - 30:10

**detection** [3] - 45:24, 61:20, 96:20

**detective** [1] - 108:7

**developed** [1] - 34:12

**Devon** [1] - 11:13

**DHS** [1] - 60:12

**dictate** [1] - 23:13

**dictated** [1] - 23:10

**Diego** [1] - 74:16

**different** [6] - 16:6, 21:5, 36:11, 67:1, 68:15, 70:8

**dining** [1] - 97:24

**DIRECT** [2] - 3:9, 4:14

**direct** [6] - 4:9, 66:8, 66:10, 72:17, 79:8, 82:11

**discovery** [5] - 69:8, 69:14, 69:20, 121:23

**discuss** [2] - 68:17, 126:15

**discussed** [1] - 6:15

**discussing** [3] - 80:23, 80:25, 82:19

**discussion** [8] - 9:6, 32:8, 34:13, 48:20, 49:10, 81:25, 92:21, 92:22

**discussions** [5] - 5:15, 31:19, 82:19, 90:1, 90:11

**display** [1] - 111:17

**disseminate** [3] - 20:25, 26:12, 26:17

**District** [2] - 71:12

**docket** [1] - 69:17

**document** [19] - 22:10, 24:5, 24:18, 24:22, 24:25, 25:7, 25:8, 25:15, 25:18, 25:19, 25:25, 26:6, 26:9, 26:16, 26:18, 67:23, 89:14, 89:17, 89:25

**documented** [2] - 67:8, 106:25

**documents** [3] - 22:5, 83:12, 83:24

**dollar** [1] - 122:4

**done** [9] - 17:25, 22:7, 32:23, 45:13, 60:7, 61:19, 62:4, 89:24,

121:10

**down** [40] - 13:25, 17:1, 19:17, 23:10, 27:19, 28:4, 31:10, 31:16, 33:23, 35:17, 37:8, 37:21, 38:3, 38:14, 42:8, 42:14, 43:3, 43:10, 43:24, 44:3, 52:25, 53:12, 58:11, 65:7, 65:25, 66:15, 74:16, 82:25, 88:15, 89:7, 89:12, 89:21, 89:22, 93:17, 105:15, 106:14, 114:8, 114:12, 116:14, 125:13

**dozen** [2] - 34:2

**drafted** [5] - 21:3, 25:4, 64:15, 121:19

**drafting** [3] - 22:4, 22:14, 80:25

**dragging** [1] - 126:11

**draw** [2] - 38:19, 91:7

**drawer** [1] - 115:2

**drilled** [1] - 13:25

**drinking** [1] - 50:13

**driver/bodyguard** [1] - 86:22

**dropping** [1] - 17:1

**Dubai** [1] - 74:18

**Ducati** [16] - 37:25, 39:21, 39:23, 39:24, 40:16, 41:23, 41:24, 42:3, 42:10, 44:12, 44:18, 44:23, 44:24, 44:25, 46:3

**dumb** [2] - 111:16, 117:15

**during** [22] - 8:4, 13:4, 20:9, 31:16, 33:4, 33:22, 34:3, 34:13, 36:11, 43:12, 46:23, 47:16, 51:18, 85:3, 88:6, 95:10, 95:19, 99:24, 102:20, 106:24, 124:18, 126:14

### E

**e-mail** [4] - 19:1, 63:14, 63:17, 68:1

**e-mailed** [1] - 42:6

**e-mails** [1] - 38:12

**early** [12] - 27:8, 65:15, 65:18, 81:1, 83:2, 83:4, 90:16, 118:3, 118:7, 118:10

**earnest** [2] - 65:8, 65:11

easier [2] - 24:8, 107:20
east [1] - 73:13
easy [1] - 88:15
EB-5 [2] - 4:20, 5:16
eBay [3] - 40:15, 40:16, 119:13
Edgar [68] - 4:23, 7:12, 7:17, 8:12, 9:16, 9:19, 9:23, 10:2, 10:14, 11:11, 13:13, 15:15, 15:22, 16:16, 16:19, 17:12, 18:1, 19:23, 23:20, 23:21, 29:15, 29:16, 29:24, 30:13, 34:8, 35:21, 36:1, 44:2, 44:4, 44:6, 46:19, 48:3, 49:10, 51:4, 52:15, 53:4, 58:20, 59:20, 62:7, 72:25, 73:1, 73:8, 81:8, 86:9, 87:2, 87:19, 90:8, 92:14, 94:20, 96:1, 96:19, 97:9, 98:19, 98:23, 100:10, 100:21, 104:4, 105:9, 105:11, 108:9, 108:16, 108:24, 109:25, 114:21, 123:6, 123:25
Edgar's [2] - 17:21, 80:22
effect [2] - 78:9, 117:10
either [6] - 33:10, 67:3, 100:1, 103:20, 123:5, 123:6
elicit [1] - 59:24
Elsinore [1] - 118:1
emails [1] - 39:2
employed [1] - 60:16
employees [2] - 118:15, 118:18
end [2] - 10:24, 115:11
ended [3] - 43:25, 44:16, 107:8
ending [2] - 36:14, 58:4
endless [1] - 27:4
ends [2] - 89:22, 89:23
Energy [1] - 14:18
enforcement [10] - 45:24, 54:12, 60:20, 61:4, 62:5, 96:1, 112:9, 112:12, 121:12, 121:13
entire [1] - 46:5
entourage [1] - 98:11

envelope [3] - 83:8, 122:4, 122:15
equipment [2] - 74:18, 105:3
Erdogan [6] - 90:13, 91:16, 92:12, 93:17, 93:24, 93:25
Erdogan's [1] - 93:16
Eric [5] - 47:5, 47:6, 47:10, 47:12, 48:2
escorts [3] - 9:6, 9:7, 9:10
escrow [1] - 65:9
essence [1] - 104:6
establishing [1] - 11:9
estate [4] - 56:18, 73:10, 76:11, 87:9
et [1] - 17:3
evening [1] - 126:9
event [5] - 7:5, 77:22, 112:21, 113:13, 114:6
events [2] - 12:11, 72:21
eventually [1] - 32:10
evidence [24] - 22:17, 23:8, 24:21, 25:3, 25:16, 25:17, 25:18, 25:20, 26:8, 27:12, 41:1, 41:3, 62:21, 64:16, 79:24, 80:2, 80:13, 80:16, 82:7, 82:9, 84:4, 84:22, 91:25, 92:2
EVIDENCE [1] - 3:14
exactly [3] - 23:17, 89:9, 108:15
EXAMINATION [2] - 3:9, 4:14
examination [1] - 23:4
example [3] - 13:23, 69:12, 85:12
except [2] - 41:12, 114:8
exchange [12] - 19:18, 54:8, 54:13, 76:21, 76:23, 77:19, 96:1, 102:8, 112:6, 121:13, 121:17, 121:19
excuse [1] - 68:24
exhibit [16] - 14:3, 15:25, 17:4, 20:13, 35:17, 38:20, 47:20, 49:9, 53:8, 53:20, 64:2, 65:21, 91:8, 91:12, 99:2, 124:4
Exhibit [27] - 3:16, 3:16, 3:17, 3:17, 3:18, 3:18, 12:21,

14:2, 18:21, 20:10, 23:8, 27:12, 38:19, 40:19, 41:3, 62:11, 72:22, 79:10, 79:14, 80:2, 80:8, 80:16, 80:18, 82:9, 91:7, 91:8, 92:2
exhibits [1] - 12:20
EXHIBITS [1] - 3:12
expenses [3] - 125:2, 125:21, 125:23
expensive [1] - 73:11
experience [1] - 60:18
expert [1] - 71:15
explain [1] - 104:8
explained [1] - 64:18
explaining [1] - 81:1
express [2] - 68:18, 126:16
extra [3] - 42:12, 111:15, 120:9
extreme [1] - 113:9

### F

fact [20] - 6:17, 14:6, 14:9, 18:10, 18:25, 19:11, 19:25, 20:22, 20:24, 21:20, 22:14, 25:3, 26:12, 27:18, 37:10, 51:8, 58:3, 64:10, 106:11, 117:13
familiar [1] - 55:5
family [6] - 49:5, 50:4, 69:18, 71:9, 114:16, 124:22
far [2] - 8:12, 71:10
Fargo [6] - 36:16, 37:18, 39:16, 40:1, 41:14, 42:24
fashioned [1] - 88:13
fast [1] - 115:9
father [6] - 102:20, 116:22, 117:21, 118:4, 121:5, 124:18
father's [5] - 98:4, 118:23, 125:3, 125:23, 126:4
favor [1] - 102:8
FBI [29] - 9:24, 10:2, 10:5, 10:16, 13:17, 21:17, 22:5, 22:8, 22:15, 28:19, 29:8, 29:18, 34:25, 60:3, 60:10, 73:24, 75:9, 84:9, 84:11, 84:24, 89:18, 104:5, 106:2, 106:5, 110:12, 111:3, 111:22,

113:9, 113:18
February [8] - 31:12, 34:4, 35:18, 36:23, 100:17, 102:24, 103:6, 114:18
federal [3] - 60:6, 60:16, 61:5
feed [1] - 35:14
feet [2] - 119:3
Felix [7] - 43:18, 96:4, 96:16, 96:22, 96:25, 98:8, 98:22
fell [1] - 112:25
felt [1] - 117:18
female [2] - 47:17, 93:13
FIFA [5] - 48:25, 49:2, 49:5
figure [3] - 19:16, 68:14, 107:12
figured [1] - 43:10
file [4] - 28:1, 69:12, 69:22
filed [1] - 109:10
files [1] - 69:10
filled [2] - 51:24, 78:18
film [1] - 73:9
finally [2] - 16:12, 93:21
financial [1] - 71:13
fine [2] - 70:22, 123:24
finish [1] - 35:24
finishing [1] - 44:25
firm [3] - 15:1, 15:19, 46:11
first [19] - 8:17, 14:2, 22:1, 24:14, 28:20, 38:10, 38:12, 39:5, 39:7, 55:6, 59:2, 60:7, 65:15, 66:1, 70:19, 81:3, 92:6, 95:17, 122:24
five [1] - 118:13
flaked [2] - 108:17, 108:24
flat [1] - 104:16
flesh [1] - 19:15
flew [2] - 6:21, 6:23
Floor [1] - 2:11
focused [1] - 13:25
follow [3] - 29:14, 82:2, 103:14
followed [3] - 75:10, 109:2, 110:1
follows [1] - 4:13
food [1] - 95:10
football [1] - 28:18
FOR [2] - 2:3, 2:9
force [1] - 35:14
forcing [1] - 104:6

foreign [1] - 49:23
forever [1] - 71:16
forget [2] - 24:8, 117:3
forgiveness [1] - 107:21
form [3] - 68:18, 78:18, 126:16
former [1] - 119:9
forth [6] - 13:1, 19:9, 42:6, 51:1, 71:17, 101:9
forthcoming [1] - 103:22
forward [2] - 59:25, 107:22
foundation [3] - 22:19, 26:14, 109:7
four [4] - 36:19, 49:1, 59:11, 79:19
Francisco [3] - 2:11, 42:16, 106:11
fraud [1] - 60:7
fraudulent [1] - 59:17
frequently [1] - 33:11
Friday [1] - 31:10
friend [9] - 11:17, 40:16, 44:9, 44:11, 46:19, 47:2, 47:3, 48:2, 53:12
friendly [2] - 13:9, 46:21
friends [2] - 33:20, 43:11
friendship [1] - 11:9
full [2] - 7:18, 29:7
fun [1] - 11:19
funds [3] - 27:3, 63:20, 65:24
funeral [3] - 125:6, 125:23, 126:4
future [1] - 71:21

