UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          ) CASE NO.
                                    ) 20-CR-00224-RGK
        vs.                         )
                                    )
BABAK BROUMAND,                     )
                                    )
                Defendant.          )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**TRIAL DAY 8 - P.M. SESSION**

THURSDAY, SEPTEMBER 29, 2022

1:03 P.M.

LOS ANGELES, CALIFORNIA

_____

MAREA WOOLRICH, CSR 12698, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, SUITE 4311
LOS ANGELES, CALIFORNIA 90012
mareawoolrich@aol.com

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR PLAINTIFF:**

OFFICE OF THE UNITED STATES ATTORNEY
By:  Ruth Pinkel
-and- Michael Morse
-and- Juan Rodriguez
Assistant United States Attorneys
312 North Spring Street
Los Angeles, CA 90012

**FOR DEFENDANT:**

LAW OFFICES OF STEVEN F. GRUEL
By:  Steven F. Gruel
315 Montgomery Street 10th Floor
San Francisco, CA 94104

**UNITED STATES DISTRICT COURT**

**I N D E X**

THURSDAY, SEPTEMBER 29, 2022

**P.M. SESSION**

-----------------------------------------------------------

**CHRONOLOGICAL INDEX OF WITNESSES**

| WITNESS | PAGE |
|---|---|
| BABAK BROUMAND | |
| CROSS-EXAMINATION (RESUMED) BY MS. PINKEL | 5 |
| REDIRECT EXAMINATION BY MR. GRUEL | 33 |
| RECROSS-EXAMINATION BY MS. PINKEL | 38 |
| SALLY MURILLO | |
| DIRECT EXAMINATION BY MR. GRUEL | 39 |
| ZAHAR ANSARI | |
| DIRECT EXAMINATION BY MR. GRUEL | 47 |
| CROSS-EXAMINATION BY MS. PINKEL | 52 |
| REDIRECT EXAMINATION BY MR. GRUEL | 57 |
| RECROSS-EXAMINATION BY MS. PINKEL | 58 |
| RICHARD CARL | |
| DIRECT EXAMINATION BY MR. GRUEL | 63 |
| CROSS-EXAMINATION BY MS. PINKEL | 93 |

**UNITED STATES DISTRICT COURT**

**I N D E X**

THURSDAY, SEPTEMBER 29, 2022

**P.M. SESSION**

------------------------------------------------------------

**INDEX OF EXHIBITS**

RECEIVED INTO EVIDENCE

Exhibit No. 235                                              8
Exhibit No. 1053                                            76
Exhibit No. 1054                                            76
Exhibit No. 1056                                            77
Exhibit No. 1067-2                                          91
Exhibit No. 1055                                            79

**UNITED STATES DISTRICT COURT**

LOS ANGELES, CALIFORNIA; THURSDAY, SEPTEMBER 29, 2022

1:03 P.M.

-oOo-

THE COURT:  Let the record reflect that all the members of the jury are in their respective seats in the jury box including the alternates.  The witness is on the witness stand.

Counsel, you may continue with your cross.

MS. PINKEL:  Thank you, Your Honor.

BABAK BROUMAND,

called as a witness by the defense, was previously sworn and testified as follows:

CROSS-EXAMINATION (RESUMED)

BY MS. PINKEL:

Q   Mr. Broumand, before lunch -- the lunch break, we were talking about Exhibit 56.  And you are aware, aren't you, that your wife's cousins didn't sign this lease?

MR. GRUEL:  Objection.  Speculation.

THE COURT:  Overruled.

Are you aware?

THE WITNESS:  No.

BY MS. PINKEL:

Q   Okay.  And you are aware that they said they never signed this lease?

**UNITED STATES DISTRICT COURT**

A       I'm not aware of that.

Q       You are familiar with the discovery in this case; right?

A       Yes.

Q       I think that's where we left.  You have discovery from this case on your personal laptop; correct?

A       No, that's not correct.

Q       Okay.  You played a recording yesterday that was evidence in this case from your own laptop; right?

A       That's correct.

Q       And you had other Bates number documents on your computer yesterday; isn't that correct?

A       That is not correct.

Q       And you know that your cousins testified -- that your wife's cousins and her -- cousin and husband testified in front of the grand jury in February of 2020; right?

A       Well, I know they testified, but I don't know the contents.

Q       Okay.  But you know that they testified because you actually talked about that in the recording that the government played of you and Sargsyan?

A       I said that they were going to testify.

Q       I believe you said that they testified last week is what you said.

A       Okay.

UNITED STATES DISTRICT COURT

Q       All right.  You knew they had testified.

And you are aware of what they said in the grand jury; right?

A       No.  There's like half a million pages of paper in this file.

Q       You saw that there were grand jury transcripts that came in that were produced to you with the testimony of the Witsons, didn't you?

A       I did.  But I didn't read every single document in this case.

Q       All right.  But you knew there were grand jury testimony for the Witsons?

A       Yes.

MR. GRUEL:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MS. PINKEL:

Q       And you know that they testified before the grand jury that they did not sign the lease which is at Exhibit 56?

A       No, I do not know that.

Q       And they were unaware of that lease?

A       I am not aware of that.

Q       Let's look at Exhibit 235.  Can you look at Exhibit 235 in the binder in front of you which will be in Volume 4.

**UNITED STATES DISTRICT COURT**

A        Okay.

Q        And do you recognize the photo in Exhibit 235?

A        Yes.

Q        All right.  What is that?

A        That's our house in Lake Tahoe.

MS. PINKEL:  All right.  Move to admit and publish, Your Honor.

MR. GRUEL:  No objection.

THE COURT:  It will be received and published.

(Exhibit No. 235 received into evidence.)

BY MS. PINKEL:

Q        So your house in Tahoe, it has a different paint job now; right?

A        Yes, we painted it.

Q        Okay.  It's white and bright blue now?

A        It's white and navy blue.

Q        White and navy -- white with navy trim?

A        That's right.

Q        All right.  But this house is actually right across the street from the lake, isn't it?

A        Yes.

Q        So your house, is it a two-lane road?

A        Yes.

Q        And then maybe a little bit of grass; right?

MR. GRUEL:  Objection.  Relevance.

**UNITED STATES DISTRICT COURT**

BY MS. PINKEL:

Q      And then the lake?

THE COURT:  Sustained.

BY MS. PINKEL:

Q      So the following year in 2016 when you upgraded your house in Lafayette, you needed to show that this house in Lake Tahoe was rented out to qualify for the loan on the Lafayette house; isn't that correct?

A      I think I was qualified before having to show that it was being rented.

Q      But you submitted to Union Bank a lease agreement to show that the Lake Tahoe house was rented out for the next year; correct?

A      That's correct.

Q      And you know when banks ask you for documentation, they rely upon the fact that you are providing true information?

A      That's correct.

Q      And the Witsons actually didn't rent out -- they never rented out your Lake Tahoe house?

A      They've used the house, yes.

Q      But they've never rented it, have they?

THE COURT:  Did they ever pay you rent for it?

THE WITNESS:  They did pay us rent.

BY MS. PINKEL:

UNITED STATES DISTRICT COURT

Q    And then you turned around and reimbursed them -- you and your wife reimbursed them within a month for that rent; correct?

A    I was not a party of that.

Q    And your wife actually -- it was $18,000 in checks that the Witsons wrote to you while you were in escrow?

A    I don't know if it was 18,000.

Q    All right.  But you were aware they wrote you checks?

A    They did write us checks.

Q    All right.  And then your wife paid them back?

A    I don't know what she did.

Q    All right.  And you know that she paid them back with $10,000 in cash in October of 2016?

MR. GRUEL:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  I don't think she gave them 10,000 in cash.

BY MS. PINKEL:

Q    And then she also gave them an $8,000 check; right?

A    8,000 or -- which check -- 80?

Q    8,000.

THE COURT:  If you know.

THE WITNESS:  No, I don't know that.  No.

BY MS. PINKEL:

Q        And this house in Homewood, that's not your primary residence, is it?

A        No.  It's an investment property.

Q        Okay.  And you live elsewhere?

A        Yes, I don't live there.

Q        Okay.  And up to maybe about a year ago you opened up an LLC and you started renting out this house; right?

A        When this was house was ready to rent out, yes.

Q        Okay.  Prior to that time, that was your vacation home that you went to; correct?

A        We used to go there, yes.

Q        Yeah.  But you went there fairly regularly?

A        Yes.

Q        And you didn't rent it out on a regular basis to anyone?

A        There was -- it wasn't in the right --

Q        Pardon me?

A        It wasn't well enough to rent out.

Q        I'm sorry.  I don't understand --

A        It wasn't in the shape that it could be rented out.  It was in shambles.

Q        Okay.  But that was your vacation property; right?

A        It was investment property, yes.

UNITED STATES DISTRICT COURT

Q        But you used to go and stay there for the weekend?

A        Of course.

Q        And you had a boat?

A        I had a boat, yes.

Q        Yeah.  And was your boat on the lake moored right across the street from the house or was it somewhere else at a marina?

MR. GRUEL:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  The house comes with two buoys, and those are the floating things you put your boat on.  So my boat was on one of the buoys, yes.

BY MS. PINKEL:

Q        Okay.  So you had a boat there.

And so you know that based upon your training and experience which we've talked about and especially your training and experience in national security that compromised agents can be a problem, right, a compromised national security agent?

MR. GRUEL:  Objection.  Speculation.

THE COURT:  Overruled.

THE WITNESS:  Yes.  Compromised agents can be an issue, yes.

BY MS. PINKEL:

Q       All right.  And they are more likely to be blackmailed?

A       Yes.

Q       And they are also more likely to accept bribes; right?

A       Sure.

Q       And they are also -- if they are compromised as part of blackmail, they can be more likely to prevent crimes to prevent harmful information from coming out?

A       Yeah.  Yes.

Q       Because that gives -- if you are compromised, it can give criminals leverage over you?

A       If the criminal is the one who's making the compromised.

Q       It's against FBI policy to alert a member of the public to who is under investigation; right?

A       Of course, yes.

Q       And also to -- whether or not there's an investigation?

A       Sure.  Yes.  Of course.

Q       Pretty strict Department of Justice policy against revealing nonpublic information; would you say?

A       Yes.

Q       And the FBI is under the Department of Justice?

A       Yes.

Q       All right.  Because that could threaten an investigation?

A       That's correct.

Q       And to the extent you are working on something with national security, that could also threaten national security; right?

A       Of course.

Q       Okay.  And you risk outing either someone who is cooperating, a witness, or risk interfering with a national security investigation?

A       That's correct.

Q       And public -- national security I'm sure you will admit is critical; correct?

A       Of course.

Q       It's very important?

A       Dedicated 20 years of my life.

Q       Right.  And so it's, you know, something that you want to take the utmost care with?

A       That's correct.

Q       All right.  And then public corruption investigations are also very sensitive; correct?

A       Yes.

Q       And you admit that after you learned Felix Cisneros was the subject of a public corruption investigation, you admit you warned him that Cisneros -- you

**UNITED STATES DISTRICT COURT**

warned Sargsyan that Cisneros was bad news?

A        That's not what I warned.

Q        What did you warn him?

A        I warned him at the party.

Q        You warned him at the party?

A        I warned Edgar Sargsyan at the party about Felix.

Q        Well, how -- how did you warn him?

A        I'm sorry?

Q        How did you warn him?

A        I vocalized it.  I told him.

Q        What did you say?

A        I said, "Who is this guy?  He's yelling about you buying diamonds for him."

Q        Okay.  So you knew that Felix Cisneros was getting items of value from Edgar Sargsyan?

A        No.  At the party Edgar -- Felix yelled out to Edgar pointing to this jeweler, "This guy is going to buy me some diamonds and you are going to pay for it."  And that's when I was like, "Who the heck is this guy?"

Q        Because you were concerned that -- and you knew he was a federal agent at the time?

A        Yes.

Q        You had known that for at least a year?

A        I didn't know exactly which department, but yes.

Q        You knew he was a federal agent?

A     Yes.  Yes.

Q     So Edgar -- just to confirm, Edgar Sargsyan gave you things of value; right?  He gave you things of value?

A     He was a very generous person.

Q     Okay.  But he gave you things of value?

A     Yes.

Q     And it included a $36,000 Ducati motorcycle; right?

A     Yes.

Q     And you mentioned previously that he just bought it for you and you tried to refuse.  But who chose the $4,000 helmet.  Was that you or was that him?

A     The $4,000 helmet?

Q     Correct.

A     He chose it.

Q     All right.  But that was all purchased at the same time and you accepted that?

A     I did.

Q     All right.  And that's a thing of value?

A     It's very expensive, yes.

Q     All right.  And then he also gave you two different $30,000 checks?

A     He only gave me one.  The other one went to my parents for their inventory.

Q     All right.  But he handed that $30,000 Arca check

to you?

A        I didn't want my sick dad to come pick up the check.

Q        Okay.  So you --

A        So I took it.

MS. PINKEL:  That wasn't my question.  Move to strike, Your Honor.

THE COURT:  It will be stricken.

THE WITNESS:  I accepted the check, yes.

BY MS. PINKEL:

Q        And you actually solicited that check from him?

A        I asked if he could find a buyer --

Q        Right.  But --

A        -- for my dad's inventory.

Q        You solicited that from Edgar Sargsyan?

A        I asked if he knew somebody who could buy the merchandise.

Q        Right.  So you -- but you solicited that money?

A        Not from him personally, no.

Q        Right.  You asked him to broker it for you; right?  At least --

A        Yes, that's correct.  Yes.

Q        And then you discussed a price, and you said I want 50 but we'll take 30?

A        No.  That's not what I said.

Q        What did you say?

A        I said my dad would like 50 --

Q        No, no.

A        That's what I told him.

Q        Okay.  Your dad would like 50?

A        My dad would like 50, but I think I can convince him to take 30 because we are in a tight spot.

Q        Because you needed money?

A        My dad needed money.

Q        Okay.  Does that mean your mom needed money?

A        No.  My mom and dad needed to get rid of the inventory.

Q        Anyway, so you got that money.  Edgar Sargsyan physically handed the $30,000 to you?

A        Yes.

Q        All right.  In that check.  And then one month later, a wire transfer of 29,300 goes from your mother's bank account, her personal bank account, to your Love Bugs bank account; right?

A        That is correct.  Was it Love Bugs, or was it my personal USAA?

Q        Oh, it was Love Bugs.

A        Okay.

Q        And then, when you were together with Edgar Sargsyan for the several years of your close

relationship, he paid for everything.  That was your testimony; right?

A        Not everything.

Q        All right.  He paid -- when you went out to dinner, he paid?

A        A couple times I paid, but he paid a greater majority, yes.

Q        Right.  And there were a lot of very -- you saw -- you saw the evidence in this case -- a lot of very expensive meals?

A        Yes.

Q        Thousands of dollars on one meal?

A        It wasn't just me and him, but yes.

Q        Right.  But thousands of dollars of one meal?

A        Yes.

Q        On meals; right?

A        Yes.

Q        And he actually told the government that you liked Macallen scotch, and that's expensive; right?

A        It's a good scotch.

Q        Right.  $400 a shot?

A        Of -- I don't know if it's $400 a shot.

Q        But he bought those for you?

A        He bought drinks for everybody, yes.

Q        But for you?

**UNITED STATES DISTRICT COURT**

A       Yes, he bought me drinks.  Yes.

Q       And then you also got use of his luxury penthouse in Beverly Hills?

A       Yes.

Q       Trips on his private jets?

A       We used the jet I believe one time.  I used the jet one time, yes.

Q       Which was the trip to Las Vegas for the porn convention?

A       Yes.

Q       And then every time you went to Los Angeles, you got a hotel room that you did not pay for; right?

A       My impression was the law firm did that, yes.

Q       But nonetheless, you got hotel rooms at five star luxury hotels?

A       That I did not pay for, that's correct.

Q       Correct.  Right.  The Montage?

A       Yes.

Q       $675 a night?

A       I don't know how much it was.

Q       All right.  Because you didn't have to pay the bill; right?

A       I didn't see the bill, that's correct.

Q       All right.  And then sometimes the Beverly Wilshire?

A       Yes.

Q       You ever stay at the Beverly Hills Hotel on their dime?

A       I don't know.

Q       You testified that you were working Edgar Sargsyan as a source; is that correct?

A       Not as a source, no.

Q       As a --

A       As a contact.

Q       All right.  But, in essence, you were doing your job as a dutiful agent gathering intel from Edgar Sargsyan?

A       He was giving me information, yes.

Q       Right.  So that was -- you considered that to be part of your job duties?

A       To collect information, yes.

Q       From him?

A       I didn't hear that part.  What?

Q       From him?

A       Sure.  He was a contact.  He was giving me valuable information, yes.

Q       But as we disused, you learned on January 2015 that Sargsyan was a subject of credit card fraud bust-out schemes in the past; right?

MR. GRUEL:  Objection.  Asked and answered.

THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

BY MS. PINKEL:

Q     And after you learned that he was the subject of fraud schemes, you accepted a Ducati that he purchased from you; right -- for you?

A     Well, the information about the bust-out, we talked about it.  And he admitted that he had done something wrong years ago.  So I was just verifying to see if he was being truthful.  And yes, I did accept a motorcycle like nine years after he had done that.

Q     Right.  But you knew that he'd engaged in credit card fraud in the past; right?

A     (No audible response.)

Q     And then at that time you also knew he was working for Levon Termendzhyan who was someone that you thought was potentially a threat to national security?

A     I had no idea that Edgar was a threat to national security or he was involved in criminal activity.

Q     No, I'm -- sir, that wasn't my question.  I'm referring to Levon Termendzhyan.

A     Yes.

Q     At that time --

A     Yes.

Q     -- you wanted to, quote, flip Levon Termendzhyan; right.

A     That's correct.

Q      And that's because you thought he was potentially a threat to national security?

A      He was, yes, Levon was.

Q      And Edgar was working for him?

A      Yes.  But there was no indication that he was involved in terrorism.

Q      But Edgar Sargsyan was working for Levon Termendzhyan at that time?

A      Levon had some legitimate businesses.

THE COURT:  That's not --

THE WITNESS:  I'm sorry.

THE COURT:  Your counsel can always expand on it.

THE WITNESS:  All right.

THE COURT:  But he was working for him at the time?

THE WITNESS:  Sure.  He was the president of the company.

BY MS. PINKEL:

Q      And, in fact, Levon Termendzhyan had an office in the Pillar Law Firm; right?

A      He was paying a portion of the rent, yes.

Q      And you knew that at the time?

A      Yes.

Q      All right.  And so after knowing these things, you accepted from Edgar use of his, you know, beautiful penthouse in Beverly Hills; right?

A       Yes.

Q       You went on his private jet to the porn convention where he paid for your meals and hotel?

A       Yes, for everybody, yes.

Q       Okay.  And then you also after -- after you came to LA and before you met Levon Termendzhyan for that first time, you lied to Special Agent Kusin from the FBI and you told him you were at the airport heading back to San Francisco when in reality you were at Edgar Sargsyan's house?

MR. GRUEL:  Objection.  Asked and answered.

THE COURT:  Sustained.  It has been.

BY MS. PINKEL:

Q       And you also accepted the services of more than one prostitute provided to you by Edgar Sargsyan or one of his friends?

MR. GRUEL:  Same objection.

THE COURT:  Sustained.  It's been asked and answered.

BY MS. PINKEL:

Q       And at the time that you received these things, you didn't disclose them to the FBI at all?

MR. GRUEL:  Same objection.

THE COURT:  Did you ever disclose it to anybody at the FBI?

THE WITNESS:  About the prostitutes?

UNITED STATES DISTRICT COURT

THE COURT: Counsel, it's your question, not mine.

BY MS. PINKEL:

Q      Did you disclose all of these things of value --
I should ask you this:  Did you disclose any of these things of
value that you got from Edgar Sargsyan?

A      On my form, my SFDF, I did the motorcycle.

Q      The motorcycle.  Okay.  But you didn't mention
anywhere in the form that Edgar Sargsyan bought that for you;
right?

A      I didn't know how to do it.

Q      There's drop-down menus where you can put notes;
right?

A      I don't know.

Q      Oh, you don't know?

A      I don't know, no.

Q      Okay.  There's no place for you to put an
explanation?

A      Not on that form, not that I'm aware of.

Q      Okay.  And you know that the FBI policy for the
security financial disclosure forms is because there is a
concern that agents might be compromised, and therefore
anything they receive that's of value from someone else should
be disclosed; right?

A      Yes.

Q      And that's because of the famous case of Robert

Hanssen, the FBI agent who was compromised?

MR. GRUEL:  Objection.  403, relevance.

THE COURT:  Sustained.

BY MS. PINKEL:

Q      It's actually stated in the policy in the executive order signed by President Clinton that it's because of the Robert Hanssen case?

MR. GRUEL:  Same objection.

THE COURT:  Sustained.

BY MS. PINKEL:

Q      You also never authored a report listing any of these items of value received from Edgar Sargsyan; right?

MR. GRUEL:  Asked and answered.

BY MS. PINKEL:

Q      You didn't author a report?

THE COURT:  Overruled.

Try the question again, Counsel.

BY MS. PINKEL:

Q      You did not author any report, any kind of FBI report listing the items of value that you received from Edgar Sargsyan?

A      There's no need to report things you get from your friends.

THE COURT:  I think your answer was no in the past.

THE WITNESS:  No, yes.

**UNITED STATES DISTRICT COURT**

BY MS. PINKEL:

Q    And you didn't tell the intel analysts that worked with you, Kyle Calvo and Suruchi Chen, that you got things from value -- of value from the person who was providing you information?

A    That's correct.

Q    And that would have been something important for them to know in verifying the information and determining the motivation of your, quote, contact?

A    Not really, no.

Q    Oh, really, it's not?

A    No.

Q    The fact that you are getting paid by your, quote, contact isn't something that they need to know in analyzing the information you have given them from this, quote, contact?

A    That has no bearing on the value of the information, no.

Q    Oh, that's not part of the analysis of the motivation of the contact or the --

MR. GRUEL:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MS. PINKEL:

Q    Let's just go back briefly to --

If we can publish Exhibit 124 which is already

UNITED STATES DISTRICT COURT

admitted.

And, sir, could you please -- you can also take a look at Exhibit 124 -- excuse me -- Exhibit 123, Exhibit 123 which is in Volume 2 in front of you.  So if you could please look at page 6 of Exhibit 123.

A        Okay.

Q        There's actually a place for comments.  Do you see that?

A        Oh, I see that, yes.

Q        Yeah.  So there's actually -- and the instructions include that you can make an extra note for anything that needs explanation; right?

A        Sure.  Yes.

Q        And you did these forms for years.  We've just shown a representative sampling of what you did.  But you did these forms for years?

A        That's correct.

Q        And there is actually a place where you can make an extra little note if you need to explain something?

MR. GRUEL:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MS. PINKEL:

Q        And then looking at page 4 where you listed -- you did list your -- that you own this Ducati.  You listed this in your 2015 calendar year form.  You just wrote that it was

UNITED STATES DISTRICT COURT

purchased for $25,000, but that's not true; right?

A       No.  It was a gift.

Q       But it was actually purchased; right?  It asks for purchase price.  I see you didn't say gift there, did you?

A       Gift is not an option in the drop-down menu.

Q       It's another item of value; right?  There are places where you can put that?

A       I was not aware of where else I could put it.  It was -- this is where you put your vehicles.  It says "owned vehicles."  They are alleging that I had to put it in "other income."  It doesn't make sense to me.  I see "owned vehicles" right there.

Q       Right.  And you see right above the entry for the Ducati, it has a box for comments; right?

A       Okay.

Q       Yeah.  That's where you could put comments to specify more detail.  You could specify that that was a gift.

A       All right.  I should have done that.

Q       Right.  And it also says that the purchase price was $25,000.  But that's not true, is it?

A       At the time I didn't know how much it was exactly.  I knew it was a lot of money.  So I just guesstimated.

Q       Did you think to call Edgar and ask him how much -- Edgar Sargsyan -- how much he made for it?

**UNITED STATES DISTRICT COURT**

A        No.  I was on a time crunch to finish this form.