### G

gag [2] - 111:9, 111:19
gaining [1] - 27:3
gambling [1] - 50:13
games [1] - 49:3
gas [1] - 81:21
gather [2] - 49:25, 95:20
gathering [1] - 103:20
general [1] - 13:23
generally [2] - 49:23, 75:9
genesis [1] - 104:7
gentleman [4] - 8:12, 61:2, 78:25, 93:7
gentlemen [3] - 68:16, 100:11, 126:10

GI [2] - 111:23, 111:24
gift [3] - 45:10, 111:19, 111:22
gifts [1] - 112:3
girlfriends [1] - 122:19
given [4] - 87:3, 87:8, 87:19, 111:19
glasses [1] - 70:20
glove [1] - 112:25
godsend [1] - 120:7
gold [3] - 8:21, 116:1, 116:2
government [8] - 18:21, 64:16, 69:3, 69:11, 71:3, 83:13, 110:23, 115:8
government's [9] - 12:20, 14:3, 15:25, 50:24, 53:19, 65:21, 69:20, 91:7, 94:11
Grand [9] - 4:25, 5:4, 10:14, 12:13, 61:11, 97:19, 100:13, 122:3, 122:12
grave [1] - 71:1
great [2] - 11:18, 30:23
Greek [1] - 42:7
ground [1] - 27:3
group [1] - 34:1
Group [3] - 6:14, 14:18, 33:17
GRUEL [74] - 2:10, 3:9, 4:10, 4:15, 5:8, 6:6, 7:20, 7:24, 8:2, 21:6, 21:10, 22:17, 23:7, 23:19, 23:24, 24:1, 24:23, 25:1, 25:6, 25:19, 26:2, 26:3, 26:11, 26:21, 27:11, 27:15, 28:10, 34:21, 38:9, 38:18, 40:25, 41:4, 48:10, 56:21, 62:24, 63:10, 63:12, 68:8, 68:9, 70:6, 70:10, 70:24, 72:4, 72:10, 72:18, 72:19, 77:17, 79:24, 80:3, 80:13, 80:17, 82:6, 82:10, 83:18, 83:23, 84:3, 84:7, 84:22, 85:1, 85:17, 86:6, 86:19, 91:24, 92:3, 92:5, 100:15, 105:24, 106:20, 109:9, 109:14, 109:24, 118:20, 125:20, 126:2
Gruel [1] - 2:10

**H**

guess [4] - 12:25, 18:20, 76:13, 97:23
guessing [1] - 33:5
guests [2] - 98:18, 99:16
guy [4] - 44:8, 47:4, 50:15, 77:11
guys [2] - 4:20, 44:2

hair [2] - 55:18, 55:20
haired [1] - 8:12
half [2] - 28:18, 34:1
hand [1] - 104:6
handed [2] - 121:25, 122:15
handle [2] - 70:14, 70:17
handwriting [1] - 80:22
hanging [1] - 43:9
Havana [9] - 5:1, 5:4, 10:14, 12:13, 61:11, 97:19, 100:13, 122:3, 122:12
head [1] - 93:14
heads [3] - 49:24, 50:12, 50:13
health [1] - 6:1
hear [1] - 60:15
heard [11] - 6:24, 9:3, 9:6, 12:8, 24:19, 31:8, 40:17, 49:13, 50:23, 60:12, 96:22
hearsay [7] - 21:5, 21:9, 22:18, 22:23, 22:25, 84:5, 84:24
heels [1] - 104:15
help [6] - 19:16, 21:18, 56:9, 63:25, 112:11, 115:7
helped [1] - 118:14
Henrik [3] - 4:17, 7:16, 9:19
Henry [15] - 6:14, 7:12, 10:6, 10:7, 10:9, 10:12, 11:10, 43:16, 47:17, 81:7, 83:11, 94:21, 98:22, 122:18
high [1] - 76:11
high-powered [1] - 76:11
highlight [2] - 61:21, 76:3
highly [1] - 69:21
Hills [10] - 33:11, 33:23, 37:5, 37:15, 37:22, 44:12, 53:14,

60:24, 99:21, 104:2
himself [1] - 25:17
hired [1] - 71:11
hit [15] - 11:18, 11:19, 16:11, 17:7, 17:11, 17:13, 17:14, 17:15, 17:22, 18:2, 18:16, 34:19, 59:14, 67:1, 75:2
hits [8] - 13:24, 16:7, 16:10, 17:21, 59:11, 73:19, 73:21, 74:23
hoard [1] - 115:2
holding [1] - 16:17
Holding [2] - 16:13, 16:25
holdings [1] - 81:14
home [3] - 33:2, 51:24, 62:13
homewood [1] - 66:16
Honda [5] - 37:25, 38:1, 39:7, 39:22, 40:6
Honor [33] - 4:10, 7:25, 21:2, 22:17, 22:18, 23:7, 23:24, 25:2, 27:11, 40:25, 62:22, 63:10, 69:2, 70:11, 71:7, 71:24, 72:18, 79:24, 80:14, 82:6, 84:3, 84:5, 84:22, 84:23, 85:15, 86:4, 91:24, 106:18, 109:12, 109:17, 118:19, 125:18, 125:25
hooked [2] - 50:9, 50:16
hopefully [3] - 19:22, 126:12, 126:13
hoping [3] - 104:2, 104:3, 108:24
Horner [2] - 75:18, 75:20
host [1] - 49:2
hotel [3] - 12:9, 33:5, 33:14
hotels [1] - 46:8
hours [3] - 7:9, 34:23, 34:24
house [8] - 45:8, 52:1, 58:9, 65:1, 66:1, 66:4, 116:13, 116:14
human [1] - 87:14
hunch [1] - 94:9

**I**

idea [4] - 93:8, 104:7, 120:10, 123:19

identity [2] - 75:8, 75:10
IDs [1] - 115:20
IIR [5] - 24:6, 24:8, 24:9, 24:10, 50:18
ill [1] - 102:21
illegal [1] - 111:6
important [5] - 15:2, 15:3, 15:4, 50:14, 63:19
impression [1] - 35:13
inaccurate [2] - 76:13, 78:5
inactive [5] - 14:13, 14:14, 14:15, 14:16, 29:2
include [3] - 69:17, 87:4, 125:5
included [5] - 4:23, 73:12, 99:16, 116:18, 125:6
including [1] - 72:16
income [2] - 53:23, 55:7
income-to-debt [1] - 53:23
incur [1] - 126:4
incurred [1] - 125:23
indeed [2] - 17:2, 120:11
independent [2] - 33:7, 85:3
INDEX [2] - 3:5, 3:12
indicating [2] - 93:15, 93:18
individual [15] - 8:18, 11:25, 16:7, 45:21, 49:18, 50:9, 75:9, 85:22, 88:3, 92:9, 98:12, 102:5, 102:7, 119:9, 119:25
individual's [1] - 21:14
individuals [3] - 8:9, 49:21, 73:12
industry [3] - 44:11, 73:9, 73:10
information [57] - 13:19, 15:1, 15:5, 15:6, 15:15, 18:19, 19:5, 19:15, 19:16, 20:19, 22:11, 24:7, 25:11, 26:4, 26:13, 26:17, 26:23, 27:16, 30:24, 33:1, 45:15, 45:20, 50:8, 50:11, 50:19, 51:7, 54:11, 59:21, 67:5, 69:23, 73:14, 75:4, 76:10, 76:25, 83:6, 84:19,

85:20, 86:8, 87:8, 87:16, 87:18, 87:20, 88:5, 88:25, 89:10, 89:11, 89:22, 89:23, 90:24, 90:25, 92:19, 94:8, 97:10, 101:22, 102:11, 103:20
informational [1] - 24:6
informed [1] - 10:8
initial [2] - 34:19, 89:24
inquire [1] - 4:9
inquiry [2] - 14:17, 77:3
instant [1] - 64:20
intel [3] - 22:20, 23:1, 59:23
intelligence [17] - 15:17, 20:16, 20:25, 24:7, 24:13, 26:13, 26:23, 27:1, 47:5, 49:23, 50:1, 50:9, 50:14, 95:21, 103:19, 115:10
intend [1] - 111:13
intent [1] - 55:22
intention [1] - 51:3
interest [8] - 13:16, 16:21, 16:22, 50:3, 74:19, 85:19, 106:23, 120:6
interested [18] - 11:9, 11:12, 11:17, 13:10, 13:11, 28:24, 28:25, 29:14, 29:16, 30:11, 30:15, 30:21, 32:14, 49:24, 73:13, 76:12, 118:25, 119:17
internal [1] - 113:18
INTO [1] - 3:14
introduce [3] - 19:4, 19:22, 30:12
introduced [7] - 9:24, 10:2, 18:15, 21:8, 25:16, 34:4, 100:10
introduction [1] - 20:7
inventory [3] - 119:5, 119:8, 121:20
investigation [4] - 15:16, 19:6, 84:12, 113:12
investigators [1] - 71:11
invited [2] - 6:12, 6:16
involved [6] - 9:9, 13:14, 15:4, 65:7, 86:2, 122:1
involving [1] - 58:20
Iran [1] - 87:3

**Iranians** [1] - 74:18
**Iraq** [1] - 27:6
**IRR** [1] - 24:11
**irrelevant** [1] - 25:25
**ISIS** [6] - 13:14, 13:15, 13:24, 27:3, 30:24, 106:17
**issue** [2] - 68:2, 68:11
**issues** [2] - 63:18
**Italy** [3] - 113:20, 113:23, 113:24
**itself** [2] - 25:16, 25:25