Q        But you had the bill of sale for the Ducati.  You brought that home with you?

A        I didn't have it with me when I did the form.

Q        Oh, okay.  So when you do your financial disclosure forms, you don't gather all the necessary documents and put them together before you do the form?

MR. GRUEL:  Objection.  Argumentive.

THE COURT:  Sustained.  And we have covered this multiple times.

BY MS. PINKEL:

Q        You actually wanted to conceal your financial relationship with Edgar Sargsyan from the FBI; isn't that correct?

MR. GRUEL:  Objection.  Argumentative.

THE COURT:  Overruled.

THE WITNESS:  No.  I put it down, the motorcycle. No.

BY MS. PINKEL:

Q        Oh, but you -- but you didn't put down Edgar Sargsyan's name; right?  It's nowhere on these forms?

A        That's correct, no.

Q        In fact, you never authored a report in your career with the FBI that had Edgar Sargsyan's name in it?

A        You don't put your contact's name in the report.

Q      But it's usually documented somewhere?

THE COURT:  Counsel, we've covered this.

MS. PINKEL:  All right.

BY MS. PINKEL:

Q      You actually didn't want anyone at the FBI to know that you were working for Edgar Sargsyan; correct?

A      I was not working for Edgar Sargsyan.

Q      One last area that I'm going to inquire on.  So when you met Beverly Hills Police Officer Jim Keenaghan who was off duty, you met him to hire him and Star Investigations to surveil Levon Termendzhyan in February of 2016; correct?

A      Yes.  That eventually led to that, yes.

Q      All right.  And you actually gave Jim Keenaghan some money when you met with him?

A      I did.

Q      All right.  How much money did you bring with you?

A      A thousand dollars.

Q      Just a thousand dollars?

A      Just a thousand.

Q      All right.  And how much did you give to Jim?

A      A thousand dollars.

Q      Where was that money from?

A      From my drawer, my cash reserves.

Q      So your cash reserves at the FBI office?

A       That's correct.

Q       All right.  But it wasn't -- it was definitely not FBI funds that you were using?

A       It was not.

Q       Because that would have required a lot of approval?

A       I don't know a lot.  But it would have required approvals, yes.

Q       All right.  Have you ever hired an outside private investigator or an outside -- someone outside the FBI who is not a federal agent to do surveillance for you?

A       No.

Q       And you actually wanted Jim Keenaghan to think that this was an FBI operation; right?

A       That's what I told him, yes.

Q       You did tell him that?  All right.

A       Yes.

Q       And when you canceled it five days later, five, six days later, you said management wanted to go in a different direction?

A       It was -- I don't know if it was five days later, but yes.

Q       All right.  And in both of those instances, you lied to him; right?

A       I was trying to get him to do something I wanted

**UNITED STATES DISTRICT COURT**

him to do, yes.

Q     Bayed upon your national security training?

A     That's correct.

Q     Right.  And in both instances when you told him -- the first instance, this is an FBI operation, that was a lie; you lied to him?

A     Unfortunately we have to lie to contacts --

Q     Sir, that wasn't my question.

Move to strike.

You lied to him?

A     Yes.

Q     All right.  And then when you canceled it, you lied to him again; isn't that correct?

A     Yes.

Q     And you told him falsely that your FBI management had canceled; right?

A     That's correct.

MS. PINKEL:  No further questions.

THE COURT:  Redirect?

MR. GRUEL:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. GRUEL:

Q     Just a few follow-up, Mr. Broumand.

This surveillance never took place with Jim Keenaghan; is that right?

**UNITED STATES DISTRICT COURT**

A       That's correct.

MS. PINKEL:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. GRUEL:

Q       When you are working as an FBI agent trying to develop sources, is it common to come up with ruses to try to get results?

A       All the time.

Q       Is that part of the thing you are trained in as an FBI human agent in recruiting sources?

A       That's correct.

Q       And recruiting contacts?

A       Yes.

Q       In trying to cultivate a hip pocket source?

A       That's correct.

Q       You were asked on direct examination about Edgar Sargsyan working for Levon Termendzhyan.  Do you remember that?

A       Yes.

Q       Wasn't it -- or is it true that his closeness to Levon Termendzhyan, it was -- it was what provided you the connection to the information?

A       Of course.

MS. PINKEL:  Objection.  Leading.

THE COURT:  Overruled.

UNITED STATES DISTRICT COURT

BY MR. GRUEL:

Q     In fact, I think we saw yesterday that photographs of Baron Korkmaz with President Erdogan were shown to you by Edgar Sargsyan?

A     Yes.  He had access.

Q     And we also saw photographs that were Levon Termendzhyan with Turkish President Erdogan; is that right?

MS. PINKEL:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. GRUEL:

Q     Would you have gotten those photographs, do you believe, based on your experience, if Mr. Sargsyan was not that close to Levon Termendzhyan?

A     No way.

MS. PINKEL:  Objection.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  No way.  There's no way I would have gotten those without him being close.

BY MR. GRUEL:

Q     Were those photographs important to you in establishing the validity of the information that --

A     Absolutely.  Absolutely.

Q     All right.  Counsel just asked you about $29,300 being wired from your mom's account to Love Bugs?

A       That's correct.

Q       What was the reason for that?

MS. PINKEL:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. GRUEL:

Q       We talked a little bit about this party where Felix Cisneros was drunk; is that right?

A       Yes.

Q       And was that at the party where you said something to the effect that he's bad news?

A       Yes.

Q       And you mentioned that to Mr. Sargsyan?

A       Yes.

Q       Why?

A       Because Felix was drunk and started yelling out something about how this jeweler was going to buy Felix's wife diamonds and Edgar was going to pay for it.

Q       Was he noticeably -- was he a loud, boisterous drunk?

A       Oh, yeah.  Everyone heard that statement.

Q       Others had witnessed it?

A       Yes.

Q       Did Mr. Sargsyan seem to be embarrassed?

A       He was embarrassed.

Q       You were asked about training in money

UNITED STATES DISTRICT COURT

laundering.  Do you remember seeing that e-mail?

A        I saw that e-mail, yes.

Q        That training was in 2017; right?

A        I believe so.

Q        After 2015 -- September 20, 2017.  Do you remember that?

A        Yes.

Q        Well after the facts of this case; is that right?

A        That's correct.

Q        Okay.  I think counsel asked something about hiding in plain sight on overseas travel.  Do you recall that?

A        I do.

Q        Do you take steps to protect yourself if you are traveling as a human agent overseas?

         MS. PINKEL:  Objection.  Relevance.

         THE WITNESS:  Of course.

         THE COURT:  I'm sorry, Counsel?  Objection what?

         MS. PINKEL:  Relevance.

         THE COURT:  Overruled.

         THE WITNESS:  Of course you do.  You have to be very cognizant.

BY MR. GRUEL:

Q        Is it dangerous?

A        It's very dangerous, overseas work.

Q        And hiding in plain sight is critical to your

                    UNITED STATES DISTRICT COURT

safety?

A       Of course.

MR. GRUEL:  I have nothing further.

THE COURT:  Redirect in that area?

MS. PINKEL:  Yes, Your Honor.

RECROSS-EXAMINATION

BY MS. PINKEL:

Q       You said you were concerned about Felix Cisneros asking Edgar Sargsyan to buy diamonds for Cisneros's wife, right?

A       Yes.

Q       And diamonds are a thing of value; right?

A       Of course, yes.

Q       Did you tell Special Agent Adkins, the agent who was actually investigating Felix Cisneros for corruption, did you tell him about that happening?

A       I believe we had a discussion about it.

Q       Did it end up in your report?

A       No, because I was just writing about what had happened.

Q       Okay.  But that happened; right?

A       Yes.

Q       A federal agent is asking Edgar Sargsyan to buy him diamonds.  So that actually happened?

A       Well, it was --

**UNITED STATES DISTRICT COURT**

Q        Sir, that happened at that party?

A        Yes.  That did happen, yes.

MS. PINKEL:  Okay.  No further questions.

THE COURT:  You may step down.

Next witness.

MR. GRUEL:  Ms. Murillo.

THE COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  You may please be seated.

For the record, please state your name and spell your last name.

THE WITNESS:  Sally Murillo, M-u-r-i-l-l-o.

THE COURT:  Thank you.

You may inquire.

MR. GRUEL:  Thank you, Your Honor.

SALLY MURILLO,

called as a witness by the defense, was sworn and testified as follows:

DIRECT EXAMINATION

BY MR. GRUEL:

Q        Good afternoon, ma'am.

A        Good afternoon.

UNITED STATES DISTRICT COURT

Q       Ma'am, where do you work now?

A       The Los Angeles -- Consumer Attorneys -- Consumer Attorneys Association of Los Angeles.  I actually just started this new job a week ago.  So it takes me a while.

Q       Congratulations.  And what do you do there?

A       I'm a membership manager.

Q       Okay.  Do you remember working at Piero Boutique Menswear?

A       Yes, I do.

Q       And when was that?

A       It was off and on from '97 through 2007 and then maybe once or twice in in 2005 or '6.

Q       Okay.  And do you know Babak Broumand?

A       Yes, I do.

Q       And how is it that you know him?

A       He is the son -- or he was the son of my -- of my employer, Fred.  Hooshang Broumand was his legal name.

Q       Hooshang -- say it again, please.

A       Hooshang Broumand.  That's how I pronounce it.

Q       Correct.

A       That was his father.

Q       Yeah, that was Mr. Broumand's father; is that correct?

A       Correct.

Q       And were you working for him at the boutique

UNITED STATES DISTRICT COURT

during a time period in early 2016 when he was ill?

A    Yes.  I helped out a couple of times.  But it was just helping out to come in for a few hours when his wife had to leave early to take care of him during his illness or -- and then I also came in to help clean out the store.

Q    Do you know how long the boutique was opened at the location that it ultimately closed at?

A    Approximately 2004, 2003 is when they moved to Lake Elsinore.  His store before was in the city of Orange and before that was in the city of Santa Ana.  He had been in business from what I remember since 1990 -- probably before that.  But I met him in '92.

Q    Okay.

A    1992.

Q    Now, I think you said just moments ago that you were involved in helping close the store; is that correct?

A    Yes, put -- yeah, to pack up all the stuff that was in the store.

Q    And was that when Mr. Broumand's father was terminally ill?

A    Yes.

Q    Were they in the process of closing the store?

A    Yes.  The store hadn't been able to function as a store or open for a few weeks already.  So he wanted to close it out so he could, you know, turn in the keys so he wouldn't

be charged any more rent.

Q      What was the size -- if you look at this courtroom, what was the size of the boutique?

A      It was easily twice of -- twice of the store. About the same width but probably double in length.  And then there was a storage room in the back.

Q      All right.  And who asked you to -- did you get involved in boxing up the merchandise of the store as it was shutting down?

A      Well, he asked me, and then I took a weekend to pack it up.  I don't know -- when I got there, nothing had been packed up.  So -- but there were box -- empty moving boxes, a lot of empty -- like crates, I mean, stacks of them.  And I had to build -- we had to build the boxes, my husband and I.  And we packed the stuff.

Q      It took two of you to do it; is that right?

A      Yes.  And we did.

Q      Was it during one weekend?

A      Yes, it was.

Q      And how many -- I know it's a long time ago.  But was it a significant amount of boxes?

A      Yes, it was.  It was a lot of merchandise.  The store was very full.

MR. MORSE:  I'm going to object as to relevancy of this witness.  There's nothing relevant.

UNITED STATES DISTRICT COURT

THE COURT: Up until this time it will be overruled. But make sure it's relevant from here out.

MR. GRUEL: All right.

BY MR. GRUEL:

Q      So ultimately the store did close; did it not?

A      Yes, it did.  As far as I know, yes.

Q      And were you aware that the merchandise had been arranged by Mr. Broumand to be picked up or sold to someone else?

A      From Babak you mean Broumand or Father Broumand? Babak?

Q      Babak.

A      Yes.  As far as I know, yes, that was the plan.

MR. MORSE: Objection.  Lack of foundation, Your Honor.

THE COURT: Sustained.

BY MR. GRUEL:

Q      Were you told --

MR. MORSE: Move to strike, Your Honor.

THE COURT: It will be stricken.

BY MR. GRUEL:

Q      During this time period, were you talking with Babak Broumand?

A      Was I talking to Babak?

Q      Yes.

**UNITED STATES DISTRICT COURT**

A     Not really because he lived up north and he was -- yeah, no, not really.  It was through his mom --

THE COURT:  Okay.  You answered the question.

Go ahead.

BY MR. GRUEL:

Q     All right.  So you -- as you were closing the store, were you communicating with his mother?

A     Yes, I did communicate with his mother.

Q     And was the merchandise actually packed?

A     Yes, it was packed.

Q     Did someone pick it up, to your knowledge?

A     I'm assuming so, but I never saw it.

MR. MORSE:  I'm going to object.  Move to strike. Lacks foundation.

THE COURT:  Sustained.

MR. MORSE:  Move to strike.

THE COURT:  It will be stricken.

BY MR. GRUEL:

Q     Did you pack the boxes?

A     Yes, I did pack the boxes.

Q     Did your husband help you pack the boxes?

A     Yes.

MR. MORSE:  Objection.  Relevance.

THE COURT:  Sustained.

MR. GRUEL:  All right.  I have nothing further,

**UNITED STATES DISTRICT COURT**

Your Honor.

MR. MORSE:  Nothing for this witness.

THE COURT:  You may step down.  Thank you very much for coming in.

Next witness.

MR. GRUEL:  Your Honor, Zahar Ansari.  I think there's an interpreter here.

THE COURT:  Okay.  The interpreter should be here.

While everybody's getting in place, ladies and gentlemen, if an interpreter is used for testimony from a witness, the evidence is what the interpreter says.  So if you understand the language and you understand it different from the way the interpreter says it, it's not what the witness says, it's what the interpreter says so everybody is operating off the same evidence.  Okay?  So just listen to the interpreter, not to the witness.

The interpreter should be sworn in and stand next to her on the witness stand.

THE COURTROOM DEPUTY:  Please raise your right hand.  Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE COURT:  Swear the interpreter in too, please.

THE COURTROOM DEPUTY:  If you could please raise

**UNITED STATES DISTRICT COURT**

your right hand.

Do you solemnly swear that you will well and truly interpret from the English language into the Farsi language and from the Farsi language into the English language in the cause now before the Court according to the best of your knowledge and ability, so help you God?

THE INTERPRETER:  I do.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  You may be seated.

THE COURT:  And we can -- if we can take the volumes off so that the interpreter can stand next to her.  I'm going to have you pull the microphone over toward you, if you don't mind, because it's the interpreter that's going to be --

THE INTERPRETER:  Right.

THE COURT:  Okay.  I don't know if you have much leeway there.  There you go.

THE INTERPRETER:  Maybe here.

THE COURT:  Thank you very much.

Can you state your name and spell your last name for the record, please.

THE WITNESS:  Zahar, first name, Ansari, last name.

THE COURT:  Okay.  Make sure the microphone is with you not with the witness.

Okay.  Counsel, you may inquire.

MR. GRUEL:  Thank you, Your Honor.

ZAHAR ANSARI,

called as a witness by the defense, was sworn and testified as follows:

DIRECT EXAMINATION

BY MR. GRUEL:

Q    I can't see you.  But good afternoon, ma'am.

A    Thank you.

Q    Are you related to Babak Broumand?

A    Yes.

Q    How are you related?

A    I'm his mother.

Q    Okay.  And were you married to Hooshang Broumand?

A    Yes.

Q    Did you have a store -- a men's clothing store with him in Southern California?

A    Yes.

Q    Where was that located?

A    I don't -- I don't recall the address precisely. But it was in Lake Encino.

Q    Okay.  And was it a large store?

A    Yes.

Q    Was there a time in early 2016 when your husband became ill?

A    Yes.

Q    Was there a time when you and your husband

UNITED STATES DISTRICT COURT

decided to close the clothing store?

A       Yes.

Q       Did you tell that to your son, Babak Broumand?

A       Yes.

Q       Did you ask Mr. Broumand, your son, to assist you with respect to the remaining inventory?

A       Yes.

Q       And what did you want him to do?

A       I wanted him to find someone who could buy the store from us.

Q       And did you -- and was he able to -- well, you asked him to find someone to buy the store; is that right?

A       Of course, the store was not ours.  I meant the inventory, the merchandise, the clothes.

Q       The merchandise.  And did you actually work at the store yourself with your husband?

A       Yes.  Yes.

Q       And the inventory that was there at the time, do you recall a value associated with it?

A       Yes.

Q       What was that value, if you recall?

MS. PINKEL:  Objection.  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  $50,000.

BY MR. GRUEL:

**UNITED STATES DISTRICT COURT**

Q        Was that the wholesale price or retail, if you recall?

A        What I had purchased.

Q        What you had purchased it for.

To your -- did Mr. Broumand, your son, ultimately find a buyer for the merchandise, to your knowledge?

A        Yes.

Q        Was the merchandise boxed up after finding the purchaser?

A        Yes, we bought boxes.  And then a lady came with her husband and they packed -- they put them in packages.

Q        All right.  And was the merchandise removed from the store that you were -- you were in at that time?

A        Yes.

Q        All right.  And did you then receive a check handed to you by your son for the merchandise?

A        Yes.

Q        Do you recall how much the check was?

A        $30,000.

Q        All right.  Do you -- do you remember the date that you received that check?

A        Either at the end of January or beginning of March.

Q        I see.  Do you recall something strange with respect to the date that was on the check?

UNITED STATES DISTRICT COURT

A       Yes.

Q       What was -- what was the date?

A       The date was December 2015.

Q       All right.  Did you try to -- after receiving the check -- oh, let me step back for a minute.

Who was the check made out to, if you recall?

A       My name.

Q       Why -- why was it in your name?

A       Because my husband was sick, and he was in bed all the time.

Q       All right.  Did you take that $30,000 -- well, the 30,000 -- strike all that.

Did you take the check to the bank then, ma'am?

A       Yes.

Q       Did you deposit it?

A       So yes, I deposited it.  But at the beginning, I was kind of scared.  I thought maybe it wouldn't be a good check.  So I asked the bank, and they said no, it's not been six months so you can deposit it.

Q       I see.  So you were concerned that the check was dated in December of 2015; is that right?

A       Yes.  Yes, I'm sure.

Q       All right.  But the check did deposit; is that right, ma'am?

A       Yes.

**UNITED STATES DISTRICT COURT**

Q        Now, did your husband pass away in April of 2016?

A        If I don't make a mistake, it was April 7, 2016.

Q        Okay.  April 7, 2016.

Who paid for the fees and expenses associated with your husband's burial?

A        I told my son to pay and then I would reimburse him later.

Q        And did you have two dinner events with respect to your son -- your husband's passing?

THE COURT:  Counsel, the number of events would not be relevant.

MR. GRUEL:  All right.

Q        All right.  So you said you would reimburse your son; is that right?

A        Yes.

Q        Now, later, ma'am, did you send a wire transfer of $29,300 to your son, Babak Broumand?

A        Yes, from my account to his account.

Q        Why did you do that?

A        So I had to give him his money.

Q        For what?

A        For the two dinners, for the grave, for the stone of the grave and the casket and the flowers.  And also I paid him for the ticket that he had purchased to come over.  That was it.

UNITED STATES DISTRICT COURT

MR. GRUEL:  All right.  I have no further --

Q      And also --

BY MR. GRUEL:

Q      Go ahead, ma'am.

A      Also I had to pay for the corpse to be delivered.

MR. GRUEL:  All right.  Thank you very much, ma'am.

THE COURT:  Thank you, Counsel.

Any questions, Counsel, cross?

MS. PINKEL:  Yes.

CROSS-EXAMINATION

BY MS. PINKEL:

Q      Ms. Ansari, at the time that -- well, let me ask you this:  When you wire transferred the money to your son, you sent it -- I can't see you either.  You sent it to his business bank account at Love Bugs; correct?

A      I just had an account number, and I had it transferred to that account number.

Q      Was this money that you -- that you really needed when you got the money for the inventory?

MR. GRUEL:  Objection.  Relevance.

THE COURT:  Sustained.

BY MS. PINKEL:

Q      Ms. Ansari, were you having trouble paying your bills at that time?

MR. GRUEL:  Objection.  Relevance.

**UNITED STATES DISTRICT COURT**

THE COURT:  Seeing her bills?

MS. PINKEL:  Paying her bills.

THE COURT:  Paying her bills.  Let me ask you, did all the money that you got -- I'm just trying to cut through this.  All the money that you got from selling the business did you put into your husband's funeral?

THE WITNESS:  I did have money in my bank account too.  And so I paid them through my accounts.

THE COURT:  Go ahead, Counsel.

BY MS. PINKEL:

Q     That was later you gave the money from your house to your son?

A     When I went back -- what I'm trying to say is that it took a while.  I don't know if it two weeks, three weeks, four weeks, but everything was taken care of.  That's when I had the money transferred to his account.

Q     It sounded like you were talking about later you sold your house and you sent the proceeds from the sale of your house to your son?

A     It was eight to nine months between the two transactions.

Q     Ms. Ansari, both before and after your husband passed away, you had multiple wire transfers into your bank account from bank and brokerage accounts in Asia, didn't you?

MR. GRUEL:  I'm going to object on relevance.

UNITED STATES DISTRICT COURT

THE COURT:  Overruled at this point.

THE WITNESS:  No.

BY MS. PINKEL:

Q     You didn't have wire transfers into your bank account from accounts in Asia?

A     No.  What happened was I went to Iran a few months after my husband had passed.  And there my sister gave me some money.  And since there is no relationship between Iran and the U.S., I had that money exchanged through private conversion.  And that was sent to me.  And it's like $10,000.  And it's still in my account.

Q     Okay.  So after your husband passed away, you had money transferred from Iran to the United States?

MR. GRUEL:  Objection.  Misstates her testimony.

THE COURT:  Overruled.  It's cross.

THE WITNESS:  Yes.  Yes.

BY MS. PINKEL:

Q     But before your husband passed away, at least as of February of 2016, you had multiple wire transfers into your bank account from accounts in Asia, didn't you?

A     If my husband was alive, that goes back to my husband.  I had nothing to do with that.

Q     Okay.  So did you have bank accounts in Asia?

A     Only in Iran.

Q     Only in Iran.  Did you have bank accounts in Iran

UNITED STATES DISTRICT COURT

at the time that your husband died?

A       Yes, prior to that too.  My sister is a wealthy woman.  And she used to send me money.

Q       Okay.  So your husband -- you said your husband passed away on April 7th.  So on May 26th of 2016, you got a wire transfer of almost $3,000 from something called Saba Capital, Inc.  is that money that came from overseas?

A       You mean after my husband died?

Q       Well, ma'am, it's both before and after your husband died, there were approximately five to six wire transfers from Asian bank accounts, and that's why I'm inquiring.

A       No.  It's just been once $10,000, the one I told you about.

Q       Okay, ma'am.  But your bank accounts show different information.

THE COURT:  Counsel, that's --

MS. PINKEL:  All right.

BY MS. PINKEL:

Q       Ms. Ansari, do you remember taking a short trip to Canada with your son in August of 2017 and flying from San Francisco to Vancouver and coming back in one day?

A       Not one day.  I did go.

Q       You did go to Vancouver with your son?

A       Yes.

UNITED STATES DISTRICT COURT

Q       All right.  And your travel actually -- you flew to Vancouver on August 22 of 2017; is that correct?  Does that sound about right?

A       I don't recall the exact date, but I did go.

Q       All right.  And then do you recall coming back the next day with your son from Canada?  That's August 23, 2017.

A       I cannot tell you the date again, but it was the next day.

Q       Okay.  And then on August 24th -- actually, at that time you were living with your son up in Northern California at Lafayette; correct?

A       Yes.

Q       All right.  So the next day, the day after you come back from Vancouver on August 24th, you go to your bank and deposit 5,000 in cash.  Do you recall that?

A       Yes.  Yes.

Q       Okay.  And then four days after that, you deposit another $5,000 in cash into your bank account while you are in Lafayette, California.  Do you remember that?

A       Yes.

MS. PINKEL:  No further questions, Your Honor.