### J

**James** [3] - 61:3, 103:8, 103:10
**January** [12] - 10:22, 10:24, 10:25, 12:23, 18:8, 18:22, 19:19, 27:8, 28:5, 90:17, 92:14, 114:9
**Jeff** [2] - 75:18, 75:20
**jets** [3] - 56:23, 94:23, 94:24
**Jim** [8] - 99:3, 99:4, 99:8, 104:14, 105:2, 108:17, 108:23, 108:25
**John** [7] - 43:20, 96:12, 96:19, 97:3, 97:13, 98:3, 98:23
**joke** [5] - 110:22, 111:9, 112:14, 117:14, 117:15
**Jon** [2] - 107:4, 113:15
**jot** [3] - 82:25, 88:15, 89:22
**Juan** [1] - 2:5
**judgment** [1] - 62:3
**jump** [1] - 51:16
**junior** [2] - 111:23, 111:24
**jurors** [1] - 68:24
**jury** [13] - 4:5, 4:7, 7:24, 23:24, 63:10, 68:19, 68:22, 71:1, 72:13, 72:15, 126:18
**jury's** [1] - 68:24

### K

**Kalantar** [12] - 4:23, 7:17, 10:12, 34:1, 43:15, 43:16, 45:13, 47:18, 94:21, 98:22, 111:20, 122:19
**Keenaghan** [9] - 99:3, 99:17, 100:2, 100:8, 103:8, 103:10,

103:14, 105:2, 108:4
**keep** [8] - 81:24, 83:6, 84:11, 85:7, 85:10, 86:13, 115:5, 115:17
**keeping** [2] - 52:22, 86:8
**Kelly** [3] - 107:4, 113:15, 114:2
**kept** [6] - 58:14, 81:24, 85:3, 85:21, 86:10, 89:8
**Khoury** [1] - 8:13
**kind** [12] - 11:11, 17:19, 43:9, 58:13, 59:24, 60:4, 83:4, 86:7, 88:13, 94:8, 111:19, 117:20
**Kingston** [1] - 93:6
**knowledge** [10] - 10:8, 33:8, 34:25, 44:21, 55:2, 56:9, 56:13, 60:19, 83:12, 97:1
**known** [2] - 12:1, 12:3
**knows** [2] - 69:23, 70:12
**Korkmaz** [13] - 16:1, 16:10, 16:18, 89:12, 90:2, 90:13, 91:15, 92:10, 93:4
**Kusin** [20] - 18:7, 19:1, 19:18, 19:23, 28:12, 28:20, 29:8, 29:11, 29:18, 30:9, 30:10, 31:16, 31:22, 31:23, 32:11, 34:14, 35:7, 106:23, 114:9
**Kusin's** [2] - 20:8, 32:6
**Kyle** [3] - 21:14, 21:21, 50:17

### L

**LA** [3] - 28:19, 30:13, 105:21
**lack** [5] - 22:18, 26:14, 60:6, 62:2, 109:6
**ladies** [2] - 68:16, 126:10
**Lafayette** [1] - 116:23
**Lake** [4] - 62:13, 66:16, 116:16, 118:1
**landed** [1] - 7:10
**landing** [1] - 53:5
**large** [3] - 24:14, 74:16, 119:2
**Las** [20] - 6:8, 6:17, 6:20, 7:4, 7:6, 10:18, 11:21, 46:13, 46:16, 46:18, 46:22, 51:19,

60:25, 94:11, 94:14, 98:14, 98:18, 99:12, 100:11, 119:10
**last** [12] - 7:14, 8:18, 10:11, 21:11, 29:4, 36:19, 44:10, 47:7, 47:8, 72:22, 77:22, 118:13
**late** [3] - 65:18, 83:2, 118:10
**Latin** [1] - 47:17
**LAW** [1] - 2:10
**law** [16] - 5:3, 15:1, 15:19, 33:18, 45:24, 46:10, 54:11, 60:20, 61:4, 62:4, 96:1, 96:19, 112:9, 112:12, 121:12, 121:13
**Law** [8] - 5:7, 5:9, 6:14, 14:22, 15:19, 33:17, 81:18
**Lawrence** [3] - 60:22, 99:16, 100:5
**lawsuit** [2] - 109:10, 109:15
**LAX** [1] - 29:22
**leading** [6] - 26:15, 68:5, 68:12, 85:15, 86:4, 86:15
**leaning** [1] - 8:11
**learned** [1] - 115:9
**least** [5] - 17:13, 17:18, 97:24, 103:14, 104:4
**leave** [3] - 9:1, 32:22, 68:20
**lectern** [1] - 69:4
**left** [6] - 4:16, 29:10, 32:16, 32:20, 68:24, 110:12
**legal** [1] - 81:8
**legitimate** [1] - 81:8
**Lem** [2] - 20:2, 20:3
**length** [1] - 28:18
**letter** [6] - 62:12, 62:15, 63:21, 64:15
**level** [3] - 11:14, 11:16, 51:9
**Levon** [36] - 9:22, 13:10, 13:14, 14:10, 14:21, 16:17, 17:7, 27:22, 28:24, 29:2, 29:14, 30:14, 31:4, 34:4, 34:15, 35:9, 35:12, 43:16, 47:18, 55:6, 85:13, 87:21, 87:25, 90:5, 90:8, 91:6, 93:19, 93:25, 103:14, 106:14,

106:23, 109:2, 109:4, 109:25, 110:2
**life** [3] - 118:14, 125:7, 125:8
**Liggens** [5] - 40:16, 41:12, 42:12, 80:4, 80:10
**limited** [1] - 64:21
**link** [1] - 18:7
**list** [4] - 40:13, 81:6, 119:25, 120:2
**listed** [5] - 24:15, 40:18, 53:19, 59:7, 64:4
**listings** [1] - 40:19
**lived** [1] - 57:1
**living** [1] - 55:8
**loan** [13] - 54:6, 55:23, 56:2, 57:8, 57:16, 57:22, 57:23, 61:23, 62:12, 63:2, 64:7, 64:24, 68:10
**loans** [1] - 56:12
**local** [9] - 28:25, 29:14, 29:17, 30:15, 30:17, 31:2, 32:3, 32:15, 104:1
**locally** [1] - 41:18
**located** [2] - 117:25, 118:1
**locked** [2] - 115:15, 115:17
**look** [13] - 22:12, 23:11, 24:14, 38:20, 43:23, 44:3, 44:4, 62:20, 80:8, 80:18, 82:15, 88:18, 91:9
**looked** [2] - 75:15, 79:11
**looking** [14] - 14:2, 23:12, 24:11, 37:10, 37:12, 39:6, 44:22, 49:9, 50:10, 59:6, 67:10, 75:12, 85:6, 93:17
**looks** [3] - 37:3, 59:6, 92:20
**Los** [25] - 2:7, 4:17, 11:2, 17:10, 20:7, 27:19, 28:5, 31:9, 31:16, 32:17, 33:23, 41:21, 42:3, 42:10, 42:20, 43:3, 43:5, 43:24, 105:15, 105:25, 106:2, 106:9, 107:5, 114:3, 114:10
**LOS** [1] - 4:1
**Love** [31] - 9:24, 35:19, 36:5, 36:6,

36:8, 36:10, 39:17, 40:2, 41:14, 42:24, 52:13, 52:19, 52:20, 54:16, 54:22, 55:19, 55:25, 57:16, 57:19, 58:4, 62:19, 64:11, 64:18, 64:23, 100:19, 114:18, 114:25, 117:1, 123:9
**love** [1] - 34:15
**lunches** [2] - 125:11, 125:13

### M

**mail** [4] - 19:1, 63:14, 63:17, 68:1
**mailed** [1] - 42:6
**mailing** [1] - 64:22
**mails** [1] - 38:12
**Malibu** [2] - 73:12, 76:12
**mansion** [6] - 7:6, 7:21, 8:4, 8:23, 10:18, 11:21
**mansions** [1] - 57:1
**Mara** [1] - 122:18
**March** [6] - 37:1, 119:19, 122:22, 123:17, 124:14
**marked** [1] - 83:9
**match** [2] - 98:13, 98:18
**matter** [3] - 54:12, 68:19, 126:17
**meal** [1] - 12:7
**meals** [2] - 12:6, 12:8
**mean** [21] - 7:15, 13:3, 13:12, 13:22, 14:15, 16:4, 36:6, 45:3, 50:4, 55:25, 56:17, 61:7, 61:8, 71:15, 79:18, 83:3, 88:2, 95:3, 106:1, 117:7, 125:8
**means** [6] - 14:16, 49:25, 75:9, 75:11, 81:9, 106:2
**meant** [2] - 56:16, 76:14
**medical** [2] - 74:16, 74:17
**meet** [12] - 23:20, 23:21, 28:11, 28:14, 29:18, 30:12, 34:15, 43:5, 53:4, 53:15, 60:22, 103:2
**meeting** [17] - 4:17, 5:4, 5:20, 9:24, 17:10, 19:19, 28:22,

29:4, 29:10, 30:2, 34:7, 34:22, 92:20, 104:16, 108:23, 108:25, 120:12
**Mel** [1] - 101:10
**MELKOUMOV** [1] - 101:10
**melkoumov** [2] - 101:19, 102:15
**member** [2] - 71:9, 124:22
**members** [4] - 4:7, 24:13, 69:18, 72:14
**memorialization** [3] - 73:23, 75:6, 75:25
**memorialize** [1] - 56:5
**memorialized** [1] - 27:7
**memorializing** [1] - 89:18
**memory** [4] - 47:25, 48:1, 96:10, 101:4
**men's** [2] - 117:22, 117:24
**mention** [3] - 81:13, 81:16, 81:18
**mentioned** [4] - 40:4, 90:2, 110:4, 111:14
**merchandise** [6] - 120:11, 120:14, 120:16, 120:18, 120:23, 120:25
**message** [1] - 119:19
**messages** [2] - 17:3, 50:25
**met** [13] - 9:23, 28:20, 35:8, 43:18, 43:20, 44:15, 60:25, 95:17, 100:1, 100:2, 100:5
**method** [1] - 115:9
**Michael** [1] - 2:5
**mid** [2] - 103:6
**middle** [2] - 32:8, 73:13
**might** [8] - 9:20, 15:6, 18:18, 19:5, 44:12, 73:13, 104:3, 119:24
**mind** [4] - 94:3, 106:13, 111:16, 119:25
**mine** [2] - 40:16, 46:19
**minute** [1] - 37:10
**minutes** [2] - 29:5, 68:16
**Miss** [5] - 73:16, 76:5, 76:15, 76:22, 76:25
**missing** [1] - 100:18
**misstates** [2] - 26:8, 28:8
**misstating** [1] - 22:20