THE COURT:  Redirect?

MR. GRUEL:  Yes, briefly.

///

UNITED STATES DISTRICT COURT

REDIRECT EXAMINATION

BY MR. GRUEL:

Q       Ma'am, you were asked some questions about helping your son purchase his current house.  Do you remember that?

THE INTERPRETER: Could you repeat the question?  There was an echo.

MR. GRUEL:  Okay.

BY MR. GRUEL:

Q       Did you help your son purchase his current house?

A       Yes.  I sold my house, and the proceeds were directly transferred from my escrow company to where they wanted to purchase a house.

Q       And you live with your son currently; is that right?

A       Yes.

Q       Now, we heard just briefly about picking -- or going to Vancouver in August of 2017.  Remember that?

A       Yes.

Q       Did you pick money up there that was sent from your sister?

A       Yes.  I went to this currency exchange private place.  And my sister had sent some money.  I showed them my banking card.  And they transferred the amount that she had sent to me to my account there.

UNITED STATES DISTRICT COURT

MR. GRUEL:  All right.  Thank you.

Nothing further, Your Honor.

THE COURT:  Okay.

MS. PINKEL:  Just briefly, Your Honor.

RECROSS-EXAMINATION

BY MS. PINKEL:

Q      Mrs. Ansari, when you said your account there, were you referring to Canada?

A      No.  I got cash money from the currency exchange store.

Q      So you got cash when you were at the currency exchange in Canada?

A      Yes.  And I do have the receipt.

Q      And your son was with you when you got this cash in Canada?

A      Yes.

Q      Are you aware that when you fly into the United States, there's a -- if you have cash on your person, you have to fill out some paperwork when you fly into the United States?

A      So on that day there were no forms distributed on the plane.  And when we got into the United States, it was like coming from Oakland to San Francisco or any other city.  No one stopped us.

Q      Okay.  But you are aware that there are forms that you have to fill out if you are bringing $10,000 or more

in cash into the United States?

A Yes. But they didn't give me a form to fill out.

Q Okay. But usually that happens on the plane when you are, you know, sort of midair on your way to the United States?

MR. GRUEL: Your Honor, objection.

THE COURT: Sustained.

BY MS. PINKEL:

Q I'm sorry. Did you carry all the cash or did you split it with your son?

A I don't recall exactly.

Q How much cash did you get while you were in Vancouver?

A $18,200.

Q 18,000. So that's over the limit, right, that you have -- you have to report that; right?

MR. GRUEL: Objection if she knows, Your Honor.

THE COURT: Sustained. Next question.

BY MS. PINKEL:

Q Ma'am, you know that banks require you to fill out a form when you deposit more than $10,000 in cash in your bank account; right? You know that?

A I did not deposit over $10,000.

Q Are you aware that banks have a requirement and if you walk in as a customer with more than $10,000 at a time,

**UNITED STATES DISTRICT COURT**

the bank is going to fill out a form about that?

MR. GRUEL:  Objection.  Relevance.

THE COURT:  Sustained.

MR. GRUEL:  Speculation.

MS. PINKEL:  Just one moment, Your Honor.

BY MS. PINKEL:

Q    So, ma'am, when you came back into the United States with the $18,000, it came from Iran originally; is that correct?

THE INTERPRETER:  Would you repeat the question, please?

BY MS. PINKEL:

Q    The $18,000 you got in cash while you were in Canada, that came from Iran?

A    Yes.  What happened was I went to this currency exchange store and received the money here -- there.  And they had been paid from money that I had in Iran.

Q    Oh, so it's your money in Iran?

A    Yes, it was my money in Iran.

Q    And then the money that you deposited, $5,000 in cash, on August 24th and then $5,000 you deposited on August 28, 2017, was that all from the 18,000 you brought back from Canada?

A    Yes.

Q    Did your son ever discuss with you that you

**UNITED STATES DISTRICT COURT**

shouldn't deposit all of the cash at one time?

A       No.

Q       And you knew you had to go to Canada to get your money from Iran because you couldn't get money from Iran directly into the United States; right?

A       Yes.  There is no relationship between here and Iran.

Q       Okay.  And it's also -- are there actually sanctions with Iran that make it improper to bring money from Iran to the United States; right?

MR. GRUEL:  Objection.  Speculation.

THE COURT:  Sustained.

BY MS. PINKEL:

Q       Did you ever discuss with your son that it would be illegal to bring money from Iran to the United States?

A       No, I never talked to him.

Q       But when you and your son flew to Vancouver together, he knew you were going to Vancouver to get your money that came from Iran; right?

A       Yes.  I told him that I wanted to go to Vancouver.  And he said he would accompany me.

Q       And you told him where the money was coming from, that it was coming from Iran?

A       Yes, I did.

Q       Was there any other time that your son went with

you outside of the United States to get money that was coming from Iran?

    A    No.

    Q    Did your son ever bring you your money from Iran back into the United States?

    A    No.

    Q    Did your son ever assist with any of the wire transfers of the money that came in from Asia?

    MR. GRUEL:  Objection.  Vague.

    THE COURT:  Sustained.

BY MS. PINKEL:

    Q    Did you discuss with your son that you had wire transfers coming into your bank account from Asia?

    MR. GRUEL:  Objection.  Asked and answered.

    THE COURT:  Sustained.  Well -- sustained.

    MS. PINKEL:  No further questions.  Your Honor.

    THE COURT:  You may step down.

    Next witness.

    MR. GRUEL:  Richard Carl.

    THE COURTROOM DEPUTY:  Please raise your right hand.

    Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

    THE WITNESS:  Yes.

    THE COURTROOM DEPUTY:  Please be seated.

**UNITED STATES DISTRICT COURT**

For the record, please state your first name and spell your last name.

THE WITNESS:  Richard Carl, C-a-r-l.

THE COURT:  You may inquire, Counsel.

MR. GRUEL:  Thank you.

RICHARD CARL,

called as a witness by the defense, was sworn and testified as follows:

DIRECT EXAMINATION

BY MR. GRUEL:

Q     Good afternoon, Mr. Carl.  Can you hear me, sir?

A     Yes, I can.

Q     And are you wearing those because it's a little difficult for you to hear?

A     Yes, it is.

Q     Okay.  Very good.  If you don't hear me, just let me know.  Wave to me, I guess.

Mr. Carl, did you work for the IRS?

A     Yes, I have.

Q     When did you work for the IRS?

A     Primarily in the San Francisco Bay area.

Q     And when?

A     I hired in in the collection division in 1972. And I transferred to criminal investigations in 1977.

Q     During the time period you were in -- I think you

UNITED STATES DISTRICT COURT

called it -- did you say collections?

A      Yes.

Q      What kind of work did you do with the IRS?

A      I was a revenue officer.  I did field collections to begin with.  Then I went to different jobs in the collection division throughout the five years.

Q      All right.  Did you work at something called the special procedures?

A      Yes, I did.

Q      What was that?

A      It's a bankruptcy unit within collection division.  It deals with lien law, primarily collections, and then suits by the government, against the government, and, you know, tax courts, and then claims that people -- claims for refund.  Somebody would have taxes collected and it was determined that they shouldn't actually have owed the money.  So you work the claim, and you refund the money.

Q      During those five years in the collection section, did you do a lot of work with respect to financial documents?

A      Yes, I did.

Q      And when you were working in the -- with bankruptcies, were you also involved in actual lawsuits, supporting in lawsuits?

A      Could you repeat that?

**UNITED STATES DISTRICT COURT**

Q        Did you supervise any paralegals?

A        Yes, I did.

Q        Why is that?

A        Well, they did a lot of the document preparation for suits, for regional counsel and district counsel.  And I reviewed them for, you know, correctness that they were finished -- not the law but, you know, just to make sure that it was properly prepared.

Q        Did you -- after five years in the collection department, did you become a special agent with the IRS?

A        Yes, I did.

Q        And when did you start that process?

A        1977.

Q        And what kind of training did you have as a -- this is in the criminal section of the IRS; is that right?

A        That's correct.

Q        Commonly referred to as CID?

A        Well, it was intelligence division in the beginning.  Then it changed its name to CID.

Q        All right.  Did you receive any training with respect to becoming a criminal investigator for the IRS?

A        Yes, we do.

Q        What did you --

A        Our basic training was in Glynco, Georgia.  It's called FLETC, Federal Law Enforcement Training Center.

**UNITED STATES DISTRICT COURT**

Evidence, procedures, you know, interview techniques, surveillance, the normal firearms training.  But -- go ahead.

Q       Okay.  And then you graduated from FLETC; is that right?

A       Yes, I did.

Q       And were you assigned to a region or office to do criminal cases with the IRS?

A       Okay.  This thing changed.  Say that again.

Q       Did you get assigned to a particular region after graduating from Glynco?

A       Well, I was actually assigned to the San Francisco district field office when I hired in.  In IRS you are hired into a certain office, and then you go to training and go back and forth.  So you know where you are going to work when you start.

THE COURT:  Ladies and gentlemen, we are going to break a little early now because we are going to be ending a little bit early.  So 15 minutes.  Come right back in in 15 minutes so we can get a full session in.

THE COURTROOM DEPUTY:  All rise.

(At 2:25 p.m. a brief recess was taken.)

(In the presence of the jury.)

THE COURT:  Let the record reflect all the members of the jury are back in their respective seats in the jury box. The witness is on the witness stand.

**UNITED STATES DISTRICT COURT**

And, Counsel, you may inquire.

MR. GRUEL:  Thank you, Your Honor.

BY MR. GRUEL:

Q      Mr. Carl, when we broke, you were telling us that you started your career as a special agent in the criminal division for the IRS; is that right?

A      That's correct.

Q      Pardon me?

A      That's correct.

Q      And did you stay in that position for about 20 years; is that right?

A      That's correct.

Q      And what -- briefly tell us what kind of cases you worked on as an IRS special agent.

A      Well, the initial training case was a general programs case.  It was an individual that was suspected of leaving income off a tax return.  Conducted an investigation.  Happened to have a currency transaction report issue on it.  And it was -- and that was began that part of my -- that began that part of my career.

Q      Okay.  And during your career, did you ever work on any of the financial investigations regarding drug cartels?

A      Yes.

Q      And tell us about that.

A      Well, I was assigned to DEA in San Francisco with

TKO, which was Targeted Kingpin Organizations, and we worked -- I worked with DEA in-house for about three years.

Q        And what type of work did you do?

A        Financial investigations part of drug investigations.

Q        And what do you mean by financial investigations?

A        Tracking money throughout the world primarily on a lot of the big ones, asset acquisition, you know, like a net worth case.

Q        I see.  And tracking money, what does that mean?

A        Well, you know, one case you started with the currency.  It was sequentially numbered.  And you trace that money from when it was printed through a bank in New York to an exchange house in Canada.  And then it was deposited in Northern California.

Q        How many cartels or organizations have you been involved in analyzing --

A        Columbian cartels was Bogota and Cali primarily.

Q        Two cartels?

A        Yes.

Q        Did you ever work with the Canadian Mounties on a financial case?

A        Yes, I did.

Q        And what was -- where was that or what was that about?

**UNITED STATES DISTRICT COURT**

A       Based on this drug case, a rather large drug case, money also moved through Canada.  The Canadians reached out to us.  I went to Canada and worked some undercover assignments under the Mounties' directions.

Q       And what role did you have as an undercover?

A       I infiltrated some known money launderings in Toronto, Montreal, and Vancouver and moved money through those organizations.

Q       Has your work with the IRS included gathering documents, financial documents, and analyzing those documents?

A       Yes, many times.

Q       And are you familiar with the term of source and application?

A       Yes.

Q       What does that source mean to you?

A       Well, the source can be whatever the source is.  It can be legal or illegal sources of funds.  It can be nontaxable sources of funds.  People can have money that, if you look into it, it's, you know, inheritances for one.  So it can be legal, illegal.  It can be just any kind of money somebody gets.  Asset acquisition is the normal distribution, you know, source and application, you know.

Q       During your term or time as a special agent towards the latter part of your career, were you involved in providing training to new IRS agents?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       And what -- briefly describe that for us.

A       Well, I was assigned OJI, on-the-job instructor, for several new agents.  Three times I assisted in writing the continuing provisional education sections on money laundering that was presented in all the different districts.

Q       This is a nationwide publication?

A       Well, it was internal.  But nationwide, yeah.

Q       Internal with who?

A       Internal within the Internal Revenue Service.

Q       I see.  You were one of the authors in that money laundering manual?

A       Yes.

Q       All right.  Have you ever been involved in writing or helping write legislation with respect to money laundering?

A       Yes.

Q       Tell us about that.

A       Well, the Canadian operation was so they could write legislation in Canada that was sufficient to deal with money laundering from anti-drug profit-sharing, that was one, and then a little bit of consulting in DC during the formation of the money laundering laws.

Q       What time period was that?

A       Pardon me?

Q        What time period was that?

A        I'm going to say '95 -- I mean '75, '78, in that time period.

Q        I see.  All right.

How many cases do you think you've worked as an IRS agent during your 20 years with CID?

A        When I was a case agent?

Q        Yes.

A        Probably 30, 40.

Q        All right.  And were some of these cases on a national level?

A        Yes.

Q        And I think you mentioned the cartels; is that right?

A        Yes.

Q        All right.  After working for the IRS, are you --

THE COURT:  Counsel, is there any objection to this witness being qualified as an expert in money laundering?

MS. PINKEL:  No, Your Honor.

THE COURT:  Okay.

MR. GRUEL:  Thank you, Your Honor.

THE COURT:  The Court will qualify him as an expert in the money laundering field.

MR. GRUEL:  Very well, Your Honor.  I'll go right to the heart of it then.

THE COURT:  Good.

BY MR. GRUEL:

Q     Mr. Carl, have you been -- you were retained to work for the defense in this case; is that right?

A     That's correct.

Q     And in doing that -- well, what did you do once you were involved in this case?  How did you jump into it?

A     Well, almost every new case, unless it's very simple, I try to get -- read all the documents that I can get, that I can read, search warrants, indictments, grand jury testimony, witness testimony, interviews, talk to the client, talk to people that may know something about the client's business practices.

Q     All right.

A     Bank records -- I'm sorry.

Q     No, no.  Go ahead.  I didn't mean to interrupt you.  You were talking about bank records.  Did you look at bank records in this case?

A     Yes, I did.

Q     Did you look at bank records with respect to Mr. Broumand and his wife; is that right?

A     Yes, and in a business entity.

Q     What was the name of the business entity?

A     Love Bugs.

Q     Love Bugs?  All right.

UNITED STATES DISTRICT COURT

And in preparation for your testimony this afternoon, have you prepared any charts for us?

A    A few, yes.

MR. GRUEL:  All right.  And the first one has actually already been admitted into evidence, Your Honor, as No. 65.  May I publish?

THE COURT:  Yes.

MS. PINKEL:  Counsel, is that 1065?

MR. GRUEL:  1065.

THE COURT:  1065, okay.

MR. GRUEL:  1065.  I forget the 10.

BY MR. GRUEL:

Q    Mr. Carl, can you see what's on the screen?

A    Yes, I can.

Q    Is that a document that you prepared for your testimony today?

A    I prepared it.  I assumed it might be used in testimony.  I don't know.

MS. PINKEL:  Your Honor, the government objects to this.  Lack of foundation.  The defendant testified that he prepared it.

THE COURT:  Did you prepare this?

THE WITNESS:  Yes, I did.

THE COURT:  You can argue that, Counsel.

Go ahead.

**UNITED STATES DISTRICT COURT**

BY MR. GRUEL:

Q      All right.  In preparing this -- well, what is this, Mr. Carl?

A      It's -- I listed transactions that relate to the purchase of a piece of property in the Tahoe area.

Q      All right.  And how did you -- how did you grab and begin putting together documents with respect to this purchase of property in Tahoe?

A      Well, I read certain documents presented, the search warrant and the indictment.  And some of these issues were raised in that.  So I looked at the records.  And there were wire transfers, withdrawals from a retirement fund, wages that the husband and wife put in a joint business account.

Q      You see on the right-hand side something called Bates number; is that right?

A      Yes.

Q      And did you actually locate those Bates numbers?

A      Yes, I did.

Q      All right.  Let's -- well, let's see.  Was this the down payment for the Tahoe purchase in 2015?

A      It ended up being the money required for the loan.  The down payment I think is -- the earnest money is not on here contained within these funds.

Q      Okay.  Thank you.  I had forgot that.  There was a -- did you see there had been some earnest money also placed

UNITED STATES DISTRICT COURT

in this purchase for the -- to close escrow?

A    Yes.

Q    All right.  And what was your conclusion from these sources of money as to the balance that was in the account at the time to purchase the Tahoe house?

MS. PINKEL:  Objection.  Lack of foundation.

THE COURT:  Why don't you lay the foundation, Counsel.  Sustained.

BY MR. GRUEL:

Q    All right.  Well, did you -- did you look at these wire transfers that are reflected in your chart?

A    Yes, I did.

Q    All right.

A    Yes.

Q    Let's -- did you see the wire transfers actually in the government's discovery?

A    Yes.

Q    All right.  Let's start with No. 54.

Now, Mr. Carl, I'm going to have to ask you to look on a binder on your right.  See the orange binder?  Orange binder.

A    Okay.

Q    Could you go to No. 54.

A    Yes.

Q    You recognize that as a wire transfer that you

**UNITED STATES DISTRICT COURT**

looked at in preparing this chart?

A      Yes.

MR. GRUEL:  Your Honor, I would move 1054 into evidence.

THE COURT:  It will be received.

(Exhibit No. 1054 received into evidence.)

BY MR. GRUEL:

Q      Now, with respect to this wire transfer, Mr. -- let's see here.  Do you see that actually -- the figure of $202,256.63 was actually wired into the USSA account?

A      Yes.  Yes.

Q      Was that then used on your chart?

A      Yes, it is.

Q      Okay.  Likewise No. 53, 1053?

A      Yes.

Q      Do you see that, Mr. Clark (sic)?

A      Yes, I do.

Q      All right.  And is this a document that you actually reviewed in preparing this chart from the government's evidence?

A      Yes, it is.

MR. GRUEL:  Your Honor, I would offer 1053 into evidence.

THE COURT:  It will be received.

(Exhibit No. 1053 received into evidence.)

UNITED STATES DISTRICT COURT

BY MR. GRUEL:

Q       Do you also see a figure of $71,000 being wired into -- into the USAA account reflected on your chart?

A       Yes.

Q       No. 56, 1056, can you look at that, Mr. Carl?

A       Yes, I got it.

Q       All right.  Is this also, Mr. Carl, another one of the wire transfers that you looked at from the government's discovery as part of the preparation of that chart?

A       Yes, it is.

        MR. GRUEL:  Your Honor, I move 1056 into evidence.

        THE COURT:  It will be received.

        (Exhibit No. 1056 received into evidence.)

BY MR. GRUEL:

Q       Likewise, do you see that chart -- that wire into the USAA account of $29,771.27?

A       Yes.

Q       Also on your chart?

A       Pardon?  Yes, it is -- or it was.  The chart is missing.

Q       And then finally I believe you mentioned on your chart $37,000 coming from a thrift savings account.  Do you recall that?

A       Yes, I do.

Q       And now I draw your attention to 1066.  Have you

UNITED STATES DISTRICT COURT

had a chance to look at that, Mr. Carl?

A        56?

Q        1066.

A        Yes.

Q        Was that one of the other documents you reviewed in preparation of this particular --

A        Yes, it is.

MR. GRUEL:  All right.  I would offer 1066 into evidence, Your Honor.

THE COURT:  It's already been received, Counsel.

MR. GRUEL:  Oh, thank you.

BY MR. GRUEL:

Q        Mr. Carl, I draw your attention to 1055.  Do you see it?

A        Just a second.

Q        1055?

A        Did you say 1055?

Q        Yes.

A        Yes.

Q        Is this also one of the wire transfers you reviewed from the government's discovery?

A        Yes.

Q        What does this one reflect?

A        It's earnest money.

Q        Earnest money of --

A        The earnest money that was initially transferred into the escrow file or the loan file.

Q        And it was $35,550; is that correct?

A        Yes.

MR. GRUEL:  Your Honor, I offer 1055.

THE COURT:  It will be received.

(Exhibit No. 1055 received into evidence.)

BY MR. GRUEL:

Q        Finally, did this money then get transferred actually to the purchase of the house in the Homewood Tahoe?

MS. PINKEL:  Objection.  Lack of foundation.

BY MR. GRUEL:

Q        Well, let me draw your attention to 1052.  Do you see that?

A        1052, yeah.  Yes.

Q        Did you review that particular document as part of your analysis?

A        Yes, I did.

Q        And what does that reflect?

A        355,335.06 transferred on October 29th of '15.

Q        And was it transferred?

A        Huh?

Q        Was it transferred?

A        Let me get to that page.  Yeah, it was transferred to City National Bank, Placer Title Company.

UNITED STATES DISTRICT COURT

Q        From your review of the documents, was that for the payment of the Homewood property in Tahoe?

A        Yes, that's the --

Q        All right.  Now, also on your chart, there are two -- how did you determine the wages reflected on 9-10, 9-11, 9-24, and 9-25 of 2015?  Do you see those figures?

A        Yes, I do.

Q        How did you determine those numbers?

A        Those were employment income for the husband and wife, the joint owners of the account, from their employment.

Q        Okay.  Now, as part of your work for the defense in this case, were you asked to use your expertise in trying to determine whether or not Mr. Broumand or his companies had a flow of cash?

A        Yes.

Q        And were you able to do that?

A        Yes.

Q        How did you do that?

A        Well, in discovery, there was several documents from Wells Fargo Bank covering 18 withdrawals.  I looked at those documents and added up how much money those documents represented.  Then I didn't have the exact documents for 2015 or 2016.  So I went to the Wells Fargo Love Bugs account, and I analyzed those accounts.  And I was able to determine cash withdrawals from -- from that account during '15 and '16.

Q      And did you prepare a chart with respect to the work you did trying to determine cash flow for Love Bugs and Mr. Broumand?

A      Yes.

Q      I draw your attention to 1067.

A      1067?

Q      Yes.

A      Okay.  Okay.  I got it.

Q      By the way, this is from the government -- the government's discovery; is that right?

          MS. PINKEL:  Objection.  Misstates the testimony.

          THE COURT:  Sustained.

BY MR. GRUEL:

Q      All right.  Can you look at 1067?

A      Oh, 57.

Q      67.

A      I'm looking, yeah.  Okay.  Yes, it is.

Q      This is a chart you prepared for your work here?

A      Say that again.

Q      This is your chart that you prepared in conducting your financial analysis; is that right?

A      One of them.

          MR. GRUEL:  All right.  Your Honor, I would offer 1067 into evidence.

          MS. PINKEL:  Your Honor, the government objects

**UNITED STATES DISTRICT COURT**

because it appears that this chart is based upon documents that the witness obtained on his own which have not been given to the government.

THE COURT:  Overruled.

MR. GRUEL:  May I publish, Your Honor?

THE COURT:  Yes.

BY MR. GRUEL:

Q    Mr. Carl, could you walk us through this in trying to understand how to -- how to read it and what it -- what it tells you.

A    This one here on the screen?

Q    The one in front of you, yes.

A    Okay.  Yes, I can.

Q    Please do.

MS. PINKEL:  I'm sorry to interrupt, Your Honor. But I don't think that the government has this Exhibit 1067. The thing we have that's marked 1067 is something else.

THE COURT:  Counsel, do you want to talk to counsel and get that straightened out?

MR. GRUEL:  Sure.  Excuse me, Your Honor.

MS. PINKEL:  Your Honor, at this time the government renews its objection.  We don't have this exhibit.

MR. GRUEL:  It was given to them.

(Discussion held off the record.)

MR. GRUEL:  Your Honor, to save time, I can give

them my copy.

THE COURT:  Okay.

THE WITNESS:  Pardon me?

MR. GRUEL:  Can I get the one from the witness, Your Honor?

MR. MORSE:  I haven't had a chance to look at this.

THE WITNESS:  It's the second page of that.