**mistake** [5] - 78:20, 110:20, 112:16, 112:17, 113:19
**mom** [5] - 116:23, 118:12, 119:11, 122:7, 123:22
**mom's** [1] - 122:5
**money** [24] - 35:21, 36:1, 36:4, 41:14, 54:1, 57:18, 57:23, 58:10, 58:15, 65:8, 65:11, 66:5, 78:9, 81:8, 81:10, 104:21, 104:22, 105:2, 108:1, 108:14, 109:5, 114:21, 115:13, 123:8
**Montage** [2] - 33:6, 33:11
**Montgomery** [1] - 2:11
**month** [1] - 115:12
**monthly** [1] - 66:11
**months** [3] - 38:13, 123:23, 124:1
**morning** [5] - 53:10, 69:7, 108:17, 126:12, 126:19
**Morse** [1] - 2:5
**mortar** [1] - 44:15
**mortgage** [2] - 53:22, 57:9
**mortuary** [1] - 125:7
**Mosesi** [16] - 4:17, 7:16, 9:19, 9:25, 10:12, 11:10, 34:1, 43:12, 43:16, 45:14, 47:18, 81:7, 83:11, 94:21, 98:22, 122:18
**most** [3] - 58:25, 63:19, 116:1
**mother** [1] - 125:22
**mother's** [2] - 124:11, 124:15
**motion** [5] - 23:5, 25:3, 71:5, 71:6, 71:7
**motivations** [1] - 109:2
**motorcycle** [12] - 37:8, 37:11, 37:13, 37:16, 39:3, 39:6, 39:22, 41:17, 44:3, 44:5, 45:1, 80:11
**motorcycles** [8] - 37:18, 37:21, 38:2, 40:12, 44:23, 79:17, 79:19, 80:5
**move** [13] - 22:17, 27:11, 35:16, 46:1, 79:24, 80:13, 82:6,

83:17, 83:21, 84:3, 91:24, 101:8, 117:19
**moved** [1] - 119:10
**movers** [1] - 49:24
**moving** [6] - 36:22, 47:19, 66:18, 94:10, 99:1, 116:24
**MR** [73] - 3:9, 4:10, 4:15, 5:8, 6:6, 7:20, 7:24, 8:2, 21:6, 21:10, 22:17, 23:7, 23:19, 23:24, 24:1, 24:23, 25:1, 25:6, 25:19, 26:2, 26:3, 26:11, 26:21, 27:11, 27:15, 28:10, 34:21, 38:9, 38:18, 40:25, 41:4, 48:10, 56:21, 62:24, 63:10, 63:12, 68:8, 68:9, 70:6, 70:10, 70:24, 72:4, 72:10, 72:18, 72:19, 77:17, 79:24, 80:3, 80:13, 80:17, 82:6, 82:10, 83:18, 83:23, 84:3, 84:7, 84:22, 85:1, 85:17, 86:6, 86:19, 91:24, 92:3, 92:5, 100:15, 105:24, 106:20, 109:9, 109:14, 109:24, 118:20, 125:20, 126:2
**MS** [37] - 6:4, 21:2, 22:18, 22:25, 25:2, 26:8, 26:14, 28:8, 38:4, 38:7, 48:8, 68:5, 68:12, 69:2, 69:7, 71:7, 71:15, 71:24, 72:6, 72:8, 83:15, 83:17, 83:21, 84:5, 84:23, 85:15, 86:4, 86:15, 106:18, 109:6, 109:12, 109:17, 109:20, 109:22, 125:18, 125:25, 126:6
**multiple** [2] - 71:11, 73:10
**must** [1] - 70:1

## N

**name** [47] - 8:17, 8:18, 9:21, 16:15, 17:22, 18:2, 21:14, 22:1, 41:25, 44:10, 45:6, 47:7, 47:8, 49:17, 49:20, 49:21, 50:5, 56:1, 59:14, 61:16, 67:4, 67:11, 67:12,

73:16, 74:8, 74:11, 75:7, 75:15, 75:21, 75:25, 76:6, 76:9, 76:18, 76:22, 77:5, 77:19, 79:6, 86:24, 87:23, 88:2, 88:3, 101:18, 102:15, 110:15, 117:23, 122:5, 124:11
**named** [1] - 86:14
**names** [14] - 7:14, 10:11, 13:20, 13:22, 15:25, 16:2, 16:4, 16:5, 16:6, 16:8, 66:23, 69:12, 84:19, 87:2
**Naser** [1] - 8:13
**national** [8] - 10:15, 13:17, 16:21, 16:22, 20:19, 21:16, 74:2, 94:3
**nature** [2] - 5:24, 13:7
**near** [1] - 77:11
**need** [4] - 30:23, 73:25, 76:3, 78:12
**needed** [3] - 32:23, 53:22, 58:16
**needs** [1] - 70:2
**nefarious** [1] - 16:24
**negative** [2] - 15:14, 49:7
**negotiated** [1] - 121:2
**never** [9] - 4:25, 18:4, 40:18, 60:3, 96:22, 98:6, 107:2, 110:4, 110:9
**new** [4] - 37:11, 37:12, 44:6, 116:23
**news** [1] - 49:6
**next** [22] - 13:19, 15:10, 15:25, 26:20, 30:25, 34:20, 50:23, 53:8, 57:14, 57:16, 62:10, 64:1, 72:22, 74:7, 75:13, 93:4, 93:17, 99:2, 100:14, 105:23, 110:6, 124:4
**nice** [3] - 95:5, 103:21, 121:9
**nights** [1] - 8:25
**nitpicking** [1] - 71:17
**Noil** [1] - 14:18
**none** [1] - 73:22
**nonetheless** [1] - 114:12
**normal** [4] - 20:17, 22:15, 84:8, 84:9
**North** [1] - 2:6
**Northern** [4] - 43:3, 48:19, 71:12, 125:14

**notable** [1] - 99:9
**notation** [1] - 88:11
**notepad** [1] - 89:17
**notes** [28] - 75:6, 81:23, 82:18, 82:20, 82:25, 83:1, 84:8, 84:11, 84:14, 85:3, 85:7, 85:8, 85:10, 85:12, 85:21, 86:1, 86:7, 86:10, 86:13, 86:23, 87:4, 87:11, 87:23, 88:9, 88:15, 89:8, 89:22
**nothing** [9] - 45:14, 56:16, 71:18, 73:24, 74:1, 74:25, 75:1, 76:23, 108:9
**novel** [2] - 107:14, 107:15
**November** [6] - 6:8, 6:10, 6:18, 8:5, 66:18
**nuclear** [1] - 50:11
**number** [4] - 14:9, 22:25, 69:10, 97:2
**numbered** [1] - 21:4
**numbers** [2] - 36:19, 83:24

## O

**o'clock** [1] - 53:9
**Oakland** [2] - 6:22, 6:23
**object** [1] - 21:2
**objection** [24] - 6:4, 22:23, 25:2, 26:8, 26:14, 28:8, 38:4, 48:8, 68:5, 68:12, 72:2, 83:15, 84:23, 85:15, 86:4, 86:15, 106:18, 109:6, 109:20, 125:18, 125:25, 126:6
**objections** [1] - 109:12
**observe** [1] - 12:10
**obtained** [1] - 91:1
**obvious** [2] - 29:13, 103:23
**obviously** [4] - 8:20, 66:21, 69:13, 98:23
**occasion** [5] - 6:7, 10:19, 28:11, 43:22, 85:8
**occur** [2] - 18:10, 90:15
**occurred** [1] - 52:24
**occurs** [1] - 74:2
**October** [6] - 5:23,

**UNITED STATES DISTRICT COURT**

58:19, 59:3, 65:18,
68:1
**OF** [5] - 2:1, 2:4, 2:10,
3:5, 3:12
**off-the-books** [2] -
105:13, 107:23
**offer** [4] - 40:25,
65:16, 84:22, 104:23
**offered** [1] - 33:20
**office** [15] - 5:3, 28:18,
28:19, 30:13, 30:14,
33:18, 75:16, 81:18,
82:21, 82:22, 83:7,
85:10, 86:23, 89:8,
111:17
**OFFICE** [1] - 2:4
**Office** [2] - 5:7, 5:10
**officer** [1] - 60:24
**officers** [2] - 61:6,
99:21
**OFFICES** [1] - 2:10
**official** [6] - 84:24,
89:14, 89:17,
110:23, 114:3,
114:10
**officially** [1] - 89:18
**officials** [1] - 49:5
**often** [1] - 107:16
**oil** [6] - 13:14, 13:24,
25:10, 27:5, 85:22,
85:24
**old** [7] - 17:20, 59:15,
59:16, 59:21, 88:13,
123:23, 124:1
**old-fashioned** [1] -
88:13
**older** [2] - 17:17, 18:2
**Olympics** [1] - 49:1
**once** [3] - 32:23,
57:15, 100:16
**one** [47] - 8:11, 9:9,
9:21, 12:6, 16:17,
21:21, 21:23, 34:9,
36:16, 39:5, 39:7,
41:21, 42:20, 46:18,
49:18, 50:16, 54:25,
55:8, 59:10, 59:11,
61:13, 66:2, 66:25,
68:25, 80:4, 87:2,
87:20, 91:21, 93:4,
93:6, 97:7, 97:24,
98:24, 100:2,
103:14, 105:20,
107:10, 111:14,
111:15, 118:16,
119:9, 119:25,
125:13, 125:14
**ones** [2] - 8:10, 79:20
**ongoing** [3] - 83:2,
83:5, 84:12

**online** [1] - 119:13
**oOo** [1] - 4:3
**open** [1] - 28:19
**opened** [2] - 113:12,
122:4
**openly** [1] - 10:13
**operate** [1] - 118:9
**operation** [7] - 105:12,
105:13, 107:5,
107:13, 107:23,
108:18, 108:21
**operations** [1] -
107:16
**opinions** [2] - 68:18,
126:17
**opportunity** [1] -
88:18
**opposed** [2] - 44:15,
64:18
**Orange** [3] - 52:25,
53:5, 53:12
**order** [6] - 69:9, 69:15,
69:16, 71:15, 71:22,
111:6
**orders** [1] - 70:11
**outgoing** [5] - 12:25,
17:3, 18:7, 101:9
**outlined** [1] - 81:11
**outside** [3] - 28:17,
28:18, 68:22
**outstanding** [1] -
63:18
**overruled** [6] - 25:5,
26:10, 26:16, 28:9,
85:16, 86:17
**owed** [1] - 58:1
**own** [2] - 90:21, 109:1
**owned** [3] - 55:9,
81:11, 82:3
**owns** [1] - 44:11