MS. PINKEL:  Your Honor, the government moves to strike.  We have not been given this document before.  And I know the Court has already admitted it.  But the government wasn't given it.  And we haven't had an opportunity to look at it or verify the information.

THE COURT:  You will be able to look at it before cross-examination, Counsel.

MS. PINKEL:  There are no Bates -- underlying Bates numbers either.

MR. GRUEL:  It came from the government's discovery.

BY MR. GRUEL:

Q      All right.  Mr. --

THE COURT:  I'm sorry, Counsel.  It came from what?

MR. GRUEL:  Your Honor, this is -- I can lay the foundation again as to where -- how Mr. --

THE COURT:  Okay.  Why don't you do that.

BY MR. GRUEL:

Q      Mr. Carl, do you see the document that's in front

**UNITED STATES DISTRICT COURT**

of you, 1067?  It's on the chart -- or the screen.

A    Yes.  It starts with 10 percent cash.

Q    How did you prepare that?  What did you use to prepare this?

A    Well, I reviewed the memorandums, the interview of various employees for Love Bugs.  And on several of the interviews it was articulated by the witness that between 5 and 10 percent of the gross receipts was received in currency and then secondarily the ATM information I received in discovery from the ATM from Wells Fargo.

Then I went to the bank statements for Wells Fargo for 2015 and 2016 and extracted the cash withdrawals.

MS. PINKEL:  Your Honor, the government again moves to have this exhibit stricken.  It is based on hearsay apparently.

THE COURT:  Okay.  Counsel, first of all, this is an expert testifying.  He can testify to hearsay.

Second of all, the document at this time, since he didn't have it earlier, can be submitted only as a demonstrative, not as an exhibit.

MR. GRUEL:  Okay.

BY MR. GRUEL:

Q    As a demonstrative, sir, let's walk through it.

A    Okay.

Q    What did -- I think you said you also relied upon

the FBI's interviews of the employees of Love Bugs; is that right?

A       Yes.

Q       And there were more than one employees of Love Bugs interviewed by the FBI in this case; is that right?

A       That's correct.

Q       And did they talk about the cash that was used or paid -- cash -- customers who paid by cash at Love Bugs?

A       By clients of Love Bugs?

Q       Yes, the clients.  The clients who came, was cash one of the methods of payment?

A       Yes, it was.

Q       And what did the employees say with respect to the percentage of cash seen at Love Bugs from the clients?

THE COURT:  Counsel, that would be calling for hearsay.

MR. GRUEL:  All right.

BY MR. GRUEL:

Q       Well, in putting your chart together, walk us through it.

A       Pardon me?

Q       What do you see in the year 2013?

A       Under 10 percent it's $54,847, which is 10 percent of the gross receipts, and 5 percent is half of that.  It's 5 percent of the gross receipts.  Similar for '14,

**UNITED STATES DISTRICT COURT**

'15, and '16.

Q   Now, on the right side, on the top --

A   Yes.

Q   -- is this the ATM withdrawals that you saw from Wells Fargo?

A   That's correct.

MS. PINKEL:  Objection.  Lack of foundation as to which Wells Fargo account.

BY MR. GRUEL:

Q   Was this the Love Bugs Wells Fargo account?

A   Yes, it is.

Q   And moving back to your demonstrative here, sir, did you see that in 2013 -- was it your analysis that at least 70,000 --  possibly as high as $70,937 in cash could have been gleaned from Love Bugs?

A   That's correct.

Q   And what would be on the low end side from Love Bugs?

A   $42,529.

Q   All right.  Did you do the same analysis for 2014?

A   Yes, I did.

Q   And what was the figure that you believed from the records and your analysis that could be the high end of cash coming from Love Bugs in 2014?

**UNITED STATES DISTRICT COURT**

A        82,520.

Q        How about low end?

A        56,013 even.

Q        What about the same questions with respect to 2015?

A        In 2015 is 81 -- pardon me -- $71,837.

Q        And on the low end?

A        $42,358.

Q        And likewise, same question for 2016?

A        '16 would be $68,702 doing 10 percent and 39,261 doing 5 percent.

Q        Now, in analyzing Mr. Broumand's financial records seen in the discovery, did you learn that he had sold some motorcycles, for example, in April of 2015?

A        Yes.

Q        And did you see that he also withdrew cash and put the cash back into that account, that Wells Fargo account?

A        He withdrew cash, and it appears that he put it back into that account.

Q        Okay.

THE COURT:  Counsel, let me help out because --

Ladies and gentlemen, it's important for you to realize this witness is testifying as an expert witness.  He can testify to hypotheticals.  He can't testify to what other people did or didn't do.  He can testify to hypotheticals.  And

then it's incumbent upon that person to prove the basis for the hypothetical to be true.

But this witness is not a fact witness or not testifying as a fact witness and therefore cannot testify to what other people did.  All he can say is if other people did this, this would be the result.

Go ahead, Counsel.

MR. GRUEL:  Thank you, Your Honor.

BY MR. GRUEL:

Q     And with that in mind, Mr. Carl, are you familiar with a term called a cash reserve or cash hoard?

A     Yes.

Q     And based on your experience, what is a cash reserve?

A     A cash reserve is, you know, currency that is set aside.  It can be taxable income.  It can be any kind of -- just currency.  You can set aside currency for whatever reason.

Q     And based on your review of the records here, hypothetically, is it possible based on your experience that there was a cash reserve in this particular case?

A     Yes.

Q     What draws you to that conclusion?

A     Pattern and practice over several years of withdrawing money from checking accounts in very small dollar amounts.  I mean, almost every time that a check was deposited,

available funds were taken out in currency.  And then just the fact that the witnesses -- the employees, they stated that 5 to 10 percent of the gross was paid in currency.  So there's availability of currency.  And people --

THE COURT:  Again, whether or not they stated that or not, you can't assume that to be a fact.  I think what he's trying to testify is if they stated that, then he can draw his conclusions.  But he's not here to testify to ultimate facts.  He's not here to testify to what other witnesses said.  Just that on a hypothetical, if this happened, this is his opinion.

Go ahead, Counsel.

MR. GRUEL:  All right, Your Honor.

Q     And hypothetically, is that what you -- your opinion, sir?

A     Yes.

MR. GRUEL:  All right.  Your Honor, I would move 1067 into evidence.

MS. PINKEL:  Same objection, Your Honor.  Hearsay, lack of foundation.

THE COURT:  Sustained.  It's shown as a demonstrative.  It cannot be an exhibit.

MR. GRUEL:  All right.  Very well.

BY MR. GRUEL:

Q     Finally, Mr. Carl, we have another exhibit also part of 1067.

**UNITED STATES DISTRICT COURT**

MS. PINKEL:  Can we have -- now we have multiple things that are 1067?  We have the first 1067.

MR. GRUEL:  You have it.

BY MR. GRUEL:

Q       Mr. Carl, can you look at 1067 -- well, the second page of 1067.

A       I gave that back.  I gave that --

THE COURT:  Why don't you have a seat.  He'll bring it to you.

THE WITNESS:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Counsel, the exhibit is behind you.

MR. GRUEL:  Thank you.

BY MR. GRUEL:

Q       Have you had a chance to look at the second chart, Mr. Carl?

A       I'm looking at it right now, yes.

Q       All right.  Do you recognize it?

A       Yes, I do.

Q       What do you recognize it to be?

A       It's a recordation of information I took off of I think credit card statements.

Q       Credit card statements belonging to whom?

A       To Mr. Broumand.

Q       And where did you get these credit card

UNITED STATES DISTRICT COURT

statements?

A       I believe they are in discovery, but I initially started with his retained records.

Q       And do you see here Bates numbers on the right side -- well, sorry.  Were Bates -- did you look at the government's documents with respect to preparing this chart?

A       Yes.

Q       And where did you get those government documents?

A       They've got Bates numbers.  So from discovery.

MR. GRUEL:  All right.  Your Honor, I would move this exhibit into evidence.

MS. PINKEL:  Your Honor, it is cumulative.  It is hearsay.  And it also fails to identify that it's a Love Bugs credit card, not the defendant's credit card.  And it's not relevant.

THE COURT:  Overruled.  It may be admitted.

(Exhibit No. 1067-2 received into evidence.)

BY MR. GRUEL:

Q       Mr. Carl, this is -- well, what is this chart?

A       It's payees and dollar amounts from credit card statements during what I've been informed or believe to be expenses related to the funeral of --

THE COURT:  This is a chart you looked at; is that correct?

THE WITNESS:  Yes, it's a chart.

UNITED STATES DISTRICT COURT

BY MR. GRUEL:

Q      Did you prepare that chart?

A      Yes, I did.

Q      And did you look at the credit card documents as reflected in the Bates number at Section D in totaling up -- identifying and totaling up the amount of credit card expenses?

A      Yes, I did.

Q      And did the Bates numbers reflect who the payees were in the Section C?

A      Yes.

Q      And the amounts of each cost is reflected in Section B; is that right?

A      That's correct.

Q      And the dates of the costs are reflected in Section A?

A      That was posted on the credit card statement.

Q      All right.  And was the total -- what was your total for the number of costs reflected on this chart?

A      $29,201.40.

MR. GRUEL:  All right.  Your Honor, I have nothing further.

THE COURT:  Okay.  Cross-examination?

MS. PINKEL:  Yes, Your Honor.

///

///

**UNITED STATES DISTRICT COURT**

CROSS-EXAMINATION

BY MS. PINKEL:

Q     Mr. Carl, are you a certified public accountant?

A     No.

Q     And when you -- and are you a forensic accountant?

A     Yes.

Q     You are?  Okay.  Do you have an accounting degree?

A     No, I have -- no, I don't.

Q     Okay.  And when you worked at the IRS, did you work on any audits -- when you were a revenue agent, did you work on any audits of small businesses?

A     Employment audits for small businesses for employment taxes.

Q     For employment taxes.  Okay.

Sir, are you getting paid for your work here?

A     Yes, I am.

Q     How much have you been paid so far?

A     $25,000.

Q     How much do you charge an hour?

A     Anywhere from $125 to $350 per hour depending what the case is.

Q     And are you getting -- you said you've made $25,000 so far.  What period of time did that cover?

**UNITED STATES DISTRICT COURT**

A       A little over two and a half years.

Q       Oh, two and a half years you've been working on this case?  Okay.

A       A little over.

Q       All right.

A       I didn't work all the time.

Q       All right.  So -- but you said you've gotten $25,000.  So what period of -- what's the last period of time you've been paid for?

A       For this trial here.

Q       So you've already been paid for the trial?

A       Yes.

Q       All right.  So that's included in the $25,000?

A       Yes, it is.

Q       All right.  You mentioned that you got the government's discovery in this case.  So that would be over the last two and a half years, you've gotten the discovery?

A       Yes.

Q       All right.  Who gave you the discovery?

A       I received it through counsel, I believe.  Yeah, through counsel and the client.

Q       Okay.  So you got some of the discovery directly from the defendant?

A       Yes.

Q       Did you also have conversations with the

defendant about how he ran Love Bugs?

A       Yes.

Q       All right.  So some of your testimony here today is based upon your conversations with the defendants -- the defendant?

A       Some of it.

Q       And this chart we just -- you just showed us -- and I'm not quite sure.  Is it page 2 of Exhibit 1067?

A       That's what it appeared to be in the folder --

Q       Page 2.  Okay.  And page 1 didn't get admitted.  So I just want to make sure we are clear.  All right.

So I see that you have listed on your chart -- actually, it's still up here, but let me put this version because it's highlighted.  You listed on your chart that one of your sources was one of the government's summary charts?

A       That was on a government's summary, the --

Q       Is one of your sources the government's summary chart; correct?

A       I believe it was the draft of the -- that flow chart.

Q       Okay.  Which flow chart was that?

A       The flow chart that was prepared by -- for this trial.

Q       But there were numerous --

A       Yeah, the draft, the original draft that I

**UNITED STATES DISTRICT COURT**

originally received.

Q      Okay.  So which subject matter was covered by that flow chart?

A      It was just a note on the side of the flow chart.

Q      It was more than a note.  Wasn't it, in fact, part of a spreadsheet that showed expenses being paid for the Love Bugs credit cards; right?

A      That's -- I believe that's correct.

Q      Okay.  And it was part of tracing where the money went once the $29,000 went from the defendant's mother's bank account to the Love Bugs bank account; right?

A      The mother's bank account?  Yes.

Q      Okay.  And so you relied in part on one of the government's summary charts.  So did you get -- did you get and review the government's expert disclosures in this case?

A      Could you --

Q      I'm sorry.  Did you receive as part of your review the government's expert disclosures in this case?

A      No, I don't believe so.

Q      You don't believe so?

A      Expert disclosures?

Q      The summary charts.  You got the summary charts; right?

A      Yes.

Q      All right.  And did you also get them with

Ms. O'Dowd's resume?

A       Please repeat again.

Q       I'm sorry.  You got them with the resume of Ms. O'Dowd, the government's forensic accountant?

A       I don't believe I've ever seen that.

Q       Okay.  So how long ago did you get the government's draft summary charts?

A       A couple months ago.

Q       And then when did you finalize your charts?

A       With correcting the spelling and everything, probably a week ago, two weeks ago.

Q       So you are aware the government just got them this week; right?  In fact, these charts we just got today; right?

A       Pardon me?

Q       You are aware that the government just got your charts today?

A       Please repeat it.  I'm sorry.  You keep going back and forth outside the --

Q       All right.  You are aware that the government just got most of your charts today; right?

A       I believe so.  That's what I understood you talking about.

Q       Let's look at Exhibit 1065.  Sir, for Exhibit 1065 -- I'm just going to display it here.  So it's

UNITED STATES DISTRICT COURT

Defense Exhibit 1065.

What tracing methods did you use to trace this money that you've listed here into the purchase of the house in Lake Tahoe?

A        What tracing?  I was trying to find it.  I'm sorry.

Q        What tracing methods did you use to draw your conclusions in this chart that all of that money you've listed is directly traced into the purchase of the Lake Tahoe home?

A        Wire transfers.

Q        But, sir, what tracing methods did you use?  I'm sorry.  You said wire transfers.  So you looked at the bottom line wire transfer of $357,000; correct?

A        Well, they are not all wire transfers.  I looked at, I believe, four wire transfers.  I believe there's a withdrawal from a thrift savings, government's 401(k)s, and then employment income that went into the joint account.

Q        But the thrift savings plan withdrawal was in May 13th of 2015.  So what methods did you use to trace that particular money over time to the wire transfer for escrow?

A        What tracing?  It went in -- it came in for -- from the sale of the property.  It went into their account. Then ultimately the $366,000 came out.

Q        Okay.  And then would the timing or the chronology of the sources -- the timing, would that affect your

tracing?

A      Say that one more time.

Q      Sir, would timing of these various amounts of money affect tracing of the money to -- in your process?

A      I don't really understand your question.  I'm sorry.

Q      All right.  Let me ask you, for --

THE COURT:  Ladies and gentlemen, we are going to break at this time as I told you earlier.  We have to break early.  Come on back in tomorrow morning at 8:30.  Remember the admonishment not to discuss the case among yourselves or with anybody else or form or express any opinions about the matter until it's submitted to you and you retire to the jury room.

We'll see you back here tomorrow morning at 8:30.  Leave quietly because I have got to talk to the attorneys.

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Sir, you may step down.

THE WITNESS:  Oh, thank you.

THE COURT:  You can have seats.

(Outside the presence of the jury.)

THE COURT:  The record will reflect the jurors have left the courtroom.

Counsel, I'm assuming that this is going to be over tomorrow morning?

MR. GRUEL:  This is our last witness, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT:  Do you at this time expect rebuttal witnesses?

MS. PINKEL:  Pardon me?  No, Your Honor, I don't believe so.

THE COURT:  Okay.  Counsel, what I'm going to do then for both of you -- what I'm going to do for both of you is the following:  I'm going to give you a copy of the instructions that I intend to give.  I have gone through the requests and the arguments on both sides as far as whether the instructions should be given or not given.  And I've prepared for you, which I don't normally do, but I've prepared for you each a copy so you can look at it tonight so that you can argue it tomorrow.

Keep in mind when you argue the instructions, if you want to argue them in front of the jury, never say to the jury the judge is going to instruct you this way.  Say you anticipate the judge will instruct you this way.  That's fine.  But many times the instructions may be changed or modified.  Even while I'm reading them sometimes I'll modify them.  And you don't want to be embarrassed by saying this is going to be given when it's not going to be given.  You certainly can say you anticipate it to be given.

And so whenever we get finished with the testimony, we'll go into instructions at that time.

Yes.

MS. PINKEL:  One additional item.  Your Honor, the defense subpoenaed approximately 10 federal agents.  And so I think some of them have been released.  But we just want to know if they've all been released from their subpoenas.

MR. GRUEL:  They have been.  Given the representation that there's no rebuttal case by the government, they can be released.

THE COURT:  That's the representation, I'm assuming.  Okay.  They can be released.

MR. GRUEL:  Thank you, Your Honor.

THE COURT:  We'll see you back tomorrow morning.  I anticipate argument about an hour each side.

MR. GRUEL:  Yes.

THE COURTROOM DEPUTY:  All rise.

(At 3:32 p.m. the proceedings adjourned.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  20TH  DAY OF JANUARY, 2023.

/S/ MAREA WOOLRICH

MAREA WOOLRICH, CSR NO. 12698, CCRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**

1

## $

**$10,000** [7] - 11:14, 55:10, 56:13, 59:25, 60:21, 60:23, 60:25
**$125** [1] - 94:22
**$18,000** [3] - 11:5, 61:8, 61:13
**$18,200** [1] - 60:14
**$202,256.63** [1] - 77:10
**$25,000** [6] - 30:1, 30:20, 94:20, 94:25, 95:8, 95:13
**$29,000** [1] - 97:10
**$29,201.40** [1] - 93:19
**$29,300** [2] - 36:24, 52:17
**$29,771.27** [1] - 78:16
**$3,000** [1] - 56:6
**$30,000** [5] - 17:22, 17:25, 19:14, 50:19, 51:11
**$35,550** [1] - 80:3
**$350** [1] - 94:22
**$357,000** [1] - 99:13
**$36,000** [1] - 17:7
**$366,000** [1] - 99:23
**$37,000** [1] - 78:22
**$4,000** [2] - 17:11, 17:13
**$400** [2] - 20:21, 20:22
**$42,358** [1] - 88:8
**$42,529** [1] - 87:19
**$5,000** [3] - 57:19, 61:20, 61:21
**$50,000** [1] - 49:24
**$54,847** [1] - 86:23
**$675** [1] - 21:19
**$68,702** [1] - 88:10
**$70,937** [1] - 87:14
**$71,000** [1] - 78:2
**$71,837** [1] - 88:6
**$8,000** [1] - 11:20

## '

**'14** [1] - 86:25
**'15** [3] - 80:20, 81:25, 87:1
**'16** [3] - 81:25, 87:1, 88:10
**'6** [1] - 41:12
**'75** [1] - 72:2
**'78** [1] - 72:2
**'92** [1] - 42:12
**'95** [1] - 72:2
**'97** [1] - 41:11

## 1

**1** [1] - 96:10
**10** [8] - 74:11, 85:2, 85:8, 86:23, 86:24, 88:10, 90:3, 102:2
**10,000** [1] - 11:17
**1052** [2] - 80:13, 80:15
**1053** [4] - 5:10, 77:14, 77:22, 77:25
**1054** [3] - 5:10, 77:3, 77:6
**1055** [6] - 5:12, 79:13, 79:16, 79:17, 80:5, 80:7
**1056** [4] - 5:11, 78:5, 78:11, 78:13
**1065** [7] - 74:8, 74:9, 74:10, 74:11, 98:24, 98:25, 99:1
**1066** [3] - 78:25, 79:3, 79:8
**1067** [14] - 82:5, 82:6, 82:14, 82:24, 83:16, 83:17, 85:1, 90:17, 90:25, 91:2, 91:5, 91:6, 96:8
**1067-2** [2] - 5:11, 92:17
**10th** [1] - 2:11
**123** [3] - 29:3, 29:5
**124** [2] - 28:25, 29:3
**13th** [1] - 99:19
**15** [2] - 67:18
**18** [1] - 81:20
**18,000** [3] - 11:7, 60:15, 61:22
**1972** [1] - 64:23
**1977** [2] - 64:24, 66:13
**1990** [1] - 42:11
**1992** [1] - 42:14
**1:03** [1] - 6:2

## 2

**2** [3] - 29:4, 96:8, 96:10
**20** [4] - 15:16, 38:5, 68:11, 72:6
**2003** [1] - 42:8
**2004** [1] - 42:8
**2005** [1] - 41:12
**2007** [1] - 41:11
**2013** [2] - 86:22, 87:13
**2014** [2] - 87:21, 87:25
**2015** [13] - 22:21, 29:25, 38:5, 51:3, 51:21, 75:20, 81:6, 81:22, 85:12, 88:5, 88:6, 88:14, 99:19

**2016** [13] - 10:5, 11:14, 32:11, 42:1, 48:22, 52:1, 52:2, 52:3, 55:19, 56:5, 81:23, 85:12, 88:9
**2017** [7] - 38:3, 38:5, 56:21, 57:2, 57:7, 58:18, 61:22
**2020** [1] - 7:16
**2022** [3] - 3:2, 5:2, 6:1
**22** [1] - 57:2
**23** [1] - 57:6
**235** [5] - 5:9, 8:23, 8:24, 9:2, 9:10
**24th** [3] - 57:10, 57:15, 61:21
**26th** [1] - 56:5
**28** [1] - 61:22
**29** [3] - 3:2, 5:2, 6:1
**29,300** [1] - 19:17
**29th** [1] - 80:20
**2:25** [1] - 67:21

## 3

**30** [3] - 18:24, 19:7, 72:9
**30,000** [1] - 51:12
**312** [1] - 2:6
**315** [1] - 2:11
**34** [1] - 3:11
**355,335.06** [1] - 80:20
**39** [1] - 3:11
**39,261** [1] - 88:10
**3:32** [1] - 102:15

## 4

**4** [2] - 8:25, 29:23
**40** [2] - 3:13, 72:9
**401(k)s** [1] - 99:16
**403** [1] - 27:2
**48** [1] - 3:14

## 5

**5** [5] - 85:7, 86:24, 86:25, 88:11, 90:2
**5,000** [1] - 57:16
**50** [4] - 18:24, 19:2, 19:5, 19:6
**53** [2] - 3:15, 77:14
**54** [2] - 76:18, 76:23
**56** [4] - 6:17, 8:19, 78:5, 79:2
**56,013** [1] - 88:3
**57** [1] - 82:15
**58** [1] - 3:15
**59** [1] - 3:16

## 6

**6** [2] - 3:10, 29:5
**64** [1] - 3:17
**65** [1] - 74:6
**67** [1] - 82:16

## 7

**7** [2] - 52:2, 52:3
**70,000** [1] - 87:14
**77** [2] - 5:10, 5:10
**78** [1] - 5:11
**7th** [1] - 56:5

## 8

**8,000** [2] - 11:22, 11:23
**80** [2] - 5:12, 11:22
**81** [1] - 88:6
**82,520** [1] - 88:1
**8:30** [2] - 100:10, 100:14

## 9

**9** [1] - 5:9
**9-10** [1] - 81:5
**9-11** [1] - 81:5
**9-24** [1] - 81:6
**9-25** [1] - 81:6
**90012** [1] - 2:7
**92** [1] - 5:11
**94** [1] - 3:18
**94104** [1] - 2:11

## A

**ability** [1] - 47:6
**able** [5] - 42:23, 49:11, 81:16, 81:24, 84:13
**absolutely** [2] - 36:23
**accept** [2] - 14:4, 23:8
**accepted** [5] - 17:17, 18:9, 23:3, 24:24, 25:13
**access** [1] - 36:5
**accompany** [1] - 62:21
**according** [1] - 47:5
**account** [39] - 19:18, 19:19, 36:25, 52:18, 53:15, 53:16, 53:17, 54:7, 54:16, 54:24, 55:5, 55:11, 55:20, 57:19, 58:25, 59:7, 60:22, 63:13, 75:13, 76:5, 77:10, 78:3, 78:16, 78:22, 81:10,