### P

**p.m** [3] - 72:12, 73:1,
126:23
**P.M** [2] - 3:3, 4:2
**page** [18] - 14:2, 18:7,
18:20, 21:3, 21:11,
22:12, 24:2, 47:20,
53:8, 57:14, 62:10,
69:16, 72:22, 80:8,
99:2, 110:6
**PAGE** [1] - 3:7
**pages** [4] - 38:22,
64:2, 82:12, 88:18
**paid** [20] - 6:25, 11:22,
12:6, 39:11, 39:13,
39:25, 40:9, 40:10,
46:9, 47:21, 48:1,
53:24, 57:17, 57:24,

62:18, 76:21, 78:25,
95:9, 105:7, 125:21
**pan** [2] - 119:11,
119:12
**panic** [1] - 123:22
**paper** [5] - 33:6,
70:13, 80:23, 88:14,
89:7
**paperwork** [1] - 79:5
**paragraph** [1] - 24:14
**paralegal** [2] - 70:15,
71:10
**pardon** [2] - 12:2,
55:13
**parentheses** [1] - 75:8
**parents** [1] - 102:18
**parking** [5] - 111:4,
111:5, 111:6,
111:13, 111:21
**parroting** [1] - 25:22
**part** [12] - 22:7, 22:15,
30:20, 49:6, 70:9,
70:22, 70:25, 71:23,
78:2, 84:12, 90:1,
98:11
**participate** [1] - 98:14
**participating** [1] -
120:22
**particular** [10] - 9:21,
22:10, 26:5, 46:13,
47:20, 64:7, 65:21,
92:25, 95:20, 107:13
**partners** [1] - 15:19
**party** [7] - 6:24, 8:24,
9:4, 9:7, 9:13,
100:13, 125:10
**passed** [3] - 97:10,
116:22, 124:19
**passing** [2] - 124:22,
125:3
**patch** [1] - 61:1
**pay** [21] - 12:11,
33:14, 33:19, 33:20,
48:5, 54:1, 54:20,
56:4, 56:7, 57:23,
61:24, 65:14, 65:25,
67:25, 77:5, 79:3,
104:23, 115:7,
120:13, 122:11,
123:13
**payable** [2] - 122:7,
122:9
**paycheck** [2] - 117:10,
117:11
**paychecks** [1] - 66:9
**payment** [5] - 27:18,
58:11, 65:7, 65:25,
66:16
**PCH** [1] - 87:11
**PCHS** [1] - 87:11

**Pelissier** [8] - 73:5,
76:5, 76:9, 76:15,
76:18, 76:25, 87:5,
95:15
**Pelissier's** [2] - 73:16,
76:22
**people** [18] - 7:13,
7:17, 34:2, 43:14,
43:15, 49:24, 56:10,
56:12, 71:18, 87:10,
92:24, 94:21, 94:22,
96:2, 97:21, 98:24,
99:18, 119:24
**people's** [1] - 91:8
**period** [16] - 10:24,
13:4, 20:9, 31:17,
36:11, 39:4, 39:20,
43:13, 46:23, 49:8,
51:18, 85:4, 88:6,
102:20, 106:24,
124:18
**permission** [1] -
107:21
**person** [4] - 16:5,
17:10, 21:5, 103:14
**personal** [14] - 11:14,
11:16, 12:10, 32:22,
46:21, 54:18, 58:6,
58:12, 64:18, 65:4,
65:20, 98:2, 98:8,
114:15
**personality** [1] - 11:19
**personally** [2] - 12:10,
91:5
**phone** [7] - 11:3,
31:18, 32:7, 64:20,
90:20, 91:23, 97:15
**phonetic** [1] - 40:17
**photo** [1] - 96:9
**photograph** [15] - 8:3,
8:7, 8:21, 80:9, 92:6,
92:7, 92:13, 92:23,
92:25, 93:9, 93:10,
93:22, 97:24, 98:1
**photographs** [7] -
90:12, 90:22, 91:2,
91:17, 94:4, 98:20,
115:21
**photos** [4] - 90:20,
96:6, 96:11, 96:13
**pick** [5] - 12:14, 30:3,
30:5, 57:5, 120:13
**picked** [3] - 7:9, 29:24,
120:20
**picking** [1] - 122:1
**piece** [3] - 80:22,
90:25, 110:23
**pieces** [1] - 70:13
**Piero** [1] - 117:24
**pillar** [1] - 15:6

**Pillar** [12] - 5:7, 5:9,
6:14, 14:22, 15:8,
15:19, 33:17, 81:18,
83:9, 83:10
**pills** [1] - 51:8
**ping** [1] - 32:25
**PINKEL** [37] - 6:4,
21:2, 22:18, 22:25,
25:2, 26:8, 26:14,
28:8, 38:4, 38:7,
48:8, 68:5, 68:12,
69:2, 69:7, 71:7,
71:15, 71:24, 72:6,
72:8, 83:15, 83:17,
83:21, 84:5, 84:23,
85:15, 86:4, 86:15,
106:18, 109:6,
109:12, 109:17,
109:20, 109:22,
125:18, 125:25,
126:6
**Pinkel** [1] - 2:4
**placard** [12] - 110:13,
110:18, 110:19,
111:21, 112:5,
112:8, 112:11,
112:20, 113:5,
113:7, 117:8, 117:17
**place** [7] - 44:15,
64:24, 98:14,
108:19, 108:21,
116:23, 120:16
**placer** [1] - 65:4
**Placer** [1] - 65:20
**places** [2] - 40:14,
61:13
**PLAINTIFF** [1] - 2:3
**plan** [3] - 34:11,
103:22, 104:14
**planes** [1] - 94:22
**planned** [2] - 15:20,
15:22
**planning** [1] - 25:9
**plans** [1] - 20:6
**plot** [1] - 125:7
**point** [3] - 79:19,
97:11, 121:6
**police** [6] - 60:20,
60:24, 61:6, 99:21,
104:2, 113:2
**pop** [1] - 66:25
**popped** [1] - 111:16
**porn** [1] - 94:17
**portion** [1] - 62:10
**positive** [1] - 73:19
**possession** [5] - 70:2,
71:4, 71:8, 71:25,
81:22
**possible** [1] - 85:20
**potential** [10] - 11:17,

**UNITED STATES DISTRICT COURT**

19:5, 35:14, 75:12, 76:2, 76:3, 77:14, 87:13, 120:4, 121:9
**potentially** [3] - 75:15, 88:4, 120:3
**powered** [1] - 76:11
**powerful** [2] - 27:4, 106:17
**practically** [1] - 118:11
**practice** [3] - 58:14, 66:23, 88:7
**preparation** [1] - 70:17
**prepare** [5] - 20:11, 67:22, 67:25, 78:1, 78:4
**prepared** [4] - 24:12, 24:13, 24:15, 24:18
**presence** [4] - 4:5, 68:22, 72:13, 80:24
**present** [3] - 29:6, 29:8, 78:1
**presented** [1] - 75:21
**presenting** [1] - 71:1
**president** [9] - 16:19, 16:20, 90:13, 91:15, 92:12, 92:20, 93:3, 93:24, 93:25
**pressure** [2] - 108:25, 120:9
**pretty** [2] - 58:25, 121:6
**prevented** [3] - 60:5, 113:20, 113:23
**previous** [2] - 22:12, 124:3
**previously** [2] - 4:12, 67:1
**price** [2] - 121:2, 121:9
**private** [3] - 31:19, 71:11, 108:6
**problem** [3] - 50:13, 70:3
**problems** [2] - 61:17, 113:18
**procedures** [1] - 69:24
**proceedings** [1] - 126:23
**proceeds** [1] - 36:9
**process** [3] - 37:10, 63:4, 84:15
**product** [1] - 70:25
**products** [1] - 74:17
**professional** [2] - 9:21, 83:11
**professionally** [1] - 49:22
**progressed** [1] -

115:14
**prohibited** [2] - 114:2, 114:3
**promise** [1] - 56:5
**prompted** [1] - 62:15
**pronounce** [1] - 87:24
**properties** [9] - 52:9, 52:10, 66:3, 73:11, 76:12, 81:12, 116:19
**property** [4] - 52:4, 65:12, 66:16, 110:24
**prosecute** [1] - 71:21
**protect** [5] - 75:8, 75:10, 95:25, 104:5, 112:9
**protection** [1] - 121:12
**protective** [5] - 69:9, 69:15, 69:16, 70:11, 71:22
**provide** [6] - 18:19, 22:11, 51:3, 54:11, 121:12, 124:11
**provided** [8] - 25:11, 45:16, 84:19, 86:8, 91:17, 91:20, 105:2, 105:5
**providing** [5] - 15:16, 51:1, 61:23, 67:4, 102:11
**public** [1] - 28:19
**publicity** [1] - 49:7
**publish** [4] - 7:24, 23:24, 63:10, 92:3
**pulled** [2] - 112:19, 112:24
**purchase** [9] - 13:15, 25:9, 39:2, 41:17, 42:3, 44:18, 58:9, 65:8, 116:16
**purchased** [3] - 65:1, 80:4, 120:11
**purchasing** [2] - 44:25, 116:21
**purple** [3] - 14:3, 18:23, 73:2
**purpose** [8] - 19:3, 19:4, 19:21, 19:22, 20:5, 30:12, 111:3, 123:12
**purposes** [3] - 62:5, 123:20, 124:2
**pursued** [1] - 14:16
**put** [20] - 20:24, 43:1, 45:6, 50:18, 50:19, 58:15, 59:9, 62:19, 63:13, 64:17, 69:1, 69:5, 70:4, 70:5, 70:10, 70:21, 84:1, 108:24, 123:23,

126:3
**putting** [3] - 61:16, 103:12, 106:14

### Q

**Qatar** [7] - 48:20, 49:2, 49:3, 49:5, 49:6, 49:7, 49:11
**Qatari** [1] - 50:15
**queried** [5] - 14:22, 15:10, 16:12, 27:21, 74:8
**queries** [1] - 58:20
**query** [4] - 14:6, 73:4, 74:11
**querying** [3] - 66:19, 75:25, 102:15
**questions** [3] - 88:24, 103:5, 113:2
**quickest** [1] - 54:21
**quickly** [1] - 79:8
**quietly** [1] - 68:20
**quite** [3] - 11:6, 31:20