81:23, 81:25, 87:8, 87:10, 88:17, 88:19, 97:11, 97:12, 99:17, 99:22
**accountant** [3] - 94:3, 94:6, 98:4
**accounting** [1] - 94:8
**accounts** [10] - 54:8, 54:24, 55:5, 55:20, 55:23, 55:25, 56:11, 56:15, 81:24, 89:24
**acquisition** [2] - 69:8, 70:21
**activity** [1] - 23:17
**actual** [1] - 65:23
**added** [1] - 81:21
**additional** [1] - 102:1
**address** [1] - 48:18
**adjourned** [1] - 102:15
**Adkins** [1] - 39:14
**admit** [4] - 9:6, 15:13, 15:23, 15:25
**admitted** [6] - 23:6, 29:1, 74:5, 84:10, 92:16, 96:10
**admonishment** [1] - 100:11
**affect** [2] - 99:25, 100:4
**afternoon** [5] - 40:24, 40:25, 48:6, 64:11, 74:2
**agent** [18] - 13:20, 16:21, 16:25, 22:11, 27:1, 33:11, 35:5, 35:10, 38:14, 39:14, 39:23, 66:10, 68:5, 68:14, 70:23, 72:6, 72:7, 94:12
**Agent** [2] - 25:7, 39:14
**agents** [6] - 13:19, 13:23, 26:21, 70:25, 71:4, 102:2
**ago** [9] - 12:7, 23:7, 41:4, 42:15, 43:20, 98:6, 98:8, 98:11
**agreement** [1] - 10:11
**ahead** [8] - 45:4, 53:4, 54:9, 67:2, 73:16, 74:25, 89:7, 90:11
**airport** [1] - 25:8
**alert** [1] - 14:15
**alive** [1] - 55:21
**alleging** [1] - 30:10
**almost** [3] - 56:6, 73:8, 89:25
**alternates** [1] - 6:7
**amount** [3] - 43:21, 58:24, 93:6
**amounts** [4] - 89:25,

2

92:20, 93:11, 100:3
**Ana** [1] - 42:10
**analysis** [6] - 28:19, 80:17, 82:21, 87:13, 87:20, 87:24
**analysts** [1] - 28:2
**analyzed** [1] - 81:24
**analyzing** [4] - 28:15, 69:17, 70:10, 88:12
**Angeles** [4] - 2:7, 21:11, 41:2, 41:3
**ANGELES** [1] - 6:1
**Ansari** [7] - 46:6, 47:21, 53:12, 53:23, 54:22, 56:20, 59:7
**ANSARI** [2] - 3:14, 48:1
**answer** [1] - 27:24
**answered** [12] - 8:14, 11:15, 22:24, 25:10, 25:18, 27:13, 29:20, 35:2, 36:9, 37:3, 45:3, 63:14
**anti** [1] - 71:21
**anti-drug** [1] - 71:21
**anticipate** [3] - 101:17, 101:22, 102:12
**anyway** [1] - 19:13
**APPEARANCES** [1] - 2:1
**appeared** [1] - 96:9
**application** [2] - 70:13, 70:22
**approval** [1] - 33:6
**approvals** [1] - 33:8
**April** [5] - 52:1, 52:2, 52:3, 56:5, 88:14
**Arca** [1] - 17:25
**area** [4] - 32:8, 39:4, 64:21, 75:5
**argue** [4] - 74:24, 101:12, 101:14, 101:15
**argument** [1] - 102:12
**argumentative** [2] - 28:21, 31:15
**argumentive** [1] - 31:8
**arguments** [1] - 101:9
**arranged** [1] - 44:8
**articulated** [1] - 85:7
**Asia** [6] - 54:24, 55:5, 55:20, 55:23, 63:8, 63:13
**Asian** [1] - 56:11
**aside** [2] - 89:16, 89:17
**asset** [2] - 69:8, 70:21
**assigned** [5] - 67:6, 67:9, 67:11, 68:25,

71:3
**assignments** [1] - 70:4
**assist** [2] - 49:5, 63:7
**Assistant** [1] - 2:6
**assisted** [1] - 71:4
**associated** [2] - 49:19, 52:4
**association** [1] - 41:3
**assume** [1] - 90:6
**assumed** [1] - 74:17
**assuming** [3] - 45:12, 100:23, 102:8
**ATM** [3] - 85:9, 85:10, 87:4
**attention** [4] - 78:25, 79:13, 80:13, 82:5
**ATTORNEY** [1] - 2:4
**attorneys** [2] - 41:2, 100:15
**Attorneys** [2] - 2:6, 41:3
**audible** [1] - 23:12
**audits** [3] - 94:12, 94:13, 94:14
**August** [8] - 56:21, 57:2, 57:6, 57:10, 57:15, 58:18, 61:21, 61:22
**author** [2] - 27:15, 27:19
**authored** [2] - 27:11, 31:23
**authors** [1] - 71:11
**availability** [1] - 90:4
**available** [1] - 90:1
**aware** [16] - 6:17, 6:21, 6:24, 7:1, 8:2, 8:22, 11:8, 26:18, 30:8, 44:7, 59:17, 59:24, 60:24, 98:12, 98:16, 98:20

## B

**Babak** [9] - 41:13, 44:10, 44:11, 44:12, 44:23, 44:24, 48:8, 49:3, 52:17
**BABAK** [2] - 3:10, 6:11
**bad** [2] - 16:1, 37:10
**balance** [1] - 76:4
**bank** [30] - 19:17, 19:18, 51:13, 51:18, 53:15, 54:7, 54:23, 54:24, 55:4, 55:20, 55:23, 55:25, 56:11, 56:15, 57:15, 57:19, 60:22, 61:1, 63:13,

69:13, 73:15, 73:17, 73:18, 73:20, 80:25, 85:11, 97:10, 97:11, 97:12
**Bank** [2] - 10:11, 81:20
**banking** [1] - 58:24
**bankruptcies** [1] - 65:23
**bankruptcy** [1] - 65:11
**banks** [3] - 10:15, 60:20, 60:24
**Baron** [1] - 36:3
**based** [9] - 13:16, 36:13, 70:1, 83:1, 85:14, 89:13, 89:18, 89:19, 96:4
**basic** [1] - 66:24
**basis** [2] - 12:15, 89:1
**Bates** [10] - 7:11, 75:15, 75:17, 84:15, 92:4, 92:5, 92:9, 93:5, 93:8
**Bay** [1] - 64:21
**bayed** [1] - 34:2
**bearing** [1] - 28:17
**beautiful** [1] - 24:24
**became** [1] - 48:23
**become** [1] - 66:10
**becoming** [1] - 66:21
**bed** [1] - 51:9
**began** [2] - 68:19
**begin** [2] - 65:5, 75:7
**beginning** [3] - 50:22, 51:16, 66:19
**behind** [1] - 91:12
**belonging** [1] - 91:23
**best** [1] - 47:5
**between** [4] - 54:20, 55:8, 62:6, 85:7
**Beverly** [5] - 21:3, 21:25, 22:2, 24:25, 32:9
**big** [1] - 69:8
**bill** [3] - 21:22, 21:23, 31:2
**bills** [4] - 53:24, 54:1, 54:2, 54:3
**binder** [4] - 8:24, 76:20, 76:21
**bit** [4] - 9:24, 37:6, 67:18, 71:22
**blackmail** [1] - 14:8
**blackmailed** [1] - 14:2
**blue** [2] - 9:15, 9:16
**boat** [6] - 13:4, 13:5, 13:6, 13:12, 13:15
**Bogota** [1] - 69:18
**boisterous** [1] - 37:18
**bottom** [1] - 99:12

**bought** [6] - 17:10, 20:23, 20:24, 21:1, 26:8, 50:10
**boutique** [4] - 41:7, 41:25, 42:6, 43:3
**box** [4] - 6:7, 30:14, 43:12, 67:24
**boxed** [1] - 50:8
**boxes** [7] - 43:12, 43:14, 43:21, 45:19, 45:20, 45:21, 50:10
**boxing** [1] - 43:8
**break** [4] - 6:16, 67:17, 100:9
**bribes** [1] - 14:4
**brief** [1] - 67:21
**briefly** [6] - 28:24, 57:24, 58:17, 59:4, 68:13, 71:2
**bright** [1] - 9:15
**bring** [5] - 32:16, 62:9, 62:15, 63:4, 91:8
**bringing** [1] - 59:25
**broke** [1] - 68:4
**broker** [1] - 18:20
**brokerage** [1] - 54:24
**brought** [2] - 31:3, 61:22
**BROUMAND** [2] - 3:10, 6:11
**Broumand** [19] - 6:16, 34:23, 41:13, 41:17, 41:19, 44:8, 44:10, 44:23, 48:8, 48:12, 49:3, 49:5, 50:5, 52:17, 73:21, 81:13, 82:3, 91:24
**Broumand's** [3] - 41:22, 42:19, 88:12
**Bugs** [23] - 19:18, 19:20, 19:22, 36:25, 53:15, 73:24, 73:25, 81:23, 82:2, 85:6, 86:1, 86:5, 86:8, 86:9, 86:14, 87:10, 87:15, 87:18, 87:25, 92:13, 96:1, 97:7, 97:11
**build** [2] - 43:14
**buoys** [2] - 13:11, 13:13
**burial** [1] - 52:5
**business** [7] - 42:11, 53:14, 54:5, 73:13, 73:22, 73:23, 75:13
**businesses** [3] - 24:9, 94:13, 94:14
**bust** [2] - 22:22, 23:5
**bust-out** [2] - 22:22, 23:5

**buy** [7] - 16:17, 18:16, 37:16, 39:9, 39:23, 49:9, 49:12
**buyer** [2] - 18:12, 50:6
**buying** [1] - 16:13
**BY** [95] - 3:10, 3:11, 3:11, 3:13, 3:14, 3:15, 3:15, 3:16, 3:17, 3:18, 6:15, 6:23, 8:16, 9:11, 10:1, 10:4, 10:25, 11:19, 12:1, 13:14, 13:25, 18:10, 23:1, 24:17, 25:12, 25:19, 26:2, 27:4, 27:10, 27:14, 27:18, 28:1, 28:23, 29:22, 31:11, 31:19, 32:4, 34:22, 35:4, 36:1, 36:11, 36:20, 37:5, 38:22, 39:7, 40:23, 44:4, 44:17, 44:21, 45:5, 45:18, 48:5, 49:25, 53:3, 53:11, 53:22, 54:10, 55:3, 55:17, 56:19, 58:2, 58:9, 59:6, 60:8, 60:19, 61:6, 61:12, 62:13, 63:11, 64:10, 68:3, 73:2, 74:12, 75:1, 76:9, 77:7, 78:1, 78:14, 79:12, 80:8, 80:12, 82:13, 83:7, 84:18, 84:24, 85:22, 86:18, 87:9, 89:9, 90:23, 91:4, 91:14, 92:18, 93:1, 94:2

## C

**C-a-r-l** [1] - 64:3
**CA** [2] - 2:7, 2:11
**calendar** [1] - 29:25
**Cali** [1] - 69:18
**California** [4] - 48:15, 57:12, 57:20, 69:15
**CALIFORNIA** [1] - 6:1
**Calvo** [1] - 28:3
**Canada** [12] - 56:21, 57:6, 59:8, 59:12, 59:15, 61:14, 61:23, 62:3, 69:14, 70:2, 70:3, 71:20
**Canadian** [2] - 69:21, 71:19
**Canadians** [1] - 70:2
**canceled** [3] - 33:18, 34:12, 34:16
**cannot** [3] - 57:8, 89:4, 90:21

capital [1] - 56:7
card [12] - 22:22,
23:11, 58:24, 91:22,
91:23, 91:25, 92:14,
92:20, 93:4, 93:6,
93:16
cards [1] - 97:7
care [3] - 15:18, 42:4,
54:15
career [5] - 31:24,
68:5, 68:20, 68:21,
70:24
Carl [21] - 63:19, 64:3,
64:11, 64:18, 68:4,
73:3, 74:13, 75:3,
76:19, 78:5, 78:7,
79:1, 79:13, 83:8,
84:25, 89:10, 90:24,
91:5, 91:16, 92:19,
94:3
CARL [2] - 3:17, 64:6
carry [1] - 60:9
cartels [5] - 68:22,
69:16, 69:18, 69:19,
72:13
case [30] - 7:2, 7:6,
7:9, 8:10, 20:9,
26:25, 27:7, 38:8,
68:15, 68:16, 69:9,
69:11, 69:22, 70:1,
70:2, 72:7, 73:4,
73:7, 73:8, 73:18,
81:12, 86:5, 89:20,
94:23, 95:3, 95:16,
97:15, 97:18,
100:11, 102:6
cases [4] - 67:7,
68:13, 72:5, 72:10
cash [37] - 11:14,
11:18, 32:24, 32:25,
57:16, 57:19, 59:9,
59:11, 59:14, 59:18,
60:1, 60:9, 60:12,
60:21, 61:13, 61:21,
62:1, 81:14, 81:24,
82:2, 85:2, 85:12,
86:7, 86:8, 86:10,
86:14, 87:14, 87:25,
88:16, 88:17, 88:18,
89:11, 89:13, 89:15,
89:20
casket [1] - 52:23
center [1] - 66:25
certain [2] - 67:13,
75:9
certainly [1] - 101:21
certified [1] - 94:3
chance [3] - 79:1,
84:6, 91:15
changed [3] - 66:19,

67:8, 101:18
charge [1] - 94:21
charged [1] - 43:1
chart [34] - 76:11,
77:1, 77:12, 77:19,
78:3, 78:9, 78:15,
78:18, 78:19, 78:22,
81:4, 82:1, 82:18,
82:20, 83:1, 85:1,
86:19, 91:16, 92:6,
92:19, 92:23, 92:25,
93:2, 93:18, 96:7,
96:12, 96:14, 96:18,
96:20, 96:21, 96:22,
97:3, 97:4, 99:8
charts [10] - 74:2,
96:15, 97:14, 97:22,
98:7, 98:9, 98:13,
98:17, 98:21
check [18] - 11:20,
11:22, 17:25, 18:3,
18:9, 18:11, 19:16,
50:15, 50:18, 50:21,
50:25, 51:5, 51:6,
51:13, 51:18, 51:20,
51:23, 89:25
checking [1] - 89:24
checks [4] - 11:6,
11:9, 11:10, 17:22
Chen [1] - 28:3
chose [2] - 17:11,
17:15
CHRONOLOGICAL
[1] - 3:7
chronology [1] -
99:25
CID [3] - 66:17, 66:19,
72:6
Cisneros [7] - 15:24,
15:25, 16:1, 16:14,
37:7, 39:8, 39:15
Cisneros's [1] - 39:9
city [4] - 42:9, 42:10,
59:22, 80:25
claim [1] - 65:17
claims [2] - 65:14
Clark [1] - 77:16
clean [1] - 42:5
clear [1] - 96:11
client [2] - 73:11,
95:21
client's [1] - 73:12
clients [4] - 86:9,
86:10, 86:14
Clinton [1] - 27:6
close [8] - 19:25,
36:14, 36:19, 42:16,
42:24, 44:5, 49:1,
76:1
closed [1] - 42:7

closeness [1] - 35:20
closing [2] - 42:22,
45:6
clothes [1] - 49:14
clothing [2] - 48:14,
49:1
cognizant [1] - 38:21
collect [1] - 22:15
collected [1] - 65:15
collection [5] - 64:23,
65:5, 65:11, 65:18,
66:9
collections [3] - 65:1,
65:4, 65:12
Columbian [1] - 69:18
coming [11] - 14:9,
46:4, 56:22, 57:5,
59:22, 62:22, 62:23,
63:1, 63:13, 78:22,
87:25
comments [3] - 29:7,
30:14, 30:16
common [1] - 35:6
commonly [1] - 66:17
communicate [1] -
45:8
communicating [1] -
45:7
companies [1] - 81:13
company [3] - 24:16,
58:12, 80:25
compromised [8] -
13:18, 13:19, 13:23,
14:7, 14:11, 14:14,
26:21, 27:1
computer [1] - 7:12
conceal [1] - 31:12
concern [1] - 26:21
concerned [3] - 16:20,
39:8, 51:20
conclusion [2] - 76:3,
89:22
conclusions [2] -
90:8, 99:8
conducted [1] - 68:17
conducting [1] - 82:21
confirm [1] - 17:2
congratulations [1] -
41:5
connection [1] - 35:22
considered [1] - 22:13
consulting [1] - 71:22
consumer [1] - 41:2
Consumer [1] - 41:3
contact [6] - 22:9,
22:19, 28:9, 28:14,
28:16, 28:20
contact's [1] - 31:25
contacts [2] - 34:7,
35:12

contained [1] - 75:23
contents [1] - 7:18
continue [1] - 6:9
continuing [1] - 71:5
convention [2] - 21:9,
25:3
conversations [2] -
95:25, 96:4
conversion [1] - 55:10
convince [1] - 19:6
cooperating [1] - 15:9
copy [3] - 84:1, 101:7,
101:12
corpse [1] - 53:5
correct [61] - 7:6, 7:7,
7:10, 7:12, 7:13,
10:8, 10:13, 10:14,
10:18, 11:3, 12:11,
15:3, 15:11, 15:13,
15:19, 15:21, 17:14,
18:22, 19:20, 21:16,
21:17, 21:23, 22:6,
23:25, 28:6, 29:17,
31:14, 31:22, 32:6,
32:11, 33:1, 34:3,
34:13, 34:17, 35:1,
35:11, 35:15, 37:1,
38:9, 41:20, 41:23,
41:24, 42:16, 53:15,
57:2, 57:12, 61:9,
66:16, 68:7, 68:9,
68:12, 73:5, 80:3,
86:6, 87:6, 87:16,
92:24, 93:13, 96:18,
97:8, 99:13
correcting [1] - 98:10
correctness [1] - 66:6
corruption [3] - 15:20,
15:24, 39:15
cost [1] - 93:11
costs [2] - 93:14,
93:18
COUNSEL [1] - 2:1
Counsel [8] - 27:17,
38:17, 53:8, 64:4,
74:24, 79:10, 84:14,
84:20
counsel [29] - 6:9,
24:12, 26:1, 32:2,
36:24, 38:10, 47:24,
52:10, 53:7, 54:9,
56:17, 66:5, 68:1,
72:17, 74:8, 76:8,
83:18, 85:16, 86:15,
88:21, 89:7, 90:11,
91:11, 95:20, 95:21,
100:23, 101:5
couple [3] - 20:6,
42:2, 98:8
course [11] - 13:3,

14:17, 14:20, 15:7,
15:14, 35:23, 38:16,
38:20, 39:2, 39:13,
49:13
COURT [115] - 6:5,
6:20, 8:15, 9:9, 10:3,
10:23, 11:16, 11:24,
13:10, 13:22, 18:8,
22:25, 24:10, 24:12,
24:14, 25:11, 25:17,
25:23, 26:1, 27:3,
27:9, 27:16, 27:24,
28:22, 29:21, 31:9,
31:16, 32:2, 34:19,
35:3, 35:25, 36:10,
36:17, 37:4, 38:17,
38:19, 39:4, 40:4,
40:16, 44:1, 44:16,
44:20, 45:3, 45:15,
45:17, 45:24, 46:3,
46:8, 46:24, 47:8,
47:10, 47:15, 47:18,
47:22, 49:23, 52:10,
53:7, 53:21, 54:1,
54:3, 54:9, 55:1,
55:15, 56:17, 57:23,
59:3, 60:7, 60:18,
61:3, 62:12, 63:10,
63:15, 63:17, 64:4,
67:16, 67:23, 72:17,
72:20, 72:22, 73:1,
74:7, 74:10, 74:22,
74:24, 76:7, 77:5,
77:24, 78:12, 79:10,
80:6, 82:12, 83:4,
83:6, 83:18, 84:2,
84:13, 84:20, 84:23,
85:16, 86:15, 88:21,
90:5, 90:20, 91:8,
92:16, 92:23, 93:22,
100:8, 100:17,
100:19, 100:21,
101:1, 101:5, 102:8,
102:11
Court [6] - 40:9,
46:21, 47:5, 63:22,
72:22, 84:10
COURTROOM [11] -
40:7, 40:12, 46:19,
46:25, 47:9, 63:20,
63:25, 67:20, 91:11,
100:16, 102:14
courtroom [2] - 43:3,
100:22
courts [1] - 65:14
cousin [1] - 7:15
cousins [3] - 6:18,
7:14, 7:15
cover [1] - 94:25
covered [3] - 31:9,

32:2, 97:2
**covering** [1] - 81:20
**crates** [1] - 43:13
**credit** [12] - 22:22, 23:10, 91:22, 91:23, 91:25, 92:14, 92:20, 93:4, 93:6, 93:16, 97:7
**crimes** [1] - 14:8
**criminal** [7] - 14:13, 23:17, 64:24, 66:15, 66:21, 67:7, 68:5
**criminals** [1] - 14:12
**critical** [2] - 15:13, 38:25
**CROSS** [6] - 3:10, 3:15, 3:18, 6:14, 53:10, 94:1
**cross** [5] - 6:9, 53:8, 55:15, 84:14, 93:22
**cross-examination** [2] - 84:14, 93:22
**CROSS-EXAMINATION** [6] - 3:10, 3:15, 3:18, 6:14, 53:10, 94:1
**crunch** [1] - 31:1
**cultivate** [1] - 35:14
**cumulative** [1] - 92:12
**currency** [13] - 58:22, 59:9, 59:11, 61:15, 68:18, 69:12, 85:8, 89:15, 89:17, 90:1, 90:3, 90:4
**current** [2] - 58:4, 58:10
**customer** [1] - 60:25
**customers** [1] - 86:8
**cut** [1] - 54:4

## D

**dad** [6] - 18:2, 19:2, 19:5, 19:6, 19:9, 19:11
**dad's** [1] - 18:14
**dangerous** [2] - 38:23, 38:24
**date** [6] - 50:20, 50:25, 51:2, 51:3, 57:4, 57:8
**dated** [1] - 51:21
**dates** [1] - 93:14
**days** [4] - 33:18, 33:19, 33:21, 57:18
**DC** [1] - 71:22
**DEA** [2] - 68:25, 69:2
**deal** [1] - 71:20
**deals** [1] - 65:12
**December** [2] - 51:3,

51:21
**decided** [1] - 49:1
**dedicated** [1] - 15:16
**DEFENDANT** [1] - 2:9
**defendant** [4] - 74:20, 95:23, 96:1, 96:5
**defendant's** [2] - 92:14, 97:10
**defendants** [1] - 96:4
**defense** [8] - 6:12, 40:20, 48:2, 64:7, 73:4, 81:11, 99:1, 102:2
**definitely** [1] - 33:2
**degree** [1] - 94:9
**delivered** [1] - 53:5
**demonstrative** [4] - 85:20, 85:23, 87:12, 90:21
**Department** [2] - 14:21, 14:24
**department** [2] - 16:24, 66:10
**deposit** [8] - 51:15, 51:19, 51:23, 57:16, 57:18, 60:21, 60:23, 62:1
**deposited** [5] - 51:16, 61:20, 61:21, 69:14, 89:25
**DEPUTY** [11] - 40:7, 40:12, 46:19, 46:25, 47:9, 63:20, 63:25, 67:20, 91:11, 100:16, 102:14
**describe** [1] - 71:2
**detail** [1] - 30:17
**determine** [5] - 81:5, 81:8, 81:13, 81:24, 82:2
**determined** [1] - 65:16
**determining** [1] - 28:8
**develop** [1] - 35:6
**diamonds** [6] - 16:13, 16:18, 37:17, 39:9, 39:12, 39:24
**died** [3] - 56:1, 56:8, 56:10
**different** [7] - 9:12, 17:22, 33:19, 46:12, 56:16, 65:5, 71:6
**difficult** [1] - 64:14
**dime** [1] - 22:3
**dinner** [2] - 20:5, 52:8
**dinners** [1] - 52:22
**direct** [1] - 35:16
**DIRECT** [6] - 3:13, 3:14, 3:17, 40:22, 48:4, 64:9
**direction** [1] - 33:20