### R

**ramifications** [1] - 113:9
**ran** [7] - 13:20, 17:21, 59:10, 59:14, 59:15, 73:16, 74:22
**rather** [3] - 30:17, 44:14, 119:2
**ratio** [1] - 53:23
**ray** [1] - 67:12
**Ray** [2] - 67:22, 77:24
**re** [1] - 68:6
**re-ask** [1] - 68:6
**reach** [1] - 104:4
**reached** [1] - 123:25
**reaching** [2] - 63:8, 103:8
**ready** [3] - 41:17, 58:9, 123:13
**real** [5] - 56:18, 73:10, 76:11, 87:8, 88:15
**really** [10] - 28:24, 34:19, 56:5, 58:16, 87:20, 103:19, 116:3, 117:18, 122:5, 126:11
**reason** [2] - 59:2, 94:14
**reasonable** [1] - 119:13
**reasons** [3] - 34:9, 105:19, 114:15
**receipts** [3] - 36:8, 36:9, 115:12

**RECEIVED** [1] - 3:14
**received** [23] - 12:10, 20:19, 23:5, 23:8, 25:17, 26:5, 26:13, 26:17, 27:14, 31:15, 41:2, 41:3, 80:1, 80:2, 80:15, 80:16, 82:8, 82:9, 88:7, 88:8, 91:6, 92:1, 92:2
**receiving** [2] - 101:9, 112:20
**receptive** [1] - 31:6
**recess** [3] - 72:12, 126:9, 126:21
**recognize** [16] - 20:12, 20:15, 38:23, 38:25, 40:11, 63:14, 63:16, 80:8, 80:19, 80:21, 91:11, 91:14, 92:24, 93:2, 93:3, 93:10
**recollection** [1] - 85:3
**record** [12] - 4:6, 22:19, 59:17, 68:23, 69:1, 69:6, 70:4, 70:5, 70:10, 70:22, 72:14
**recorded** [2] - 26:5, 26:17
**recordings** [1] - 88:19
**records** [3] - 46:7, 46:15, 53:7
**reduce** [1] - 53:22
**reestablish** [1] - 10:19
**refer** [1] - 108:20
**reference** [4] - 63:25, 64:6, 64:10, 88:16
**referred** [1] - 21:12
**referring** [3] - 48:24, 108:21, 108:22
**reflect** [4] - 4:6, 24:4, 68:23, 72:14
**reflected** [4] - 40:19, 47:20, 73:2, 103:7
**reflecting** [1] - 24:18
**refreshes** [1] - 96:9
**regarding** [5] - 14:10, 59:17, 85:21, 101:10, 102:5
**regular** [3] - 43:14, 43:15, 52:22
**regularly** [1] - 58:15
**Regulin** [1] - 81:16
**reimburse** [2] - 115:8, 125:22
**rejected** [1] - 60:15
**relate** [1] - 25:11
**related** [1] - 16:25
**relates** [1] - 15:17
**relationship** [10] -

9:16, 9:18, 83:2, 83:11, 90:11, 96:16, 96:18, 98:2, 98:8, 102:12
**relevance** [6] - 6:4, 106:18, 109:18, 125:18, 125:25, 126:6
**relevancy** [2] - 109:20, 109:21
**reliable** [1] - 17:20
**relieved** [1] - 120:9
**remains** [1] - 69:3
**remember** [26] - 11:5, 11:6, 17:6, 27:2, 36:19, 38:11, 41:25, 43:9, 44:10, 46:22, 47:7, 47:8, 51:21, 62:9, 68:17, 75:5, 77:13, 87:23, 91:22, 96:13, 97:25, 98:1, 99:19, 104:4, 126:15
**remembrance** [2] - 125:7, 125:9
**renew** [1] - 25:2
**rental** [3] - 52:9, 52:10, 125:16
**repetitive** [1] - 59:7
**report** [13] - 20:16, 21:3, 24:7, 27:25, 31:2, 32:3, 32:9, 32:23, 35:15, 75:11, 75:24, 102:4
**reporting** [3] - 16:24, 32:15, 51:9
**reprimanded** [1] - 113:15
**request** [2] - 27:19, 71:19
**reserve** [2] - 52:22, 116:12
**reserves** [3] - 115:2, 115:3, 115:11
**resolve** [1] - 70:3
**resort** [1] - 47:22
**respect** [44] - 5:16, 11:9, 11:21, 17:12, 20:18, 20:19, 22:4, 25:7, 29:1, 30:9, 37:15, 49:11, 53:18, 54:12, 61:14, 61:20, 61:23, 64:7, 64:15, 65:11, 65:19, 70:17, 77:2, 77:24, 84:18, 85:7, 85:12, 86:1, 86:14, 88:25, 90:13, 95:20, 97:3, 102:24, 104:25, 105:1, 106:5, 108:10, 110:7, 113:1, 113:4,

113:15, 125:15, 125:23
**respective** [3] - 4:7, 49:25, 72:15
**respond** [3] - 19:7, 63:21, 101:20
**responded** [1] - 117:13
**responding** [1] - 64:14
**response** [3] - 63:8, 63:22, 68:1
**responses** [1] - 59:24
**responsibilities** [1] - 125:5
**responsibility** [2] - 106:6, 106:8
**rest** [1] - 116:3
**result** [1] - 16:8
**results** [2] - 107:17, 107:20
**RESUMED** [2] - 3:9, 4:14
**retire** [2] - 68:19, 126:18
**retired** [1] - 47:5
**retirement** [1] - 66:5
**return** [4] - 5:20, 32:10, 35:5, 35:8
**returned** [1] - 9:12
**rid** [1] - 53:23
**ride** [1] - 44:4
**ridiculous** [1] - 67:20
**rise** [4] - 51:9, 68:21, 72:11, 126:22
**risky** [1] - 107:8
**Riverside** [1] - 118:2
**Road** [1] - 5:12
**robust** [2] - 17:19, 58:24
**Rodeo** [1] - 5:12
**Rodriguez** [1] - 2:5
**role** [1] - 119:4
**Rolex** [4] - 8:21, 116:1, 116:2
**Rolodex** [1] - 73:12
**Room** [7] - 5:1, 5:4, 10:14, 12:13, 61:12, 97:19, 122:12
**room** [6] - 33:14, 48:5, 68:19, 95:10, 97:24, 126:18
**rooms** [3] - 12:9, 47:21, 76:20
**rough** [1] - 115:24
**roughly** [3] - 5:23, 6:10, 41:5
**roundabout** [1] - 59:22
**routinely** [2] - 22:7,

74:2
**royal** [1] - 49:5
**rule** [1] - 22:20
**ruled** [1] - 27:13
**rules** [1] - 106:4
**rummaging** [1] - 111:15
**run** [17] - 13:23, 15:20, 15:23, 16:2, 19:11, 50:5, 50:21, 61:14, 66:23, 76:6, 76:8, 76:14, 76:18, 77:5, 101:24, 102:7, 107:16
**running** [4] - 59:12, 72:25, 76:21, 77:19
**runs** [2] - 16:17, 50:4
**Russia** [1] - 101:19
**Russian** [2] - 101:19, 101:25
**Ruth** [1] - 2:4
**Ryan** [3] - 60:22, 99:16, 100:5

## S

**salaries** [2] - 66:12, 66:13
**sale** [18] - 13:14, 13:15, 27:5, 61:17, 63:1, 63:20, 64:8, 67:12, 67:22, 67:23, 68:2, 72:20, 77:23, 78:1, 78:4, 78:12, 79:1, 100:24
**sales** [4] - 36:9, 41:5, 123:9
**salesman** [1] - 44:22
**salon** [2] - 55:18, 55:20
**Sam** [9] - 74:8, 74:14, 74:15, 75:10, 77:6, 77:9, 77:20, 86:24, 88:25
**San** [4] - 2:11, 42:16, 74:16, 106:11
**sandbox** [1] - 71:17
**Sargsyan** [167] - 4:23, 6:25, 7:17, 8:12, 9:16, 9:23, 10:2, 10:7, 10:8, 10:14, 10:15, 10:19, 11:8, 11:11, 12:14, 13:1, 13:13, 15:10, 15:11, 15:22, 16:16, 16:19, 17:4, 17:12, 18:1, 19:12, 19:23, 23:20, 23:21, 25:12, 26:5, 29:15, 29:24, 30:8, 30:13, 30:18, 31:1,

31:20, 32:2, 32:9, 32:14, 33:12, 33:24, 33:25, 34:14, 35:4, 35:21, 36:1, 36:25, 43:6, 43:23, 44:18, 45:18, 46:9, 46:24, 47:15, 47:21, 48:3, 48:6, 48:12, 48:24, 49:10, 49:17, 50:15, 51:1, 51:4, 51:11, 52:15, 53:4, 53:15, 53:25, 54:2, 54:12, 55:16, 55:18, 55:23, 56:3, 56:9, 58:20, 59:12, 59:18, 59:20, 60:9, 60:18, 61:5, 61:15, 61:20, 61:23, 66:15, 66:19, 67:7, 69:13, 73:1, 73:8, 73:14, 74:15, 76:6, 76:8, 76:17, 76:24, 77:18, 82:19, 82:22, 84:19, 85:8, 86:9, 86:22, 87:2, 87:19, 88:4, 88:8, 88:20, 89:3, 90:2, 90:8, 90:12, 91:18, 92:14, 94:20, 95:9, 96:1, 96:16, 96:19, 98:19, 98:23, 99:24, 100:10, 100:21, 101:6, 101:9, 101:15, 101:23, 102:9, 102:24, 103:2, 104:8, 104:21, 105:9, 106:24, 108:9, 108:16, 108:18, 109:1, 109:5, 109:11, 109:15, 109:16, 109:25, 110:13, 110:19, 112:6, 112:8, 112:19, 114:22, 117:5, 117:16, 119:15, 119:22, 120:10, 121:5, 121:7, 121:13, 122:14, 123:6, 124:5, 124:8
**Sargsyan's** [8] - 33:2, 55:1, 57:15, 77:3, 88:12, 98:11, 103:13, 112:1
**sat** [1] - 97:23
**savings** [2] - 58:7, 58:16
**saw** [14] - 14:11, 24:19, 25:25, 26:4, 43:14, 69:7, 69:9, 69:13, 69:22, 79:5,