**directions** [1] - 70:4
**directly** [4] - 58:12, 62:5, 95:22, 99:9
**disclose** [4] - 25:21, 25:23, 26:3, 26:4
**disclosed** [1] - 26:23
**disclosure** [2] - 26:20, 31:6
**disclosures** [3] - 97:15, 97:18, 97:21
**discovery** [16] - 7:2, 7:5, 76:16, 78:9, 79:21, 81:19, 82:10, 84:17, 85:9, 88:13, 92:2, 92:9, 95:16, 95:17, 95:19, 95:22
**discuss** [4] - 61:25, 62:14, 63:12, 100:11
**discussed** [1] - 18:23
**discussion** [1] - 39:17
**Discussion** [1] - 83:24
**display** [1] - 98:25
**distributed** [1] - 59:20
**distribution** [1] - 70:21
**district** [2] - 66:5, 67:12
**districts** [1] - 71:6
**disused** [1] - 22:21
**division** [5] - 64:23, 65:6, 65:12, 66:18, 68:6
**document** [8] - 8:9, 66:4, 74:15, 77:18, 80:16, 84:9, 84:25, 85:18
**documentation** [1] - 10:16
**documented** [1] - 32:1
**documents** [19] - 7:11, 31:6, 65:20, 70:10, 73:9, 75:7, 75:9, 79:5, 81:1, 81:19, 81:21, 81:22, 83:1, 92:6, 92:8, 93:4
**dollar** [2] - 89:24, 92:20
**dollars** [5] - 20:12, 20:14, 32:18, 32:19, 32:22
**done** [3] - 23:6, 23:9, 30:18
**double** [1] - 43:5
**down** [11] - 26:11, 30:5, 31:17, 31:20, 40:4, 43:9, 46:3, 63:17, 75:20, 75:22, 100:17
**draft** [4] - 96:19,

96:25, 98:7
**draw** [6] - 78:25, 79:13, 80:13, 82:5, 90:7, 99:7
**drawer** [1] - 32:24
**draws** [1] - 89:22
**drinks** [2] - 20:24, 21:1
**drop** [2] - 26:11, 30:5
**drop-down** [2] - 26:11, 30:5
**drug** [5] - 68:22, 69:4, 70:1, 71:21
**drunk** [3] - 37:7, 37:15, 37:19
**Ducati** [5] - 17:7, 23:3, 29:24, 30:14, 31:2
**during** [12] - 42:1, 42:4, 43:18, 44:22, 64:25, 65:18, 68:21, 70:23, 71:22, 72:6, 81:25, 92:21
**duties** [1] - 22:14
**dutiful** [1] - 22:11
**duty** [1] - 32:10

## E

**e-mail** [2] - 38:1, 38:2
**early** [6] - 42:1, 42:4, 48:22, 67:17, 67:18, 100:10
**earnest** [5] - 75:22, 75:25, 79:24, 79:25, 80:1
**easily** [1] - 43:4
**echo** [1] - 58:7
**Edgar** [33] - 16:6, 16:15, 16:16, 16:17, 17:2, 18:15, 19:13, 19:25, 22:5, 22:11, 23:16, 24:4, 24:7, 24:24, 25:9, 25:14, 26:5, 26:8, 27:12, 27:21, 30:24, 30:25, 31:13, 31:21, 31:24, 32:6, 32:7, 35:17, 36:4, 37:17, 39:9, 39:23
**education** [1] - 71:5
**effect** [1] - 37:10
**eight** [1] - 54:20
**either** [4] - 15:8, 50:22, 53:14, 84:16
**elsewhere** [1] - 12:5
**Elsinore** [1] - 42:9
**embarrassed** [3] - 37:23, 37:24, 101:20
**employees** [5] - 85:6, 86:1, 86:4, 86:13,

90:2
**employer** [1] - 41:17
**employment** [6] - 81:9, 81:10, 94:14, 94:15, 94:16, 99:17
**empty** [2] - 43:12, 43:13
**Encino** [1] - 48:19
**end** [6] - 39:18, 50:22, 87:17, 87:24, 88:2, 88:7
**ended** [1] - 75:21
**ending** [1] - 67:17
**enforcement** [1] - 66:25
**engaged** [1] - 23:10
**English** [2] - 47:3, 47:4
**entity** [2] - 73:22, 73:23
**entry** [1] - 30:13
**Erdogan** [2] - 36:3, 36:7
**escrow** [5] - 11:6, 58:12, 76:1, 80:2, 99:20
**especially** [1] - 13:17
**essence** [1] - 22:10
**establishing** [1] - 36:22
**events** [2] - 52:8, 52:10
**eventually** [1] - 32:12
**EVIDENCE** [1] - 5:8
**evidence** [20] - 7:9, 9:10, 20:9, 46:11, 46:15, 67:1, 74:5, 77:4, 77:6, 77:20, 77:23, 77:25, 78:11, 78:13, 79:9, 80:7, 82:24, 90:17, 92:11, 92:17
**exact** [2] - 57:4, 81:22
**exactly** [3] - 16:24, 30:22, 60:11
**examination** [3] - 35:16, 84:14, 93:22
**EXAMINATION** [20] - 3:10, 3:11, 3:11, 3:13, 3:14, 3:15, 3:15, 3:16, 3:17, 3:18, 6:14, 34:21, 39:6, 40:22, 48:4, 53:10, 58:1, 59:5, 64:9, 94:1
**example** [1] - 88:14
**exchange** [5] - 58:22, 59:9, 59:12, 61:16, 69:14
**exchanged** [1] - 55:9

**excuse** [2] - 29:3, 83:20
**executive** [1] - 27:6
**Exhibit** [27] - 5:9, 5:10, 5:10, 5:11, 5:11, 5:12, 6:17, 8:19, 8:23, 8:24, 9:2, 9:10, 28:25, 29:3, 29:5, 77:6, 77:25, 78:13, 80:7, 83:16, 92:17, 96:8, 98:24, 98:25, 99:1
**exhibit** [7] - 83:22, 85:14, 85:20, 90:21, 90:24, 91:11, 92:11
**EXHIBITS** [1] - 5:6
**expand** [1] - 24:12
**expect** [1] - 101:1
**expenses** [4] - 52:4, 92:22, 93:6, 97:6
**expensive** [3] - 17:20, 20:10, 20:19
**experience** [5] - 13:17, 13:18, 36:13, 89:13, 89:19
**expert** [7] - 72:18, 72:22, 85:17, 88:23, 97:15, 97:18, 97:21
**expertise** [1] - 81:12
**explain** [1] - 29:19
**explanation** [2] - 26:17, 29:12
**express** [1] - 100:12
**extent** [1] - 15:4
**extra** [2] - 29:11, 29:19
**extracted** [1] - 85:12

### F

**fact** [11] - 10:16, 24:18, 28:13, 31:23, 36:2, 89:3, 89:4, 90:2, 90:6, 97:5, 98:13
**facts** [2] - 38:8, 90:8
**fails** [1] - 92:13
**fairly** [1] - 12:13
**falsely** [1] - 34:15
**familiar** [3] - 7:2, 70:12, 89:10
**famous** [1] - 26:25
**far** [5] - 44:6, 44:13, 94:19, 94:25, 101:9
**Fargo** [8] - 81:20, 81:23, 85:10, 85:12, 87:5, 87:8, 87:10, 88:17
**Farsi** [2] - 47:3, 47:4
**father** [3] - 41:21, 41:22, 42:19

**Father** [1] - 44:10
**FBI** [20] - 14:15, 14:24, 25:7, 25:21, 25:24, 26:19, 27:1, 27:19, 31:13, 31:24, 32:5, 32:25, 33:3, 33:10, 33:14, 34:5, 34:15, 35:5, 35:10, 86:5
**FBI's** [1] - 86:1
**February** [3] - 7:16, 32:11, 55:19
**federal** [6] - 16:21, 16:25, 33:11, 39:23, 66:25, 102:2
**fees** [1] - 52:4
**Felix** [8] - 15:24, 16:6, 16:14, 16:16, 37:7, 37:15, 39:8, 39:15
**Felix's** [1] - 37:16
**few** [5] - 34:23, 42:3, 42:24, 55:6, 74:3
**field** [3] - 65:4, 67:12, 72:23
**figure** [3] - 77:9, 78:2, 87:23
**figures** [1] - 81:6
**file** [3] - 8:5, 80:2
**fill** [5] - 59:19, 59:25, 60:2, 60:20, 61:1
**finalize** [1] - 98:9
**finally** [3] - 78:21, 80:9, 90:24
**financial** [11] - 26:20, 31:5, 31:12, 65:19, 68:22, 69:4, 69:6, 69:22, 70:10, 82:21, 88:12
**fine** [1] - 101:17
**finish** [1] - 31:1
**finished** [2] - 66:7, 101:23
**firearms** [1] - 67:2
**firm** [2] - 21:13, 24:19
**first** [7] - 25:6, 34:5, 47:21, 64:1, 74:4, 85:16, 91:2
**five** [8] - 21:14, 33:18, 33:21, 56:10, 65:6, 65:18, 66:9
**FLETC** [2] - 66:25, 67:3
**flew** [2] - 57:1, 62:17
**flip** [1] - 23:23
**floating** [1] - 13:12
**Floor** [1] - 2:11
**flow** [7] - 81:14, 82:2, 96:19, 96:21, 96:22, 97:3, 97:4
**flowers** [1] - 52:23
**fly** [2] - 59:17, 59:19

**flying** [1] - 56:21
**folder** [1] - 96:9
**follow** [1] - 34:23
**follow-up** [1] - 34:23
**following** [2] - 10:5, 101:7
**follows** [4] - 6:13, 40:21, 48:3, 64:8
**FOR** [2] - 2:3, 2:9
**forensic** [2] - 94:5, 98:4
**forget** [1] - 74:11
**forgot** [1] - 75:24
**form** [11] - 26:6, 26:8, 26:18, 29:25, 31:1, 31:4, 31:7, 60:2, 60:21, 61:1, 100:12
**formation** [1] - 71:22
**forms** [7] - 26:20, 29:14, 29:16, 31:6, 31:21, 59:20, 59:24
**forth** [2] - 67:14, 98:19
**foundation** [10] - 44:14, 45:14, 49:22, 74:20, 76:6, 76:7, 80:11, 84:22, 87:7, 90:19
**four** [3] - 54:15, 57:18, 99:15
**Francisco** [7] - 2:11, 25:8, 56:22, 59:22, 64:21, 67:12, 68:25
**fraud** [3] - 22:22, 23:3, 23:11
**Fred** [1] - 41:17
**friends** [2] - 25:15, 27:23
**front** [6] - 7:16, 8:24, 29:4, 83:12, 84:25, 101:15
**full** [2] - 43:23, 67:19
**function** [1] - 42:23
**fund** [1] - 75:12
**funds** [5] - 33:3, 70:17, 70:18, 75:23, 90:1
**funeral** [2] - 54:6, 92:22

### G

**gather** [1] - 31:6
**gathering** [2] - 22:11, 70:9
**general** [1] - 68:15
**generous** [1] - 17:4
**gentlemen** [4] - 46:10, 67:16, 88:22, 100:8
**Georgia** [1] - 66:24
**gift** [4] - 30:2, 30:4,

30:5, 30:17
**given** [11] - 28:15, 83:2, 83:23, 84:9, 84:11, 101:10, 101:21, 101:22, 102:5
**gleaned** [1] - 87:15
**Glynco** [2] - 66:24, 67:10
**God** [4] - 40:10, 46:22, 47:6, 63:23
**government** [18] - 7:21, 20:18, 65:13, 74:19, 82:9, 82:25, 83:3, 83:16, 83:21, 84:8, 84:10, 85:13, 92:8, 98:12, 98:16, 98:20, 102:6
**government's** [17] - 76:16, 77:19, 78:8, 79:21, 82:10, 84:17, 92:6, 95:16, 96:15, 96:16, 96:17, 97:14, 97:15, 97:18, 98:4, 98:7, 99:16
**grab** [1] - 75:6
**graduated** [1] - 67:3
**graduating** [1] - 67:10
**grand** [6] - 7:16, 8:2, 8:6, 8:11, 8:18, 73:10
**grass** [1] - 9:24
**grave** [2] - 52:22, 52:23
**greater** [1] - 20:6
**gross** [4] - 85:8, 86:24, 86:25, 90:3
**GRUEL** [128] - 2:10, 3:11, 3:13, 3:14, 3:15, 3:17, 6:19, 8:14, 9:8, 9:25, 11:15, 13:9, 13:21, 22:24, 25:10, 25:16, 25:22, 27:2, 27:8, 27:13, 28:21, 29:20, 31:8, 31:15, 34:20, 34:22, 35:4, 36:1, 36:11, 36:20, 37:5, 38:22, 39:3, 40:6, 40:18, 40:23, 44:3, 44:4, 44:17, 44:21, 45:5, 45:18, 45:25, 46:6, 47:25, 48:5, 49:25, 52:12, 53:1, 53:3, 53:6, 53:20, 53:25, 54:25, 55:14, 57:24, 58:2, 58:8, 58:9, 59:1, 60:6, 60:17, 61:2, 61:4, 62:11, 63:9, 63:14,

63:19, 64:5, 64:10, 68:2, 68:3, 72:21, 72:24, 73:2, 74:4, 74:9, 74:11, 74:12, 75:1, 76:9, 77:3, 77:7, 77:22, 78:1, 78:11, 78:14, 79:8, 79:11, 79:12, 80:5, 80:8, 80:12, 82:13, 82:23, 83:5, 83:7, 83:20, 83:23, 83:25, 84:4, 84:17, 84:18, 84:21, 84:24, 85:21, 85:22, 86:17, 86:18, 87:9, 89:8, 89:9, 90:12, 90:16, 90:22, 90:23, 91:3, 91:4, 91:13, 91:14, 92:10, 92:18, 93:1, 93:20, 100:25, 102:5, 102:10, 102:13
**Gruel** [1] - 2:10
**guess** [1] - 64:17
**guesstimated** [1] - 30:23
**guy** [3] - 16:12, 16:17, 16:19

### H

**half** [5] - 8:4, 86:24, 95:1, 95:2, 95:17
**hand** [5] - 40:7, 46:19, 47:1, 63:20, 75:14
**handed** [3] - 17:25, 19:14, 50:16
**Hanssen** [2] - 27:1, 27:7
**harmful** [1] - 14:9
**heading** [1] - 25:8
**hear** [4] - 22:17, 64:11, 64:14, 64:16
**heard** [2] - 37:20, 58:17
**hearsay** [5] - 85:14, 85:17, 86:16, 90:18, 92:13
**heart** [1] - 72:25
**heck** [1] - 16:19
**held** [1] - 83:24
**helmet** [2] - 17:12, 17:13
**help** [8] - 40:10, 42:5, 45:21, 46:22, 47:6, 58:10, 63:23, 88:21
**helped** [1] - 42:2
**helping** [4] - 42:3, 42:16, 58:4, 71:15
**hiding** [2] - 38:11, 38:25

**high** [2] - 87:14, 87:24
**highlighted** [1] - 96:14
**Hills** [4] - 21:3, 22:2, 24:25, 32:9
**hip** [1] - 35:14
**hire** [1] - 32:10
**hired** [4] - 33:9, 64:23, 67:12, 67:13
**hoard** [1] - 89:11
**home** [3] - 12:11, 31:3, 99:9
**Homewood** [1] - 81:2
**homewood** [2] - 12:2, 80:10
**Honor** [53] - 6:10, 9:7, 18:7, 34:20, 39:5, 40:18, 44:15, 44:19, 46:1, 46:6, 47:25, 57:22, 59:2, 59:4, 60:6, 60:17, 61:5, 63:16, 68:2, 72:19, 72:21, 72:24, 74:5, 74:19, 77:3, 77:22, 78:11, 79:9, 80:5, 82:23, 82:25, 83:5, 83:15, 83:20, 83:21, 83:25, 84:5, 84:8, 84:21, 85:13, 89:8, 90:12, 90:16, 90:18, 91:10, 92:10, 92:12, 93:20, 93:23, 100:25, 101:3, 102:1, 102:10
**Hooshang** [4] - 41:17, 41:18, 41:19, 48:12
**hotel** [4] - 21:12, 21:14, 22:2, 25:3
**hotels** [1] - 21:15
**hour** [3] - 94:21, 94:22, 102:12
**hours** [1] - 42:3
**house** [28] - 9:5, 9:12, 9:19, 9:22, 10:6, 10:8, 10:12, 10:20, 10:21, 12:2, 12:8, 12:9, 13:7, 13:11, 25:9, 54:11, 54:18, 54:19, 58:4, 58:10, 58:11, 58:13, 69:2, 69:14, 76:5, 80:10, 99:3
**human** [2] - 35:10, 38:14
**husband** [22] - 7:15, 43:14, 45:21, 48:22, 48:25, 49:16, 50:11, 51:9, 52:1, 54:22, 55:7, 55:12, 55:18, 55:21, 55:22, 56:1, 56:4, 56:8, 56:10,

75:13, 81:9
**husband's** [3] - 52:5, 52:9, 54:6
**hypothetical** [2] - 89:2, 90:10
**hypothetically** [2] - 89:19, 90:13
**hypotheticals** [2] - 88:24, 88:25

**I**

**idea** [1] - 23:16
**identify** [1] - 92:13
**identifying** [1] - 93:6
**ill** [3] - 42:1, 42:20, 48:23
**illegal** [3] - 62:15, 70:17, 70:20
**illness** [1] - 42:4
**important** [4] - 15:15, 28:7, 36:21, 88:22
**impression** [1] - 21:13
**improper** [1] - 62:9
**in-house** [1] - 69:2
**Inc** [1] - 56:7
**include** [1] - 29:11
**included** [3] - 17:7, 70:9, 95:13
**including** [1] - 6:7
**income** [5] - 30:11, 68:17, 81:9, 89:16, 99:17
**incumbent** [1] - 89:1
**INDEX** [2] - 3:7, 5:6
**indication** [1] - 24:5
**indictment** [1] - 75:10
**indictments** [1] - 73:10
**individual** [1] - 68:16
**infiltrated** [1] - 70:6
**information** [17] - 10:17, 14:9, 14:22, 22:12, 22:15, 22:20, 23:5, 28:5, 28:8, 28:15, 28:18, 35:22, 36:22, 56:16, 84:12, 85:9, 91:21
**informed** [1] - 92:21
**inheritances** [1] - 70:19
**initial** [1] - 68:15
**inquire** [5] - 32:8, 40:17, 47:24, 64:4, 68:1
**inquiring** [1] - 56:12
**instance** [1] - 34:5
**instances** [2] - 33:23, 34:4
**instruct** [2] - 101:16,

101:17
**instructions** [6] - 29:11, 101:8, 101:10, 101:14, 101:18, 101:24
**instructor** [1] - 71:3
**intel** [2] - 22:11, 28:2
**intelligence** [1] - 66:18
**intend** [1] - 101:8
**interfering** [1] - 15:9
**internal** [3] - 71:8, 71:9, 71:10
**Internal** [1] - 71:10
**interpret** [1] - 47:3
**interpreter** [11] - 46:7, 46:8, 46:10, 46:11, 46:13, 46:14, 46:16, 46:17, 46:24, 47:11, 47:13
**INTERPRETER** [5] - 47:7, 47:14, 47:17, 58:6, 61:10
**interrupt** [2] - 73:16, 83:15
**interview** [2] - 67:1, 85:5
**interviewed** [1] - 86:5
**interviews** [3] - 73:11, 85:7, 86:1
**INTO** [1] - 5:8
**inventory** [7] - 17:24, 18:14, 19:12, 49:6, 49:14, 49:18, 53:19
**investigating** [1] - 39:15
**investigation** [6] - 14:16, 14:19, 15:2, 15:10, 15:25, 68:17
**investigations** [7] - 15:21, 32:10, 64:24, 68:22, 69:4, 69:5, 69:6
**investigator** [2] - 33:10, 66:21
**investment** [2] - 12:4, 12:25
**involved** [9] - 23:17, 24:6, 42:16, 43:8, 65:23, 69:17, 70:24, 71:14, 73:7
**Iran** [21] - 55:6, 55:8, 55:13, 55:24, 55:25, 61:8, 61:14, 61:17, 61:18, 61:19, 62:4, 62:7, 62:9, 62:10, 62:15, 62:19, 62:23, 63:2, 63:4
**IRS** [15] - 64:18, 64:20, 65:3, 66:10, 66:15,

66:21, 67:7, 67:12, 68:6, 68:14, 70:9, 70:25, 72:6, 72:16, 94:11
**issue** [2] - 13:24, 68:18
**issues** [1] - 75:10
**item** [2] - 30:6, 102:1
**items** [3] - 16:15, 27:12, 27:20

**J**

**January** [2] - 22:21, 50:22
**jet** [3] - 21:6, 21:7, 25:2
**jets** [1] - 21:5
**jeweler** [2] - 16:17, 37:16
**Jim** [5] - 32:9, 32:13, 32:21, 33:13, 34:25
**job** [5] - 9:13, 22:11, 22:14, 41:4, 71:3
**jobs** [1] - 65:5
**joint** [3] - 75:13, 81:10, 99:17
**Juan** [1] - 2:5
**judge** [2] - 101:16, 101:17
**jump** [1] - 73:7
**jurors** [1] - 100:21
**jury** [15] - 6:6, 7:16, 8:3, 8:6, 8:11, 8:18, 67:22, 67:24, 73:10, 100:13, 100:20, 101:15
**Justice** [2] - 14:21, 14:24

**K**

**Keenaghan** [4] - 32:9, 32:13, 33:13, 34:25
**keep** [2] - 98:18, 101:14
**keys** [1] - 42:25
**kind** [7] - 27:19, 51:17, 65:3, 66:14, 68:13, 70:20, 89:16
**kingpin** [1] - 69:1
**knowing** [1] - 24:23
**knowledge** [3] - 45:11, 47:5, 50:6
**known** [2] - 16:23, 70:6
**knows** [1] - 60:17
**Korkmaz** [1] - 36:3
**Kusin** [1] - 25:7
**Kyle** [1] - 28:3

**L**

**LA** [1] - 25:6
**lack** [7] - 44:14, 49:22, 74:20, 76:6, 80:11, 87:7, 90:19
**lacks** [1] - 45:14
**ladies** [4] - 46:9, 67:16, 88:22, 100:8
**lady** [1] - 50:10
**Lafayette** [4] - 10:6, 10:8, 57:12, 57:20
**Lake** [7] - 9:5, 10:7, 10:12, 10:20, 42:9, 99:4, 99:9
**lake** [4] - 9:20, 10:2, 13:6, 48:19
**lane** [1] - 9:22
**language** [5] - 46:12, 47:3, 47:4
**laptop** [2] - 7:6, 7:9
**large** [2] - 48:20, 70:1
**Las** [1] - 21:8
**last** [9] - 7:23, 32:8, 40:14, 47:19, 47:21, 64:2, 95:8, 95:17, 100:25
**latter** [1] - 70:24
**laundering** [8] - 38:1, 71:5, 71:12, 71:16, 71:21, 71:23, 72:18, 72:23
**launderings** [1] - 70:6
**Law** [1] - 24:19
**law** [4] - 21:13, 65:12, 66:7, 66:25
**LAW** [1] - 2:10
**laws** [1] - 71:23
**lawsuits** [2] - 65:23, 65:24
**lay** [2] - 76:7, 84:21
**leading** [1] - 35:24
**learn** [1] - 88:13
**learned** [3] - 15:23, 22:21, 23:2
**lease** [5] - 6:18, 6:25, 8:18, 8:21, 10:11
**least** [4] - 16:23, 18:21, 55:18, 87:13
**leave** [2] - 42:4, 100:15
**leaving** [1] - 68:17
**led** [1] - 32:12
**leeway** [1] - 47:16
**left** [2] - 7:5, 100:22
**legal** [3] - 41:17, 70:17, 70:20
**legislation** [2] - 71:15, 71:20
**legitimate** [1] - 24:9