111:15, 115:21, 122:4, 122:5
**SBK** [3] - 16:13, 16:17, 16:25
**Schoonover** [2] - 78:23, 100:25
**scientists** [1] - 49:24
**scratch** [1] - 80:22
**screen** [1] - 63:13
**sea** [1] - 67:12
**Sea** [2] - 67:22, 77:24
**search** [1] - 13:25
**searched** [1] - 83:13
**searches** [5] - 58:19, 59:3, 62:6, 89:24
**searching** [2] - 37:18, 39:2
**seats** [3] - 4:7, 68:25, 72:15
**second** [4] - 54:16, 92:23, 116:16, 123:2
**section** [6] - 14:3, 17:2, 18:21, 24:4, 73:2, 74:3
**secured** [2] - 70:2, 71:24
**security** [15] - 10:16, 13:17, 16:22, 20:19, 21:16, 74:3, 74:20, 94:3, 99:23, 103:13, 103:25, 110:1
**see** [90] - 9:4, 9:7, 12:23, 14:1, 14:9, 14:12, 14:17, 14:22, 14:25, 15:4, 15:8, 15:10, 15:14, 15:15, 15:25, 16:7, 16:23, 17:1, 17:4, 18:6, 18:8, 18:21, 18:23, 21:14, 22:13, 27:21, 27:25, 35:17, 35:19, 36:13, 42:8, 42:23, 43:10, 43:12, 47:1, 47:20, 48:4, 48:11, 48:20, 52:11, 53:1, 53:12, 59:8, 59:25, 61:4, 62:11, 64:4, 65:3, 65:21, 67:1, 67:11, 70:19, 70:20, 72:21, 72:22, 73:1, 74:7, 74:9, 75:21, 79:13, 81:10, 83:8, 92:23, 93:13, 94:2, 96:6, 97:18, 100:16, 100:19, 101:11, 101:24, 102:14, 102:15, 102:17, 107:22, 112:18, 113:24, 114:8, 114:9, 114:18,

118:3, 119:18, 119:19, 122:21, 122:25, 123:3, 124:4, 124:14, 126:18
**seeing** [4] - 75:5, 77:13, 91:22, 98:1
**seem** [4] - 56:15, 60:19, 119:13
**seized** [1] - 83:12
**Selgan** [2] - 16:1, 16:10
**sell** [13] - 37:21, 37:24, 38:10, 38:16, 39:9, 39:19, 39:23, 40:7, 40:11, 57:11, 119:5, 119:8, 119:12
**seller** [4] - 41:20, 41:21, 41:25, 43:24
**selling** [4] - 40:17, 74:17, 78:2, 116:19
**send** [4] - 117:10, 117:11, 119:25, 120:2
**sense** [3] - 17:20, 55:21, 59:11
**sensitive** [1] - 69:21
**sent** [7] - 27:7, 62:19, 63:17, 78:19, 101:18, 119:21, 119:22
**Sentinel** [10] - 14:7, 14:17, 15:23, 16:2, 73:4, 75:22, 76:1, 76:6, 84:15, 101:24
**sentinel** [5] - 15:20, 17:13, 59:15, 67:3, 73:17
**separately** [1] - 47:2
**SEPTEMBER** [2] - 3:2, 4:1
**September** [3] - 53:1, 53:16, 65:18
**serious** [1] - 48:21
**SESSION** [1] - 3:3
**set** [6] - 17:10, 19:10, 34:7, 58:13, 58:16, 110:7
**setting** [2] - 19:18, 125:7
**settled** [1] - 42:7
**several** [11] - 7:9, 7:17, 13:24, 31:21, 38:22, 59:7, 81:11, 81:16, 82:12, 102:14, 105:19
**shade** [1] - 49:4
**shakers** [1] - 49:25
**shared** [1] - 50:16
**sheet** [1] - 89:7

**sheets** [1] - 88:14
**sheik** [2] - 49:13, 50:2
**shield** [3] - 45:24, 112:11, 121:12
**shop** [1] - 111:22
**short** [2] - 69:10, 69:22
**shot** [1] - 104:3
**show** [5] - 90:12, 90:19, 92:6, 94:7, 104:1
**showed** [4] - 7:1, 7:3, 90:16, 90:17
**showing** [1] - 116:9
**shown** [2] - 91:18, 92:13
**showroom** [1] - 44:24
**shows** [3] - 21:4, 51:20, 58:18
**sic)** [1] - 36:24
**sick** [1] - 118:4
**sides** [1] - 71:16
**sight** [1] - 58:14
**signed** [1] - 67:7
**significance** [1] - 94:4
**significant** [5] - 13:20, 13:22, 17:9, 92:16, 93:16
**similar** [2] - 111:19, 111:25
**simply** [1] - 23:1
**sitting** [1] - 69:4
**six** [2] - 96:7, 118:13
**slides** [2] - 50:23, 116:9
**soccer** [1] - 49:1
**social** [1] - 95:23
**socialize** [1] - 33:24
**Solakyan** [16] - 74:8, 74:12, 74:14, 74:16, 74:22, 75:10, 75:12, 75:14, 75:15, 77:2, 77:6, 77:9, 77:20, 86:24, 88:25
**Solakyan's** [2] - 75:7, 75:25
**sold** [22] - 37:20, 37:25, 38:1, 39:1, 39:8, 39:21, 39:22, 39:24, 40:5, 56:18, 62:13, 66:1, 66:2, 66:3, 78:9, 78:10, 78:11, 78:22, 79:20, 100:25
**someone** [11] - 18:18, 25:4, 41:19, 44:15, 50:2, 50:11, 56:15, 59:1, 67:4, 86:14, 124:5
**sometimes** [1] - 66:24

**soon** [2] - 54:20, 56:8
**sorry** [16] - 7:16, 8:17, 10:12, 11:15, 18:11, 35:25, 47:11, 55:11, 55:13, 56:20, 75:1, 83:20, 91:8, 100:17, 109:19, 117:3
**sort** [2] - 50:12, 92:22
**source** [15] - 35:14, 51:13, 55:7, 55:23, 65:24, 67:8, 75:12, 75:16, 75:17, 76:2, 76:4, 77:14, 106:25, 123:5
**sources** [1] - 87:14
**South** [1] - 5:12
**Southern** [4] - 4:17, 53:4, 71:12, 125:14
**specific** [2] - 50:20, 69:12
**specifically** [2] - 69:16, 70:14
**speculation** [2] - 83:15, 109:6
**speed** [1] - 126:13
**spelling** [1] - 22:2
**SPK** [2] - 81:13, 109:5
**spots** [1] - 111:6
**Spring** [1] - 2:6
**spy** [1] - 24:16
**square** [2] - 119:3
**stainless** [1] - 116:2
**stand** [2] - 4:8, 72:16
**standing** [2] - 69:4, 93:17
**stands** [1] - 69:23
**star** [3] - 108:6, 108:7
**start** [3] - 9:18, 24:2, 126:19
**started** [5] - 60:4, 83:4, 115:7, 115:13, 115:14
**starting** [1] - 12:22
**starts** [1] - 44:10
**state** [3] - 49:24, 50:12, 50:13
**statement** [1] - 67:14
**STATES** [1] - 2:4
**states** [1] - 69:16
**States** [4] - 2:6, 16:19, 60:8, 87:16
**station** [1] - 81:21
**stay** [10] - 7:21, 8:4, 8:23, 33:4, 33:10, 46:8, 47:24, 71:8, 77:8, 95:12
**stayed** [7] - 31:9, 31:12, 33:1, 33:6, 46:5, 58:11, 95:7
**staying** [1] - 45:20

**stealing** [1] - 109:5
**steel** [1] - 116:2
**Stein** [3] - 86:14, 86:20, 87:22
**step** [1] - 89:24
**steps** [2] - 37:14, 42:5
**Steve** [2] - 18:7, 44:9
**STEVEN** [1] - 2:10
**Steven** [2] - 2:10, 19:23
**stick** [4] - 44:7, 103:21, 104:19, 106:14
**still** [2] - 30:21, 90:20
**stood** [1] - 87:21
**store** [7] - 118:11, 118:23, 119:1, 119:2, 119:11, 119:16, 122:9
**Street** [2] - 2:6, 2:11
**street** [1] - 33:1
**stricken** [1] - 83:22
**strike** [6] - 23:6, 25:3, 34:10, 75:1, 83:17, 83:21
**stuff** [4] - 38:13, 44:6, 51:20, 120:8
**stupid** [2] - 110:22, 117:18
**subject** [5] - 23:5, 25:8, 35:15, 60:2, 69:9
**submit** [1] - 27:18
**submitted** [1] - 126:17
**sufficient** [1] - 50:18
**suggested** [1] - 55:16
**suing** [1] - 109:16
**suits** [1] - 119:14
**summer** [2] - 49:3
**Sunday** [1] - 31:13
**supervisor** [4] - 19:25, 20:4, 107:4, 113:16
**support** [1] - 62:12
**supposed** [2] - 108:23, 114:9
**surgery** [2] - 48:12, 48:16
**surprise** [3] - 45:2, 45:3, 95:5
**surrounded** [1] - 60:20
**Suruchi** [2] - 21:24, 50:16
**suruchi** [1] - 21:25
**SURUCHI** [1] - 22:1
**surveillance** [7] - 99:9, 103:13, 103:23, 104:1, 108:3, 110:8, 110:9
**sustained** [15] - 6:5,

48:9, 68:6, 83:16, 84:6, 84:25, 86:5, 106:19, 109:8, 109:13, 109:23, 125:19, 126:1, 126:7
**sworn** [1] - 4:12
**Syria** [1] - 27:6
**system** [7] - 17:20, 27:16, 59:13, 61:15, 66:20, 66:24, 67:3

---

### T

**tab** [2] - 12:15, 57:6
**Tahoe** [6] - 51:24, 52:1, 62:13, 66:1, 66:16, 116:17
**Tahoma** [1] - 66:2
**taint** [1] - 15:6
**tape** [1] - 110:15
**target** [1] - 103:21
**tasks** [3] - 20:18, 21:18, 22:4
**taught** [1] - 59:1
**tax** [2] - 123:20, 124:2
**taxes** [2] - 123:13, 123:14
**team** [3] - 69:17, 103:13, 108:3
**Teigen** [1] - 122:18
**telephoned** [1] - 96:25
**teller** [1] - 123:24
**tempt** [1] - 121:9
**ten** [2] - 59:16, 115:23
**term** [3] - 13:24, 16:15, 75:8
**Termendzhyan** [39] - 9:22, 11:13, 13:10, 13:14, 13:25, 14:6, 14:10, 16:17, 17:8, 19:12, 27:22, 28:24, 29:2, 30:14, 30:22, 31:5, 34:5, 34:15, 34:22, 35:9, 55:6, 85:13, 86:8, 87:21, 89:1, 90:5, 90:9, 91:6, 93:20, 94:1, 103:15, 104:16, 106:15, 106:23, 109:2, 109:4, 109:11, 109:16, 110:2
**Termendzhyan's** [1] - 14:21
**terms** [4] - 14:1, 16:16, 56:2, 58:24
**territory** [1] - 106:3
**testified** [3] - 4:13, 57:5, 61:2
**testify** [5] - 24:24,