**UNITED STATES DISTRICT COURT**

length [1] - 43:5
level [1] - 72:11
leverage [1] - 14:12
Levon [13] - 23:14, 23:19, 23:23, 24:3, 24:7, 24:9, 24:18, 25:6, 32:11, 35:17, 35:21, 36:7, 36:14
lie [2] - 34:6, 34:7
lied [5] - 25:7, 33:24, 34:6, 34:10, 34:13
lien [1] - 65:12
life [1] - 15:16
likely [3] - 14:1, 14:4, 14:8
likewise [3] - 77:14, 78:15, 88:9
limit [1] - 60:15
line [1] - 99:13
list [1] - 29:24
listed [7] - 29:23, 29:24, 75:4, 96:12, 96:14, 99:3, 99:8
listen [1] - 46:15
listing [2] - 27:11, 27:20
live [3] - 12:5, 12:6, 58:14
lived [1] - 45:1
living [1] - 57:11
LLC [1] - 12:8
loan [3] - 10:7, 75:22, 80:2
locate [1] - 75:17
located [1] - 48:17
location [1] - 42:7
look [22] - 8:23, 29:3, 29:5, 43:2, 70:19, 73:17, 73:20, 76:10, 76:20, 78:5, 79:1, 82:14, 84:6, 84:11, 84:13, 91:5, 91:15, 92:5, 93:4, 98:24, 101:12
looked [7] - 75:11, 77:1, 78:8, 81:20, 92:23, 99:12, 99:14
looking [3] - 29:23, 82:17, 91:17
LOS [1] - 6:1
Los [4] - 2:7, 21:11, 41:2, 41:3
loud [1] - 37:18
Love [23] - 19:18, 19:20, 19:22, 36:25, 53:15, 73:24, 73:25, 81:23, 82:2, 85:6, 86:1, 86:4, 86:8, 86:9, 86:14, 87:10, 87:15, 87:18, 87:25,

92:13, 96:1, 97:7, 97:11
low [3] - 87:17, 88:2, 88:7
lunch [2] - 6:16
luxury [2] - 21:2, 21:15

## M

M-u-r-i-l-l-o [1] - 40:15
ma'am [13] - 40:24, 41:1, 48:6, 51:13, 51:24, 52:16, 53:4, 53:6, 56:9, 56:15, 58:3, 60:20, 61:7
Macallen [1] - 20:19
mail [2] - 38:1, 38:2
majority [1] - 20:7
management [2] - 33:19, 34:15
manager [1] - 41:6
manual [1] - 71:12
March [1] - 50:23
marina [1] - 13:8
marked [1] - 83:17
married [1] - 48:12
matter [2] - 97:2, 100:12
meal [2] - 20:12, 20:14
meals [3] - 20:10, 20:16, 25:3
mean [10] - 19:10, 43:13, 44:10, 56:8, 69:6, 69:10, 70:15, 72:2, 73:16, 89:25
meant [1] - 49:13
member [1] - 14:15
members [2] - 6:6, 67:23
membership [1] - 41:6
memorandums [1] - 85:5
men's [1] - 48:14
menswear [1] - 41:8
mention [1] - 26:7
mentioned [5] - 17:10, 37:12, 72:13, 78:21, 95:15
menu [1] - 30:5
menus [1] - 26:11
merchandise [11] - 18:17, 43:8, 43:22, 44:7, 45:9, 49:14, 49:15, 50:6, 50:8, 50:12, 50:16
met [5] - 25:6, 32:9, 32:10, 32:14, 42:12
methods [5] - 86:11, 99:2, 99:7, 99:11,

99:19
Michael [1] - 2:5
microphone [2] - 47:12, 47:22
midair [1] - 60:4
might [2] - 26:21, 74:17
million [1] - 8:4
mind [3] - 47:13, 89:10, 101:14
mine [1] - 26:1
minute [1] - 51:5
minutes [2] - 67:18, 67:19
missing [1] - 78:20
misstates [2] - 55:14, 82:11
mistake [1] - 52:2
modified [1] - 101:18
modify [1] - 101:19
mom [3] - 19:10, 19:11, 45:2
mom's [1] - 36:25
moment [1] - 61:5
moments [1] - 42:15
money [74] - 18:18, 19:8, 19:9, 19:10, 19:13, 30:22, 32:14, 32:16, 32:23, 37:25, 52:20, 53:13, 53:18, 53:19, 54:4, 54:5, 54:7, 54:11, 54:16, 55:8, 55:9, 55:13, 56:3, 56:7, 58:20, 58:23, 59:9, 61:16, 61:17, 61:18, 61:19, 61:20, 62:4, 62:9, 62:15, 62:18, 62:22, 63:1, 63:4, 63:8, 65:16, 65:17, 69:7, 69:10, 69:13, 70:2, 70:6, 70:7, 70:18, 70:20, 71:5, 71:11, 71:15, 71:21, 71:23, 72:18, 72:23, 75:21, 75:22, 75:25, 76:4, 79:24, 79:25, 80:1, 80:9, 81:21, 89:24, 97:9, 99:3, 99:8, 99:20, 100:4
Montage [1] - 21:17
Montgomery [1] - 2:11
month [2] - 11:2, 19:16
months [4] - 51:19, 54:20, 55:7, 98:8
Montreal [1] - 70:7
moored [1] - 13:6
morning [4] - 100:10, 100:14, 100:24,

102:11
Morse [1] - 2:5
MORSE [8] - 43:24, 44:14, 44:19, 45:13, 45:16, 45:23, 46:2, 84:6
most [1] - 98:21
mother [3] - 45:7, 45:8, 48:11
mother's [3] - 19:17, 97:10, 97:12
motivation [2] - 28:9, 28:20
motorcycle [5] - 17:7, 23:8, 26:6, 26:7, 31:17
motorcycles [1] - 88:14
Mounties [1] - 69:21
Mounties' [1] - 70:4
move [10] - 9:6, 18:6, 34:9, 44:19, 45:13, 45:16, 77:3, 78:11, 90:16, 92:10
moved [3] - 42:8, 70:2, 70:7
moves [2] - 84:8, 85:13
moving [2] - 43:12, 87:12
MR [135] - 3:11, 3:13, 3:14, 3:15, 3:17, 6:19, 8:14, 9:8, 9:25, 11:15, 13:9, 13:21, 22:24, 25:10, 25:16, 25:22, 27:2, 27:8, 27:13, 28:21, 29:20, 31:8, 31:15, 34:20, 34:22, 35:4, 36:1, 36:11, 36:20, 37:5, 38:22, 39:3, 40:6, 40:18, 40:23, 43:24, 44:3, 44:4, 44:14, 44:17, 44:19, 44:21, 45:5, 45:13, 45:16, 45:18, 45:23, 45:25, 46:2, 46:6, 47:25, 48:5, 49:25, 52:12, 53:1, 53:3, 53:6, 53:20, 53:25, 54:25, 55:14, 57:24, 58:2, 58:8, 58:9, 59:1, 60:6, 60:17, 61:2, 61:4, 62:11, 63:9, 63:14, 63:19, 64:5, 64:10, 68:2, 68:3, 72:21, 72:24, 73:2, 74:4, 74:9, 74:11, 74:12, 75:1, 76:9, 77:3, 77:7, 77:22,

78:1, 78:11, 78:14, 79:8, 79:11, 79:12, 80:5, 80:8, 80:12, 82:13, 82:23, 83:5, 83:7, 83:20, 83:23, 83:25, 84:4, 84:6, 84:17, 84:18, 84:21, 84:24, 85:21, 85:22, 86:17, 86:18, 87:9, 89:8, 89:9, 90:12, 90:16, 90:22, 90:23, 91:3, 91:4, 91:13, 91:14, 92:10, 92:18, 93:1, 93:20, 100:25, 102:5, 102:10, 102:13
MS [88] - 3:10, 3:11, 3:15, 3:16, 3:18, 6:10, 6:15, 6:23, 8:16, 9:6, 9:11, 10:1, 10:4, 10:25, 11:19, 12:1, 13:14, 13:25, 18:6, 18:10, 23:1, 24:17, 25:12, 25:19, 26:2, 27:4, 27:10, 27:14, 27:18, 28:1, 28:23, 29:22, 31:11, 31:19, 32:3, 32:4, 34:18, 35:2, 35:24, 36:9, 36:16, 37:3, 38:15, 38:18, 39:5, 39:7, 40:3, 49:22, 53:9, 53:11, 53:22, 54:2, 54:10, 55:3, 55:17, 56:18, 56:19, 57:22, 59:4, 59:6, 60:8, 60:19, 61:5, 61:6, 61:12, 62:13, 63:11, 63:16, 72:19, 74:8, 74:19, 76:6, 80:11, 82:11, 82:25, 83:15, 83:21, 84:8, 84:15, 85:13, 87:7, 90:18, 91:1, 92:12, 93:23, 94:2, 101:3, 102:1
multiple [4] - 31:10, 54:23, 55:19, 91:1
Murillo [2] - 40:6, 40:15
MURILLO [2] - 3:12, 40:19

## N

name [16] - 31:21, 31:24, 31:25, 40:13, 40:14, 41:17, 47:19, 47:21, 51:7, 51:8, 64:1, 64:2, 66:19, 73:23

**UNITED STATES DISTRICT COURT**

national [12] - 13:18, 13:19, 15:5, 15:9, 15:12, 23:15, 23:16, 24:2, 34:2, 72:11, 80:25
nationwide [2] - 71:7, 71:8
navy [3] - 9:16, 9:17
necessary [1] - 31:6
need [3] - 27:22, 28:14, 29:19
needed [6] - 10:6, 19:8, 19:9, 19:10, 19:11, 53:18
needs [1] - 29:12
net [1] - 69:8
never [9] - 6:25, 10:20, 10:22, 27:11, 31:23, 34:24, 45:12, 62:16, 101:15
new [4] - 41:4, 70:25, 71:4, 73:8
New [1] - 69:13
news [2] - 16:1, 37:10
next [10] - 10:12, 40:5, 46:5, 46:17, 47:11, 57:6, 57:9, 57:14, 60:18, 63:18
night [1] - 21:19
nine [2] - 23:8, 54:20
nonetheless [1] - 21:14
nonpublic [1] - 14:22
nontaxable [1] - 70:18
normal [2] - 67:2, 70:21
normally [1] - 101:11
North [1] - 2:6
north [1] - 45:1
Northern [2] - 57:11, 69:15
note [4] - 29:11, 29:19, 97:4, 97:5
notes [1] - 26:11
nothing [11] - 39:3, 40:10, 43:11, 43:25, 45:25, 46:2, 46:22, 55:22, 59:2, 63:23, 93:20
noticeably [1] - 37:18
nowhere [1] - 31:21
number [7] - 7:11, 52:10, 53:16, 53:17, 75:15, 93:5, 93:18
numbered [1] - 69:12
numbers [6] - 75:17, 81:8, 84:16, 92:4, 92:9, 93:8
numerous [1] - 96:24

## O

O'Dowd [1] - 98:4
O'Dowd's [1] - 98:1
Oakland [1] - 59:22
object [3] - 43:24, 45:13, 54:25
objection [43] - 6:19, 8:14, 9:8, 9:25, 11:15, 13:9, 13:21, 22:24, 25:10, 25:16, 25:22, 27:2, 27:8, 28:21, 29:20, 31:8, 31:15, 35:2, 35:24, 36:9, 36:16, 37:3, 38:15, 38:17, 44:14, 45:23, 49:22, 53:20, 53:25, 55:14, 60:6, 60:17, 61:2, 62:11, 63:9, 63:14, 72:17, 76:6, 80:11, 82:11, 83:22, 87:7, 90:18
objects [2] - 74:19, 82:25
obtained [1] - 83:2
October [2] - 11:14, 80:20
OF [5] - 2:1, 2:4, 2:10, 3:7, 5:6
offer [4] - 77:22, 79:8, 80:5, 82:23
OFFICE [1] - 2:4
office [5] - 24:18, 32:25, 67:6, 67:12, 67:13
officer [2] - 32:9, 65:4
OFFICES [1] - 2:10
OJI [1] - 71:3
on-the-job [1] - 71:3
once [4] - 41:12, 56:13, 73:6, 97:10
one [40] - 13:13, 14:13, 17:23, 19:16, 20:12, 20:14, 21:6, 21:7, 25:14, 32:8, 43:18, 56:13, 56:22, 56:23, 59:22, 61:5, 62:1, 69:11, 70:19, 71:11, 71:21, 74:4, 78:7, 79:5, 79:20, 79:23, 82:22, 83:11, 83:12, 84:4, 86:4, 86:11, 96:14, 96:15, 96:17, 97:13, 100:2, 102:1
ones [1] - 69:8
oOo [1] - 6:3
open [1] - 42:24
opened [2] - 12:8, 42:6

operating [1] - 46:14
operation [3] - 33:14, 34:5, 71:19
opinion [2] - 90:10, 90:14
opinions [1] - 100:12
opportunity [1] - 84:11
option [1] - 30:5
orange [3] - 42:9, 76:20
order [1] - 27:6
organizations [3] - 69:1, 69:16, 70:8
original [1] - 96:25
originally [2] - 61:8, 97:1
outing [1] - 15:8
outside [6] - 33:9, 33:10, 63:1, 98:19, 100:20
overruled [15] - 6:20, 11:16, 13:10, 13:22, 27:16, 31:16, 35:25, 36:17, 38:19, 44:1, 49:23, 55:1, 55:15, 83:4, 92:16
overseas [4] - 38:11, 38:14, 38:24, 56:7
owed [1] - 65:16
own [3] - 7:9, 29:24, 83:2
owned [2] - 30:9, 30:11
owners [1] - 81:10

## P

P.M [3] - 3:3, 5:3, 6:2
p.m [2] - 67:21, 102:15
pack [5] - 42:17, 43:11, 45:19, 45:20, 45:21
packages [1] - 50:11
packed [5] - 43:12, 43:15, 45:9, 45:10, 50:11
page [8] - 29:5, 29:23, 80:24, 84:7, 91:6, 96:8, 96:10
PAGE [1] - 3:9
pages [1] - 8:4
paid [21] - 11:11, 11:13, 20:1, 20:4, 20:5, 20:6, 25:3, 28:13, 52:4, 52:23, 54:8, 61:17, 86:8, 90:3, 94:17, 94:19, 95:9, 95:11, 97:6
paint [1] - 9:12

painted [1] - 9:14
paper [1] - 8:4
paperwork [1] - 59:19
paralegals [1] - 66:1
pardon [9] - 12:18, 68:8, 71:25, 78:19, 84:3, 86:21, 88:6, 98:15, 101:3
parents [1] - 17:24
part [17] - 14:8, 22:14, 22:17, 28:19, 35:9, 68:19, 68:20, 69:4, 70:24, 78:9, 80:16, 81:11, 90:25, 97:6, 97:9, 97:13, 97:17
particular [5] - 67:9, 79:6, 80:16, 89:20, 99:20
party [8] - 11:4, 16:4, 16:5, 16:6, 16:16, 37:6, 37:9, 40:1
pass [1] - 52:1
passed [5] - 54:23, 55:7, 55:12, 55:18, 56:5
passing [1] - 52:9
past [3] - 22:23, 23:11, 27:24
pattern [1] - 89:23
pay [9] - 10:23, 10:24, 16:18, 21:12, 21:16, 21:21, 37:17, 52:6, 53:5
payees [2] - 92:20, 93:8
paying [3] - 24:20, 53:23, 54:2
Paying [1] - 54:3
payment [4] - 75:20, 75:22, 81:2, 86:11
penthouse [2] - 21:2, 24:25
people [7] - 65:14, 70:18, 73:12, 88:25, 89:5, 90:4
per [1] - 94:22
percent [9] - 85:2, 85:8, 86:23, 86:24, 86:25, 88:10, 88:11, 90:3
percentage [1] - 86:14
period [9] - 42:1, 44:22, 64:25, 71:24, 72:1, 72:3, 94:25, 95:8
person [4] - 17:4, 28:4, 59:18, 89:1
personal [3] - 7:6, 19:18, 19:21
personally [1] - 18:19

photo [1] - 9:2
photographs [4] - 36:3, 36:6, 36:12, 36:21
physically [1] - 19:14
pick [3] - 18:2, 45:11, 58:20
picked [1] - 44:8
picking [1] - 58:17
piece [1] - 75:5
Piero [1] - 41:7
Pillar [1] - 24:19
Pinkel [1] - 2:4
PINKEL [88] - 3:10, 3:11, 3:15, 3:16, 3:18, 6:10, 6:15, 6:23, 8:16, 9:6, 9:11, 10:1, 10:4, 10:25, 11:19, 12:1, 13:14, 13:25, 18:6, 18:10, 23:1, 24:17, 25:12, 25:19, 26:2, 27:4, 27:10, 27:14, 27:18, 28:1, 28:23, 29:22, 31:11, 31:19, 32:3, 32:4, 34:18, 35:2, 35:24, 36:9, 36:16, 37:3, 38:15, 38:18, 39:5, 39:7, 40:3, 49:22, 53:9, 53:11, 53:22, 54:2, 54:10, 55:3, 55:17, 56:18, 56:19, 57:22, 59:4, 59:6, 60:8, 60:19, 61:5, 61:6, 61:12, 62:13, 63:11, 63:16, 72:19, 74:8, 74:19, 76:6, 80:11, 82:11, 82:25, 83:15, 83:21, 84:8, 84:15, 85:13, 87:7, 90:18, 91:1, 92:12, 93:23, 94:2, 101:3, 102:1
place [6] - 26:16, 29:7, 29:18, 34:24, 46:9, 58:23
placed [1] - 75:25
Placer [1] - 80:25
places [1] - 30:7
plain [2] - 38:11, 38:25
PLAINTIFF [1] - 2:3
plan [2] - 44:13, 99:18
plane [2] - 59:21, 60:3
played [2] - 7:8, 7:21
pocket [1] - 35:14
point [1] - 55:1
pointing [1] - 16:17
police [1] - 32:9
policy [4] - 14:15, 14:21, 26:19, 27:5

**porn** [2] - 21:8, 25:2
**portion** [1] - 24:20
**position** [1] - 68:10
**possible** [1] - 89:19
**possibly** [1] - 87:14
**posted** [1] - 93:16
**potentially** [2] - 23:15, 24:1
**practice** [1] - 89:23
**practices** [1] - 73:13
**precisely** [1] - 48:18
**preparation** [4] - 66:4, 74:1, 78:9, 79:6
**prepare** [5] - 74:22, 82:1, 85:3, 85:4, 93:2
**prepared** [10] - 66:8, 74:2, 74:15, 74:17, 74:21, 82:18, 82:20, 96:22, 101:10, 101:11
**preparing** [4] - 75:2, 77:1, 77:19, 92:6
**presence** [2] - 67:22, 100:20
**presented** [2] - 71:6, 75:9
**President** [1] - 36:7
**president** [3] - 24:15, 27:6, 36:3
**pretty** [1] - 14:21
**prevent** [2] - 14:8, 14:9
**previously** [2] - 6:12, 17:10
**price** [4] - 18:23, 30:4, 30:19, 50:1
**primarily** [4] - 64:21, 65:12, 69:7, 69:18
**primary** [1] - 12:3
**printed** [1] - 69:13
**private** [5] - 21:5, 25:2, 33:10, 55:9, 58:22
**problem** [1] - 13:19
**procedures** [2] - 65:8, 67:1
**proceedings** [1] - 102:15
**proceeds** [2] - 54:18, 58:11
**process** [3] - 42:22, 66:12, 100:4
**produced** [1] - 8:7
**profit** [1] - 71:21
**profit-sharing** [1] - 71:21
**programs** [1] - 68:16
**pronounce** [1] - 41:19
**properly** [1] - 66:8

**property** [7] - 12:4, 12:23, 12:25, 75:5, 75:8, 81:2, 99:22
**prostitute** [1] - 25:14
**prostitutes** [1] - 25:25
**protect** [1] - 38:13
**prove** [1] - 89:1
**provided** [2] - 25:14, 35:21
**providing** [3] - 10:16, 28:4, 70:25
**provisional** [1] - 71:5
**public** [5] - 14:16, 15:12, 15:20, 15:24, 94:3
**publication** [1] - 71:7
**publish** [4] - 9:6, 28:25, 74:6, 83:5
**published** [1] - 9:9
**pull** [1] - 47:12
**purchase** [13] - 30:4, 30:19, 58:4, 58:10, 58:13, 75:5, 75:8, 75:20, 76:1, 76:5, 80:10, 99:3, 99:9
**purchased** [7] - 17:16, 23:3, 30:1, 30:3, 50:3, 50:4, 52:24
**purchaser** [1] - 50:9
**put** [19] - 13:12, 26:11, 26:16, 30:7, 30:8, 30:9, 30:10, 30:16, 31:7, 31:17, 31:20, 31:25, 42:17, 50:11, 54:6, 75:13, 88:17, 88:18, 96:13
**putting** [2] - 75:7, 86:19

### Q

**qualified** [2] - 10:9, 72:18
**qualify** [2] - 10:7, 72:22
**questions** [7] - 34:18, 40:3, 53:8, 57:22, 58:3, 63:16, 88:4
**quietly** [1] - 100:15
**quite** [1] - 96:8
**quote** [4] - 23:23, 28:9, 28:14, 28:15

### R

**raise** [4] - 40:7, 46:19, 46:25, 63:20
**raised** [1] - 75:11
**ran** [1] - 96:1
**rather** [1] - 70:1

**reached** [1] - 70:2
**read** [5] - 8:9, 73:9, 73:10, 75:9, 83:9
**reading** [1] - 101:19
**ready** [1] - 12:9
**reality** [1] - 25:9
**realize** [1] - 88:23
**really** [6] - 28:10, 28:11, 45:1, 45:2, 53:18, 100:5
**reason** [2] - 37:2, 89:17
**rebuttal** [2] - 101:1, 102:6
**receipt** [1] - 59:13
**receipts** [3] - 85:8, 86:24, 86:25
**receive** [4] - 26:22, 50:15, 66:20, 97:17
**RECEIVED** [1] - 5:8
**received** [21] - 9:9, 9:10, 25:20, 27:12, 27:20, 50:21, 61:16, 77:5, 77:6, 77:24, 77:25, 78:12, 78:13, 79:10, 80:6, 80:7, 85:8, 85:9, 92:17, 95:20, 97:1
**receiving** [1] - 51:4
**recess** [1] - 67:21
**recognize** [4] - 9:2, 76:25, 91:18, 91:20
**record** [7] - 6:5, 40:13, 47:20, 64:1, 67:23, 83:24, 100:21
**recordation** [1] - 91:21
**recording** [2] - 7:8, 7:20
**records** [9] - 73:15, 73:17, 73:18, 73:20, 75:11, 87:24, 88:13, 89:18, 92:3
**RECROSS** [4] - 3:11, 3:16, 39:6, 59:5
**RECROSS-EXAMINATION** [4] - 3:11, 3:16, 39:6, 59:5
**recruiting** [2] - 35:10, 35:12
**REDIRECT** [4] - 3:11, 3:15, 34:21, 58:1
**redirect** [3] - 34:19, 39:4, 57:23
**referred** [1] - 66:17
**referring** [2] - 23:19, 59:8
**reflect** [6] - 6:5, 67:23, 79:23, 80:19, 93:8, 100:21