25:17, 25:23, 25:24, 26:1
**testimony** [5] - 9:3, 28:8, 82:14, 88:17, 110:7
**Texas** [6] - 52:5, 52:7, 54:18, 64:19, 66:3, 66:4
**text** [9] - 17:2, 18:25, 50:25, 97:4, 101:13, 108:20, 112:21, 117:4, 119:19
**texted** [4] - 48:18, 91:21, 96:22, 97:9
**texting** [3] - 13:3, 48:12, 51:6
**texts** [6] - 12:25, 13:4, 13:7, 17:3, 101:9, 102:25
**Thani** [2] - 49:11, 50:21
**THE** [91] - 2:4, 4:6, 5:7, 6:5, 7:14, 7:16, 7:19, 8:1, 21:8, 22:22, 23:3, 23:9, 23:11, 23:12, 23:14, 23:15, 23:17, 23:18, 23:25, 24:17, 24:20, 24:21, 24:24, 25:5, 25:15, 25:21, 26:10, 26:16, 26:19, 26:20, 27:13, 28:9, 34:20, 38:5, 38:6, 38:16, 38:17, 41:2, 48:9, 56:19, 56:20, 62:23, 63:11, 68:6, 68:13, 68:21, 68:23, 69:5, 70:4, 70:7, 70:21, 71:5, 71:14, 71:16, 72:2, 72:5, 72:7, 72:9, 72:11, 72:14, 77:15, 77:16, 80:1, 80:15, 82:8, 83:16, 83:20, 83:22, 84:6, 84:25, 85:16, 86:5, 86:16, 86:17, 86:18, 92:1, 92:4, 100:14, 105:22, 106:19, 109:8, 109:13, 109:19, 109:21, 109:23, 118:17, 118:19, 125:19, 126:1, 126:7, 126:22
**theory** [1] - 27:4
**they've** [1] - 67:21
**thinking** [1] - 60:4
**third** [3] - 18:20, 40:4, 93:9
**thousand** [1] - 56:6
**threats** [2] - 72:1, 72:6

**three** [15] - 6:15, 16:5, 34:23, 34:24, 38:1, 38:13, 40:12, 41:6, 52:12, 52:16, 63:18, 79:19, 79:21, 123:23, 124:1
**threshold** [1] - 50:19
**throughout** [3] - 12:9, 70:16, 102:12
**Tim** [1] - 78:23
**timeline** [6] - 27:17, 31:8, 36:22, 37:3, 50:24, 62:11
**title** [2] - 65:4, 65:20
**today** [1] - 88:17
**together** [2] - 103:12, 106:14
**tomorrow** [3] - 108:17, 126:12, 126:18
**took** [9] - 7:10, 9:2, 13:20, 23:10, 29:20, 53:13, 78:11, 91:5, 98:14
**top** [2] - 12:22, 24:2
**total** [2] - 45:3, 65:8
**totaled** [1] - 79:21
**touch** [3] - 58:10, 75:16, 123:24
**toward** [1] - 23:4
**transaction** [2] - 120:15, 123:16
**transcribe** [1] - 23:16
**transfer** [7] - 39:14, 40:1, 57:18, 57:23, 58:3, 58:6
**transferred** [1] - 79:6
**transfers** [1] - 41:11
**travel** [2] - 43:2, 125:15
**traveled** [1] - 86:11
**traveling** [1] - 37:4
**tremendously** [1] - 118:14
**Trent** [1] - 8:18
**trial** [4] - 12:9, 70:9, 70:16, 70:17
**tried** [6] - 19:10, 35:14, 45:11, 87:20, 119:11, 120:1
**trigger** [1] - 104:3
**trip** [22] - 6:7, 6:8, 6:13, 34:3, 46:18, 47:16, 48:2, 94:16, 94:25, 95:13, 95:15, 95:20, 95:23, 96:2, 96:4, 96:5, 96:12, 98:15, 98:18, 100:3, 100:5, 100:7
**trouble** [4] - 77:12,

113:7, 117:5, 117:8
**true** [6] - 31:15, 32:19, 36:10, 67:16, 67:19, 108:13
**try** [8] - 7:14, 45:23, 59:23, 70:13, 87:24, 103:21, 104:19, 119:8
**trying** [16] - 19:15, 19:16, 31:2, 32:2, 32:8, 40:11, 49:2, 51:7, 60:15, 63:1, 77:22, 95:20, 107:12, 110:7, 119:5, 119:12
**Turkey** [1] - 90:8
**turkey** [2] - 16:18, 86:2
**Turkish** [4] - 25:9, 92:12, 92:20, 93:3
**turn** [1] - 118:8
**turned** [1] - 31:18
**Tustin** [1] - 53:9
**twice** [1] - 74:8
**twist** [1] - 103:22
**two** [24] - 7:18, 8:9, 8:25, 21:20, 34:23, 34:24, 36:10, 36:11, 38:13, 40:15, 56:6, 56:22, 64:1, 71:18, 91:22, 94:24, 98:24, 99:19, 100:10, 103:19, 116:1, 117:14, 122:21
**type** [14] - 11:1, 15:5, 45:15, 45:20, 61:19, 73:23, 75:25, 88:24, 96:15, 96:18, 102:4, 104:5, 121:12, 122:2

### U

**Uber** [3] - 9:2, 29:20, 53:13
**ultimately** [6] - 45:8, 52:25, 61:24, 78:22, 103:2, 107:22
**under** [1] - 46:10
**undercover** [2] - 115:8, 115:20
**understood** [2] - 11:10, 60:3
**UNITED** [1] - 2:4
**United** [4] - 2:6, 16:19, 60:8, 87:16
**unorthodox** [7] - 103:18, 105:17, 107:5, 107:8, 107:16, 107:23, 110:8

**unpack** [1] - 94:18
**unpaid** [1] - 68:10
**unsecure** [1] - 69:12
**untrue** [1] - 108:14
**up** [45] - 7:2, 7:3, 7:9, 12:14, 13:24, 17:9, 17:10, 19:10, 19:19, 20:22, 29:14, 29:24, 30:3, 30:5, 34:7, 43:25, 44:16, 44:25, 49:6, 53:4, 53:13, 57:5, 60:2, 66:25, 68:10, 70:8, 72:20, 74:25, 82:2, 89:22, 89:23, 103:2, 106:11, 107:8, 110:7, 115:14, 116:23, 120:13, 120:20, 122:1, 122:4, 125:7, 125:14, 126:13, 126:19
**upset** [1] - 12:6
**USAA** [6] - 54:19, 57:19, 57:22, 58:4, 64:12, 64:20
**useful** [1] - 19:6
**USIC** [3] - 20:25, 22:5, 24:16
**USSA** [1] - 65:4
**usual** [2] - 34:1, 66:23
**Utah** [1] - 93:6

### V

**vacation** [5] - 46:21, 51:22, 53:11, 114:13
**vague** [1] - 38:4
**validated** [1] - 92:19
**validates** [1] - 94:8
**valuable** [5] - 26:23, 51:9, 87:15, 88:5, 116:2
**valuables** [1] - 115:17
**value** [7] - 26:25, 76:14, 77:19, 102:8, 112:6, 115:24, 116:3
**variety** [1] - 40:14
**various** [4] - 16:6, 80:23, 81:1, 119:11
**Vegas** [21] - 6:8, 6:17, 6:20, 7:4, 7:6, 10:18, 11:21, 46:13, 46:16, 46:18, 46:22, 51:19, 60:25, 94:11, 94:15, 94:17, 98:14, 98:18, 99:12, 100:11, 119:10
**vehicle** [3] - 38:10, 38:12, 40:5

**vehicles** [3] - 39:1, 39:19, 40:12
**verified** [2] - 87:19, 90:24
**verify** [3] - 82:2, 87:20, 90:25
**vet** [1] - 59:23
**via** [1] - 74:18
**Victor** [2] - 20:2, 20:3
**view** [1] - 50:2
**violates** [1] - 69:15
**violations** [1] - 71:22
**visiting** [2] - 33:11, 102:17

### W

**wait** [1] - 37:21
**wants** [1] - 71:3
**wash** [2] - 81:20, 81:21
**waste** [1] - 58:13
**watch** [1] - 8:20
**watches** [5] - 115:20, 115:21, 115:25, 116:5, 116:6
**ways** [3] - 16:6, 103:19, 119:12
**wealthy** [8] - 11:24, 12:3, 56:15, 73:11, 73:12, 76:11, 87:9, 101:19
**wearing** [1] - 8:20
**WEDNESDAY** [2] - 3:2, 4:1
**weekend** [10] - 7:21, 31:9, 33:4, 33:22, 34:3, 46:6, 47:13, 95:7, 95:12, 99:24
**weeks** [1] - 56:6
**weight** [1] - 23:4
**Wells** [6] - 36:16, 37:18, 39:16, 40:1, 41:14, 42:24
**whatnot** [1] - 81:12
**whatsoever** [1] - 73:21
**whereabouts** [1] - 32:23
**white** [2] - 8:12, 62:10
**white-haired** [1] - 8:12
**whole** [3] - 33:25, 47:18, 63:23
**wife** [2] - 51:24, 66:8
**Williams** [2] - 98:10, 98:24
**Wilshire** [3] - 33:11, 37:5
**wire** [4] - 39:14, 40:1, 41:11, 65:3

**wired** [1] - 65:20
**withdraw** [4] - 41:10, 41:13, 42:9, 42:11
**withdrew** [1] - 42:11
**witness** [7] - 4:8, 4:12, 23:5, 72:6, 72:16
**WITNESS** [14] - 3:7, 7:16, 23:11, 23:14, 23:17, 24:20, 26:19, 38:5, 38:17, 56:20, 77:16, 86:16, 86:18, 118:19
**witnesses** [1] - 25:24
**WITNESSES** [1] - 3:5
**word** [1] - 60:6
**words** [1] - 23:15
**world** [2] - 24:16, 103:19
**wrapping** [1] - 72:20
**write** [8] - 20:22, 26:9, 62:12, 62:15, 73:25, 88:11, 124:3
**writing** [3] - 62:10, 88:25, 89:11
**wrote** [6] - 20:16, 25:23, 63:7, 63:22, 75:11

### Y

**year** [2] - 10:25, 124:3
**years** [5] - 17:25, 49:2, 59:16, 96:7, 118:13
**yellow** [1] - 17:2
**yourself** [2] - 8:8, 48:11
**yourselves** [2] - 68:18, 126:16

**UNITED STATES DISTRICT COURT**