**reflected** [7] - 76:11, 78:3, 81:5, 93:5, 93:11, 93:14, 93:18
**refund** [2] - 65:15, 65:17
**refuse** [1] - 17:11
**regarding** [1] - 68:22
**region** [2] - 67:6, 67:9
**regional** [1] - 66:5
**regular** [1] - 12:15
**regularly** [1] - 12:13
**reimburse** [2] - 52:6, 52:13
**reimbursed** [2] - 11:1, 11:2
**relate** [1] - 75:4
**related** [3] - 48:8, 48:10, 92:22
**relationship** [4] - 20:1, 31:13, 55:8, 62:6
**released** [4] - 102:3, 102:4, 102:7, 102:9
**relevance** [10] - 9:25, 13:9, 27:2, 38:15, 38:18, 45:23, 53:20, 53:25, 54:25, 61:2
**relevancy** [1] - 43:24
**relevant** [4] - 43:25, 44:2, 52:11, 92:15
**relied** [2] - 85:25, 97:13
**rely** [1] - 10:16
**remaining** [1] - 49:6
**remember** [11] - 35:17, 38:1, 38:6, 41:7, 42:11, 50:20, 56:20, 57:20, 58:4, 58:18, 100:10
**removed** [1] - 50:12
**renews** [1] - 83:22
**rent** [9] - 10:19, 10:23, 10:24, 11:2, 12:9, 12:15, 12:19, 24:20, 43:1
**rented** [6] - 10:7, 10:10, 10:12, 10:20, 10:22, 12:21
**renting** [1] - 12:8
**repeat** [5] - 58:6, 61:10, 65:25, 98:2, 98:18
**report** [10] - 27:11, 27:15, 27:19, 27:20, 27:22, 31:23, 31:25, 39:18, 60:16, 68:18
**representation** [2] - 102:6, 102:8
**representative** [1] - 29:15

**represented** [1] - 81:22
**requests** [1] - 101:9
**require** [1] - 60:20
**required** [3] - 33:5, 33:7, 75:21
**requirement** [1] - 60:24
**reserve** [4] - 89:11, 89:14, 89:15, 89:20
**reserves** [2] - 32:24, 32:25
**residence** [1] - 12:3
**respect** [13] - 49:6, 50:25, 52:8, 65:19, 66:21, 71:15, 73:20, 75:7, 77:8, 82:1, 86:13, 88:4, 92:6
**respective** [2] - 6:6, 67:24
**response** [1] - 23:12
**result** [1] - 89:6
**results** [1] - 35:7
**resume** [2] - 98:1, 98:3
**RESUMED** [2] - 3:10, 6:14
**retail** [1] - 50:1
**retained** [2] - 73:3, 92:3
**retire** [1] - 100:13
**retirement** [1] - 75:12
**return** [1] - 68:17
**revealing** [1] - 14:22
**Revenue** [1] - 71:10
**revenue** [2] - 65:4, 94:12
**review** [5] - 80:16, 81:1, 89:18, 97:15, 97:18
**reviewed** [5] - 66:6, 77:19, 79:5, 79:21, 85:5
**RICHARD** [2] - 3:17, 64:6
**Richard** [2] - 63:19, 64:3
**rid** [1] - 19:11
**right-hand** [1] - 75:14
**rise** [3] - 67:20, 100:16, 102:14
**risk** [2] - 15:8, 15:9
**road** [1] - 9:22
**Robert** [1] - 26:25
**Robert** [1] - 27:7
**Rodriguez** [1] - 2:5
**role** [1] - 70:5
**room** [3] - 21:12, 43:6, 100:13
**rooms** [1] - 21:14

**ruses** [1] - 35:6
**Ruth** [1] - 2:4

### S

**Saba** [1] - 56:6
**safety** [1] - 39:1
**sale** [3] - 31:2, 54:18, 99:22
**Sally** [1] - 40:15
**SALLY** [2] - 3:12, 40:19
**sampling** [1] - 29:15
**San** [7] - 2:11, 25:8, 56:22, 59:22, 64:21, 67:11, 68:25
**sanctions** [1] - 62:9
**Santa** [1] - 42:10
**Sargsyan** [28] - 7:21, 16:1, 16:6, 16:15, 17:2, 18:15, 19:13, 19:25, 22:6, 22:11, 22:22, 24:7, 25:14, 26:5, 26:8, 27:12, 27:21, 30:25, 31:13, 32:6, 32:7, 35:17, 36:4, 36:13, 37:12, 37:23, 39:9, 39:23
**Sargsyan's** [3] - 25:9, 31:21, 31:24
**save** [1] - 83:25
**savings** [3] - 78:22, 99:16, 99:18
**saw** [8] - 8:6, 20:9, 36:2, 36:6, 38:2, 45:12, 87:4
**scared** [1] - 51:17
**schemes** [2] - 22:23, 23:3
**scotch** [2] - 20:19, 20:20
**screen** [3] - 74:13, 83:11, 85:1
**search** [2] - 73:10, 75:10
**seat** [1] - 91:8
**seated** [3] - 40:12, 47:9, 63:25
**seats** [3] - 6:6, 67:24, 100:19
**second** [5] - 79:15, 84:7, 85:18, 91:6, 91:15
**secondarily** [1] - 85:9
**section** [2] - 65:19, 66:15
**Section** [4] - 93:5, 93:9, 93:12, 93:15
**sections** [1] - 71:5
**security** [11] - 13:18,

13:19, 15:5, 15:6, 15:10, 15:12, 23:15, 23:17, 24:2, 26:20, 34:2
**see** [36] - 21:23, 23:7, 29:8, 29:9, 30:4, 30:11, 30:13, 48:6, 50:24, 51:20, 53:14, 69:10, 71:11, 72:4, 74:13, 75:14, 75:19, 75:25, 76:15, 76:20, 77:9, 77:16, 78:2, 78:15, 79:14, 80:14, 81:6, 84:25, 86:22, 87:13, 88:16, 92:4, 96:12, 100:14, 102:11
**seeing** [2] - 38:1, 54:1
**seem** [1] - 37:23
**selling** [1] - 54:5
**send** [2] - 52:16, 56:3
**sense** [1] - 30:11
**sensitive** [1] - 15:21
**sent** [7] - 53:14, 54:18, 55:10, 58:20, 58:23, 58:25
**September** [1] - 38:5
**SEPTEMBER** [3] - 3:2, 5:2, 6:1
**sequentially** [1] - 69:12
**Service** [1] - 71:10
**services** [1] - 25:13
**session** [1] - 67:19
**SESSION** [2] - 3:3, 5:3
**set** [2] - 89:15, 89:17
**several** [5] - 19:25, 71:4, 81:19, 85:6, 89:23
**SFDF** [1] - 26:6
**shall** [6] - 40:8, 40:9, 46:20, 46:21, 63:21, 63:22
**shambles** [1] - 12:22
**shape** [1] - 12:21
**sharing** [1] - 71:21
**short** [1] - 56:20
**shot** [2] - 20:21, 20:22
**show** [4] - 10:6, 10:9, 10:12, 56:15
**showed** [3] - 58:23, 96:7, 97:6
**shown** [3] - 29:15, 36:3, 90:20
**shutting** [1] - 43:9
**sic** [1] - 77:16
**sick** [2] - 18:2, 51:9
**side** [6] - 75:14, 87:2, 87:17, 92:5, 97:4, 102:12

**sides** [1] - 101:9
**sight** [2] - 38:11, 38:25
**sign** [2] - 6:18, 8:18
**signed** [2] - 6:25, 27:6
**significant** [1] - 43:21
**similar** [1] - 86:25
**simple** [1] - 73:9
**single** [1] - 8:9
**sister** [4] - 55:7, 56:2, 58:21, 58:23
**six** [3] - 33:19, 51:19, 56:10
**size** [2] - 43:2, 43:3
**small** [3] - 89:24, 94:13, 94:14
**sold** [4] - 44:8, 54:18, 58:11, 88:13
**solemnly** [4] - 40:8, 46:20, 47:2, 63:21
**solicited** [3] - 18:11, 18:15, 18:18
**someone** [8] - 15:8, 23:14, 26:22, 33:10, 44:8, 45:11, 49:9, 49:12
**sometimes** [2] - 21:24, 101:19
**somewhere** [2] - 13:7, 32:1
**son** [29] - 41:16, 49:3, 49:5, 50:5, 50:16, 52:6, 52:9, 52:14, 52:17, 53:13, 54:12, 54:19, 56:21, 56:24, 57:6, 57:11, 58:4, 58:10, 58:14, 59:14, 60:10, 61:25, 62:14, 62:17, 62:25, 63:4, 63:7, 63:12
**sorry** [15] - 12:20, 16:8, 24:11, 38:17, 60:9, 73:15, 83:15, 84:20, 92:5, 97:17, 98:3, 98:18, 99:6, 99:12, 100:6
**sort** [1] - 60:4
**sound** [1] - 57:3
**sounded** [1] - 54:17
**source** [8] - 22:6, 22:7, 35:14, 70:12, 70:15, 70:16, 70:22
**sources** [8] - 35:6, 35:10, 70:17, 70:18, 76:4, 96:15, 96:17, 99:25
**Southern** [1] - 48:15
**Special** [2] - 25:7, 39:14
**special** [5] - 65:8,

66:10, 68:5, 68:14, 70:23
**specify** [2] - 30:17
**speculation** [5] - 6:19, 13:21, 36:16, 61:4, 62:11
**spell** [3] - 40:13, 47:19, 64:2
**spelling** [1] - 98:10
**split** [1] - 60:10
**spot** [1] - 19:7
**spreadsheet** [1] - 97:6
**Spring** [1] - 2:6
**stacks** [1] - 43:13
**stand** [5] - 6:8, 46:17, 46:18, 47:11, 67:25
**star** [2] - 21:14, 32:10
**start** [3] - 66:12, 67:15, 76:18
**started** [6] - 12:8, 37:15, 41:4, 68:5, 69:11, 92:3
**starts** [1] - 85:2
**state** [3] - 40:13, 47:19, 64:1
**statement** [2] - 37:20, 93:16
**statements** [5] - 85:11, 91:22, 91:23, 92:1, 92:21
**STATES** [1] - 2:4
**States** [13] - 2:6, 55:13, 59:18, 59:19, 59:21, 60:1, 60:5, 61:8, 62:5, 62:10, 62:15, 63:1, 63:5
**stay** [3] - 13:1, 22:2, 68:10
**step** [5] - 40:4, 46:3, 51:5, 63:17, 100:17
**steps** [1] - 38:13
**STEVEN** [1] - 2:10
**Steven** [1] - 2:10
**still** [2] - 55:11, 96:13
**stone** [1] - 52:22
**stopped** [1] - 59:23
**storage** [1] - 43:6
**store** [23] - 42:5, 42:9, 42:16, 42:18, 42:22, 42:23, 42:24, 43:4, 43:8, 43:23, 44:5, 45:7, 48:14, 48:20, 49:1, 49:10, 49:12, 49:13, 49:16, 50:13, 59:10, 61:16
**straightened** [1] - 83:19
**strange** [1] - 50:24
**Street** [2] - 2:6, 2:11
**street** [2] - 9:20, 13:7

**stricken** [4] - 18:8, 44:20, 45:17, 85:14
**strict** [1] - 14:21
**strike** [7] - 18:7, 34:9, 44:19, 45:13, 45:16, 51:12, 84:9
**stuff** [2] - 42:17, 43:15
**subject** [4] - 15:24, 22:22, 23:2, 97:2
**submitted** [3] - 10:11, 85:19, 100:13
**subpoenaed** [1] - 102:2
**subpoenas** [1] - 102:4
**sufficient** [1] - 71:20
**suits** [2] - 65:13, 66:5
**summary** [7] - 96:15, 96:16, 96:17, 97:14, 97:22, 98:7
**supervise** [1] - 66:1
**supporting** [1] - 65:24
**Suruchi** [1] - 28:3
**surveil** [1] - 32:11
**surveillance** [3] - 33:11, 34:24, 67:2
**suspected** [1] - 68:16
**sustained** [27] - 8:15, 10:3, 22:25, 25:11, 25:17, 27:3, 27:9, 28:22, 29:21, 31:9, 35:3, 36:10, 37:4, 44:16, 45:15, 45:24, 53:21, 60:7, 60:18, 61:3, 62:12, 63:10, 63:15, 76:8, 82:12, 90:20
**swear** [5] - 40:8, 46:20, 46:24, 47:2, 63:21
**sworn** [5] - 6:12, 40:20, 46:17, 48:2, 64:7

### T

**Tahoe** [13] - 9:5, 9:12, 10:7, 10:12, 10:20, 75:5, 75:8, 75:20, 76:5, 80:10, 81:2, 99:4, 99:9
**targeted** [1] - 69:1
**tax** [2] - 65:14, 68:17
**taxable** [1] - 89:16
**taxes** [3] - 65:15, 94:15, 94:16
**techniques** [1] - 67:1
**term** [3] - 70:12, 70:23, 89:11
**termendzhyan** [1] - 35:21

**Termendzhyan** [10] - 23:14, 23:19, 23:23, 24:8, 24:18, 25:6, 32:11, 35:17, 36:7, 36:14
**terminally** [1] - 42:20
**terrorism** [1] - 24:6
**testified** [13] - 6:13, 7:14, 7:15, 7:17, 7:19, 7:23, 8:1, 8:17, 22:5, 40:20, 48:2, 64:7, 74:20
**testify** [9] - 7:22, 85:17, 88:24, 88:25, 89:4, 90:7, 90:8, 90:9
**testifying** [3] - 85:17, 88:23, 89:4
**testimony** [16] - 8:7, 8:12, 20:1, 40:8, 46:10, 46:20, 55:14, 63:21, 73:11, 74:1, 74:16, 74:18, 82:11, 96:3, 101:23
**THE** [164] - 2:4, 6:5, 6:20, 6:22, 8:15, 9:9, 10:3, 10:23, 10:24, 11:16, 11:17, 11:24, 11:25, 13:10, 13:11, 13:22, 13:23, 18:8, 18:9, 22:25, 24:10, 24:11, 24:12, 24:13, 24:14, 24:15, 25:11, 25:17, 25:23, 25:25, 26:1, 27:3, 27:9, 27:16, 27:24, 27:25, 28:22, 29:21, 31:9, 31:16, 31:17, 32:2, 34:19, 35:3, 35:25, 36:10, 36:17, 36:18, 37:4, 38:16, 38:17, 38:19, 38:20, 39:4, 40:4, 40:7, 40:11, 40:12, 40:15, 40:16, 44:1, 44:16, 44:20, 45:3, 45:15, 45:17, 45:24, 46:3, 46:8, 46:19, 46:23, 46:24, 46:25, 47:7, 47:8, 47:9, 47:10, 47:14, 47:15, 47:17, 47:18, 47:21, 47:22, 49:23, 49:24, 52:10, 53:7, 53:21, 54:1, 54:3, 54:7, 54:9, 55:1, 55:2, 55:15, 55:16, 56:17, 57:23, 58:6, 59:3, 60:7, 60:18, 61:3, 61:10, 62:12, 63:10, 63:15, 63:17,

63:20, 63:24, 63:25, 64:3, 64:4, 67:16, 67:20, 67:23, 72:17, 72:20, 72:22, 73:1, 74:7, 74:10, 74:22, 74:23, 74:24, 76:7, 77:5, 77:24, 78:12, 79:10, 80:6, 82:12, 83:4, 83:6, 83:18, 84:2, 84:3, 84:7, 84:13, 84:20, 84:23, 85:16, 86:15, 88:21, 90:5, 90:20, 91:8, 91:10, 91:11, 92:16, 92:23, 92:25, 93:22, 100:8, 100:16, 100:17, 100:18, 100:19, 100:21, 101:1, 101:5, 102:8, 102:11, 102:14
**therefore** [2] - 26:21, 89:4
**they've** [4] - 10:21, 10:22, 92:9, 102:4
**thousand** [4] - 32:18, 32:19, 32:20, 32:22
**thousands** [2] - 20:12, 20:14
**threat** [3] - 23:15, 23:16, 24:2
**threaten** [2] - 15:1, 15:5
**three** [3] - 54:14, 69:2, 71:4
**thrift** [3] - 78:22, 99:16, 99:18
**throughout** [2] - 65:6, 69:7
**THURSDAY** [3] - 3:2, 5:2, 6:1
**ticket** [1] - 52:24
**tight** [1] - 19:7
**timing** [3] - 99:24, 99:25, 100:3
**title** [1] - 80:25
**TKO** [1] - 69:1
**today** [5] - 74:16, 96:3, 98:13, 98:17, 98:21
**together** [5] - 19:24, 31:7, 62:18, 75:7, 86:19
**tomorrow** [5] - 100:10, 100:14, 100:24, 101:13, 102:11
**tonight** [1] - 101:12
**took** [6] - 18:5, 34:24, 43:10, 43:16, 54:14, 91:21
**top** [1] - 87:2

**Toronto** [1] - 70:7
**total** [2] - 93:17, 93:18
**totaling** [2] - 93:5, 93:6
**toward** [1] - 47:12
**towards** [1] - 70:24
**trace** [3] - 69:12, 99:2, 99:19
**traced** [1] - 99:9
**tracing** [8] - 97:9, 99:2, 99:5, 99:7, 99:11, 99:21, 100:1, 100:4
**tracking** [2] - 69:7, 69:10
**trained** [1] - 35:9
**training** [13] - 13:16, 13:18, 34:2, 37:25, 38:3, 66:14, 66:20, 66:24, 66:25, 67:2, 67:13, 68:15, 70:25
**transaction** [1] - 68:18
**transactions** [2] - 54:21, 75:4
**transcripts** [1] - 8:6
**transfer** [7] - 19:17, 52:16, 56:6, 76:25, 77:8, 99:13, 99:20
**transferred** [13] - 53:13, 53:17, 54:16, 55:13, 58:12, 58:24, 64:24, 80:1, 80:9, 80:20, 80:21, 80:23, 80:25
**transfers** [15] - 54:23, 55:4, 55:19, 56:11, 63:8, 63:13, 75:12, 76:11, 76:15, 78:8, 79:20, 99:10, 99:12, 99:14, 99:15
**travel** [2] - 38:11, 57:1
**traveling** [1] - 38:14
**trial** [3] - 95:10, 95:11, 96:23
**tried** [1] - 17:11
**trim** [1] - 9:17
**trip** [2] - 21:8, 56:20
**trips** [1] - 21:5
**trouble** [1] - 53:23
**true** [5] - 10:17, 30:1, 30:20, 35:20, 89:2
**truly** [1] - 47:2
**truth** [9] - 40:9, 40:10, 46:21, 46:22, 63:22, 63:23
**truthful** [1] - 23:8
**try** [4] - 27:17, 35:6, 51:4, 73:9
**trying** [10] - 33:25, 35:5, 35:14, 54:4,

54:13, 81:12, 82:2, 83:9, 90:7, 99:5
**Turkish** [1] - 36:7
**turn** [1] - 42:25
**turned** [1] - 11:1
**twice** [3] - 41:12, 43:4
**two** [14] - 9:22, 13:11, 17:21, 43:16, 52:8, 52:22, 54:14, 54:20, 69:19, 81:5, 95:1, 95:2, 95:17, 98:11
**two-lane** [1] - 9:22
**type** [1] - 69:3

## U

**U.S** [1] - 55:9
**ultimate** [1] - 90:8
**ultimately** [4] - 42:7, 44:5, 50:5, 99:23
**unaware** [1] - 8:21
**under** [4] - 14:16, 14:24, 70:4, 86:23
**undercover** [2] - 70:3, 70:5
**underlying** [1] - 84:15
**understood** [1] - 98:22
**unfortunately** [1] - 34:7
**Union** [1] - 10:11
**unit** [1] - 65:11
**UNITED** [1] - 2:4
**United** [13] - 2:6, 55:13, 59:17, 59:19, 59:21, 60:1, 60:4, 61:8, 62:5, 62:10, 62:15, 63:1, 63:5
**unless** [1] - 73:8
**up** [22] - 12:7, 12:8, 18:2, 34:23, 35:6, 39:18, 42:17, 43:8, 43:11, 43:12, 44:1, 44:8, 45:1, 45:11, 50:8, 57:11, 58:20, 75:21, 81:21, 93:5, 93:6, 96:13
**upgraded** [1] - 10:5
**USAA** [3] - 19:21, 78:3, 78:16
**USSA** [1] - 77:10
**utmost** [1] - 15:18

## V

**vacation** [2] - 12:10, 12:23
**vague** [1] - 63:9
**validity** [1] - 36:22
**valuable** [1] - 22:20

**value** [17] - 16:15, 17:3, 17:5, 17:19, 26:3, 26:5, 26:22, 27:12, 27:20, 28:4, 28:17, 30:6, 39:12, 49:19, 49:21
**Vancouver** [10] - 56:22, 56:24, 57:2, 57:15, 58:18, 60:13, 62:17, 62:18, 62:21, 70:7
**various** [2] - 85:6, 100:3
**Vegas** [1] - 21:8
**vehicles** [3] - 30:9, 30:10, 30:11
**verify** [1] - 84:12
**verifying** [2] - 23:7, 28:8
**version** [1] - 96:13
**vocalized** [1] - 16:10
**Volume** [2] - 8:25, 29:4
**volumes** [1] - 47:10

## W

**wages** [2] - 75:12, 81:5
**walk** [4] - 60:25, 83:8, 85:23, 86:19
**warn** [3] - 16:3, 16:7, 16:9
**warned** [6] - 15:25, 16:1, 16:2, 16:4, 16:5, 16:6
**warrant** [1] - 75:10
**warrants** [1] - 73:10
**wave** [1] - 64:17
**wealthy** [1] - 56:2
**wearing** [1] - 64:13
**week** [4] - 7:23, 41:4, 98:11, 98:13
**weekend** [3] - 13:2, 43:10, 43:18
**weeks** [5] - 42:24, 54:14, 54:15, 98:11
**Wells** [8] - 81:20, 81:23, 85:10, 85:11, 87:5, 87:8, 87:10, 88:17
**white** [4] - 9:15, 9:16, 9:17
**whole** [3] - 40:10, 46:21, 63:23
**wholesale** [1] - 50:1
**width** [1] - 43:5
**wife** [9] - 11:2, 11:5, 11:11, 37:16, 39:9, 42:3, 73:21, 75:13,

81:10
**wife's** [2] - 6:18, 7:15
**Wilshire** [1] - 21:25
**wire** [24] - 19:17,
52:16, 53:13, 54:23,
55:4, 55:19, 56:6,
56:10, 63:7, 63:12,
75:12, 76:11, 76:15,
76:25, 77:8, 78:8,
78:15, 79:20, 99:10,
99:12, 99:13, 99:14,
99:15, 99:20
**wired** [3] - 36:25,
77:10, 78:2
**withdrawal** [2] -
99:16, 99:18
**withdrawals** [5] -
75:12, 81:20, 81:25,
85:12, 87:4
**withdrawing** [1] -
89:24
**withdrew** [2] - 88:16,
88:18
**WITNESS** [33] - 3:9,
6:22, 10:24, 11:17,
11:25, 13:11, 13:23,
18:9, 24:11, 24:13,
24:15, 25:25, 27:25,
31:17, 36:18, 38:16,
38:20, 40:11, 40:15,
46:23, 47:21, 49:24,
54:7, 55:2, 55:16,
63:24, 64:3, 74:23,
84:3, 84:7, 91:10,
92:25, 100:18
**witness** [30] - 6:7,
6:12, 15:9, 40:5,
40:20, 43:25, 46:2,
46:5, 46:11, 46:13,
46:16, 46:18, 47:23,
48:2, 63:18, 64:7,
67:25, 72:18, 73:11,
83:2, 84:4, 85:7,
88:23, 89:3, 89:4,
100:25
**witnessed** [1] - 37:21
**witnesses** [3] - 90:2,
90:9, 101:2
**WITNESSES** [1] - 3:7
**Witsons** [4] - 8:8,
8:12, 10:19, 11:6
**woman** [1] - 56:3
**world** [1] - 69:7
**worth** [1] - 69:9
**write** [3] - 11:10,
71:15, 71:20
**writing** [3] - 39:19,
71:4, 71:15
**wrote** [3] - 11:6, 11:8,
29:25

### Y

**year** [6] - 10:5, 10:13,
12:7, 16:23, 29:25,
86:22
**years** [16] - 15:16,
19:25, 23:7, 23:9,
29:14, 29:16, 65:6,
65:18, 66:9, 68:11,
69:2, 72:6, 89:23,
95:1, 95:2, 95:17
**yelled** [1] - 16:16
**yelling** [2] - 16:12,
37:15
**yesterday** [3] - 7:8,
7:12, 36:2
**York** [1] - 69:13
**yourself** [2] - 38:13,
49:16
**yourselves** [1] -
100:11

### Z

**ZAHAR** [2] - 3:14, 48:1
**Zahar** [2] - 46:6, 47:21

**UNITED STATES DISTRICT COURT**